Walter L. REAZIN, M.D.; HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center; Health Care Plus, Inc.; and New Century Life Insurance Co., Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Defendant and Counterclaim Plaintiff.

and

HMO KANSAS, INC., Additional Counterclaim Plaintiff,

v.

HOSPITAL CORPORATION OF AMERICA, Additional Counterclaim Defendant.

No. 85–6027–K.

United States District Court, D. Kansas.

May 22, 1987.

Robert H. Rawson, Jr., Joe Sims, & Joseph Winterscheid, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, Robert M. Duncan, of Jones, Day, Reavis & Pogue, Columbus, Ohio, Donald R. Newkirk, of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiffs and counterclaim defendants.

Joseph M. Alioto, San Francisco, Cal., Dan R. Shulman & Penny Tibke, Minneapolis, Minn., Gary D. McCallister, of Davis, Wright, Unrein, Hummer & McCallister, Topeka, Kan., for defendant and counterclaim plaintiffs.

PATRICK F. KELLY, District Judge.

## MEMORANDUM AND ORDER

On August 30, 1985, defendant Blue Cross and Blue Shield of Kansas, Inc. announced its intention to terminate its contracting provider agreement with Wesley Medical Center, effective January 1, 1986. Plaintiffs brought this action seeking damages and other relief under the federal antitrust laws,[1] and the laws of the State of Kansas. Blue Cross and Blue Shield answered and, with its subsidiary HMO Kansas, Inc., filed a counterclaim challenging certain business conduct and activities of the plaintiffs and Hospital Corporation of America. The court granted plaintiffs' motion for separate trials of their complaint and the counterclaim. Following a lengthy trial of plaintiffs' claims during the summer of 1986, and a significant period of deliberation, the jury returned a verdict in Wesley's favor finding Blue Cross and Blue Shield liable for anticompetitive conspiratorial restraint of trade violating Section 1 of the Sherman Act, monopolization of the relevant market violating Section 2 of the Act, and tortious interference with Wesley's present and prospective business relations violating Kansas law.

The months following the verdict were consumed with a host of motions. First, Blue Cross and Blue Shield moves under Fed.R.Civ.P. 12(b) to set aside the verdict and dismiss the case for lack of jurisdiction. Second, defendant alternatively moves for judgment notwithstanding the verdict or a new trial, under Fed.R.Civ.P. 50(b) and 59 respectively. Third, plaintiffs move for injunctive relief against Blue Cross and Blue Shield under Section 16 of the Clayton Act, 15 U.S.C. § 26. Fourth,

---

1. Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, provides:

 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade among the several States ... is declared to be illegal....

 Section 2 of the Act, 15 U.S.C. § 2, states:

 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, ... shall be deemed [to have violated the law]....

 Section 4 of the Clayton Act authorizes civil antitrust suits:

 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which defendant resides ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

 Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes private suits for injunctive relief:

 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws....

plaintiffs move for an award of costs and attorneys' fees against defendant pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. Finally, plaintiffs and Hospital Corporation of America move for summary judgment on the counterclaim, under Fed. R.Civ.P. 56. On January 16, 1987, the court heard oral argument on these motions. This memorandum and order will address each.

Before analyzing these issues, however, some discussion of the parties and the history of their disputes is necessary. Perhaps more so than any federal antitrust litigation to date, this case results from the unprecedented economic pressures and turmoil within the health care services and financing industries from the beginning of this decade. Although the suit focuses on participants and events in Sedgwick County, Kansas, it embraces difficult health care issues facing many areas throughout the country. All the principal players are present: hospitals and physicians as health care providers, struggling to cut costs while maintaining quality of care, adequate capital and a sufficient patient base; emerging alternative delivery systems, such as health maintenance organizations and preferred provider organizations, radically altering traditional notions about delivering and financing health care by merging those components into unified systems; a large nonprofit health care indemnity insurance plan, seeking both the lowest price for the benefit of its subscribers, and to maintain or increase its position in an ever changing market; and a large publicly held, for profit company owning and managing hospitals throughout the country, searching for the best ways to deliver low cost, quality health care to its patients, while maintaining or increasing its market position. Each of these players competes for the loyalty, and thus the dollars, of public consumers of health insurance products and health care services. All the players vigorously assert they have acted throughout in the best interests of those consumers.

This case is the consequence of the parties' perceptions and misperceptions of the public interest. The consuming public is the quintessential beneficiary of the federal antitrust laws. In its interests this case proceeded; through its interests are judged the legality of the parties' actions, and reactions, in the marketplace.

Wesley Medical Center ("Wesley") is a 760–bed tertiary care hospital located in Wichita, Kansas. Wesley provides sophisticated health care services to residents of Wichita, Sedgwick County, the State of Kansas, and out-of-state patients. (Dkt. 76, Pretrial Conf. Order, p. 4, Stip. d; hereafter "Stip. __".) It is a major teaching hospital, operating a number of graduate medical education residency programs in affiliation with the Wichita branch of the University of Kansas School of Medicine. Wesley additionally provides clinical services; medical research; and outreach care programs for Kansans. Six hundred and forty physicians are currently staff members at the hospital. Within the City of Wichita, Wesley competes against St. Francis Regional Medical Center, St. Joseph's Medical Center, and Riverside Hospital. A.B. Jack Davis, Chairman and Chief Executive Officer of Wesley, views the hospital's primary strength as the ability to provide quality care at reasonable cost. Wesley garners approximately 10% of all patient admissions throughout the State of Kansas. (Dkt. 212, Tran. of Jury Trial, Vol. 1,[2] pp. 13–19.)

Blue Cross and Blue Shield of Kansas, Inc. ("BCBSK") was formed in 1983 by combining Blue Cross of Kansas, Inc. and Blue Shield of Kansas, Inc. pursuant to special enabling legislation. (Stip. m.) BCBSK is engaged in the business of providing private health care financing to businesses and individuals in Kansas, including Sedgwick County and the City of Wichita. (Stip. h.) Under its enabling legislation BCBSK is required to pursue health care cost containment as the primary goal in conducting its business. (Stip. o.) G. Wayne Johnston, the company's president,

---

**2.** Hereafter "Tran. [x]" refers to the record and volume number of the proceedings during trial; transcripts of all other proceedings will be specifically identified.

defines its business as making available to Kansans "a mechanism whereby we can provide good quality health care at very reasonable prices, as reasonable as we can possibly make it." (Tran. 3, p. 479; Tran. 4, p. 536.) BCBSK offered three principal health care financing products in 1985: conventional indemnity health insurance; a preferred provider organization called "Choice Care"; and a health maintenance organization through the company's wholly-owned subsidiary, HMO Kansas, Inc. ("HMOK"). (Tran. 3, p. 481.) BCBSK is the largest private health care financing organization in Kansas, and its service area includes the entire state except for Johnson and Wyandotte Counties in the northeast. In 1985, all hospitals and approximately 90% of all physicians in this service area were under contract with BCBSK as providers of medical services to the company's subscribers. (Stip. j.) No other health insurance company has contracts with all of the hospitals in BCBSK's service area. (Tra. 3, p. 499.) BCBSK is also the federal Medicare intermediary in Kansas, administering the Medicare program throughout the company's service area; as well, it is one of the larger third-party administrators of self-insured programs in the state. (Tran. 3, pp. 495, 499; Tran. 4, p. 519.)

Conventional or "all provider" indemnity insurance, the mainstay of BCBSK's business and historical success in Kansas, is a third-party insurance contract paying, based on certain benefit levels, a predetermined portion of the actual charges for health care services the subscriber may receive from any hospital or any doctor of his choice. (Tran. 1, p. 24; Tran. 3, p. 487.) Hospitals and doctors, as contracting providers, are reimbursed by the insurance carrier for health care services rendered its subscribers on an "as needed" basis. There is no incentive to economize, using the most cost effective methods of practicing medicine, and conventional indemnity arrangements are perceived as contributing to the overuse and spiraling costs of medical services. Alternative delivery systems, such as health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs"), emerged as a consequence of this and other trends in the health industries:

"In recent years increased emphas[is] has been placed on alternatives to conventional insurance with respect to both financing and delivery. The primary reason for this is a belief that conventional insurance is neither an efficient nor an effective method to finance and deliver health care. The recent recession caused business and government to focus more attention than ever on the necessity to control and reduce the cost of medical care. The result of this increased interest has been restructuring of the delivery system to include widespread availability of HMOs and PPOs. Containment efforts have also been incorporated in the traditional programs."

(Tran. 4, p. 593, quoting Pltfs.' Ex. 64, p. 4). In contrast to conventional indemnity arrangements, alternative delivery systems operate on selected contracting under which the subscriber is limited in his choices of medical care providers. (Tran. 3, p. 487.) By relinquishing his freedom of choice, an HMO or PPO subscriber pays less for his health care coverage; traditional indemnity insurance, with higher premiums, is more expensive. (Tran. 3, p. 490.)

Health Care Plus ("HCP") was created and developed in Wichita by Garland H. Bugg. (Tran. 17, pp. 2928–30.) HCP is a health maintenance organization engaged in the business of providing private health care financing to businesses and individuals in Kansas and elsewhere, including businesses and individuals in Sedgwick County and the City of Wichita. (Stip. e.) HCP contracts with doctors and hospitals to provide medical care to its members. HCP received federal qualification on July 1, 1981, at which time it operated only in Sedgwick County. Federal qualification designated the company had developed adequate quality assurance mechanisms, financial stability, and medical provider contracts. With this qualification HCP also received a federal loan to fund its expansion. (Tran. 17, pp. 2930–32.) The growth and success of alternative delivery systems such as HCP occur at the expense of tradi-

tional indemnity insurance arrangements (Tran. 4, p. 565), because of the historical predominance of the conventional plans.

HCP was a very early, if not the first, health maintenance organization to operate in Kansas. BCBSK did not enter the market for alternative delivery systems until three years later when its health maintenance organization, HMO Kansas, received federal qualification. (Tran. 4, p. 532.) HMOK competes with HCP in private health care financing in Kansas and Sedgwick County. (Stip. k.) As a health care financing option, HMOK also competes with BCBSK's conventional indemnity product. (Tran. 4, p. 518.)

Hospital Corporation of America ("HCA"), through its subsidiary corporations, is engaged in the business of providing health care services, private health care financing and hospital management services. (Stip. g.) From its Nashville, Tennessee headquarters, HCA owns or manages approximately 480 hospitals located in the United States and abroad. (Tran. 19, p. 3151.) The company's defined purpose is " 'to attain international leadership in the health care field.' " (Tran. 19, p. 3154, quoting Pltfs.' Ex. 292, p. 4.) Measured in number of hospitals, HCA is the largest for profit hospital company in this country. (Tran. 21, p. 3320.) Dr. Thomas Frist, one of the founders of HCA and its current chairman and chief executive officer, acknowledges the company's hospital base may give it a "tremendous advantage" in other health care business opportunities. (Tran. 21, p. 3311.) But he also states HCA represents less than 3% of the hospital business sector in this country, and almost half the company's total corporate revenue comes from third-party insurance carriers comprised largely of the various Blue Cross plans across the United States. (Tran. 19, p. 3187.)

New Century Life Insurance Company ("New Century") is a California corporation with principal executive offices in Nashville, Tennessee. New Century is engaged, *inter alia*, in the business of providing private health care financing to businesses and individuals. On June 16, 1983,

the company received a certificate of authority to do business in Kansas. (Stip. f.)

Dr. Walter Reazin is a medical doctor and a partner in the Hillside Medical Office, a group practice in Wichita. Dr. Reazin is a medical staff member at Wesley; during much of the time period related to this suit he was also Chairman of the Wesley Board of Trustees. (Stip. c; Tran. 16, pp. 2664–65, 2669.) Dr. Reazin is a long-standing subscriber to BCBSK's indemnity insurance coverage; he is as well a contracting physician provider for BCBSK. (Tran. 16, pp. 2671, 2673.)

The court fully explored the recent economic upheaval in the health care service and insurance industries in its earlier memorandum and order on defendant's motion for summary judgment. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 635 F.Supp. 1287, 1297–1300 (D.Kan.1986) ("*Reazin I*"). I will not repeat that background material here other than to note particular items underlying the parties' conduct.

Prior to its merger with Blue Shield, Blue Cross utilized retrospective reimbursement contracts with Kansas hospitals to provide medical services to Blue Cross subscribers, which services were covered by the subscribers' Blue Cross indemnity insurance policies. Under these contracts Blue Cross directly reimbursed the hospitals on the basis of 104% of allowable costs. (Stip. p.) In other words, for the greater part of Blue Cross' 40-year history the company simply paid hospitals and doctors their full charges for providing health service to Blue Cross' subscribers. (Tran. 4, p. 536.) Under such systems, hospitals had no incentive to keep prices down for the benefit of the consumer (Tran. 21, p. 3347); Blue Cross' retrospective reimbursement program simply did not contain costs (Tran. 4, pp. 536–37). In the mid–1970s, Blue Cross implemented a prospective rate review system for hospital reimbursement, and encouraged all Kansas hospitals to continue as participating providers under the new contract. (Stip. p.) Under the prospective rate contracts Blue Cross retained the right to approve hospital budgets and

rate structures, and agreed to pay unlimited hospital charges based on approved rate structures. (Tran. 4, p. 537.) The program generated extreme variations in hospital charges for equivalent medical procedures and, similar to the earlier retrospective reimbursement system, failed to contain costs or utilization. (Tran. 4, pp. 537–39.) By the early 1980s utilization of hospital services in this state was the second highest in the entire country; Kansans were using approximately 1,000 days of hospital care for every 1,000 people. (*Id.*)

These and other trends in the health industries provided the catalyst for rapid development of alternative delivery systems, "brokered" arrangements for purchasing and providing health services. These arrangements are fueled both by demand (from consumers of health services and insurance) and supply (of increasing numbers of health care providers). Garland Bugg's development of Health Care Plus in Wichita and Sedgwick County was no different; he and HCP capitalized on opportunities arising from the inefficiencies of prevailing market conditions:

> [It] seemed that insurance companies would not listen to physicians about where care could be cost effectively delivered. [The insurance companies] insisted on having care delivered on an in-patient basis ... rather than in the doctor's office. One example of that, a surgeon who I talked to just to see if he would be interested in having a health plan in Wichita ... said that there was one procedure, which is a proctosigmoidoscopy. For instance, Blue Shield would pay thirty-five dollars to do that procedure in his office. If he did the same thing in the hospital, they would pay him a larger amount, if I remember it was fifty-five dollars, plus they would pay for a procedure room of a hundred and twenty dollars. [There] really was no cost effectiveness in our [then] current system. In my opinion, that's how we got so many hospital beds today. More care really should be delivered outpatient, and the HMO concept sponsored that....
>
> ....

> [Employers] were saying that their health care costs were just going out of the sky. If I recall at the time ... about twenty-eight percent was the average increase for a premium, and in cases where maybe a son of someone in the company would have a motorcycle accident, they might have a two or three or four hundred percent increase in their premiums from one year to the next....

(Tran. 17, pp. 2929–30).

With HCP's federal qualification in early 1981 the company received the power to mandate employers, requiring the employers to make available an HMO program as an individual alternative for their employees. (Tran. 4, pp. 531–32.) HCP used the federal mandate capability extensively and successfully. By the end of 1983 HCP had acquired approximately 13,000 members (subscribers) in Sedgwick County. (Tran. 17, p. 2932.) HCP is an "individual practice association", or "gatekeeper", model HMO in which members must select a primary care physician from those under contract with HCP. A member's monthly premiums pay for all needed medical care so long as it is obtained from the chosen primary care physician, or a specialist or hospital authorized by that physician as needed. (Tran. 17, pp. 2938–39.)

Each physician contracting with HCP is paid a capitation fee, a specified amount for each member choosing that physician as his or her primary care provider. HCP does not separately contract with specialists; rather, each primary care physician determines in his own discretion whether to refer an HCP patient elsewhere for needed medical attention, upon which HCP pays the specialist's fees. HCP sets aside a portion of the capitation fund (the "withhold"), and a hospital fund, to cover specialist and hospital costs for services rendered HCP patients. Funds not used at the end of a year are returned to the contracting physicians, each of whom receives a prorata share of the refund based on the number of HCP patients treated.

Although not contracting with specialists, HCP does contract with hospitals.

HCP has capitation agreements with Wesley and St. Francis Hospitals. Under these contracts the hospitals are paid a certain monthly figure per member. These amounts are paid whether or not the members receive care at the hospitals, but if the members do seek services there the hospitals must provide care and are paid no more than the monthly capitation. HCP has fee-for-service contracts with St. Joseph and Riverside, under which those hospitals are not paid capitation but are simply reimbursed for any services which may be provided HCP members. *Reazin I,* 635 F.Supp. at 1300.

Based on HCP's success in Sedgwick County, in 1983 company officials sought to expand into Lawrence, Salina, Hutchinson, Topeka and other Kansas cities. The officials explored the conversion of HCP from a nonprofit to a for profit company, and eventually issued a private stock placement to generate the roughly $2 million needed for expansion. (Tran. 17, pp. 2933–35.) Under securities regulations governing such limited offerings, HCP was confined to no more than 35 sophisticated investors. HCP offered the stock to wealthy individuals inside, or closely affiliated with, the company. (*Id.,* p. 2936.) The stock was a "very risky" investment. (*Id.,* p. 2937.) It was offered to a number of Wichita physicians, some of whom were under contract with HCP as primary care providers, and others who were not contracting providers. (*Id.,* pp. 2937–40.) Among the contracting physician offerees, certain individuals and groups accepted the invitation and bought the stock, while others did not; all of the noncontracting physicians who were offered stock invested in HCP. (*Id.,* p. 2941.)

The development and growth of alternative delivery systems were not the only results of the crisis in the health insurance and service industries. BCBSK faced criticism and demands for change from the Commissioner of Insurance of the State of Kansas, the Kansas Legislature, and BCBSK's own subscribers, all alarmed over increasing utilization and spiraling costs. From 1975 through 1982, in-patient utilization in Kansas was up to 38% higher than the national average. For the four year period from 1980 through 1983, BCBSK's premium rate increases to subscribers were 17%, 23%, 33% and 22% respectively, an overall rate increase of 95%. (Tran. 4, pp. 538–40, 543; Pltfs.' Ex. 191.)

On January 1, 1984, BCBSK responded to these problems by implementing a new contract, the "Contracting Provider Agreement (Hospital) of the Competitive Allowance Program ('CAP')", and encouraged all hospitals, including Wesley, to enter into the new agreement. (Stip. p; Tran. 4, p. 539.) CAP was a "severe change" to BCBSK's reimbursement system under the previous cost-plus arrangements. (Tran. 4, pp. 544–45.) The CAP program established the maximum amount BCBSK would reimburse a medical provider for services within particular diagnostic related group. (Tran. 4, pp. 546–47.) Providers contracting with BCBSK under the CAP program commit themselves to a maximum allowable payment ("MAP") for each service provided to the subscribers. The MAPs are based on uniform diagnostic-related groupings (DRGs) of medical services; thus, only a limited amount of money is paid to a provider for medical services which might be rendered. The MAP clause is one of the cost containment provisions of BCBSK's contracting provider agreements. The clause protects BCBSK's subscribers by assuring predictability of their health care expenses; the "hold harmless" provision ensures subscribers will not receive bills for covered medical services in excess of the contract amount BCBSK pays a participating provider. (Stip. o; Tran. 3, pp. 483–84; Tran. 4, pp. 546–47.) The CAP program was BCBSK's effort to develop a more cost effective reimbursement program; contracting hospitals agreed to the MAPs, the hold harmless provision, utilization review by BCBSK, and other programs designed to control health care costs. (Tran. 4, pp. 547–48.) CAP contracting provider agreements also contain a significant competitive advantage for BCBSK in the form of a "most favored nations" clause under which participating providers agree to "fully and promptly inform" BCBSK

about, and make available to it, any rates lower than the MAPs the hospital might agree to charge competing insurance carriers. (Tran. 4, p. 596.) At least "one of the reasons" BCBSK uses the most favored nations clause is to forestall other insurance companies from receiving any better prices from a hospital, which would enable competitors to offer lower rates to subscribers for medical insurance; that "would be a disadvantage to our subscribers." (Tran. 4, pp. 596–98.) In 1984, all 104 Kansas hospitals in BCBSK's service area were contracting providers under the CAP program, including Wesley. (Tran. 4, pp. 558–59.) BCBSK's president is unaware of any other health insurance company in this area that has the advantage of a most favored nations clause in its provider contracts, with the exception of Delta Dental Insurance Company. (Tran. 4, p. 598.)

Slowly, BCBSK finally developed its own alternative delivery system for health care financing. (Tran. 4, p. 574.) HMO Kansas received state certification in February, 1984, and did not receive federal qualification until July, 1984, over three years after Health Care Plus. (Tran. 6, pp. 1036–37; Tran. 12, p. 2027; Knack Depo., p. 110.) Although HMOK was licensed to operate throughout the State of Kansas, BCBSK recognized HCP's earlier arrival and presence in Wichita placed HMOK at a considerable disadvantage here. (Tran. 4, pp. 533–34, 575; Tran. 6, p. 1038.)

From the outset, HMOK experienced difficulty penetrating the Wichita market. (Tran. 6, pp. 1079–80; Def.'s. Ex. 546.) HCP's early presence in this market allowed it to capture a significant membership base and develop a comprehensive physician provider list. (*Id.*) HMOK attempted to enter Wichita with the same HMO model as HCP (an IPA or gatekeeper model), offering substantially similar benefits. (Tran. 12, pp. 2027–28.) Employers are not required to offer more than one federally qualified HMO option to employees; only an HMO different in structure and benefit design than existing HMOs can mandate employers to offer its products as a second option to employees. (Tran. 4, p. 532; Tran. 12, pp. 2022–23.) Even after receiving federal qualification HMOK was therefore unable to mandate employers to offer HMOK to their employees along with HCP.

In addition to problems in attracting sufficient membership, HMOK experienced difficulties in securing an adequate physician provider base. Certain groups declined to do business with HMOK from the outset. Another disadvantage HMOK faced was the higher capitation paid to physicians by HCP. (Tran. 8, p. 1348.) HMOK offered two different risk packages to physician providers: full risk and partial risk contracts. (Tran. 16, pp. 2702–03; Tran. 29, p. 4762–63.) However, HMOK required physicians already under contract with HCP to accept HMOK's full risk contract in order to participate. (Tran. 29, pp. 4762–63.) Certain doctors objected to this requirement and declined to participate in the HMOK program. (Tran. 29, p. 4763.) Nevertheless, a number of primary care physicians and specialists in Wichita entered contracts with HMOK in late 1983 and early 1984. (Tran. 6, pp. 1037–38; Knack Depo., pp. 115–16.) Included in this number were the Hillside Medical Office and the Wichita Clinic, both of whom were already under contract with HCP when they entered separate contracts with HMOK in late 1983. (Tran. 16, pp. 2688, 2706; Tran. 26, pp. 4144–45.) Physicians in both practices subsequently purchased stock in HCP during early 1984.

HMOK's problems in attracting an adequate membership base proved insurmountable. When federally qualified in July of 1984, HMOK had enrolled 1800 members. By the end of that year, HMOK's Wichita enrollment totalled only 2000 members, while HCP had approximately 35,000. (Tran. 12, pp. 2027; Tran. 17, p. 3025; Pltfs.' Ex. 65, p. 9.) The Hillside Medical Office terminated its contract with HMOK on July 11, 1984. (Tran. 6, pp. 1065–66; Tran. 25, p. 4051.) The Wichita Clinic terminated its contract with HMOK on July 19, 1984. (Tran. 17, p. 2993; Tran. 25, p. 4051; Def.'s Exs. 455, 456.)

In early September, 1984, the HMOK Board of Directors voted to discontinue HMOK's activities in Sedgwick County (Def's. Ex. 553), and the Wichita area primary care physicians were notified of this decision on March 27, 1985 (Pltfs.' Ex. 49). However, HMOK continued its business pursuits in other parts of Kansas, and is a strong competitor against HCP in areas where the two companies entered those markets at similar times.

In 1984 Wesley was the largest, strongest and most competitive low cost, nonprofit tertiary care hospital in this area. Concerned about Wesley's future, in the fall of 1984 the hospital's administrators began a feasibility study of the sale of its assets to a well-financed, investor-owned, for profit corporation. The factors motivating this decision included the market trends and economic forces previously discussed. Reactions to high utilization and rising costs of medical care were severely impacting the health care sectors; by that time Kansas in-patient utilization had decreased more than 50%. (O'Brien Depo., p. 153.) In addition to reduced utilization, Wesley faced increasing regulatory controls and restricted revenue from third-party payors, increasing competitive forces, and increasing capital requirements. Sale of the hospital's assets to a profit corporation was perceived as offering the following advantages: unlimited access to capital; system efficiencies (purchasing, marketing, accounting, etc.); reduced economic risk; improved market position; preservation of quality; and an expanded, enhanced health care mission. (Stewart Depo., pp. 104–05; Def's. Ex. 31.) Wesley administrators approached HCA, "the best in the field," because the company possessed the quality care and administrative efficiencies Wesley sought. (Tran. 1, pp. 36–37.) At that time HCA was interested in adding tertiary care hospitals to its operations because of government deregulation programs and the emerging diagnostic-related group payment systems. Attempting to relate the growing cost effectiveness of the marketplace to quality health care, HCA was seeking "centers of excellence" around the country through which the company could develop a provider network to meet these needs. (Tran. 19, p. 3168.)

Negotiations between Wesley and HCA continued throughout the fall, and in November, 1984, they agreed to the sale of Wesley's assets for $265 million. (Tran. 1, p. 36; Tran. 19, p. 3174.) Dr. Thomas Frist, HCA's Chairman of the Board, lists the following as the factors supporting the company's decision: Wesley's past, present and projected future financial performance; the hospital's national reputation as a teaching school; the quality medical staff; the characteristics of the marketplace in which Wesley is located; HCA's ability to enter the midwest where it did not have a strong presence; and the strategic importance of Wesley, as a "center of excellence," to HCA's overall goals. (Tran. 19, pp. 3172–73.) On July 11, 1985, HCA, through its wholly-owned subsidiary HCA Health Services of Kansas, Inc., consummated the sale and acquired Wesley. (Stip. v.) Of considerable importance to Wesley's decision to sell was its understanding of HCA's operational philosophy of decentralized control and local autonomy for its hospitals. (Tran. 1, pp. 37–38.) Day to day operation of the hospital remains the responsibility of A.B. Davis, the chief executive officer, and control of the Medical Center remains the province of the Wesley Board of Trustees, the same local group of volunteers who likewise made hospital policies prior to the sale. HCA preserved existing Wesley management personnel following the sale because of HCA's confidence in Wesley's sound, proven management team. (Tran. 19, p. 3176.) Wesley's duties to HCA are primarily financial: providing financial information to the company and its shareholders, and participating in budget approval processes. (Tran. 1, pp. 38–39.)

At that point HCA was facing criticism for its reluctance to enter the health care financing industry, particularly with HMOs. (Tran. 19, p. 3178.) Initially, in order to provide life and other insurance products primarily for its own employees, on April 25, 1985, HCA purchased New Century Life Insurance Company, an inac-

tive shell company with licenses to operate in over 30 states. (Tran. 19, pp. 3181–82; Stip. u.) HCA purchased the company because of its multi-state licenses; New Century gave HCA access to life insurance products in those states. (Tran. 19, p. 3182.)

During this time period Health Care Plus began exploring the possibility of expanding its HMO operations beyond Kansas, to a national scale. (Tran. 17, p. 2963.) Recognizing the additional capital needed to finance this expansion, HCP officials explored various opportunities with investment bankers, venture capitalists, and other institutional investors. (*Id.*, pp. 2963–64.) Upon learning of HCP's plans, Wesley's Davis indicated HCA might be interested because that company was in the process of purchasing some HMOs and third-party administrators in other parts of the country. (*Id.*, p. 2965.) In the spring of 1985 HCP began discussing its plans with HCA, initially focusing on the possibility of HCA making a limited investment in HCP. (*Id.*, pp. 2966–67.) HCA lacked the expertise needed to successfully create and market its HMOs, and recognized it would take years to adequately develop the necessary internal management systems and guidance. (Tran. 19, p. 3180.) When HCA committed itself to the purchase of Wesley in late 1984, the company was not planning to purchase an HMO in Wichita. (Tran. 19, p. 3181.) With this new opportunity, however, HCA ultimately pursued HCP as a potential acquisition because HCP offered the most advanced, sophisticated management tools of any HMO under consideration. (*Id.*, p. 3180.) For their part, HCP officials eventually discarded the idea of a limited investment, to avoid "creeping acquisition" as capital needs grew and the risk of ultimately realizing less than the full value of the company. (Tran. 17, p. 2967.) The sale of HCP to HCA was publicly announced in May, 1985; on August 14, 1985, HCA, through its wholly-owned subsidiary Health Care Plus of America, Inc., consummated the acquisition of HCP for approximately $41 million. (Tran. 17, p. 2970; Tran. 19, p. 3269; Stip. w.) The purchase price was the equivalent of $18.00 per share of HCP's outstanding stock. Corporate personnel and area physicians who previously bought that stock, at prices ranging from $.25 to $1.00 per share, made substantial profits from the sale to HCA.

Following the acquisition, Garland Bugg was appointed President and Chief Executive Officer of HCP of America, Inc., with responsibility for overall management and development of HCP plans in the states assigned to that unit. (Tran. 17, p. 2971.) Much like the post-acquisition management of Wesley, HCP management remained decentralized and autonomous; its interaction with HCA was primarily financial. (Tran. 17, p. 2971.) HCP continues to contract with Wesley, St. Francis and St. Joseph Hospitals in Wichita to provide medical care to its members. (Tran. 1, p. 96; Tran. 17, p. 2970.)

Wesley, a contracting provider with BCBSK from the 1940s and a charter member of the original Blue Cross program formulated under the Kansas enabling statute, has participated in BCBSK's CAP program since its implementation in 1984. (Stip. q.) Five days after the effective date of Wesley's sale to HCA, BCBSK sent Wesley a revised CAP contract reflecting the hospital's name change. (Tran. 1, pp. 34, 36; Pltfs.' Exs. 6, 7.) Approximately two weeks later, on July 29, 1985, BCBSK sent Wesley the "Hospital Policies and Procedures and MAPs" (maximum allowable payments) materials for calendar year 1986. (Tran. 1, pp. 34–36; Pltfs.' Exs. 74, 75.) The materials reflected a *4% increase* in the 1986 MAPs over the 1985 levels. (Tran. 1, p. 36.) The cover letter from BCBSK to Wesley stated in part:

> No action is required, at this time, if your hospital desires to continue contracting with Blue Cross and Blue Shield of Kansas during calendar year 1986. We hope that you will find the 1986 Policies and Procedures and MAPs acceptable in order that we may continue our contractual relationship in 1986.

(Tran. 1, p. 35, quoting Pltfs.' Ex. 74.)

After abandoning HMOK in the Wichita area in early 1985, BCBSK attempted to re-enter the market with a preferred pro-

vider organization known as "Choice Care". (Tran. 4, p. 631.) BCBSK originally structured Choice Care to include no more than 35% of the most cost effective area physicians as participating providers, with BCBSK exercising a stringent utilization review program and a significant capitation withhold for those physicians. (Tran. 2, pp. 248–49.) On this basis competitive bids were then solicited from all Wichita hospitals. (Tran. 4, p. 631.) BCBSK also represented that during the first year of Choice Care operation, from 40% to 60% of its current CAP subscribers would likely switch to Choice Care. (Tran. 2, pp. 249–50.) In May, 1985, Wesley, which seeks to participate in programs of all third-party payors likely to generate patient business, bid significant discounts from its regular charges, relying on BCBSK's announced structure of Choice Care. (Tran. 2, pp. 246–47; Tran. 16, p. 2821.) BCBSK received bids from all four Wichita hospitals, and chose Wesley and St. Francis as the successful bidders on Choice Care. (Tran. 4, p. 631; Tran. 7, pp. 1165–1169.) The Choice Care physician withhold provision proved too much, however, and BCBSK was unsuccessful in securing the participation of the necessary physicians. (Tran. 2, p. 250–51.) BCBSK then altered the Choice Care utilization review and physician payment mechanisms. (Tran. 7, pp. 1185–86.) Although the modified Choice Care program would have appealed to more physicians and subscribers, it exposed the bidding hospitals to greater financial risk for the same reasons. The bids were calculated on assumptions of a certain patient load; BCBSK's subsequent alterations meant the lower rates would be extended to more patients than the hospitals originally anticipated. (Tran. 16, p. 2822.)

Officials from Wesley and BCBSK met throughout June and July of 1985, attempting to resolve these problems. (Tran. 2, p. 251.) On July 24, John Knack, Vice President of Marketing for BCBSK, and Marlon Dauner, BCBSK Senior Vice President for External Affairs, met with Edmund Berry, Wesley's Senior Vice President and Chief Finance Officer, to discuss the Choice Care program. (Tran. 7, p. 1186; Tran. 16, p. 2818.) Knack and Dauner anticipated they could obtain Wesley's commitment to the Choice Care contract; they attempted to respond to Wesley's concerns about the contract and persuade Berry to act. (Tran. 7, p. 1190.) However, Berry lacked the authority to act alone on Wesley's behalf; he was authorized only to continue negotiations and attempt to resolve the financial discrepancies of the Choice Care contract. (Tran. 2, p. 253; Tran. 17, p. 2844.) The other Wesley officials responsible for the Choice Care contract, Robert O'Brien, Senior Vice President, and Donald Stewart, President and Chief Operating Officer, were not present at the July 24 meeting. (Tran. 2, pp. 251–53; Tran. 7, p. 1186.) Berry indicated he was facing problems with the HCA office in Dallas regarding the existing terms of the Choice Care contract as written, and asked how Wesley could rebid the program. The BCBSK representatives replied they would not reopen the program for new bids. At that point, Berry allegedly responded Wesley desired to participate as a Choice Care hospital because " 'it was HCA's intention to put one of the other large hospitals in Wichita out of business and then work with the other.' " (Tran. 7, pp. 1190, 1193–94.) Berry acknowledges there was detailed discussion about other Wichita hospitals and possible adverse consequences of their present bids on Choice Care, but denies making any such statement about HCA's intent to put another hospital out of business, either at the July 24 meeting or at any other time. (Tran. 17, pp. 2852–53.) After further discussion, Berry concluded the July 24 meeting stating he needed to do more work on the Choice Care contract and would later contact BCBSK. (Tran. 7, p. 1203.)

Throughout early 1985 BCBSK was also attempting to reestablish HMO, Kansas in the Wichita area. (Tran. 7, pp. 1153–56.) Unlike the abandoned HMOK program, the "new" HMOK was designed as a staff model HMO, rather than an IPA or gatekeeper model; through the staff model, BCBSK sought to establish its own medical practice in the Wichita community, rather than contract with individual physicians.

(*Id.*, pp. 1155–56.) St. Joseph's Medical Center, and later St. Francis Regional Medical Center, both expressed enthusiasm for opportunities presented by the new HMOK. Officials from those hospitals and BCBSK periodically met during the late spring and summer of 1985 to discuss possible HMOK alternatives: selling financial interests in HMOK; forming another HMO; or developing a hospital-based HMO for the Wichita area. (*Id.*, pp. 1156–59, 1213–15.)

On July 24, Knack and Dauner went from the Wesley meeting to another scheduled meeting with St. Joseph and St. Francis representatives regarding HMOK. Dauner told the hospital officials about the earlier meeting with Berry, expressing "alarm" over Berry's purported statement. (Tran. 7, pp. 1206–07.) However, there was no discussion at that time about the possibility of BCBSK terminating Wesley as a contracting provider. (*Id.*, p. 1207.)

The Steering Committee of the BCBSK Board of Directors met on July 30, 1985. (Pltfs.' Ex. 167.) The steering committee is composed of Johnston, Dauner, Knack, and other senior management officials; they are not members of the board of directors, but are responsible for the decision-making process generating recommended policies which are then offered to the full board or its executive committee for approval and adoption. (Tran. 2, pp. 215–16; Tran. 4, p. 644.) Berry's alleged remarks at the July 24 meeting with Dauner and Knack were not mentioned at the July 30 steering committee meeting, and there was no discussion of the possible termination of Wesley. (Tran. 4, pp. 643, 652; Pltfs.' Ex. 167.) On July 31, Wesley received the proposed Choice Care contract from BCBSK. (Tran. 17, p. 2845.)

On August 1, 1985, an article entitled "Hospital Corp. to Market Group Health Insurance" appeared on page 19 of the Wall Street Journal. In its entirety, the article stated:

NASHVILLE, Tenn.—Hospital Corp. of America said it will begin selling group health insurance and a preferred provider hospitalization plan in three cities this month.

Hospital Corp., a for-profit operator of hospitals and health-maintenance organizations, said it will offer the group health insurance through New Century Life Insurance Co., which it acquired earlier this year from E.F. Hutton Group, Inc. New Century has insurance licenses in 35 states.

The move is part of an industrywide trend to mesh health insurers with health-care providers. "Within the next six years, we expect to see two or three dominant fully integrated health-care companies," said Thomas F. Frist, Jr., chief executive and president. Hospital Corp. also eventually will offer life insurance, Mr. Frist said.

People covered by Hospital Corp. health insurance wouldn't be required to use Hospital Corp. facilities. But under the preferred provider plan also unveiled yesterday, Hospital Corp. will give financial incentives in the employees of eligible companies who use facilities designated by the chain.

Hospital Corp. will begin marketing both plans in Nashville and Chattanooga, Tenn., and Charleston, S.C. It plans to offer them to 15 to 20 additional cities within 18 months, a spokesman said.

Hospital Corp. is initially targeting the group health-care programs at companies with five to 250 employees, but eventually will seek larger employers, a company spokesman said.

(Def's. Ex. 278.)

In the preliminary meetings between BCBSK, St. Joseph and St. Francis concerning HMOK, the hospitals indicated they desired majority ownership of the HMO. BCBSK's Johnston, however, refused this idea. (Tran. 6, p. 962.) On August 4, 1985, administrative officials from both hospitals met in Wichita with Marlon Dauner, John Knack, and William Pitsenberger, BCBSK's general counsel, and presented the three men with a personal opportunity to leave their employment with BCBSK and join the hospitals in the creation, management and marketing of a

new HMO which would be owned by the hospitals. (Tran. 6, pp. 959–964.) This HMO would have competed with all of the BCBSK health insurance products (CAP, HMOK and Choice Care), as well as HCP. (*Id.*, p. 961.) Dauner, Knack and Pitsenberger indicated their interest in such a program, but required a firm commitment from the hospitals that same day. That commitment was not forthcoming, and the idea was dropped. (*Id.*, pp. 965–66.) Wayne Johnston was not aware of this meeting when it occurred. (*Id.*, p. 960.)

Immediately following that meeting, Dauner, Knack and Pitsenberger developed an alternative program to be owned and operated by BCBSK but which would be structured on a hospital-based HMO in conjunction with St. Joseph and St. Francis Hospitals. What emerged was a new HMOK product known as the "Kansas Health Plan", a corporation owned by St. Francis and St. Joseph Hospitals and under contract with HMO, Kansas. (Tran. 6, pp. 966–67.)

The next day, August 5, 1985, John Knack returned to Wichita to speak with St. Francis and St. Joseph representatives about the Kansas Health Plan concept. (Tran. 6, pp. 967–68.) The BCBSK steering committee met in Topeka at the same time, during which there was general discussion about the Wichita health care environment but nothing specifically related to Wesley, HCP or HCA. (Tran. 4, pp. 645–46; Tran. 6, pp. 968–69.) The headnote on the minutes of the August 5 steering committee meeting states:

> PLEASE NOTE: On Monday, August 12, Steering Committee will have its usual meeting at 8:30 a.m. for which there will be an agenda. The meeting will be adjourned for lunch and meet again immediately thereafter, probably for the rest of the afternoon. The afternoon portion of the meeting will cover environmental changes occurring since the planning session and how these affect the direction of the Plan and plans for 1986.

(Pltfs.' Ex. 168, p. 1.)

The next BCBSK steering committee meeting occurred as scheduled on August 12, 1985. (Tran. 4, p. 647; Tran. 6, p. 969.) The relevant portion of the minutes of that meeting states simply: "The remainder of the afternoon was spent discussing various environmental changes in the health care scene." (Pltfs.' Ex. 169, p. 4.) What actually occurred that afternoon was anything but a casual discussion. Marlon Dauner went to that meeting prepared to recommend that the BCBSK Board of Directors terminate Wesley as a contracting provider under the CAP program. (Tran. 6, p. 970.) The proposal was made and that afternoon the steering committee decided *to recommend* "to the Executive Committee of our Board of Directors to cease contracting with Wesley." (Tran. 4, p. 647.) The steering committee also decided on August 12 to abandon the Choice Care PPO program in Wichita. (Tran. 4, p. 647; Tran. 6, pp. 969–70, 977.) The last decision made by the steering committee on August 12 is critical: the committee members, BCBSK's senior management staff, also decided to seek to negotiate reduced MAPs with the other Wichita hospitals in order to acquire a price competitive CAP insurance product without Wesley's participation as a contracting provider. (Tran. 6, pp. 969–70, 977–78.)

On August 13, 1985, the day after the steering committee meeting, BCBSK's Dauner and Knack met with representatives of St. Joseph and St. Francis Hospitals. Dauner and Knack opened that meeting by announcing that BCBSK was considering terminating Wesley's contracting provider agreement and, because that would result in a different CAP product, BCBSK wanted the hospitals to accept at least a 20% reduction in the MAPs. (Tran. 6, pp. 980–81; but see Pltfs. Ex. 4 (BCBSK initially sought *25%* discount).) The hospital representatives indicated at this meeting they were receptive to discounting the MAPs contingent upon Wesley's termination by BCBSK. (Tran. 15, pp. 2600–03.) After further discussion, Knack was asked to appear before the St. Francis executive committee the following day to discuss proposed Wesley termination and MAPs reduction. (Tran. 15, p. 2498.)

On August 14, Knack made the requested presentation to the St. Francis executive committee. The minutes of the August 14 meeting read in pertinent part as follows:

> Bruce Carmichael [St. Francis' Vice President of Planning] gave a brief update of the recent transactions between St. Joseph, Blue Cross & St. Francis. After a brief discussion, John Knack, Blue Cross, Marketing, was asked to join the group. He explained the CAP Program which would be a program signing contracts only with St. Joseph and St. Francis. The discussion of a discount was held. Steve Harris [St. Francis' Chief Financial Officer] was asked to work out what would be a percentage that SFRMC could live with. [Mr. Knack stated that an] answer would be necessary by August 16th so that Blue Cross could cancel the Wesley contract, giving 120 day notice....

(Pltfs.' Ex. 3; Tran. 12, p. 2103.) BCBSK's contracting provider agreement with Wesley required 120 days' notice for termination without cause. BCBSK was accordingly required to give Wesley notice of termination no later than September 1, 1985, for an effective date of January 1, 1986.

Within a week after the August 14 meeting, Carmichael called Knack and told Knack that St. Francis did not want to give discounts on all MAP payments but would give discounts on any new business resulting from Wesley's termination. (Tran. 11, p. 1883.) Knack informed Carmichael that Carmichael's suggested modification of the arrangement was unacceptable to BCBSK. (*Id.*, pp. 1884–85.) On August 21, Knack again met with representatives of St. Francis and St. Joseph and further discussions ensued concerning the Wesley termination/MAPs discount. (*Id.*, p. 1889.) At the August 21 meeting, Knack indicated that Blue Cross would be making a similar proposal to Riverside Hospital. (*Id.*) At this same meeting BCBSK offered the hospitals another suggested modification: instead of terminating Wesley and obtaining reduced MAPs from the "Saints", BCBSK offered to market a PPO product featuring only St. Francis and St. Joseph as pre-

ferred providers. (Tran. 11, pp. 1889–90.) St. Francis and St. Joseph hospital officials responded they wanted no part of the suggested alternative because they preferred BCBSK's original proposal involving Wesley's termination as a contracting provider under the CAP program. (*Id.*, pp. 1890–91.)

Two days later, on August 23, a meeting was held between representatives of St. Francis and St. Joseph Hospitals. At that meeting, St. Francis' agreement to accept a 20% MAPs reduction may have been communicated to St. Joseph. (Tran. 14, pp. 2295–96.) That very day Wayne Johnston sent out a letter calling a special August 29 meeting of the BCBSK board of directors executive committee:

> This will serve as a reminder following my telephone call to each of you that we have called a special meeting of the Executive Committee for Thursday, August 29, ...

> We have a critical decision to make regarding contracting with hospitals. We found it necessary to call a special meeting of the Executive Committee to consider this critical issue before the scheduled September meeting. We have discussed this with your Chairman, Pete Haas, and he agrees such a meeting should be called.

> I'm enclosing a few articles that I hope will indicate to you some of the new competitive pressures we feel developing. If you have the opportunity to review this material, I think it will become evident that many new competitors are coming on the scene and we will see shortly health care cost price wars. This material will give you a better understanding of some of the recommendations we will be making on August 29.

(Pltfs.' Ex. 171.) Accompanying the letter were reports and articles detailing the plans and operations of the following health care and health insurance corporations: HCA; American Medical International; National Medical Enterprises; Humana; U.S. Health Care Systems; Prudential; and Cigna. (*Id.*)

At the August 29 executive committee meeting, Wayne Johnston presented the staff's proposal to terminate Wesley as a contracting provider. His presentation began with a review of the health care environment and BCBSK's responses to those changes. The minutes reflect the following:

What is happening is a total revolution is occurring in health care. The public is seeing rapid growth of for-profit hospital chains such as the Hospital Corporation of America (HCA), Humana and others. Not only is the rapid growth occurring but these for-profit hospital chains are developing very strong strategies toward what they call "vertical integration". These chains will not only supply health care, they will also provide insurance coverage and are in the process of buying PPO's, HMO's and developing third party administrators and doing it successfully.

The problems faced by Blue Cross and Blue Shield are not confined to these for-profit institutions. There are 450 to 500 major hospitals around the country that belong to the Voluntary Hospital Association. This Association will be entering into the same kinds of activities as the for-profit chains, but will be doing so through the commercial insurance company—Aetna, another of Blue Cross and Blue Shield's competitors.

Physicians are equally responsive to the new competitive environment and are forming PPO's and HMO's. They feel strongly they must maintain control over programs being developed locally and nationally.

All kinds of joint ventures are being proposed among commercial insurance companies, Blue Cross and Blue Shield Plans, etc. said Johnston. There are probably many more on the drawing board today that staff isn't even aware of.

(Pltfs.' Ex. 10, p. 3.)

Johnston commented that the foregoing was a modest effort to describe the health care revolution. What will be the result of this revolution? There will be a wide choice of health care coverage for every individual in every business and the public will be confused about what to buy. In the short run, there will be a proliferation of alternatives which the consumer likes. Staff's assessment is that in the long run, many of those schemes will fail.

. . . .

Johnston feels that health care price wars are coming and asked the question, "How do we react to that?" Some feel that health care costs will not skyrocket again, but staff feels this thinking is erroneous.

. . . .

Johnston concluded by saying, with the review of the last three years ... where Blue Cross and Blue Shield of Kansas stands today ... and staff's perception of the future, the major question staff wants the Executive Committee to consider today is—"Does Blue Cross and Blue Shield of Kansas wish to continue to do business with entities that openly desire to compete with the organization and enroll Blue Cross and Blue Shield subscribers in their programs? We think not. We believe now is the time to bite the bullet and work with providers who want to work with us to best serve our subscribers."

Johnston continued, saying, "HCA (Hospital Corporation of America) has a carefully structured and thought through strategy to dominate health care and health insurance in Wichita and surrounding areas. They have the experts and dollars to do it with. This has been demonstrated by aggressive actions taken in Wichita with the purchase of a prestigious hospital (Wesley Medical Center), the purchase of Health Care Plus (HCP)—a competitive HMO—purchase of an insurance company and the purchase of a third party to administer self-insured groups. While staff isn't aware of the future plans of HCA, it is apparent they have abundant capital to use in Wichita and perhaps other areas. With the present structure of Blue Cross and Blue Shield, the Plan doesn't have the capital to vertically integrate into the

health care market as do the for-profit hospital chains.

Staff's recommendation to the Executive Committee is that Blue Cross and Blue Shield staff immediately inform the Hospital Corporation of America (HCA) that Blue Cross and Blue Shield will cease contracting with Wesley Medical Center effective January 1, 1986 with our CAP program....

Staff feels the Plan can retain favorable CAP programs with the remaining hospitals in Wichita that will continue to be beneficial to Blue Cross and Blue Shield subscribers. Also, they believe a sufficient number of physicians will be interested to make the program successful. Johnston said, "This was a hard recommendation for staff to make, but we sincerely believe if we don't enter quickly into contracts with other hospitals not competing with us, they will make other arrangements and Blue Cross and Blue Shield will be left with no hospitals to have effective contracts with for our subscribers.["]

(Pltfs.' Ex. 10, pp. 3–6.)

One executive committee member inquired about the effect of such a decision on BCBSK subscribers who were accustomed to a close relationship between BCBSK and Wesley. In his response, Johnston noted:

[S]taff is not talking about Wesley Medical Center ... they are talking about HCA and must talk about this issue from that perspective.... Wesley supported Blue Cross and Blue Shield through some tough years. It appears that HCA, Humana and other organizations have made strategic decisions that they are going to be the best in the health insurance field and plan to dominate it.

(Pltfs.' Ex. 10, p. 7.) The minutes of this meeting also contain the following points which bear note:

Johnston noted that when staff developed CAP it was felt it would be a program that would long accrue to the benefit of Kansans, but that hasn't turned out to be true and the Plan has to structure itself realistically. Staff doesn't see

in the long run continuing as the organization is today since everyone will be working to form joint ventures or aligning to become more competitive. "If you do not make arrangements today, all the arrangements will be made and we will be without effective contracts for our subscribers," noted Johnston. Staff feels there is an opportunity with the remaining hospitals in Wichita, but if Blue Cross and Blue Shield waits until a year from now that opportunity will not be available.

Staff pointed out that HCA would not know any more about Blue Cross and Blue Shield's business if they were contracting than if they were not. The critical issue is a matter of alignment to solidify Blue Cross and Blue Shield's place in the market to retain its share of the market. The options will go very quickly.

(*Id.*, p. 9.)

Prior to the August 29 meeting, Johnston had approved staff's presentation of reduced MAPs to St. Joseph and St. Francis Hospitals in Wichita, and was aware that Dauner, Knack and Pitsenberger had already discussed with those hospitals the proposed Wesley termination and new MAPs. (Tran. 4, pp. 505–06; Tran. 5, pp. 674–76.) In fact, Johnston at that time believed the Saints would be willing, if Wesley were terminated, to consider lower MAPs because instead of BCBSK subscribers choosing among all three major Wichita hospitals (Wesley and the Saints), there would be an opportunity for St. Joseph and St. Francis to acquire more patients and thus a greater market share; Johnston also understood St. Francis' reaction to this concept to be "generally speaking favorable." (Tran. 5, pp. 676–79.) This information, however, was *never* presented to the executive committee on August 29. In fact, one of the members posed the question: "If the staff recommendation is the organization not go with Wesley, what does staff suggest be done as far as the other Wichita hospitals are concerned?" Johnston responded:

If action is taken not to renew the CAP contract with Wesley, staff *would contact* the other Wichita hospitals and modify the Blue Cross and Blue Shield contracts that are currently in effect (as of September 1, 1985) with these other hospitals.

(Pltfs.' Ex. 10, p. 11; emphasis added.) Implicit, if not express, in Johnston's answer was his assurance to the executive committee that BCBSK's contacts with the Saints on the issue of reduced MAPs would take place "in the future" *if* the committee voted to terminate Wesley's contract, when in fact numerous, substantial and fruitful discussions between BCBSK senior staff and the other hospitals had been continuing for weeks before the August 29 meeting. (Tran. 4, pp. 506–08.)

Johnston also said to the executive committee on August 29:

The provider community has initiated the new environment we find ourselves in. Blue Cross and Blue Shield did not initiate it. The provider community is going into the insurance business and will control both the supply and demand. We have seen this coming for a long time. To date, we cannot think of another alternative. It is our assessment that time is of the essence.... [T]he real issue is not HCA ... it is not Wesley ... but who do we align with while we still can and get a product with a price subscribers can afford.

(Pltfs.' Ex. 10, p. 11.) Robert O'Brien, Wesley's representative on the executive committee, commented on Wesley's need to remain competitive as a health care provider:

I have a lot of friends in this room and I hope to keep those friends. I have a lot to share having over 13 years with Blue Cross. I can probably show slides of the process [Wesley] went through in making the decision we did. I resent being singled out as a provider for that. I think providers reacted to a changing situation we found ourselves in because of governmental or third party payers. We were destined to say we were going to survive. One other resentment I have

is that no one has contacted us to discuss this. I have no personal hurt and want you to understand that. In my personal judgment, singling out one institution, whether it is mine or someone else's is foreboding. I think it will send signals to providers that will not be accepted. That will be the real problem for the organization. I'm of the opinion that the line will be drawn with this decision ... not for Wesley, but for the providers of the state of Kansas. There are a lot of others more formidable to Blue Cross and Blue Shield than HCA and Wesley. The decision this Board has to reach is whether to contract or not. We may some day see Blue Cross and Blue Shield buying a hospital. The name of the game is competition and we are going to be competitors.

(*Id.*, p. 12.) Following further discussion, the executive committee voted, seven to three, with O'Brien abstaining, to terminate BCBSK's CAP contract with HCA and Wesley effective January 1, 1986. (*Id.*, p. 15.)

The decision was not unexpected by the BCBSK staff; a prepared press release announcing Wesley's termination was immediately distributed to the committee members on August 29 for their review. (Pltfs.' Ex. 10, p. 12.) Wesley's O'Brien requested that the board delay any news releases or publicity about the decision to enable him to return to Wichita, meet with the Wesley management staff, and inform them of the decision. (Tran. 2, p. 279.) The board agreed (Tran. 2, p. 280), and because the committee members had other suggestions for the wording of the news release, requested that BCBSK staff not release news of the decision until the next morning. (Pltfs.' Ex. 10, p. 14.) The requests of O'Brien and the executive committee were ignored. On the morning of August 29, even before the executive committee began its meeting, John Knack had driven from Topeka to Wichita for a pre-arranged meeting with the public relations staffs of St. Francis and St. Joseph Hospitals. (Tran. 15, p. 2604.) Knack told those people he "needed some media contacts in order to deal with the questions that might

arise." (*Id.*, p. 2605.) Knack was later informed about O'Brien's request for some time prior to any public announcement of BCBSK's decision, but Knack recommended, and Dauner agreed, Knack should issue the press release on the afternoon of the 29th. (*Id.*, p. 2606.) He was interviewed on film by local television reporters, both at BCBSK's Wichita building and at a parking lot across the street from Wesley; the announcement of Wesley's termination and Knack's interviews were carried on the evening news. (Tran. 2, p. 280; Tran. 15, p. 2606.) A letter notifying Wesley of its termination was prepared and sent by BCBSK the same day. (Pltfs.' Ex. 11.)

The BCBSK news release, sent to all Kansas newspapers and television stations, stated in part:

Beginning January 1, 1986, payment for all covered services at Wesley Medical Center will be essentially the same amount paid to a Contracting Hospital. However, payment will be sent directly to the subscriber and cannot be assigned. Also, any balance above the Blue Cross and Blue Shield allowance will be the subscriber's responsibility.

"In the last few months," said [Wayne] Johnston "HCA has clearly announced its intention to enter into all lines of insurance and become a direct competitor of [BCBSK]. Their recent purchase of Health Care Plus is clear evidence of this.

"We still have contracts with St. Francis, St. Joseph and Riverside Hospitals in Wichita. Therefore, our subscribers will be able to continue receiving care from a contracting hospital. We also feel we will be able to better negotiate better programs for our subscribers at the other hospitals which should provide a positive impact on our subscriber's cost of health care."

(Pltfs.' Ex. 12.)

Wesley officials, shocked and angry over the announcement and the way it was handled by BCBSK, responded with their own media campaign to assure physicians, employers, and the community at large that notwithstanding the termination, beginning January 1, 1986, BCBSK policyholders were still welcome at Wesley; Wesley would bill BCBSK for any charges incurred; BCBSK's payment to the subscriber could be assigned or endorsed to Wesley; and other than standard deductibles or co-payments, the subscribers would not be held personally responsible for any excess charges. (Pltfs.' Exs. 14, 15, 19, 20, 226, 227.) BCBSK then informed its subscribers: "If Wesley's charges are more than [BCBSK] allowances to other hospitals for the same services, the subscriber will be responsible for the difference." (Pltfs.' Exs. 16; 18, p. 2.) BCBSK further directed its staff that payment for covered services received by subscribers at Wesley was to be sent directly to the subscriber "and cannot be assigned to the hospital." (Stip. y; Pltfs.' Ex. 17.)

During September, 1985, Wesley and HCA officials communicated with BCBSK senior management a number of times, attempting to persuade them to reverse their decision. In a meeting on September 5, and during telephone conversations September 9, Wayne Johnston said he might be willing to reconsider if he received assurances HCA "would not be competing with us in that environment," or that HCA would agree not to market its new products in competition with BCBSK. (Stips. z, aa; Tran. 4, p. 68.) Johnston also indicated BCBSK had been meeting with the Saints "developing ... some basis of understanding," and "in a few years, one of the two, either St. Francis or St. Joseph might not be around and at that time perhaps we could get back together." (Tran. 1, pp. 65–66; Tran. 4, pp. 682–85.) During a September 10 telephone conversation between Johnston and David Williamson, HCA Vice Chairman, the following points were made:

*Mr. Johnston:* "... [W]e'll have to align ourselves with hospitals that are not directly competing with us. We feel we have to align with these hospitals to get a very favorable contract."

. . . .

*Mr. Williamson:* "Would it be your position that any hospital that has a PPO will

be excluded from participating in Blue Cross?"

*Mr. Johnston:* "Not necessarily."

*Mr. Williamson:* "Then it's the degree of competition?"

*Mr. Johnston:* "I think so."

. . . .

*Mr. Williamson:* "My main objective is to try to determine if we can have some type of truce in this. If we went further, we'd have no choice but to pull out all the stops and fight this. And we don't want to do that.

I'd like to be partners with you rather than adversaries, because both Blue Cross and Wesley would be hurt. I think it is a lose/lose deal for all parties. Would you reconsider?"

*Mr. Johnston:* "Given what I know today, I don't think so. I don't hear you say that you are not going to compete with Blue Cross. . . . ."

(Stip. bb; Pltfs.' Ex. 22; Tran. 4, pp. 687–89; Tran. 11, pp. 1796, 1799.)

Immediately following the executive committee's approval of Wesley's termination on August 29, BCBSK staff moved rapidly to implement the reduced MAPs with the remaining Peer Group V hospitals. The very next day, August 30, the BCBSK internal affairs staff met; its discussion included the following:

*Discounts on St. Joseph and St. Frances* [sic] Pitsenberger check to make sure we have fully executed contract.

Need to present to Executive Committee on September 19. Brungardt to have meeting to finalize. Adapt policy to change MAPs. Find out if Riverside [Hospital] is part of that.

(Pltfs.' Ex. 182, p. 2; Tran. 4, pp. 680–82.) Brungardt is BCBSK's Vice President of the Electronic Data Processing Department. (Tran. 4, p. 682.)

Wesley officials requested, and were reluctantly granted, permission to appear before the BCBSK executive committee at its September 19 meeting. Following Davis' remarks urging the committee to reconsider its approval of the termination, Johnston said:

I'm convinced more than ever that our decision was a proper one. I'm convinced that HCA will be vertically integrated and believe this was demonstrated by the fact they [sic] have already purchased an HMO and their strategy is to compete with [BCBSK].

(Pltfs.' Ex. 24, p. 11.) After Davis departed from the meeting, the committee approved the reduced MAPs for the remaining Wichita Peer Group V hospitals, subject to the Hospital Advisory Committee's review and advice. (*Id.,* p. 22–23; Tran. 4, pp. 691–92.) The committee then voted to reaffirm its approval of Wesley's termination as a contracting provider effective January 1, 1986. (Pltfs.' Ex. 24, p. 24.) Johnston, again, did not inform the executive committee on September 19 that BCBSK staff had previously been meeting with St. Joseph and St. Francis officials regarding the reduced MAPs. (Tran. 5, p. 718.)

On September 25, 1985, Donald A. Wilson, President of the Kansas Hospital Association, sent a letter to Wayne Johnston requesting information about, and clarification of, the decision to terminate Wesley, and the following points in specific:

1) the decision that was made by Blue Cross;

2) the rationale supporting the decision; and

3) Blue Cross policy emerging from this decision and its implications on future Blue Cross relationships for hospitals as they also attempt to respond to this competitive environment that we all face.

(Stip. ff; Pltfs.' Ex. 468–B; Tran. 5, pp. 850, 857–58.) In a memorandum to all Kansas hospitals dated October 4, 1985, Johnston responded in part:

We believe a vigorous, multi-hospital environment is essential to the people of Wichita in order to preserve competitive hospital pricing and competitive health insurance rates.

With the size and resources of HCA and with the actions they have already taken in Wichita and with the plans they have announced, we could only come to the conclusion that our role with the Wesley

Medical Center has drastically changed. We no longer fit into their long range plans. Thus, our decision to cease contracting with HCA and the Wesley Medical Center.

Regarding our future relationship with Kansas hospitals, I would emphasize that we wish to continue our long and satisfactory relationship with each hospital. We do believe that to properly serve our subscribers, we must make available highly desirable health benefit products at reasonable and competitive prices. We cannot stand idly by and watch insurance-hospital corporations, such as HCA, monopolize the delivery and financing of care by seeking to enroll Blue Cross and Blue Shield subscribers in their insurance programs. Vertical integration is a strategy some hospitals may feel to be in their best interest. However, if hospitals decide to compete with Blue Cross and Blue Shield in the manner that HCA is competing, Blue Cross and Blue Shield must make a business decision about its future relationship with these entities. Hospitals that wish to continue their current relationship with Blue Cross and Blue Shield, that abide by the terms of our hospital agreement, that do not seek to enroll subscribers in other programs, and that wish to cooperate with Blue Cross and Blue Shield as a major marketing arm of the hospital, will experience no change in the contractual relationship that has historically served Kansans well.

(Pltfs.' Ex. 468–C, p. 2.)

BCBSK's approval and implementation of the reduced Peer Group V MAPs did not follow standard operating procedure. The company reviews and revises MAPs annually, and presents proposed revisions to the cost containment committee, the hospital advisory committee, and ultimately, the executive committee. (Tran. 4, p. 691.) Proposed MAPs are not discussed with hospitals individually; after approval by BCBSK they are sent out on a peer group basis, to be accepted or rejected by the hospitals. (Tran. 5, pp. 716–17.) BCBSK undertook this process for the 1986 MAPs in late spring and early summer, 1985; in July it sent out the 1986 CAP materials reflecting a 4% increase in the 1986 MAPs. (Pltfs.' Exs. 74, 75; Tran. 6, pp. 949–52.) This process, however, was disregarded for the later reduction of 1986 MAPs for Peer Group V. (Tran. 4, p. 691.) Even the executive committee's September 19 request that the reduced MAPs next be presented to the hospital advisory committee, for review and report back to the executive committee, was ignored. (Tran. 4, pp. 692–93.) Without consulting the hospital advisory committee, BCBSK sent revised 1986 CAP materials, with a 20% reduction in MAPs, to St. Francis, St. Joseph and Riverside Hospitals on October 9, 1985. (Pltfs.' Ex. 33; Tran. 6, p. 953.) The hospital advisory committee met on October 22 and voted overwhelmingly "to strongly recommend to the Executive Committee that the revised MAPs for the Wichita peer group be rejected." (Pltfs.' Ex. 32, p. 4; Tran. 4, p. 695.) That response was reported to the executive committee on November 7, but no further action was taken. (Pltfs.' Ex. 163, pp. 9–10.) St. Francis, St. Joseph and Riverside Hospitals did not affirmatively reject the reduced MAPs, and thereby committed themselves to the new contracts on November 10, 30 days after they received these materials from BCBSK. (Tran. 12, pp. 1970–71.) The reduction affects only Wichita hospitals in Peer Group V; MAPs for other peer groups in Kansas remain unchanged. (Stip. ee.)

On November 12, 1985, plaintiffs filed a 17–count complaint against BCBSK. (Dkt. 1.) The thrust of the complaint was that defendant, in conjunction with St. Francis and St. Joseph Hospitals, had terminated Wesley as a contracting provider and drastically reduced the MAPs for the remaining Peer Group V hospitals, the effects of which were to restrain trade in the Kansas health care service and insurance industries, and to preserve, create or attempt to create defendant's monopoly of the Kansas health care insurance market, to the detriment of Kansas health care consumers generally and plaintiffs in particular. Counts I–III alleged restraint of trade violations of Section 1 of the Sherman Anti-

trust Act, 15 U.S.C. § 1. Counts IV–VI alleged monopolization, attempt to monopolize, and conspiracy to monopolize, violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Counts VII–XVII contained pendent state law claims, including allegations of state and common law violations, violations of Kansas public policy and defendant's enabling act, claims of breach of contract, and tortious interference with plaintiffs' present and future business relations with third parties. Plaintiffs requested injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; actual damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Kansas law; punitive damages for their state law tort claims; certain declaratory relief; and costs and attorneys' fees under federal law.

Three days later, on November 15, plaintiffs filed a motion seeking a preliminary injunction suspending defendant's termination of Wesley's contracting provider agreement on January 1, 1986, to preserve the status quo and protect plaintiffs from irreparable injury pending disposition of their complaint on its merits. (Dkt. 5–6.) This and other matters were argued to the court on November 21, 1985. Upon learning Wesley's CAP contract with BCBSK clearly permitted termination after 120 days' notice, the court closely questioned plaintiffs' counsel about the propriety of the requested injunction. (Dkt. 274; Tran. of In-Chambers Proceeding Nov. 21, 1985, pp. 3–6.) Defense counsel insisted the termination, unequivocally permitted by the terms of the contract, did not violate any laws, antitrust or otherwise. (Tran. Nov. 21, 1985, pp. 7–8.) The discussion then focused on the possibility of the parties voluntarily maintaining the status quo pending resolution of plaintiffs' claims. Defense counsel responded they had already discussed that approach with BCBSK officials, who were willing to hold Wesley's termination in abeyance so long as the case could be tried and resolved as quickly as possible. (Tran. Nov. 21, 1985, pp. 9–11.) The parties ultimately agreed to this, negating any need for a ruling on the preliminary injunction.[3] (*Id.*, pp. 9–13.) Counsel

---

**3.** Interwoven among a number of BCBSK's present arguments is the assertion this court somehow "coerced" defendant into suspending Wesley's termination pending trial. The transcript of the November 21, 1985 proceeding belies this accusation:

> THE COURT: ... [W]hat is your suggestion as to what we might do between now and the first of the year? You agree that you might be well advised to have the issue adjudicated in advance of January 1 and if you're wrong, at least know it first or up front?
> MR. SHULMAN: Your Honor, we are pleased to have the issue adjudicated whenever it is convenient for the Court. Our concerns—and whether that is before the first of the year or after, we'll defer to the Court on that.
> THE COURT: Would you sit still to maintain your present status until it is adjudicated?
> MR. SHULMAN: *We have discussed that, Your Honor, and I believe we would be willing to do that* because we are—assuming, as I'm sure the Court is interested in doing, that the matter is adjudicated promptly. We have two real concerns procedural [sic], Your Honor: First is that we have an opportunity to present as fully as possible our side of the matter.
> THE COURT: You will have that. You may be assured of it.
> MR. SHULMAN: Okay.
> THE COURT: I'm giving credence to the plaintiffs' claim. If I gave them full credence

and acquiesced in what they said, seems to me that Blue Cross is in some trouble if that's what they are going to do and they did violate the [Sherman] Act. That's not to acquiesce in a thing they have said.
> MR. SHULMAN: If we violated the Act, Your Honor, I agree with you.
> THE COURT: ... What they have asked is some kind of preliminary injunction. Would it make more sense that if we agree in principle to the substantive issues here, that perhaps Blue Cross would continue as presently operating pending full hearing on the issue as if we could take all the time we need on it and get an opinion out and then one side or the other can take me to the Circuit and see where we are. Would that make more sense?
> MR. SHULMAN: I think we would be willing to do that, Your Honor, assuming that the matter does move ahead reasonably promptly.
> THE COURT: If we agree to that in principle, I can put you on stream to the satisfaction of everybody what time you might need for what discovery you need, but sounds to me you pretty much would agree in principle at least to what the issues are.
> MR. SHULMAN: Yes.
> THE COURT: Be more of a legal argument as to where we are, wouldn't it?
> MR. SHULMAN: Yes. There are some factual issues, Your Honor....
> ....

also agreed to draft and distribute mutually approved communications to BCBSK subscribers and the entire Wichita community announcing Wesley would continue as a CAP contracting provider under the newly-reduced Peer Group V MAPs, pending hearing and disposition of plaintiffs' claims. (*Id.*, pp. 12–14, 22–26.) The court and counsel then scheduled a pretrial conference on February 28, 1986, and trial for March 25. At that point in the discussion the court was, frankly, surprised to learn both sides insisted on a jury trial. (*Id.*, pp. 17–18, 21, 23.) Counsel for both sides agreed to arrange an acceptable discovery schedule. (*Id.*, p. 20.) Toward the end of the proceeding defense counsel requested that, unless plaintiffs' counsel would agree, the court order Hospital Corporation of America to respond to discovery in addition to the named plaintiffs. (*Id.*, p. 30.) Plaintiffs' attorneys agreed to the request, however, and no ruling was needed. (*Id.*) The meeting concluded with no indication whatsoever BCBSK would be filing a counterclaim against plaintiffs and HCA. The court order reciting the parties' agreement and the procedural timetable was filed the next day. (Dkt. 9.)

On December 12, 1985, BCBSK moved the court to add HMO, Kansas, Inc. as an additional counterclaim plaintiff, and HCA as an additional counterclaim defendant. (Dkt. 13.) A copy of defendant's proposed answer and counterclaim was appended to the motion. In its answer BCBSK denied its conduct violated any federal or state laws as claimed by plaintiffs. Among its other defenses were the following: failure to state a claim; lack of subject matter jurisdiction; immunity from the federal antitrust laws by virtue of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, and the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny; lack of standing; failure to allege a "properly cognizable relevant market;" estoppel by virtue of unclean hands and inequitable conduct on plaintiffs' part; and immunity by reason of defendant's statutory duty to contain hospital and medical costs by preserving a competitive marketplace. (Dkt. 13, Ans. & Counterclaim, pp. 1–12.) In their counterclaim BCBSK and HMOK alleged plaintiffs and HCA had, during the summer of 1984, conspired with the Wichita Clinic and the Hillside Medical Office to illegally boycott HMOK, exclude it from the Wichita market, and refuse to do business with HMOK in the future, for the purpose and with the effect of restraining trade and eliminating competition for HMO services in Wichita. BCBSK and HMOK also claimed HCA's acquisitions of New Century, Wesley Medical Center and Health Care Plus were undertaken with the intent and actual effect of becoming vertically integrated in the market for health care services and health care financing in Wichita, "and for the anticompetitive purpose of eliminating competition from Blue Cross, HMO Kansas, other Wichita hospitals, and others in said market." Counterclaim defendants' activities vis-a-vis HMO Kansas were alleged to constitute a group boycott and concerted refusal to deal per se in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, as well as tortious interference with BCBSK's and HMOK's prospective advantages and contractual relations. Additionally, both the activities with the Hillside Medical Office and the Wichita Clinic, and HCA's acquisitions, were challenged as "a contract, combination, or conspiracy unrea-

---

MR. DUNCAN: I don't have any problem with that, Your Honor. Sounds like a good solution to me....

....

THE COURT: [It] makes sense to me that both sides would be well advised to proceed this way. I don't see any harm done to Blue Cross to [have the contract] remain in effect and I would be happy to take the blame in the sense that I could enter some kind of a brief order that we have conferred, this is in the best interest of the parties that the present contract remain in effect pending hearing on the issue and give you assurance I will do it as readily as we can and you guys tells me what that time should be. What do you think?

MR. SHULMAN: *I think that is fine as long as it's clear that it is a matter of voluntary agreement of the parties.*

THE COURT: Sure. Sure. Wouldn't be as if I put it on you....

(Dkt. 274, Tran. of In-Chambers Proceeding Nov. 21, 1985, pp. 9–13; emphasis added.)

sonably to restrain trade in the market for health care financing and health care services" in Wichita, Sedgwick County, and the State of Kansas, in violation of the rule of reason under Section 1 of the Sherman Act; "monopolization, attempt to monopolize, ... and/or a conspiracy to monopolize" that market in violation of Section 2 of the Sherman Act; and a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18,[4] because the effect of HCA's acquisitions "has in fact been, and/or will be, substantially and unreasonably to restrain trade and eliminate competition in the market." (Dkt. 13, Ans. & Counterclaim, pp. 12–28.) Counterclaim plaintiffs requested actual damages, together with trebled damages as required by law; punitive or exemplary damages; injunctive relief; costs and attorneys' fees. (*Id.*, pp. 28–29.)

Plaintiffs opposed defendant's motion to join HMOK and HCA, arguing the proposed counterclaim ought not to be considered in this action and joinder was therefore unnecessary. Plaintiffs alternatively requested that if the court admitted the counterclaim and permitted joinder, the court also order separate trials and discovery schedules for plaintiffs' claims and defendant's counterclaim. (Dkt. 20.)

On January 8, 1986, I upheld BCBSK's right to plead its permissive counterclaim under Fed.R.Civ.P. 13(b), and ordered joinder of HMO, Kansas as an additional counterclaim plaintiff, and HCA as an additional counterclaim defendant, under Fed.R.Civ.P. 13(h), 19(a) and 20(a). (Dkt. 24.) I also conditionally ordered separate trials of the complaint and counterclaim for reasons which assumed increasing importance as the case progressed, and which bear repeating now:

Unquestionably, the claims set forth in plaintiffs' complaint and defendant's counterclaims are different in character. Although there may be some duplication among the evidence supporting the parties' respective claims, specifically evidence relating to the parties' position in the industry, current market conditions, etc., by and large the evidence will be different. The acts and evidence supporting BCBS's counterclaims historically precede that company's termination of the Contracting Provider Agreement by a period of months or years. Further, it is well established the alleged illegal action of HCA and plaintiffs in violation of the antitrust laws cannot stand as BCBS's defense against the independent antitrust violations alleged in plaintiffs' complaint. *See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 [71 S.Ct. 259, 95 L.Ed. 219] (1951); *Moore v. Mead Service Co.*, 190 F.2d 540 (10th Cir.1951); *Magna Pictures Corp. v. Paramount Pictures Corp.*, 265 F.Supp. 144 (C.D. Cal. 1967). Taking the allegations of both the complaint and counterclaims as true, it may well be both the plaintiffs and the counterclaim plaintiffs are entitled to relief.

. . . .

Plaintiffs' last challenge to the motion is that it will escalate what is already complex litigation by the introduction of difficult issues requiring extensive discovery, delay, and a lengthy trial. Those concerns cannot prevent a defendant from pleading a counterclaim, but rather are properly addressed in a motion for separate trials. *PLC, [PIC,] Inc. v. Prescon Corp.*, 77 F.R.D. 678, 680 (D. Del. 1977). Such relief has been requested in the alternative by plaintiffs, and at this stage of the proceedings appears justified. As previously noted, the alleged illegal conduct of a plaintiff in an anti-

---

4. Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. Violation of this statute supports a private cause of action for money damages. *Gottesman v. General Motors Corp.*, 414 F.2d 956 (2d Cir. 1969); *see also Highland Supply Corp. v. Reynolds Metals Co.*, 327 F.2d 725 (8th Cir.1964) (private right of action exists only where acquisition has demonstrable anticompetitive effects).

trust action cannot legalize the alleged unlawful conduct of the defendant or immunize it against liability. *Kiefer-Stewart, supra.* Nor are the defenses of "unclean hands" and *"in pari delicto"* properly invoked in an antitrust suit for money damages. *Pearl Brewing Co. v. Jos. Schlitz Brewing Co.,* 415 F.Supp. 1122 (S.D. Tex. 1976). In the *Pearl Brewing* case, after a thorough review of the limitations on a defendant's antitrust counterclaims in a suit of this type, the court said:

> On the present record, the Court is unable to determine whether, and the extent to which, the same evidence would be presented by defendant for its counterclaim as for the plaintiffs' case-in-chief. Even accepting the premise of total dependency *arguendo*, the Court concludes that plaintiffs have demonstrated sufficient grounds to merit consecutive rather than concurrent presentation of the two cases. Simultaneous presentation of the claim and the counterclaim in this case could well confuse the jury into basing a decision, at least in part, upon the allegedly "unclean hands" of plaintiffs, in acting within the appropriate market, when the proper inquiry as to plaintiffs' entitlement to recovery should be whether the defendant has engaged in any activity violative of the Sherman Act so as to have caused injury and measurable damages to any or all of the plaintiffs....
>
> Not only to avoid confusion but also to preserve a logical presentation, defendant's case should be queued behind plaintiffs' case and not superimposed upon it.... Duplication of testimony may be avoidable in a second trial phase through utilization in transcribed form of pertinent testimony brought out in the case-in-chief. Thus, in the exercise of its discretion, ... the Court concludes that separate trials are required here to avoid prejudice and confusion....

415 F.Supp. at 1133–34 (citations omitted).

In this case, BCBS contends it is justified in terminating the contract with Wesley Medical Center because of HCA's acquisitions of health care and insurance providers, its vertical integration within the market, and the consequent competitive threat posed to BCBS. Assuming defendant can present evidence thereof to the jury as the underlying reason for its proposed termination of the contract, nevertheless to further permit the allegations those actions are themselves antitrust violations would unduly complicate and confuse the jury, much as it was found to in *Pearl Brewing.* Both the parties to the suit and the public at large have a pressing need to quickly resolve the matter of the Contracting Provider Agreement between BCBS and Wesley Medical Center. By contrast, the acts and occurrences implicated in defendant's counterclaims are a *fait accompli* and, while undeniably important, are not matters awaiting judicial action for their outcome in the same sense as the contract. Thus, considerations of both the public welfare and fairness to the parties point to separate trials.

That said, the Court acknowledges discovery is still in its initial stages. Subsequent proof by the counterclaim plaintiffs may demonstrate the need to reconsider this ruling. BCBS and HMO Kansas are granted leave to fully brief this issue and request reconsideration of the Court's ruling at or before pretrial conference.

(Dkt. 24, Memorandum & Order Jan. 8, 1986, pp. 2, 5–8.) Following extensions of time and the court's order, BCBSK formally filed its answer and counterclaim on January 13, 1986. (Dkt. 25.)

Throughout this period, in preparation for the March 25 trial date, counsel for the parties undertook the most intensive, thorough and productive discovery this court has ever supervised.

On March 3, 1986, defendant BCBSK moved for summary judgment on the entirety of plaintiffs' complaint. (Dkt. 50, 51.) The motion was premised on three arguments: first, plaintiffs HCP, New Cen-

tury, and Dr. Reazin lacked standing to sue; second, Wesley had no viable federal antitrust claims; and third, the pendent state law claims were invalid under controlling case law from the Kansas Supreme Court. The March 25 trial setting was cancelled. Oral argument on the motion was heard May 9; my written opinion was filed May 23, 1986. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 635 F.Supp. 1287 (D. Kan. 1986). (Dkt. 135.) For reasons fully set forth in that opinion, I held HCP had standing to bring an action for actual damages under the federal antitrust laws, while New Century and Dr. Reazin had standing only to pursue injunctive relief.[5] *Reazin*, 635 F.Supp. 1287, 1309–1320. I disagreed with BCBSK's contention the Wesley termination was purely a unilateral act, holding the evidence, and derivative inferences, of defendant's interactions with the other Wichita hospitals sufficiently raised a jury question about the existence of a concerted refusal to deal and/or group boycott amounting to a per se violation of Section 1 of the Sherman Act. *Reazin*, 635 F.Supp. at 1320–27. Based on prevailing case law, I further held plaintiffs' antitrust damage claims under Section 1 would be presented to the jury with alternate instructions on the per se and rule of reason analyses. *Id.*, pp. 1327–28. Although concerned about the sufficiency of plaintiffs' evidence supporting their claims under Section 2, specifically the disputed evidence BCBSK holds a 60% market share, I held defendant had not clearly shown it was

entitled to judgment in its favor as a matter of law on plaintiffs' claims of monopolization, attempt to monopolize, and conspiracy to monopolize the relevant market. *Id.*, pp. 1328–33. And, rejecting defendant's arguments, I concluded plaintiffs' pendent claims were not controlled by the two Kansas Supreme Court cases defendant relied on, and denied summary judgment on those issues as well. *Reazin*, 635 F.Supp. at 1333–35. Finally, based on my fuller understanding of the breadth and complexity of the issues the jury would address, I denied defendant's request for reconsideration of my order for separate trials of the complaint and counterclaim. Trial to the jury on Wesley's and HCP's complaint was set for July 22, 1986. *Id.*, pp. 1335–36.

One of the most difficult analytical problems pervading this entire case is the conflict between defendant's inability to use the alleged antitrust violations of plaintiffs and HCA as its defense to plaintiffs' claims (*Kiefer-Stewart Co. v. Jos. E. Seagram & Sons*, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951)), and defendant's right, under the rule of reason analysis, to show the factfinder the "real world scenario":

The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint

---

5. In addressing the issues of standing at the summary judgment stage, I noted the following:

Particular attention must be given to defendant's argument HCP's damages, as well as those of New Century and Reazin, are "speculative". The case is presently before the Court in a unique posture because of the parties' voluntary agreement to preserve the status quo, continuing to abide by the terms of the Wesley/BCBSK contracting provider agreement pending the outcome of this suit. The Court perceives the case as primarily a declaratory judgment action which will be tried to the jury to determine whether what is now the proposed termination of Wesley's contract, along with the formation and effect of the revised BCBSK contracting provider agreements with the remaining Wichita hospitals, would violate the antitrust laws if carried out.

To that extent all plaintiffs' claimed injuries and damages are "speculative", but of course BCBSK cannot make any such argument. Consistent with the manner in which this case [is postured and] will be presented to the jury, the Court looks not to the existing situation to determine the merit of plaintiffs' claimed damages, but to their merit if BCBSK were to carry out its allegedly anticompetitive conduct.

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 635 F.Supp. 1287, 1316–17 (D.Kan.1986). Recognizing the procedural impact of the unusual posture of this case is *critical*, as will be discussed *infra*, because one of defendant's present challenges to the verdict is the alleged impropriety of the jury basing its decision in part upon "likely future competitive effects" of defendant's activities in the market.

is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Prior to trial BCBSK gave the following indications of its defenses to plaintiffs' complaint:

The defense of this case will rest, in part, on Blue Cross' evidence that its termination of Wesley's agreement was in fact a legitimate and procompetitive response to a course of anticompetitive conduct entered into by HCA and the Plaintiffs that not only threatens to foreclose, but had in fact substantially foreclosed, competition for health care financing and health care services in Kansas.

. . . .

In the present case, in order to show that the termination of Wesley does not violate Section 1 under the rule of reason analysis, Blue Cross will be permitted to show the history of and changes in the health care financing market in Wichita, including both the Health Care Plus boycott freezing HMO Kansas out of the market and the subsequent HCA acquisitions cementing the Health Care Plus monopoly position.

(Blue Cross' Memorandum in Support of Motion for Reconsideraton of Court's Order of Separate Trials, pp. 3, 10.)

On July 11, 1986, plaintiffs filed a motion *in limine* seeking to prohibit any reference, in the jury's presence, to the counterclaims and the alleged illegal activities of plaintiffs and HCA. (Dkt. 154.) I entertained oral argument on this motion and other matters on July 21 and 22, 1986, immediately prior to trial. (Dkt. 292; Tran. of *In Limine* Proceedings, July 21–22,

1986.) Plaintiffs identified nine separate matters which they sought to exclude from the jury. I fully sustained plaintiffs' motion on four of those items:

Alleged price fixing by, or an alleged conspiracy to fix prices involving Wesley. The decision of the Federal Trade Commission rendered in *Hospital Corporation of America,* No. 9161 (FTC Oct. 25, 1985), or any conduct or allegations of conduct on the part of Hospital Corporation of America which are the subject of that proceeding or any other reference to HCA's having allegedly previously violated antitrust law.

HCA's alleged efforts to acquire American Hospital Supply Corporation and its alleged threat to cancel a supply contract with Baxter Travenol.

Alleged pressure from or upon doctors contracting with HCP not to hospitalize patients requiring hospitalization, and other alleged conduct relating to the quality of care provided by HCP contracting doctors.

(Tran. of *In Limine* Proceedings, July 21–22, 1986, pp. 40–49.)

The remaining *in limine* questions were more difficult, requiring reconciliation of defendant's evidentiary privileges under the rule of reason and plaintiffs' rights to a trial solely on their complaint, unimpeded by any consideration of the counterclaim. A balance was necessary, as I indicated at the hearing:

The defendants are at liberty to defend this case to the fullest, but we are going to defend the plaintiffs' case and not going to try the defendant's [counterclaim] in this case. This is a difficult case, to say the least. It's taken much of our time trying to come to grips with it. . . . I think there is a balance here. I think I have met it. In doing that, I have to say to all of you I never guarantee a perfect trial—in this case, no way—but just the fairest I know how, and simply suggest[ ] that what we should do is go slow, let me see how it plays and comes in and decide as it arises what is admissible, but somewhat within the[se] guidelines. . . .

(Tran. of *In Limine* Proceedings, July 21–22, 1986, p. 64.)

Plaintiffs first sought to exclude all evidence and arguments concerning the allegations HCA's acquisitions of Wesley, HCP and New Century were illegal, anticompetitive, etc. Plaintiffs acknowledged defendant was entitled to show the facts and effects of HCA's activities in these markets; defendant agreed it would proceed without attempting to characterize the activities of HCA and HCP as violations of federal antitrust laws. (Tran. of *In Limine* Proceedings, July 21–22, 1986, pp. 15–18.) The second item concerned the alleged boycott of HMOK, involving HCP and physicians under contract with HCP. Plaintiffs argued this evidence was irrelevant because it was never given as a reason underlying Wesley's termination, but even if relevant, it was inflammatory and prejudicial. I again deferred to the broad rule of reason analysis, ruling defendant could present evidence and arguments about HCP's activities without referring to them as a "boycott" or otherwise illegal. (*Id.,* pp. 19–22, 55–56.) Plaintiffs' third *in limine* item was the price HCP investors paid for the stock in the private placement, and profits they enjoyed from the sale to HCA. Defendant argued the stock was the mechanism by which HCP kept HMOK out of the market, and HCA, by purchasing HCP, effectively bought "the exclusive loyalty of the doctors." BCBSK insisted it had evidence certain providers were offered stock by HCP in exchange for taking adverse actions against HMOK. I permitted defendant to proceed with this, admonishing counsel to be sure that evidence truly supported their contentions because of the risk of unfair prejudice to plaintiffs' case if it did not. (*Id.,* pp. 24–34, 57–68.) The fourth item of plaintiffs' motion concerned alleged contacts, relations and future plans between HCA and Physicians Corporation of America, a new organization founded by Dr. Stanley Kardatzke. Dr. Kardatzke worked closely with Gary Bugg in the development, marketing and ultimate sale of HCP, after which Kardatzke left HCP and began Physicians Corporation of America, which is pursuing other alternative delivery systems in the Wichita/Sedgwick County health care financing and services markets. Physicians Corp. had announced plans to start its own HMO program. I permitted defendant to use this evidence as it related to the presence or absence of market power and monopoly power by BCBSK, but prohibited any reference to an alleged relationship between Physicians Corp. and HCA because none was established by the evidence. (*Id.,* pp. 34–38, 70–72.) The last item of the *in limine* motion concerned "an alleged policy of HCA, Wesley and HCP to channel patients to HCA hospitals and their alleged intention to take steps to cause another Wichita hospital to go out of business." I overruled plaintiffs' requested exclusion of this evidence, particularly in light of the testimony concerning Berry's alleged remark at the July 24, 1985 meeting with BCBSK's Dauner and Knack. (*Id.,* pp. 38–40.)

Another matter I addressed before trial was the propriety of my earlier ruling plaintiffs' Section 1 claims would be submitted to the jury under alternate instructions on the per se and rule of reason analyses. The Supreme Court decided *Federal Trade Comm. v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), ten days after my summary judgment ruling in this case. In *Indiana Federation of Dentists,* the FTC found the "work rule" of a professional dental association, which required members to withhold x-rays requested by dental insurers for use in evaluating claims, to be an unreasonable restraint of trade violating § 1. The Seventh Circuit Court of Appeals vacated the FTC's order, but the Supreme Court reversed. In the course of its opinion, the Court noted:

> The policy of the Federation with respect to its members' dealings with third-party insurers resembles practices that have been labeled "group boycotts": the policy constitutes a concerted refusal to deal on particular terms with patients covered by group dental insurance. Although this Court has in the past stated that group boycotts are unlawful per se,

we decline to resolve this case by forcing the Federation's policy into the "boycott" pigeonhole and invoking the per se rule. As we observed last Term in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. [284], 86 L.Ed.2d 202, 105 S.Ct. 2613 (1985), the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor—a situation obviously not present here. Moreover, we have been slow to condemn rules adopted by professional associations as unreasonable per se, and, in general, to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious. Thus, as did the FTC, we evaluate the restraint at issue in this case under the Rule of Reason rather than a rule of per se illegality.

*Indiana Federation of Dentists*, 476 U.S. 447, at ___, 106 S.Ct. 2009, at 2017–18, 90 L.Ed.2d 445, at 456–57 (certain citations omitted). In its rule of reason analysis, the Court found the federation's policy was a horizontal agreement among the participating dentists to withhold from customers a particular service, the forwarding of x-rays to insurance companies, and noted " '[w]hile this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.' " *Indiana Federation of Dentists*, 476 U.S. at ——, 106 S.Ct. at 2018, 90 L.Ed.2d at 457 (quoting *National Society of Professional Engineers v. United States*, 435 U.S. 679, at 692, 98 S.Ct. 1355, at 1365, 55 L.Ed.2d 637 (1978)). The federation advanced no countervailing procompetitive effects of its agreement, but argued there was no unreasonable restraint of trade because the FTC had not engaged any detailed market analysis, the FTC made no finding the federation's activities resulted in higher cost dental care, and the FTC failed to consider "quality of care" justifications for the federation's pol-

icy. The Supreme Court rejected all three arguments, and made the following significant observations about the first:

"As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output," and ... such a restriction "requires some competitive justification even in the absence of a detailed market analysis." [*NCAA v. Board of Regents of Univ. of Okla.*,] 468 U.S. [85], at 104–110, 82 L.Ed.2d 70, 104 S.Ct. 2948 [at 2961–2965 (1984)]. Moreover, even if the restriction imposed by the Federation is not sufficiently "naked" to call this principle into play, the Commission's failure to engage in a detailed market analysis is not fatal to its finding of a violation of the Rule of Reason.... Since the purpose of inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output" can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects." 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986). In this case we conclude that the [FTC's] finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.

*Indiana Federation of Dentists*, 476 U.S. at —— – ——, 106 S.Ct. at 2018–19, 90 L.Ed.2d at 457–58.

The Tenth Circuit Court of Appeals decided *Westman Com'n. Co. v. Hobart Intern., Inc.*, 796 F.2d 1216 (1986), approximately three weeks later. That case involved a kitchen equipment distributor's Section 1 claims against the manufacturer, Hobart, for its refusal to grant plaintiff a distributorship. A competing distributor urged Hobart to deny plaintiff the distributorship, and Westman claimed Hobart's

compliance with that request amounted to a conspiracy to prevent plaintiff from competing in the Denver-area market. The trial court determined Hobart's refusal to deal was a per se violation of Section 1 and, even under a rule of reason analysis, defendant's conduct violated the antitrust laws. *Hobart,* 796 F.2d 1216, at 1219–20. The Circuit reversed, holding that the Section 1 per se analysis applies to vertical restraints only where there is evidence of intent to raise prices:

> Since the record reveals not the slightest hint of price maintenance or price fixing, Hobart's refusal to deal cannot be illegal per se. Of course, if there were allegations of retail price maintenance, price fixing, or tying arrangements, our analysis would be quite different.

*Hobart,* 796 F.2d at 1224. In its rule of reason analysis the circuit pointed to the procompetitive benefits of a manufacturer limiting the number of its distributors, and held:

> Because we believe that manufacturers should be free to choose and terminate their distributors free of antitrust scrutiny so long as their motivation does not involve illegal pricing or tying arrangements, we hold that section one of the Sherman Act does not proscribe refusals to deal absent a showing of monopoly or market power on the part of the manufacturer. *See [United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, at 376, 87 S.Ct. 1856, at 1864, 18 L.Ed.2d 1249 (1967), overruled on other grounds by *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).] The evil to be avoided is the reduction of *interbrand* competition between the manufacturer's distributors, not the reduction of *intrabrand* competition. The trial court's findings in this case compel the conclusion that, on an interbrand basis, the restaurant equipment supply market in the Denver area is highly competitive. Moreover, nothing in the record demonstrates that Hobart had market power. Thus, Hobart's refusal to grant Westman a distributorship at the insistence of Nobel [the competing distributor] did not

violate section one of the Sherman Act. If Westman has any remedy against Hobart or Nobel, it must resort to state law. *Hobart,* 796 F.2d at 1229 (emphasis original). The court defined "market power" as *"either* 'power to control prices' *or* 'the power to exclude competition,'" distinguishing it from "monopoly power" which for purposes of a Section 2 analysis requires proof of *both* elements together. *Id.,* pp. 1225–26, n. 3. The Tenth Circuit, in *Hobart,* did not address the Supreme Court's statements in *Indiana Federation of Dentists* that a market analysis is "but a 'surrogate for detrimental effects,'" and is therefore *unnecessary* where there is evidence of actual, sustained adverse effects on competition. 476 U.S. at —–—, 106 S.Ct. at 2018–19, 90 L.Ed.2d at 457–58 (quoted *supra*).

It was the two courts' treatment of the per se analysis that immediately concerned me. BCBSK argued *Hobart* clearly meant Section 1 challenges to termination of vertical relationships, absent price fixing, must be treated under the more lenient rule of reason standard. Plaintiffs countered that *Hobart* did not prohibit application of the per se analysis in this case; while *Hobart* involved a purely vertical arrangement between the manufacturer and distributor, the arrangement at issue here has horizontal ramifications in both the hospital market and the health care insurance/financing market. I permitted plaintiffs to go forward with their evidence and attempt to show the applicability of the per se analysis. (Tran. of *In Limine* Proceedings, July 21–22, 1986, pp. 2–12.)

Prior to trial, plaintiffs and HCA filed a motion for summary judgment on the counterclaim. (Dkt. 160–61.) The motion was held in abeyance pending trial of plaintiffs' complaint.

That trial began July 22, 1986. After four days of testimony from as many witnesses, defendant moved for a directed verdict on all of plaintiffs' Section 1 claims, the conspiracy to monopolize claim under Section 2, and the state law civil conspiracy claim. (Dkt. 184–85.) That motion was taken under advisement. (Dkt. 206.) On

August 18, defendant moved to allow the counterclaim to be decided by the jury or, in the alternative, to retain the jury and proceed with the counterclaim following the verdict on plaintiffs' claims. (Dkt. 192–93; Tran. 19, pp. 3124–30.) I denied that motion (Dkt. 194; Tran. 20, pp. 3298–3305), after which defendant sought mandamus from the Tenth Circuit Court of Appeals (Dkt. 198). The petition was likewise denied. (Dkt. 201.)

Trial lasted for six weeks; defendant rested on September 2, 1986. I ruled that plaintiffs' evidence, in light of *Hobart,* was insufficient to go to the jury on their claims of per se violations of Section 1. Plaintiffs voluntarily limited their numerous pendent state law claims to two: tortious interference, by BCBSK, with Wesley's and HCP's present and prospective business relationships. At the conclusion of all evidence, defendant renewed its motion for directed verdict, seeking judgment on plaintiffs' Section 1 claims under the rule of reason; the claims of monopoly, attempt to monopolize, and conspiracy to monopolize under Section 2; and the pendent claims. (Dkt. 252; Tran. of Post-Trial Motions Sept. 2, 1986, pp. 3–10.) I took under advisement defendant's motion with regard to plaintiffs' Section 1 claims, expressing misgivings about the sufficiency of their conspiracy evidence, and overruled the motion as to plaintiffs' Section 2 and pendent claims. (Dkt. 243; Tran. of Rulings & Findings on Post-Trial Motions Sept. 2, 1986, pp. 2–22.) Plaintiffs' own motion for directed verdict in its favor was also overruled. (*Id.,* p. 21.)

The jury began its deliberations on September 3, and consumed a full month with its labors. During this 4–week period, the court received over 20 written inquiries from the jury ranging from requests for supplies, through requests for particular testimony, and including intricate, probing questions relating to the substantive law the jury was to apply. (Dkt. 211.) On September 30, 1986, the jury returned its verdict:

## A. SHERMAN ACT, SECTION 1: RESTRAINT OF TRADE.

1. Did Blue Cross engage in a contract, combination or conspiracy with St. Francis and/or St. Joseph Hospitals, encompassing within its terms the termination of Wesley as a contracting provider, and the reduction of the MAPs for the remaining Peer Group V hospitals?

 Yes x No___

[If you answer "no" to this question, do not respond to Nos. 2 through 5, but instead proceed directly to No. 7 relating to plaintiffs' monopolization claim. If you answer "yes" to this question, then proceed to No. 2].

2. What do you find to be the relevant geographic market at issue in this case? (check one.)

 x The State of Kansas, excluding Johnson and Wyandotte Counties

 ___Sedgwick County

The relevant market is the private health care financing market in the geographic area you identify.

3. Does Blue Cross possess market power in the relevant market, that is, *either* the power to control prices *or* the power to exclude competition?

 Yes x No___

4. Did Blue Cross' participation in a contract, combination or conspiracy result in a restraint of trade in the relevant market?

 Yes x No___

5. If, in No. 4 you find a restraint of trade, was the restraint unreasonable?

 Yes x No___

6. If you answered "yes" to Nos. 1, 3, 4 and 5, has either of the plaintiffs shown that it has suffered injury to, or loss from, its business or property as a direct or proximate result of Blue Cross' unreasonable restraint of trade?

HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center

Yes x No___

Health Care Plus

Yes___ No x

## B. SHERMAN ACT, SECTION 2: MONOPOLIZATION.

7. What do you find to be the relevant geographic market at issue in this case? (Check one.)

_x_ The State of Kansas, excluding Johnson and Wyandotte Counties

___Sedgwick County

The relevant market is the private health care financing market in the geographic area you identify.

8. Does Blue Cross possess monopoly power in the relevant market identified in No. 7, that is, *both* the power to control prices *and* the power to exclude competition? (You must answer "no" to this question if you answer "no" to No. 3.)

Yes_x_ No___

9. If you answer "yes" to No. 8, is this monopoly by Blue Cross the result of willful acquisition, maintenance or use of that power by exclusionary or anticompetitive means?

Yes_x_ No___

10. If you answer "yes" to Nos. 8 and 9, has either of the plaintiffs shown that it has suffered injury to, or loss from, its business or property as a direct or proximate result of Blue Cross' monopolization of the relevant market?

HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center

Yes_x_ No___

Health Care Plus

Yes___ No_x_

[If you answer "yes" to Nos. 8 and 9, and you find that either or both plaintiffs have suffered injury to their businesses or property as a direct result of Blue Cross' actual monopolization, then do *not* respond to Nos. 11 through 19 below, but proceed directly to No. 20 for a determination of damages. However, if you find no actual monopolization by Blue Cross, you should next consider Nos. 11 through 19.]

C. SHERMAN ACT, SECTION 2: ATTEMPT TO MONOPOLIZE.

11. Is there a dangerous probability that, if unchecked, Blue Cross will succeed in monopolizing the relevant market?

Yes___ No___

12. Did Blue Cross engage in predatory, exclusionary or anticompetitive conduct in furtherance of its attempt to monopolize?

Yes___ No___

13. Did Blue Cross have the specific intent to monopolize the relevant market?

Yes___ No___

14. Did Blue Cross' attempt to monopolize occur in the relevant market?

Yes___ No___

15. If you answer "yes" to Nos. 11 through 14, has either plaintiff shown that it has suffered injury to, or loss from, its business or property as a direct or proximate result of Blue Cross' attempt to monopolize the relevant market?

HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center

Yes___ No___

Health Care Plus

Yes___ No___

D. SHERMAN ACT, SECTION 2: CONSPIRACY TO MONOPOLIZE.

16. Was there a conspiracy between Blue Cross and others to monopolize trade and commerce in the relevant market?

Yes___ No___

17. Did both Blue Cross and its co-conspirators enter into the conspiracy with the specific intent of monopolizing commerce?

Yes___ No___

18. Was one or more of the acts at issue done in furtherance of this conspiracy to monopolize?

Yes___ No___

19. If you answer "yes" to Nos. 16 through 18, has either plaintiff shown that it has suffered injury to, or losses from, its business or property as a direct or proximate result of Blue Cross' conspiracy to monopolize?

HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center

Yes___ No___

Health Care Plus

Yes___ No___

## E. DAMAGES.

[Answer the following questions only if you find plaintiffs have proven by a preponderance of the evidence *all* of the elements of one or more of their federal antitrust claims, as those claims and elements are identified in Sections A, B, C and D above. In other words, answer these questions only if you find in plaintiffs' favor on one or more of their claims of restraint of trade, actual monopolization, attempted monopolization, or conspiracy to monopolize.]

20. If you find that plaintiff Health Care Plus was injured in its business or property as a direct or proximate result of any antitrust violations by Blue Cross [see Nos. 6, 10, 15 and 19 above], please state the amount of damages, if any, suffered by Health Care Plus.

$_____

21. If you find that plaintiff HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center, was injured in its business or property as a direct or proximate result of any antitrust violations by Blue Cross [see Nos. 6, 10, 15 and 19 above], please state the amount of damages, if any, suffered by HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center.

$1,542,980.00

## F. STATE LAW: TORTIOUS INTERFERENCE.

### Plaintiff Health Care Plus

22. Did there exist a present business relationship and/or the expectancy of future relationships with economic benefit between Health Care Plus, hospitals and other health care providers?

Yes_x_ No___

23. Did Blue Cross actually know of this present business relationship and/or the expectancy of future relationships between Health Care Plus, hospitals, and other health care providers?

Yes_x_ No___

24. Was Health Care Plus reasonably certain to have continued in its existing relationship, or realized future expectancies, but for Blue Cross' termination of Wesley as a contracting provider, and defendant's related acts and practices?

Yes_x_ No___

25. Did Blue Cross undertake this conduct with the wrongful intent of injuring or destroying the business of Health Care Plus?

Yes___ No_x_

26. If you answered "yes" to Nos. 22 through 25 above, did Health Care Plus suffer injury, loss or damage to its business relations as a direct or proximate result of this misconduct of Blue Cross?

Yes___ No___

### Plaintiff HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center

27. Did there exist a present business relationship and/or the expectancy of future relationships with economic benefit between Wesley Medical Center and Blue Cross' subscribers?

Yes_x_ No___

28. Did Blue Cross itself actually know of this present relationship and/or the expectancy of future relationships between Wesley and Blue Cross' subscribers?

Yes_x_ No___

29. Was Wesley Medical Center reasonably certain to have continued in its existing relationship, or realized future expectancies, but for Blue Cross' deliberate use of the media and other efforts to discourage its subscribers from using Wesley for medical services?

Yes_x_ No___

30. Did Blue Cross undertake this conduct with the wrongful intent of injuring or destroying the business of Wesley Medical Center?

Yes_x_ No___

31. If you answered "yes" to Nos. 27 through 30 above, did Wesley Medical Center suffer injury, loss or damage to its business relations as a direct or proximate result of this misconduct by Blue Cross?

Yes_x_ No___

## G. STATE LAW: DAMAGES.
### Actual

32. If you answered "yes" to Nos. 22 through 26 above, that is, if you find Health Care Plus has established by a preponderance of the evidence the elements of its claim of tortious interference by Blue Cross, please state the amount of actual damages, if any, suffered by Health Care Plus as a consequence of Blue Cross' tortious interference [keep in mind any damages you award Health Care Plus on this claim may *not* duplicate any damage award it may receive from you on its federal antitrust claims against Blue Cross].

$_____

33. If you answered "yes" to Nos. 27 through 31 above, that is, if you find HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center, has established by a preponderance of the evidence the elements of its claim of tortious interference by Blue Cross, please state the amount of actual damages, if any, suffered by Wesley as a consequence of Blue Cross' tortious interference [keep in mind any damages you award Wesley Medical Center on this claim may *not* duplicate any damage award it may receive from you on its federal antitrust claims against Blue Cross].

$ _$1.00_

### Punitive

34. If you have found plaintiff Health Care Plus is entitled to an award of actual damages (even nominal damages) in response to No. 32 above, you are to decide whether to award Health Care Plus punitive damages from Blue Cross.

a. Is plaintiff Health Care Plus entitled to an award of punitive damages for conduct by Blue Cross that was willful or wanton with regard to the rights of Health Care Plus?

Yes___ No___

b. If your answer to the previous question is "yes", please state the amount of punitive damages to be awarded Health Care Plus.

$_____

35. If you have found plaintiff Wesley Medical Center is entitled to an award of actual damages (even nominal damages) in response to No. 33 above, you are to decide whether to award Wesley Medical Center punitive damages from Blue Cross.

a. Is plaintiff Wesley Medical Center entitled to an award of punitive damages for conduct by Blue Cross that was willful or wanton with regard to the rights of Wesley?

Yes_x_ No___

b. If your answer to the previous question is "yes", please state the amount of punitive damages to be awarded to Wesley Medical Center.

$750,000.00

John D. Beltz
Foreperson

Sept. 30, 1986
Date

(Dkt. 209.)

### JURISDICTION

BCBSK's first challenge to this verdict is that the court lacks jurisdiction. (Dkt. 249.) Defendant contends that because the relevant market was defined as "health care financing", defendant's conduct is exempt from federal antitrust scrutiny under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015.

The McCarran Act is designed to preserve state regulation and taxation of the "business of insurance." 15 U.S.C. § 1011.[6] But the Sherman Act and the Clayton Act apply to the "business of insurance to the extent that such business is *not regulated by State law,*" 15 U.S.C. § 1012(b),[7] and regardless of state regula-

---

6. 15 U.S.C. § 1011 states:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

7. 15 U.S.C. § 1012 states:

(a) The business of insurance, and every person engaged therein, shall be subject to the

tion, the Sherman Act applies "to any agreement to boycott, coerce or intimidate, or act of boycott, coercion or intimidation," 15 U.S.C. § 1013(b).[8]

■ This statutory scheme erects three requirements which must be met to obtain the McCarran-Ferguson exemption. The challenged practices (1) must constitute the "business of insurance" under § 2(b) [15 U.S.C. § 1012(b)]; (2) must be regulated by state law pursuant to § 2(b); and (3) must not amount to "boycott, coercion or intimidation" under § 3(b) [§ 1013(b)]. *See Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 124, 102 S.Ct. 3002, 3006, 73 L.Ed.2d 647 (1982); *Hahn v. Oregon Physicians Service,* 689 F.2d 840, 842 (9th Cir. 1982), *cert. denied* 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983).

BCBSK points out that well into the trial of this case, plaintiffs Wesley and HCP asserted its conduct illegally restrained trade in two relevant product markets: private health care financing; and health care services. Defendant argues that once the court limited and defined the relevant product market as "private health care financing,"[9] only an insurance market remained at issue; the McCarran Act preserves this market for state regulation, and precludes plaintiff's recovery under the Sherman Act.

Where the challenged activities of an insurance company do not meet the "business of insurance" criterion of § 2(b), but are alleged to anticompetitively restrain trade in the market for insurance, does the McCarran Act shield the company's activi-

ties from scrutiny under the federal antitrust laws? In the context of this case, defendant's argument is based on three premises: (a) the market for private health care financing is a pure insurance market within the ambit of the McCarran Act; (b) so long as there exists a scheme for state regulation of insurance companies the McCarran Act immunizes a company's efforts to privately regulate competition in the insurance market; and (c) a "market impact" analysis can be readily substituted for the "business of insurance" analysis required under § 2(b) because Congress intended to foreclose application of the federal antitrust laws to all activities of an insurance company affecting the insurance market.

There are serious questions about each of these premises; defendant has not shown the McCarran Act shields the conduct and activities at issue. Congress provided only a qualified antitrust immunity for insurance companies through the McCarran Act. Courts have carefully defined the "business of insurance" requirement to effect the limited congressional purposes behind the act, and for the same reasons consistently use a fact-based conduct analysis to determine whether that requirement is met in a particular case; they have never utilized the "market impact" analysis BCBSK now requests. Absent any controlling precedent on this question (and defendant acknowledges there is none), I am left attempting to reconcile defendant's novel approach with the established purposes of the McCarran Act, the

---

laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, ... the Sherman Act, and ... the Clayton Act, and ... the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

8. 15 U.S.C. § 1013(b) states:

Nothing contained in this chapter shall render the said Sherman Act inapplicable to any

agreement to boycott, coerce or intimidate, or act of boycott, coercion or intimidation.

9. Jury Instruction No. 37 stated:

The second component of the relevant market, the product market, includes reasonably interchangeable services or products, that is, products or services which may be substitutes for the identical products or services in question, but only if such substitutes are actually competitive with the products or services in question. You are instructed that the relevant product market in this case is private health care financing, within the relevant geographic market as you define it according to the previous instruction.

Sherman Act, and the Clayton Act. It cannot be done.

The initial premise of defendant's argument is that the market for "health care financing" is a pure insurance market. But for purposes of the McCarran Act, the insurance "market" is narrowly defined as the "business of insurance", with the primary elements being the "spreading and underwriting of a policyholder's risk." *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979). Plaintiffs respond, and I agree, there are two immediate problems with defendant's attempt to equate the market for private health care financing to an insurance market *qua* the "business of insurance." This case proceeded under all parties' agreement "private health care financing" includes "self-insurance and self-insured administration" products. (Tran. 6, p. 1013; Tran. 10, pp. 1659–65; Tran. 28, p. 4565; Tran. 30, pp. 4842–43.) From the standpoint of BCBSK, "self-insurance" is not "insurance" at all because it involves no underwriting or spreading of risk by that company, and because this aspect of defendant's business [functioning as a third-party administrator (TPA) for self-insured plans] is "entirely unregulated" by the Commissioner of Insurance for the State of Kansas. (Memorandum in Support of Motion to Set Aside the Verdict and Dismiss, p. 16.) Defendant's TPA activities are not the "business of insurance" after *Royal Drug*,[10] and their inclusion in the market for private health care financing distinguishes that market from those to which the McCarran Act applies. Secondly, defendant's activities in private health care financing affect entities beyond the business of insurance because the formerly distinct boundaries among hospitals, physicians and insurers are "blurring" with the emergence of HMO, PPO and other new financing arrangements attempting to obtain health services for less than full retail price, adopting benefit options restricting consumer choice to a select provider panel, and implementing management systems designed to insure cost effective utilization of health services. *See Reazin I*, 635 F.Supp. at 1298–99. The market for private health care financing embraces defendant's activities with and through its subsidiary, HMO Kansas. Defendant's activities beyond traditional indemnity coverage merit careful consideration of the following observations:

> Prepaid health care provider plans are difficult to analyze because they go beyond the normal insurance function of insuring against specific casualty losses, and may also provide routine health care services. Courts should be careful not to allow insurance companies to broaden the antitrust exemption [of the McCarran Ferguson Act] by simply diversifying into areas not traditionally considered to be the business of insurance.

*Hahn v. Oregon Physicians Service*, 689 F.2d at 843 n. 2. The market for private health care financing, embracing defendant's HMO, PPO and TPA activities, is not an "insurance" market within the exemption from federal antitrust laws for the business of insurance.

This holding negates any need for analysis of defendant's remaining arguments concerning jurisdiction. Nevertheless, to show the McCarran-Ferguson Act does not in any way apply to defendant's conduct, let us assume *arguendo* private health care financing might fall within § 2(b), and discuss whether BCBSK's illegal activities are exempt from antitrust scrutiny under the Sherman and Clayton Acts.

The second premise of BCBSK's argument is that, so long as there exists state regulation, the McCarran Act was designed to insulate an insurance company's activities even to the extent of attempts to privately regulate competition in

---

**10.** *See also SEC v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1969) (variable annuity contracts sold by life insurance companies are not "insurance" under the McCarran Act because the insurance companies do not underwrite risks); *U.S. v. Title Insurance Rating Bureau of Arizona*, 700 F.2d 1247 (9th Cir.1983), *cert. denied* 467 U.S. 1240, 104 S.Ct. 3509, 82 L.Ed.2d 819 (1984) (escrow services by insurers not the "business of insurance").

the insurance market. Of course, the presence of the "boycott, coercion or intimidation" exception in § 3(b) of the McCarran Act is clear evidence Congress never intended the exemption to cripple application of the Sherman Act to activities restraining trade in an insurance market. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 548–49, 98 S.Ct. 2923, 2933, 57 L.Ed.2d 932 (1978). But even confining the analysis to § 2(b) itself, it is highly doubtful whether plenary state regulation extends so far as defendant intimates, that is, to preclude Sherman Act scrutiny of an unsupervised agreement between an insurance company with others outside that industry. Section 2(b) was designed both by representatives of the insurance industry and Congress to exempt from the antitrust laws cooperative efforts for statistical and ratemaking purposes. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. at 221–22, 99 S.Ct. at 1078; *see also Union Labor Life Ins. Co. v. Pireno*, 458 U.S. at 133. Congress did not intend, through § 2(b), to foreclose all federal antitrust scrutiny of private conspiracies of insurers simply because a state has enacted generally comprehensive regulation. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. at 551, n. 24, 98 S.Ct. at 2935, n. 24.

> Given [the legislative history, the McCarran Act does] not purport to make the States supreme in regulating all the activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply.

*SEC v. National Securities, Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) (emphasis original). The McCarran Act does not recreate a broad field for state regulation of the insurance industry free from federal intervention. *Women in City Government United v. City of New York*, 515 F.Supp. 295, 304 (S.D.N.Y.1981) (citing *Hamilton Life Ins. Co. v. Republic National Life Ins. Co.*, 408 F.2d 606, 611 (2d Cir.1969)). Thus,

> [t]he fact that Sherman Act violations are committed by insurance companies does not render those violations exempt from federal regulation. Rather, the anti-competitive acts must be within "the business of insurance" as that phrase is used in § 1012(b). The Supreme Court made [this] point very clearly in *SEC v. National Securities, Inc.*, ...

*Ray v. United Family Life Ins. Co.*, 430 F.Supp. 1353, 1357 (W.D.N.C.1977) (holding insurance company's refusal to deal with its agent is not the "business of insurance" under § 2(b), and denying defendant summary judgment on plaintiff agent's federal antitrust claims alleging, *inter alia*, defendant's restraint of trade in the burial insurance market).[11]

In *American Family Life Assur. Co. v. Planned Marketing Associates, Inc.*, 389 F.Supp. 1141, 1146 (E.D.Va.1974), the court stated:

> It is true that the Court in *National Securities* noted that Congress had in mind anti-trust laws at the time it enacted the McCarran-Ferguson Act. But the Court did not conclude that Congress was concerned with the anti-trust laws per se, but instead the Court observed that "Congress was mainly concerned with the relationship between insurance ratemaking and the antitrust laws...." This observation by the Court coupled with its clear holding that the focus of the term "business of insurance" as used in the McCarran-Ferguson Act "was on the relationship between the insurance company and the policy holder," compels this Court to conclude that a complaint based upon the Sherman Act and the Clayton Act involving interactions between two insurance companies, as dis-

---

11. The *Ray* court went on to note defendant insurance company's threat to terminate plaintiff's agency constituted "coercion" under § 3(b). 430 F.Supp. at 1358. This was simply an additional observation by the court, unnecessary to its actual holding in light of defendant's failure to prove the conduct at issue was the "business of insurance" under § 2(b).

tinguished from transactions between an insurance company and its policy holders, is not barred from federal jurisdiction by the McCarran-Ferguson Act.

The only market restraint at issue was in the "insurance market", yet the court declined to forego a fact-based "business of insurance" analysis to determine application of the § 2(b) exemption. That requirement was not met. Thus, noting the complaint alleged activities on the part of defendant insurance company, and its officers and agents, proscribed by the Sherman Act, the court held § 2(b) did not bar federal jurisdiction regardless of the fact Virginia had state legislation similar to the Sherman and Clayton Acts. *American Family Life Assur. Co.,* 389 F.Supp. at 1146.

■ BCBSK's argument suggests § 2(b) shields all activities of an insurance company privately regulating competition in an insurance market, so long as (a) there is existing state regulation, and (b) no act or agreement of boycott, coercion or intimidation under § 3(b). The principles previously set forth, however, negate this argument. Section 2(b) was enacted principally to preserve state regulatory and taxation efforts, and only secondarily to afford insurance companies *limited* relief from federal antitrust laws. Even absent § 3(b) considerations, neither an insurance company's activities regarding one of its agents (*Ray v. United Family Life Ins. Co., supra*), nor an insurance company's conduct regarding a competitor (*American Family Life Assur. Co., supra*) are shielded from federal antitrust scrutiny simply because the restraints allegedly occur in an insurance market. In both cases the courts held defendants' conduct must comply with the business of insurance requirement of § 2(b) before the McCarran-Ferguson exemption would attach; in both cases that requirement was not satisfied. Defendant BCBSK's presumption all activities of an insurance company are protected by § 2(b), especially when they are alleged to restrain trade within an insurance market, is simply false. The McCarran Act itself, and voluminous case law construing and applying the statutory language, make clear the facts of each case must be evaluated to determine whether the conduct in question is the "business of insurance", *thereby* invoking the shield of § 2(b).

This leads me to defendant's third and final premise: a "market impact" analysis can be readily substituted for the "business of insurance" analysis under § 2(b) in light of the congressional purposes underlying the McCarran Act. The cases already noted, principally *SEC v. National Securities, Inc., supra,* dispel the notion Congress intended to protect all activities of insurance companies affecting insurance markets. To come within the McCarran exemption, the activities must constitute "the business of insurance" as that term is used in § 2(b). The Supreme Court has carefully defined "the business of insurance", and consistently distinguished it from the "business of insurance companies". The focus of the statutory term is on the relationship between the insurance company and the policyholder; the core of "the business of insurance" is the relationship between insurer and insured, the type of policy which can be issued, its reliability, interpretation and enforcement. *National Securities,* 393 U.S. at 460, 89 S.Ct. at 568.

■ There is no question that a health insurer's provider agreements, entered into to secure health care services and products for the insurer's policyholders, are not "the business of insurance" under § 2(b). *Royal Drug,* 440 U.S. at 205, 99 S.Ct. at 1070.

The Pharmacy [provider] Agreements [entered into by Blue Shield] ... do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with the pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost-savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the "business of insurance."

*Royal Drug,* 440 U.S. at 214, 99 S.Ct. at 1075. BCBSK's present contention, the "business of insurance" is implicated because the restraint occurred in the market for insurance, is reminiscent of Blue Shield's argument in *Royal Drug* the "business of insurance" was implicated because the cost savings resulting from provider agreements might be reflected in lower premiums to subscribers. The Court flatly rejected any such attempt to derivatively invoke the "business of insurance", and thereby, antitrust immunity:

> [I]n that sense, every business decision made by an insurance company has some impact on its reliability, its ratemaking, and its status as a reliable insurer. The manager of an insurance company is no different from the manager of any enterprise with the responsibility to minimize costs and maximize profits. If terms such as "reliability" and "status as a reliable insurer" were to be interpreted in the broad sense urged by the petitioners, almost every business decision of an insurance company could be included in the "business of insurance." Such a result would be plainly contrary to the statutory language, which exempts the "business of insurance" and not the "business of insurance companies."

*Id.* at 216–17, 99 S.Ct. at 1076. Given that the derivative, *positive* "market impact" of provider agreements on health insurance consumers is insufficient to bring those agreements within the "business of insurance" exemption, it is inconceivable that the *negative* "market impact" of manipulated provider agreements, *adversely* affecting health insurance consumers by restraining competition within that market, is somehow different and analytically sufficient to invoke the McCarran-Ferguson exemption.

Focusing on the congressional purposes underlying the McCarran Act, the Court in *Royal Drug* next noted Congress had rejected proposed legislation which would have totally exempted the insurance industry from federal antitrust laws. Congress' principal concern was to ensure the states' continued ability to tax and regulate the business of insurance; the secondary concern was the degree to which antitrust laws apply to the insurance industry.

There is no question that the *primary* purpose of the McCarran-Ferguson Act was to preserve state regulation of the activities of insurance companies, ... The power of the States to regulate and tax insurance companies was threatened after [*United States v. Southeastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)] because of its holding that insurance companies are in interstate commerce. The McCarran-Ferguson Act operates to assure that the States are free to regulate insurance companies without fear of Commerce Clause attack. *The question in the present case, however, is one under the quite different secondary purpose of the McCarran-Ferguson Act—to give insurance companies only a limited exemption from the antitrust laws.*

The repeated insistence in the dissenting opinion that the McCarran-Ferguson Act should be read as protecting the right of the States to regulate what they traditionally regulated is thus entirely correct—and entirely irrelevant to the issue now before the Court. For *the question here is not whether the McCarran-Ferguson Act made state regulation of these Pharmacy Agreements exempt from attack under the Commerce Clause. It is the quite different question whether the Pharmacy Agreements are exempt from the antitrust laws.*

In short, the McCarran-Ferguson Act freed the States to continue to regulate and tax the business of insurance companies, in spite of the Commerce Clause. *It did not, however, exempt the business of insurance companies from the antitrust laws. It exempted only "the business of insurance."*

*Royal Drug,* 440 U.S. at 218, n. 18, 99 S.Ct. 1077, n. 18 (citations omitted; emphasis added). The Court's analysis adhered to the principle that merely because a state regulates a particular practice, or labels an activity "insurance", does not mean the challenged practice or activity thereby acquires the McCarran exemption. Noting it

"is next to impossible" to assure Congress could have thought provider agreements constitute the "business of insurance", the Court then stated:

> Many aspects of insurance companies are regulated by state law, but are not the "business of insurance." Similarly, the enabling statutes in existence at the time the Act was enacted typically regulated such diverse aspects of the plans as the composition of their boards of directors, when their books and records could be inspected, how they could invest their funds, when they could liquidate or merge, as well as how they could purchase goods and services by entering into provider agreements.

> Provider agreements are no more the "business of insurance" because they were regulated by state law at the time of the McCarran-Ferguson Act than are these other facets of the plans which were similarly regulated. If Congress had exempted the "business of insurance companies," then these aspects of the plans which are not themselves insurance as that term is commonly understood would nevertheless be arguably exempt. But since Congress explicitly rejected this approach, they are not within the exemption even though they are the subject of state regulation.

> This Court has implicitly recognized that state regulation of a practice of an insurance company does not mean that the practice is the "business of insurance" within the meaning of the McCarran-Ferguson Act. In both cases, SEC v. Variable Annuity Life Ins. Co., 359 US 65, 3 L Ed 2d 640, 79 S Ct 618, and SEC v. National Securities, Inc. 393 US 453, 21 L Ed 2d 668, 89 S Ct 654, the challenged conduct was regulated by the State Insurance Commissioner, but this Court held that the practices were not the "business of insurance."

Id. at 230 n. 38, 99 S.Ct. at 1082–83 n. 38 (emphasis added). If the "business of insurance" requirement is not displaced or satisfied by the mere fact a state regulates a particular insurance practice, neither can that requirement be displaced or satisfied by the fact a state regulates the insurance market as a whole.

The Supreme Court has most recently applied the "business of insurance" requirement of § 2(b) to hold an insurance company's use of a professional peer review committee, to determine usual, customary and reasonable fees and evaluate claims for health care treatments, does not qualify for the McCarran Act exemption from scrutiny under federal antitrust laws. Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647. Recognizing that much more is involved in these questions than simply the interests of an insurance company, the Court acknowledged the Sherman Act expresses "a 'longstanding congressional commitment to the policy of free markets and open competition,'" and thus every exemption from the antitrust laws must be construed narrowly. Pireno, 455 U.S. at 126, 102 S.Ct. at 3007 (quoting Community Communications Co. v. Boulder, 455 U.S. 40, 56, 102 S.Ct. 835, 843, 70 L.Ed.2d 810 (1982)). Three criteria are relevant in determining whether a particular practice is part of the "business of insurance" exempted from the antitrust laws by § 2(b) of the McCarran Act: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Id. at 129, 102 S.Ct. at 3008 (emphasis original). Regarding the third criterion, the Court stated:

> We may assume that the challenged peer review practices need not be denied the § 2(b) exemption solely because they involve parties outside the insurance industry. But the involvement of such parties, even if not dispositive, constitutes part of the inquiry mandated by the Royal Drug analysis. As the Court noted there, § 2(b) was intended primarily to protect "intra-industry cooperation" in the underwriting of risks. 440 US [205], at 221, 59 L Ed 2d 261, 99 S Ct 1067 [at 1078] (emphasis added). Arrangements between insurance compa-

nies and parties outside the insurance industry can hardly be said to lie at the center of that legislative concern. More importantly, such arrangements may prove contrary to the spirit as well as the letter of § 2(b), because they have the potential to restrain competition in noninsurance markets. Indeed, the peer review practices challenged in the present cases assertedly realize precisely this potential: Respondent's claim is that the practices restrain competition in a provider market—the market for chiropractic services—rather than in an insurance market. Thus we cannot join petitioners in depreciating the fact that parties outside the insurance industry are intimately involved in the peer review practices at issue in these cases.

*Id.* at 133–34, 102 S.Ct. at 3011 (emphasis original).

I do not agree with BCBSK's argument these observations mean an insurance company's practices involving third parties acquire the McCarran exemption when those practices restrain trade in the insurance market alone. The three criteria for determining whether the "business of insurance" requirement is met are stated by the Court in the conjunctive ("and"), not the disjunctive. All three must be satisfied to bring a particular practice or activity within the § 2(b) exemption. The Court's statements regarding the third criterion in isolation cannot be interpreted as defendant now suggests. Had the Court intended its observations on market impact to be dispositive that thesis would have been stated, negating any need for analysis of the other criteria, and *Pireno* would have been decided solely on the grounds the McCarran exemption was lost because the market restrained did not involve insurance. Defendant's attempt to elevate the Court's market impact observations to the status of a dispositive factor must be rejected in light of the Court's adherence to a detailed "business of insurance" analysis, giving equal consideration to all three criteria, in *Pireno* (and in *Royal Drug,* and in *National Securities,* etc.). Thus, the above-quoted language cannot be isolated and extrapolated to support defendant's . current proposition, that activities of an insurance company with third parties are exempt under the McCarran Act, even though the activities are not the "business of insurance" under § 2(b), simply because the consequent restraint is inflicted on the insurance market.

The principal error in defendant's argument is the implicit notion that absent a "boycott, coercion or intimidation" under § 3(b), all activities of an insurance company are embraced by the § 2(b) exemption. That simply is not so. The statutory analysis is whether the challenged practice satisfies the "business of insurance" requirement of § 2(b). If it does not, there is no exemption from scrutiny of the practice under the federal antitrust laws. The § 2(b) exemption arises only where the "business of insurance" and state regulation requirements are met. Even if those requirements are met, the exemption is nevertheless lost where plaintiff proves a "boycott, coercion or intimidation" under § 3(b). In *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), the conduct of the defendant insurance companies fell within the § 3(b) exception, and plaintiffs were permitted to pursue their Sherman Act challenges *to defendants' restraint of trade in the market of medical malpractice insurance.*[12] If restraints in an insur-

---

**12.** *See also Malley-Duff & Associates v. Crown Life Ins. Co.,* 734 F.2d 133, 144 (3d Cir.), *cert. denied* 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.,* 64 F.R.D. 35 (S.D.N.Y.1974); *Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co.,* 326 F.2d 841 (2d Cir.1963), *cert. denied* 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); *California League of Independent Ins. Producers v. Aetna Cas. & Sur. Co.,* 179 F.Supp. 65 (N.D.Cal.1959);

and *Professional & Business Men's Life Ins. Co. v. Bankers Life Co.,* 163 F.Supp. 274 (D.Mont. 1958).

Even before the Supreme Court's decision in *Barry,* those courts which narrowly construed the § 3(b) exception recognized restraints of trade in an insurance market were actionable under federal antitrust laws by injured competitors in that market. *See Addrisi v. Equitable Life Assur. Society of U.S.,* 503 F.2d 725 (9th Cir.1974), *cert. denied* 420 U.S. 929, 95 S.Ct.

ance market are actionable where an insurance company *loses* its § 2(b) exemption because of acts of boycott, intimidation or coercion, ineluctably, such restraints are actionable where the insurance company fails to even initially acquire the § 2(b) exemption because its conduct is not the "business of insurance."

■ BCBSK concedes the activities challenged here, its provider agreements with the Wichita hospitals, are not the "business of insurance" under § 2(b) following *Royal Drug* and *Pireno.* It asks, "so what?", in light of the fact the market allegedly restrained is that of "state regulated insurance." The answer is that § 2(b) provides an exemption *only* for state regulated "business of insurance," not the "business of insurance companies" in a regulated insurance market. Defendant's approach ignores the primary legislative purpose underlying the McCarran Act, preserving state regulation and taxation, and the secondary purpose of providing a *limited* antitrust exemption to insurance companies, to foster and promote intra-industry *cooperative ratemaking and statistical efforts.* Those goals are hardly imperiled by subjecting to federal antitrust scrutiny defendant's conduct alleged (and *found*) to have restrained trade and foreclosed competition in the market for private health care financing, even assuming that market can somehow be brought within the ambit of § 2(b). In the face of the Supreme Court's consistent determinations the "business of insurance" has a critical, limited and well-defined meaning giving full effect to Congress' purposes, acquiescing in defendant's proposed competitive impact or market analysis would implicitly repeal the "business of insurance" requirement of § 2(b). That is intolerable; this requirement defines the line between protected and unprotected activities of an insurance company.

To hold that regardless of the "business of insurance" requirement the McCarran Act exempts all activities of an insurance company restraining trade and competition in an insurance market, would both immunize practices presently subject to federal antitrust scrutiny, and impute a congressional indulgence of insurance companies far beyond anything evident in the legislative history of the act.

Even in cases where § 2(b) cloaks an insurance company's activities, a company will be accountable for restraints of trade in an insurance market if it rends that protective cloak by acts or agreements of boycott, coercion or intimidation under § 3(b). Failing to weave its challenged activities into the § 2(b) "business of insurance" exemption in this case, BCBSK cannot be any less accountable than would be true if it otherwise *lost* this immunity by virtue of § 3(b). This holding obviates any need for inquiry into the adequacy of regulation by the State of Kansas, or the presence of "boycott, intimidation or coercion" under § 3(b) of the McCarran-Ferguson Act.

Defendant BCBSK's motion to set aside the verdict and dismiss this case for lack of jurisdiction is overruled.

## JNOV/NEW TRIAL

BCBSK next moves for judgment notwithstanding the verdict pursuant to Fed. R.Civ.P. 50(b), or alternatively, for a new trial pursuant to Rule 59. (Dkt. 246, 248.) In support of its motion, defendant presents 16 contentions of alleged error. The court has reviewed the parties' memoranda, the oral arguments entertained on January 16, 1987, and subsequent communications from counsel regarding these is-

1129, 43 L.Ed.2d 400 (1975); *McIlhenny v. American Title Ins. Co.,* 418 F.Supp. 364 (E.D.Pa. 1976); *Meicler v. Aetna Cas. & Sur. Co.,* 372 F.Supp. 509 (S.D.Tex.1974), *aff'd* 506 F.2d 732 (5th Cir.1975); and *Transnational Ins. Co. v. Rosenlund,* 261 F.Supp. 12 (D.Ore.1966). *Barry* rejected this narrow "blacklisting" interpretation of § 3(b), holding the protections afforded by that exception are not limited solely to com-

panies or persons engaged in insurance. 438 U.S. at 550–52. The Court thus *expanded* the class of potential plaintiffs entitled to recover for anticompetitive activities affecting an insurance market; nowhere has the Court ever intimated that federal preservation of competition in an insurance market is foreclosed by the McCarran-Ferguson Act.

sues.[13] Defendant's approach is a wholesale attack on virtually everything which has occurred in this case from the moment it was filed. Consequently, my present efforts have necessitated a complete study of the same, not the least of which is the approximate 5,000 page transcript of the jury trial, without which any review of this case is incomplete, and which accounts for the delay and breadth of this opinion.

In considering a motion for judgment notwithstanding the verdict, the court must review the evidence in the light most favorable to plaintiffs and may not weigh the evidence presented, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. *Miller v. City of Mission, Kansas*, 516 F.Supp. 1333, 1337 (D.Kan.1981). Judgment nov is appropriate only when the evidence "points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made." *E.E.O.C. v. Univ. of Oklahoma*, 774 F.2d 999, 1001 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986). The court cannot deprive plaintiffs of a jury verdict in their favor unless "it is certain that the evidence conclusively favors one party such that reasonable men could not arrive at a contrary result." *E.E.O.C. v. Univ. of Oklahoma*, 774 F.2d at 1001. The standard for determining whether to grant JNOV, as for a directed verdict, is *not* whether there is literally no evidence to support the party opposing the motion, but rather, whether there is evidence upon which a jury could properly find a verdict for that party. *Brown v. McGraw-Edison Co.*, 736 F.2d 609, 613 (10th Cir.1984).

A motion for new trial, made on the ground the jury verdict is against the weight of the evidence, normally presents questions of fact, not of law, and is addressed to the discretion of the trial court. *Brown v. McGraw-Edison Co.*, 736 F.2d at

616. A party seeking reversal of a judgment entered on a verdict must establish the alleged trial court errors were prejudicial and clearly erroneous. *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1148 (10th Cir.1978). Reversal of a judgment entered on a jury verdict following trial in a diversity-based civil case is not warranted on clearly erroneous grounds where the choice is between two permissible views of the evidence. *Rasmussen Drilling*, 571 F.2d at 1148. Jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given testimony, taking into consideration the appearance and general demeanor of each and every witness. *Id.* at 1149. The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact. No error in either the admission or exclusion of evidence, and no error in any ruling or order or in anything done or omitted by the trial court or by the parties, is ground for granting a new trial or for setting aside a verdict unless the error or defect affects the substantial rights of the parties. *Id.* at 1149. A new trial is not warranted unless the court finds prejudicial error has entered the record and substantial justice has not been done. *Foster v. American Bankers Ins. Co.*, No. 77–4141, slip op. (D.Kan. Oct. 3, 1980).

*Is the Finding of Unreasonable Restraint of Trade Under § 1 Contrary to Law?*

Defendant advances three arguments in support of its claim that, as a matter of law, it did not unreasonably restrain trade in the market for private health care financing: first, § 1 does not proscribe concerted activity giving rise to a buyer's termination of a seller, as in this case; second,

---

**13.** One of these communications from defense counsel submits, for my consideration, a self-serving denigration of *Reazin I* by a lawyer representing another Blue Cross and Blue Shield plan not involved in this case. This person concludes his "analysis" by suggesting (or hoping) "it is doubtful that many courts will cite *Reazin* [I] for its legal analysis...." Of course, how my opinions applying the law to the facts of this case are treated by courts addressing different facts in other cases is not my immediate concern.

defendant's conspiratorial conduct did not result in a past or present restraint of trade in the relevant market; and third, § 1 does not reach conduct that may in the future create a restraint of trade.

The first contention, that § 1 does not proscribe the concerted activities in this case, is simply wrong. Defendant argues that "supplier or customer terminations, even when they occur out of a 'conspiracy' or other agreement, no matter how labeled, between a buyer and seller, are not justiciable under Section 1" of the Sherman Act. BCBSK contends that the Tenth Circuit's opinion in *Westman Com'n Co. v. Hobart Intern., Inc., supra,* is simply a more eloquent statement of what has always been the law, that a manufacturer's termination of one of its distributors, pursuant to a vertical agreement with remaining distributors, is no violation of § 1. The facts of the present case, however, point to a different result. Within the context of manufacturer termination cases, the Tenth Circuit has not stated or held that a termination of a distributor, pursuant to a vertical agreement with the distributor's competitors, can *never* be a violation of § 1. In *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432 (10th Cir.), *cert. denied* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983), such a termination was held not only a violation of § 1, but was subject to a per se analysis because of the price fixing and price maintenance aspects of that vertical agreement. In *Hobart,* the court reached its conclusion there was no violation of § 1, not because "supplier or customer terminations are not justiciable under § 1," but on the facts of that case under which: (1) there was no showing of market power on the part of defendant Hobart; (2) there was no evidence of a reduction of interbrand competition in the relevant market; and (3) there was no showing of any anticompetitive effects from the reduction of intrabrand competition resulting from the distributor termination. By direct contrast, in the present case plaintiffs alleged, and the jury was instructed on and found, all three of these elements: market power on the part of BCBSK; a reduction of interbrand competition in private health care financing; and an anticompetitive restraint of trade in that market.

Plaintiffs correctly contend the conspiratorial conduct in this case, between BCBSK and St. Francis and St. Joseph Hospitals, contains elements of both vertical and horizontal impacts because the Saints are direct competitors of Wesley Medical Center. Secondly, the purpose of this agreement was not to design and implement an efficient distribution system for BCBSK's own insurance products, but to sanction a perceived competitor and deter competition in the health care financing market. Third and finally, refusals to deal by other Blue Cross and Blue Shield systems across the company have not only been held a violation of § 1, but under certain circumstances have been held per se violations, as discussed in *Reazin I,* 635 F.Supp. at 1322–27 (citing *Glen Eden Hospital v. Blue Cross & Blue Shield of Michigan,* 740 F.2d 423 (6th Cir.1984), and *St. Bernard Gen. Hospital v. Hospital Service Assn.,* 712 F.2d 978 (5th Cir.1983), *cert. denied* 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984)).

*Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir.1986), does not change the result in this case. In *Barry,* two physicians sued Blue Cross alleging defendant participated in price fixing and a group boycott in violation of federal antitrust law. Pursuant to enabling legislation, Blue Cross implemented a "Prudent Buyer Plan" under which it contracted with physicians and hospitals to provide services at a fixed rate to those subscribing to that plan. Blue Cross paid 90% of the cost of services obtained by subscribers from participating physicians, but paid only 60–70% of services obtained from non-participating physicians. Subscribers and participating physicians were free to deal with any other patient, physician, or insurance company, but a participating physician could not refer a patient insured under the plan to a nonparticipating physician without the patient's consent. Plaintiff doctors, one of which contracted under the plan, and one of which declined to do so, sought recovery under § 1 of the Sherman Act. Plaintiffs

raised three principal claims: horizontal price fixing; unlawful vertical restraint of trade; and monopolization under § 2. The Ninth Circuit rejected the allegation of horizontal agreement among competing physicians, finding the evidence clear that all decisions regarding the plan's terms and structure were made by the Blue Cross staff, not by physicians. *Barry,* 805 F.2d at 868–70. The court rejected application of per se standards to the vertical restraint allegation, focusing instead on the rule of reason. The fact Blue Cross' plan affected nonparticipating physicians by interfering with their access to insured patients was determined to be permissible as the logical result of every contract between a buyer and seller. *Barry,* 805 F.2d at 871. The court stated:

> For a contract to have an impermissible anticompetitive effect, it must contain a provision that distorts transactions in another market. For example, we condemn tying arrangements where a seller offers a product only on condition that a buyer purchase a second product as well, because the contract distorts the market for the second product. Similarly, we may condemn distributional restraints that affect a buyer's freedom to sell a product to a third party, or boycott agreements that affect a party's freedom to deal with a third party.

*Barry,* 805 F.2d at 871–72. The court rejected plaintiffs' allegations the referral clause of the plan constituted a refusal to deal. Insured subscribers were free to seek treatment from a nonparticipating physician, and plan physicians could refer any or all patients to a nonparticipating physician. The court reasoned that it was not the operation of defendant's plan, but ordinary competitive market forces, i.e., lower prices, which reduced the demand for the nonparticipating physician's services.

> Therefore, although the vertical agreements in this case tend to foreclose nonparticipating physicians from doing business with the patients insured under the plan, the agreements do not cause impermissible market distortions. They do not prevent patients from seeing nonparticipating physicians, nor physicians from seeing nonsubscribing patients. Neither do they prevent participating physicians from referring patients to nonparticipating physicians, *nor from contracting with other insurance companies. Therefore the agreements do not have any prohibited anticompetitive effects.*

*Barry,* 805 F.2d at 872. The Ninth Circuit then noted the following procompetitive consequences flowing from the plan. By demanding lower prices from participating physicians, Blue Cross injected an element of competition into the market for physician services that might not otherwise be present. The plan also incorporated utilization review by Blue Cross, giving rise to quality control in the health care services market. The court found support for its holding under § 1 in *Klamath-Lake Pharmaceutical Assn. v. Klamath Medical Service Bureau,* 701 F.2d 1276 (9th Cir.1983) (an insurer's prescription drug benefit plan available only through a single participating pharmacy did not constitute a boycott of other pharmacies because insureds remained free to purchase drugs from other pharmacies albeit at higher prices); *Brillhart v. Mutual Medical Insurance, Inc.,* 768 F.2d 196 (7th Cir.1985) (insurer's agreement with physicians to provide services at predetermined prices does not violate antitrust laws); *Kartell v. Blue Shield of Massachusetts,* 749 F.2d 922 (1st Cir.1984) (same); and *Royal Drug Co. v. Group Life & Health Ins. Co.,* 737 F.2d 1433 (5th Cir. 1984) (insurer who pays reduced benefits for drugs purchased at nonparticipating pharmacies does not engage in a boycott or unlawful vertical price fixing under § 1).

The *Barry* decision is limited in its application to the present case. First, the market allegedly restrained in *Barry* was that of physician services, not private health care financing as in the present case. There is no statement in the Ninth Circuit's opinion that Blue Cross of California abandoned its traditional indemnity insurance plan when it introduced the Prudent Buyer Plan, a form of preferred provider organization. By contrast, the market restraint alleged in this case is within private health care financing. BCBSK's abandonment of

its indemnity insurance in favor of a "new PPO", under which it will contract only with providers not aligned with competing insurance companies, injects a market distortion here which was absent in *Barry*. Blue Cross of California did "not discriminate against a particular class of medical provider, but instead [was] willing to purchase services from all [providers] on equal terms," and BCC's Prudent Buyer Plan did not "prevent [providers] ... from contracting with other insurance companies. *Barry*, 805 F.2d at 872–73. In the present case, by contrast, BCBSK discriminated against a particular class of medical provider, and there was abundant evidence from which the jury could have found defendant's conduct was undertaken with the intent and effect of preventing providers from contracting with other insurance companies. At issue in this case is not a pristine "agreement to purchase services from certain sellers, and not from another." Rather, substantial evidence demonstrated, and the jury apparently found, BCBSK's conduct restricted the ability of other buyers (competing health care financing organizations) to purchase hospital services on a competitive basis through alternative delivery systems, thereby restraining competition in the health care financing market— precisely the type of conduct that the *Barry* court observed would have impermissible anticompetitive effects because they distort transactions in another market. 805 F.2d at 871–72. Moreover, unlike the situation in *Barry*, less restrictive alternatives were available to BCBSK if it truly desired a selective contracting plan for making its product more competitive, *e.g.*, the Choice Care program, which was also abandoned in favor of its "new PPO" with the Saints.

Second, the Ninth Circuit expressly found that all decisions regarding the Prudent Buyer Plan were made by the staff of Blue Cross of California, not by physician providers, a finding which limits the court's analysis of *both* hospital and vertical conspiracy to that factual situation. Indeed, the court implicitly recognized its conclusion might be very different if it were faced with meritorious allegations, and substantial proof, of independent conspiratorial conduct. One of the cases cited in support of its decision is *Proctor v. State Farm Mut. Auto Ins. Co.*, 675 F.2d 308 (D.C.Cir.1982), holding that agreements between an insurer and repair shops to provide services to insureds at reduced rates do not violate antitrust laws *in the absence of unlawful horizontal agreement or conspiracy in restraint of trade.* The court in *Barry* went on to distinguish cases involving either conspiratorial conduct or a refusal to deal with all willing health care providers:

> The agreement that the Fourth Circuit found unlawful in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980), cert. denied 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), is distinguishable. In that case, Blue Shield reimbursed for psychologists' services only when billed through a member physician. Psychiatrists, who compete with psychologists, did not face this obstacle because, as medical doctors, they could simply become members of Blue Shield. *By contrast, in the present case, Blue Cross does not discriminate against a particular class of medical provider, but instead is willing to purchase services from all physicians on equal terms.* Furthermore, the defendant insurer in *Virginia Academy* was found to be controlled by physicians and thus a horizontal conspiracy existed. *Id.* at 480–81. Similarly, the other two cases that the doctors cite as analogous to the present facts involved, at least in part, horizontal conspiracies between competitors. *See United States v. General Motors Corp.*, 384 U.S. 127 [86 S.Ct. 1321, 16 L.Ed.2d 415] ... (1966); *St. Bernard General Hospital, Inc. v. Hospital Service Assn.*, 712 F.2d 978, 987 (5th Cir.1983).

805 F.2d at 873 (emphasis added). BCBSK's "new PPO", unlike the Prudent Buyer Plan, involved interaction with the Saints on issues of price and patient load, participation in the terms and structure of the "new PPO" by Wesley's horizontal competitors in a degree wholly absent from

the situation in *Barry*. The differences in this case cannot be overemphasized: conduct involving at least in part a horizontal conspiracy between competing providers; discrimination by BCBSK against a particular class of medical provider (those aligned with competing health care financing mechanisms); a restraint on the ability of other buyers (competing health care financing organizations) to purchase hospital services on a competitive basis through alternative delivery systems; and an impermissible anticompetitive effect because of the significant market distortion in private health care financing.

None of the distributor termination cases from the Tenth Circuit or other jurisdictions, nor *Barry*, support defendant's bald allegation that supplier or customer terminations are not justiciable under § 1. These cases do provide guidance on the elements a plaintiff must prove in order to recover under § 1. These elements, market power by BCBSK, conspiratorial conduct involving at least in part horizontal competitors, and an anticompetitive reduction of interbrand competition in the relevant market, were addressed and presented to the jury in my instructions. The jury found for plaintiff Wesley and against BCBSK on each of these elements, as well as the other elements comprising plaintiff's § 1 claim. No authority is provided to support defendant's allegation that plaintiff may not recover when these elements are established. The sufficiency of the evidence to support these elements is addressed in subsequent issues.

■ Defendant next contends no past or present foreclosure has occurred in the market for health care financing. BCBSK points out the jury found no injury to Health Care Plus, the "only non-Blue Cross HMO doing business in Kansas." But the jury did find an unreasonable restraint of trade in the health care financing market. The finding that HCP itself was not injured by defendant's activities can be understood as consistent with that finding for at least two reasons. First, HCP made no attempt to quantify its damages in monetary terms for the benefit of the jury; second, the fact

HCP continues to do business not only with Wesley, but as well with at least one of the Saints, may be the result of the parties' voluntary agreement to delay termination of Wesley's contracting provider agreement pending the outcome of this suit. In this light, Wesley's damages were liquidated because of the expense incurred as a result of the announced termination by BCBSK, while HCP may never have been affected in its business or property because the termination was not carried out.

In any event, injury to HCP is not the *sine qua non* of restraint of trade in the relevant market. The fact the jury found HCP was not injured does not mean it was unable to find, at the same time, that defendant undertook its activities with both the intent and actual effect of foreclosing competition in the Kansas health care financing market. Plaintiffs correctly point out that a number of hospital administrators from across this state testified that BCBSK's conduct impacted their own institutions' involvement in the private health care financing market. [See Tran. 5, pp. 857–61 (Donald Wilson, Kansas Hospital Assn.); Tran. 7, pp. 1256–64 (Ingo Angermeier, Asbury Hospital, Salina, Kan.); Tran. 15, pp. 2547–50 (Lynne Jeane, Humana Hospital, Dodge City, Kan.); and Tran. 15, p. 2645 (Dale Martin, Grant County Hospital).]

■ This leads to defendant's third contention, that § 1 does not reach conduct which may "in the future create a restraint." Defendant argues:

> This Court has repeatedly stated, and so instructed the jury, that the jury was to treat this action as one for declaratory judgment, and look to the likely *future* effects of Blue Cross' conduct. (E.g., Instruction No. 18.) Such an approach, however, is flatly contrary to the terms of both Section 1 of the Sherman Act and Section 4 of the Clayton Act.

(Def's. Memorandum in Support of JNOV or New Trial, p. 11.) Let me remind defendant and its counsel of the status in which this case was presented to the court, and the degree to which the parties volun-

tarily tailored their conduct in anticipation of trial.

As previously indicated, at the very first status conference in this case on November 21, 1985, defendant, through its lawyers, voluntarily agreed to suspend the termination of Wesley's contracting provider agreement which would otherwise take place on December 31, 1985. Consequently, the court had no reason to rule on plaintiffs' motion for a preliminary injunction. Even at that date, I verified with counsel that the effect of defendant's acquiescence would create "more of a legal argument" as to where the parties stood.[14] The fact the parties' voluntary agreement to maintain the status quo would directly affect the way in which this case would be tried to, and decided by, the jury was explicitly acknowledged by defense counsel Shulman during oral argument on defendant's motion for summary judgment on May 9, 1986. On pages 8–9 of the transcript, the following exchange occurred:

THE COURT: Now, on filing of [plaintiffs' complaint] and of course the [defendant's counterclaim] that we'll address later, this matter came on here principally as it might regard taking up of injunctive relief. Somewhere in mid-December, I think, following conference with counsel as regards these procedures and having given assurances to the litigants that we would proceed as expeditiously as practicable, Blue Cross did elect to hold its present agreement in force, and, as I understand [it] remains in force today, is that correct?

MR. SHULMAN: Yes, Your Honor.

THE COURT: Now, the effect of this as we would contemplate hearing here or on trial in the issues, should it proceed, seems akin to a declaratory judgment, in effect, giving rise to factual findings of a jury. In other words, it would be put to the jury as if to say: You would assume this contract is cancelled and the effect is this. Do we understand that to be the case?

MR. SHULMAN: I'm not quite sure I understand what Your Honor is saying.

THE COURT: Ramifications of having kept the contract in effect, and I think I once said, well advised if the plaintiffs prevail as to damages that could follow, but testing the case to a jury as if to say that the contract was cancelled and is cancelled and its effect as of January, 1986. Is that what you understand it would be?

MR. SHULMAN: Well, Your Honor, hitting [me with this is] a little cold *but I think I would generally agree that the question for the jury is would the termination have violated the antitrust laws. I think that's right.*

Only after receiving this assurance from defendant did I state in *Reazin I* the case was "primarily a declaratory judgment action which will be tried to the jury to determine whether what is now the proposed termination of Wesley's contract, along with the formation and effect of the revised BCBSK contracting provider agreements with the remaining Wichita hospitals, would violate the antitrust laws if carried out." [15]

I have no more "forced" BCBSK to defend a declaratory judgment action than I "forced" BCBSK to suspend its termination of Wesley's contract. Defendant voluntarily agreed to maintain the status quo in order to avoid the preliminary injunction requested by plaintiffs. Defendant then agreed on the record that the consequence of its decision was to shape this case as a declaratory judgment action to be presented to the jury, under which the jury was required to evaluate the anticompetitive effects of defendant's conduct if the termination were to occur in the future. Defendant can hardly now be heard to insist it is entitled to a JNOV, or new trial, because § 1 does not reach conduct which "may in the future create a restraint in the relevant market."

*Is There Sufficient Evidence to Support the Finding of Market Power Under § 1?*

Following my summary judgment ruling in this case, but prior to trial, the Tenth

14. See n. 3, *supra.*

15. See n. 5, *supra.*

Circuit held that § 1 of the Sherman Act does not proscribe any refusal to deal absent a showing of monopoly or market power on the part of a manufacturer. *Westman Comm. Co. v. Hobart International, Inc.,* 796 F.2d 1216. The court defined market power as evidence of either power to control prices or the power to exclude competition. *Hobart,* 796 F.2d at 1225 n. 3. I instructed the jury that plaintiffs must prove, and it must find, as an element of the § 1 claims in this case, that BCBSK has market power in the relevant market. *See* Instruction Nos. 21, 34–35. The jury found BCBSK does possess market power in the relevant market. BCBSK now contends the evidentiary record in this case does not support that finding.

■ Initially, I agree with plaintiffs' suggestion the finding of market power may well be unnecessary given the jury's findings of actual anticompetitive restraint of trade. The Tenth Circuit handed down *Hobart* on June 25, 1986. The circuit did not address or reconcile its holding with the Supreme Court's earlier statements in *FTC v. Indiana Federation of Dentists,* 476 U.S. ——, at ——, 106 S.Ct. at 2109, 90 L.Ed.2d 445, at 457–58:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as a reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects." 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986). In this case, we conclude that the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.

*See also Assam Drug Co., Inc. v. Miller Brewing Co., Inc.,* 798 F.2d 311, 315–16 (8th Cir.1986). Nowhere in its argument does defendant address the effect of *Indiana Federation of Dentists* on *Hobart.* Plaintiffs conclude, and I concur, that "where, as here, full-blown rule of reason inquiry has caused the trier of fact to conclude that the defendant's conduct has resulted in an unreasonable restraint of trade, the 'threshold' inquiry into the defendant's market power serves no purpose: the anticompetitive potential to which that inquiry is directed has been established as fact." (Memorandum in Opposition to Defendant's Motion for JNOV or New Trial, p. 20 n. 11.) *Indiana Federation of Dentists* can mean nothing less.

■ Even assuming the jury's finding of market power by BCBSK must be justified in light of the jury's subsequent findings of actual anticompetitive effect, plaintiffs' evidence on this question was sufficient. The adequacy of this evidence will be addressed in my analysis of monopoly power, under which the jury found BCBSK has both power over price and power over competition.

*Is There Sufficient Evidence to Support the Finding of Monopoly Power Under § 2?*

BCBSK argues there is insufficient record evidence to support a finding of either power over competition or power over price, let alone the conjunction of both elements.

The record contains extensive evidence from which any jury could reasonably find BCBSK possesses power to exclude competition. Defendant's own in-house estimate of its market share is 60%. (Pltfs.' Ex. 41.) BCBSK is roughly 15 times larger than its next largest competitor in this market. (Tran. 9, p. 1481; Tran. 21, p. 3377.) Defendant possesses significant economic leverage over Kansas hospitals in its position as the largest nonfederal source of revenues to hospitals in its service area. [Tran. 11, p. 1864 (defendant accounts for 16% of St. Francis' revenues, while the next largest competitor accounts for less than 5%); Tran. 7, p. 1233 (19% of Asbury Hospital's revenues came from BCBSK, while the next largest private insurer con-

tributes at most 3–5% of that hospital's revenues).] Plaintiffs' expert, Dr. George Hay, testified about the existence of barriers to effective entry. (Tran. 22, pp. 3530–36.) The jury also could easily have understood that defendant's dominant position in this industry is unlikely to be eroded quickly. [Tran. 5, pp. 792–93, and Tran. 9, pp. 1487, 1490–91 (prior to mid–1985 BCBSK had the unique ability to contract directly with hospitals, a privilege denied other insurers); Tran. 2, pp. 237–41, Tran. 4, p. 601, Tran. 10, p. 1748, and Pltfs.' Ex. 161 (the adverse effect of BCBSK's most favored nations clause on competitors' efforts in this market).]

The jury's finding of power to exclude competition is also supported by substantial testimony from plaintiffs' expert witnesses. Mr. William Guy, former head of four separate Blue Cross plans, testified that an effective competitive challenge to BCBSK's dominant position was extremely difficult for a variety of reasons, including the unique competitively significant advantages BCBSK derived from being the first health insurance company in Kansas; the legislation giving it the state's imprimatur; its tax advantages; and its historically unique ability to contract directly with Kansas hospitals. (Tran. 21, pp. 3370–76.) Guy also testified BCBSK's termination of Wesley, and Wayne Johnston's October, 1985 letter to all other Kansas hospitals (Pltfs.' Ex. 1), sent a message to those hospitals not to affiliate with or help form an alternative delivery system that competes with defendant, and that this message effectively discouraged these new types of competition. (*Id.*, pp. 3397–98, 3402–03, 3478–79.)

The jury also heard Dr. George Hay explain how alternative delivery systems represent the only viable competitive challenge to defendant's domination of this market. Dr. Hay explained how defendant has substantial leverage over the hospitals in its service area because BCBSK is the source of such a large percentage of the hospitals' revenues. This permits defendant to exert considerable influence on the receptivity of these hospitals to alternative delivery systems. By threatening to deny these hospitals this revenue and other advantages associated with contracting status, defendant can effectively prevent them from affiliating with new alternative delivery systems. Dr. Hay thus concluded that defendant has the power to prevent the entry of alternative delivery systems as effective new competitors; thus, Dr. Hay concluded, defendant has the power to exclude competition. (Tran. 22, pp. 3522–39.)

Granted, during trial I expressed some personal reservations about Dr. Hay's testimony. But there was never any timely challenge by defendant to this evidence, and it was heard and fully considered by the jury. Moreover, " 'the full burden of exploration of the facts *and assumptions* underlying the testimony of an expert witness [is] squarely on the shoulders of opposing counsel's cross-examination.' " *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1524 (10th Cir. 1984), *aff'd* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (emphasis original; quoting *Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir.1980), *cert. denied* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981)).

Finally, defendant's argument it lacks power to exclude competition because many conventional insurance companies and new conventional insurance companies can easily start doing business in Kansas is irrelevant to the thrust of plaintiffs' evidence: conventional insurance coverage provides only limited competition to defendant and poses little, if any, threat to its entrenched and dominant market position. The only effective challenge to that position comes from alternative delivery systems. Defendant's evidence about the number of conventional insurance companies licensed to do business in Kansas was heard by the jury, but obviously rejected in favor of plaintiffs' foregoing evidence.

The record also contains ample evidence to support the jury's conclusion BCBSK has the power to control prices. Dr. Hay and Mr. Guy noted the only competitors with the potential to effectively challenge defendant are the newer alternative forms of health care financing. Professor Davis

testified the introduction of these new alternative delivery systems results in cost savings to consumers. (Tran. 9, pp. 1434, 1438, 1498–1502, 1505–06.) Dr. Hay later amplified Professor Davis' empirical data:

> [T]hese new forms of competition, that's where the downward pressure on price is going to come from. That's what is going to cause health care costs to Kansas consumers to be lower, all right. If Blue Cross can stop that, can suppress it or can slow it down, that means that the cost of health care financing in Kansas is going to be higher than it otherwise would and that means that because Blue Cross has the power to do that, the power to stop it or slow it down, in a very real sense Blue Cross has the power over price, the power to prevent those price pressures, all right, from coming about to the advantage of Kansas consumers.

(Tran. 22, pp. 3538–39.)

Mr. Guy also testified defendant's termination of Wesley effectively slowed or inhibited the spread of alternative delivery systems in Kansas, and that these new systems otherwise would have resulted in "significant" cost savings for consumers. (Tran. 21, pp. 3404–06.) Guy stated "where you hold up the development of the alternative systems ... there's an eventual price to be paid for that." (*Id.*, p. 3479.)

The evidence surrounding the effect of BCBSK's "most favored nations" clause in its provider contracts has already been addressed. The jury could readily understand the existence of this clause effectively prevented discounting to other insurers, and since the price of hospital care is the single largest element of health care financing companies' costs (see, e.g., Pltfs.' Ex. 155), the "most favored nations" clause effectively prevents competing insurance companies from offering more favorable insurance rates to consumers. This clause gives defendant the ability to prevent insurance prices from falling, thus providing it the ability to effectively control insurance prices.

Defendant belatedly asserts there can be no legitimate finding of power over price on its part because its ratemaking activities are actively supervised by the Kansas Commissioner of Insurance. Defendant therefore concludes it is immune from antitrust liability under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Plaintiffs cogently respond this defense has been waived. Although asserted in defendant's answer (¶ 40), this defense, similar to the McCarran-Ferguson exemption argument, was abandoned when BCBSK filed its motion for summary judgment on February 28, 1986, and in the March 14, 1986 pretrial conference order. Nevertheless, I will address this issue, as I did the McCarran-Ferguson Act defense, to show it is likewise without merit.

■ *Parker v. Brown* addressed the question whether the federal antitrust laws prohibited a state, in the exercise of its sovereign powers, from imposing certain anticompetitive restraints. Noting there was "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature," the court held the Sherman Act does not apply to the anticompetitive conduct of a state acting through its legislature. *Parker*, 317 U.S. at 350, 63 S.Ct. at 313; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985). At the same time, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 350, 63 S.Ct. at 313. The Supreme Court has established and adhered to a two-part test for determining immunity under *Parker*. " 'First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the state itself.' " *324 Liquor Corp. v. Duffy*, 479 U.S. ——, ——, 107 S.Ct. 720, 725, 93 L.Ed.2d 667, 677 (1987) (quoting *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)); *see also State ex rel. Stephan v. Lamb*, No. 87–4059 (D.Kan. Feb. 26, 1987) [Available on WESTLAW, DCT database].

Any attempt to invoke the state action immunity doctrine of *Parker v. Brown* must surmount the strong federal interest in enforcing the national policy in favor of unrestrained competition.

"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. TOPCO Associates, Inc.*, 405 U.S. 596, 610, 31 L.Ed.2d 515, 92 S.Ct. 1126 [1135] (1972). Although this federal interest is expressed through a statute rather than a constitutional provision, Congress "exercis[ed] all the power it possessed" under the Commerce Clause when it approved the Sherman Act. We must acknowledge the importance of the Act's procompetition policy.

*California Retail Liquor Dealers*, 445 U.S. at 110–11, 100 S.Ct. at 946. Further, the Supreme Court's "decisions reflect the principle that the federal antitrust laws preempt state laws authorizing or compelling private parties to engage in anticompetitive behavior." *324 Liquor Corp.*, 479 U.S. at ————— n. 8, 107 S.Ct. at 726 n. 8, 93 L.Ed.2d at 678–79 n. 8.

■ To establish that a state's policy is clearly articulated and affirmatively expressed, defendant must show there is a state policy to displace competition and that the legislature contemplated the kind of actions alleged to be anticompetitive. *California Aviation, Inc. v. City of Santa Monica*, 806 F.2d 905, 907 (9th Cir.1986). The clear articulation and affirmative expression requirement is not met by state neutrality toward the challenged action. *Sterling Beef Co. v. City of Fort Morgan*, 810 F.2d 961, 963 (10th Cir.1987) (citing *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 55, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982)). In this case there simply is no clearly articulated and affirmatively expressed policy by the State of Kansas to displace competition in this market and permit the activities of defendant at issue in this case. Indeed, the

policy of the State of Kansas is precisely the opposite. BCBSK's own enabling statute expressly asserts a procompetitive state policy: "Nothing in the ... act is intended to prohibit or discourage reasonable competition or discourage or prohibit uniformity of rates except to the extent necessary to accomplish the aforementioned purposes." K.S.A. 40–19c07.

■ Regarding the second element of the *Parker v. Brown* state action immunity, it is equally clear that the active supervision required is over the conduct at issue. *California Retail Liquor Dealers*, 445 U.S. at 105, 100 S.Ct. at 943. Where a state simply authorizes a particular practice and enforces the consequences through private parties, there is no active supervision. *324 Liquor Corp.*, 479 U.S. at ———, 107 S.Ct. at 725, 93 L.Ed.2d at 677. The challenged restraint in this case flows not from defendant's ratemaking activities, but from the conspiratorial termination of Wesley, the threat to all Kansas hospitals, and related activities surrounding defendant's provider agreements. As far as defendant's argument there is no power over price because of state regulation, the factual predicate for such an argument is simply absent in this case. Defendant's own economic expert, Peter Hamilton, was specifically asked at his deposition two weeks prior to trial: "What role, if any, does the fact that Blue Cross is regulated by the Insurance Commissioner of Kansas play in your opinions?" His unequivocal answer: "None at this time." (Hamilton Depo., p. 57.) At trial, BCBSK called Dr. Hamilton to present its best defense to market and monopoly power. Dr. Hamilton's testimony was utterly bereft of any reference whatsoever to state rate regulation. (Tran. 30, pp. 4830–34, 4841–58.)

I have already concluded that denying defendant the McCarran-Ferguson exemption does not violate intra-industry cooperation for ratemaking or statistical purposes, nor the Kansas-regulated "business of insurance." Similarly, denying defendant immunity under *Parker v. Brown* works no violation of any clearly articulated, affirma-

tively expressed and actively supervised Kansas policy. The conduct for which the jury found defendant liable is not the business of insurance; it was not undertaken pursuant to any clearly articulated or affirmatively expressed Kansas policy; and it was not actively supervised by the State of Kansas itself. What is at issue generally in this case is activity by BCBSK conforming to neither the McCarran-Ferguson Act nor *Parker v. Brown.* According to the jury it is, rather, concerted activity effectively restraining trade in the market for private health care financing, injuring not only Wesley Medical Center, but as well all Kansas consumers of health care financing products. Defendant's belated attempts to bootstrap itself into either McCarran-Ferguson immunity or *Parker v. Brown* immunity must be, and are, rejected.

Lastly, defendant asserts as a matter of law that it cannot be found to possess market or monopoly power under the federal antitrust laws, citing *Ball Memorial Hospital v. Mutual Hospital Ins. Co. Inc.,* 784 F.2d 1325 (7th Cir.1986), and *Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir.1986). In *Ball Memorial,* the Seventh Circuit found that Blue Cross of Indiana, insuring only 27% of all patients in that state, lacked market power. 784 F.2d at 1330. In *Barry,* the Ninth Circuit found that Blue Cross of California insured 16%, "far below what we would require for a monopoly." 805 F.2d at 874. The limited application of *Ball Memorial* to the facts of this case has already been addressed. *Reazin I,* 635 F.Supp. at 1328–31. The same distinctions apply to *Barry.* That case is unpersuasive in the present context

because BCBSK's own estimate of its market share is 60%. (Pltfs.' Ex. 41.) In *Ball Memorial,* the market share of Blue Cross of Indiana (BCI) was declining rapidly, 784 F.2d at 1331, whereas in this case, there was evidence BCBSK's market share increased significantly from 1983 to 1985. (Tran. 21, pp. 3378–80, 3393–94; Tran. 22, pp. 3642–43.) In contrast to *Ball Memorial,* the evidence here, as previously summarized, shows BCBSK does have the ability to block or delay entry of competing alternative delivery systems. Thus, the *Ball Memorial* findings there were many conventional insurance companies in Indiana, that entry into the Indiana insurance business by conventional insurance companies was easy, and that these conditions effectively prevented BCI from raising prices, are simply inapposite to BCBSK's ability to exclude alternative delivery systems and the existence of its market power. Plaintiffs contend that effective competition in the Kansas health care financing market— the only competition that can effectively challenge BCBSK and force insurance prices down—comes from HMOs and PPOs. As discussed, this is the type of competition that BCBSK has the power to exclude and, in fact, unlawfully sought to exclude. What is at issue is the market conditions in Kansas, and the jury found that BCBSK possesses both the power to control price and the power to exclude competition. Both the factual predicates, and the expert testimony, supporting those findings are abundant, and the findings of monopoly power and market power were clearly within the jury's prerogative.[16]

---

**16.** The additional factual distinctions between this case and *Ball Memorial* cannot be overemphasized. BCI kept its traditional indemnity insurance plan on the market, and simply attempted to introduce a *new* PPO, making it available to *all* competing providers on a bid basis. 784 F.2d at 1331, 1341. Plaintiffs in that case were attempting to *prevent* this from coming about. The district court's conclusion BCI possessed no market power was based in part on its finding Indiana hospitals " 'are *vertically integrating* into the health care financing market.' " 784 F.2d at 1332 (quoting 603 F.Supp. at 1082 (emphasis added)). "[T]he Blues have not insisted that hospitals in the Blues' PPO refrain from joining other PPOs, *so rivals have access to*

*the hospitals on the same basis as the Blues."* 784 F.2d at 1339 (emphasis added). By distinct contrast, this case concerns BCBSK's attempts to *prevent* vertical integration in Kansas; plaintiffs alleged and the jury found, that as a direct consequence, rivals do *not* have access to Kansas hospitals on the same basis as BCBSK.

One frightening aspect of *Ball Memorial,* as I view the facts of this case, is that in selecting providers for its PPO (which, again, was open to *all* hospitals on a bid basis), BCI unequivocally *rejected* one hospital's bid of a 20% discount from its normal charges:

The Blues excluded St. Joseph's Hospital of Ft. Wayne for two reasons—they deemed its bid of 80% of prior prices a "low-ball" that

From the limited standpoint in which I must now review those conclusions, and in light of the foregoing resumé of plaintiff's evidence, I decline to disturb the jury's findings.

*Is the Jury's Finding of a "Contract, Combination, or Conspiracy" Under § 1 Contrary to the Evidence and Law?*

Defendant renews its argument plaintiffs' evidence is insufficient to support the jury's finding of contract, combination or conspiracy to restrain trade in the market for private health care financing for two reasons. First, defendant contends there is no competent evidence that prior to August 29, 1985, there was any agreement or understanding between BCBSK and the Saints to terminate the Wesley contract. Second, defendant argues that even assuming such evidence is present, it cannot be held to have been a participant in such because its board of directors had no knowledge of the alleged agreement or understanding with the Saints prior to the date it decided to terminate the Wesley contract. Both points are already before the court in defendant's motion for directed verdict.

This court is well aware of the trilogy of cases from the Supreme Court in 1986 which gave new vigor to summary judgments and directed verdicts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Those standards are readily articulated, but the task of instantaneous application at the close of a 6–week jury trial, with hundreds of exhibits, dozens of witnesses, and a 5,000 page transcript, is far different. Defendant's motion for directed verdict came on the heels of its own evidence, and I was far more conversant with defendant's position and arguments than those of plaintiffs, presented weeks earlier. It was in this posture I made the following observations about plaintiffs' evidence. First, I felt the series of meetings between BCBSK and the Saints throughout the spring and summer of 1985 (which I found significant in *Reazin I,* 635 F.Supp. at 1321) were "absolutely irrelevant to any kind of a suggestion of conspiracy." Second, the executive committee of the BCBSK board of directors was clearly unaware of any meetings or agreement with the Saints when it voted to terminate the Wesley contract on August 29. Third, and finally, there was no evidence the Saints had responded to Knack's request that he be informed of their decision to accept or reject the reduced MAPs prior to August 29. (Dkt. 243, Tran. of Rulings & Findings on Post-Trial Motions Sept. 2, 1986, pp. 2–7.) In light of these concerns, I put the burden squarely on plaintiffs' counsel to justify their position: "Those are at least three factors that are clarified in this case, and when it's finished, Mr. Rawson, in the face of the *Zenith* decision, which you asked me to freely engage [on defendant's counterclaim], you just step up here, sir, and put one fact on the scales that this jury could weigh that somehow takes this to the jury on the question of conspiracy." (*Id.,* p. 7.)

was sure to be increased, and they concluded that it was not as conveniently located as Parkview Hospital in the same city. 784 F.2d at 1342. The Seventh Circuit interpreted the state enabling act to deny any right to discriminate on the basis of geography, but to require simply that any PPO "must not 'unreasonably discriminate' among hospitals." *Id.* The court then found there had been no unreasonable discrimination on price:

> The Hospitals do not disagree with the Blues' contention that they determined St. Joseph's bid to be a low-ball quote, too low to be justified by its costs (on which the Blues had data) and therefore too low to be sustained. One witness testified without contradiction that St. Joseph's bid was well below that of any other hospital, and another testified that the Blues feared that "at the first opportune time [St. Joseph's] would be asking for an unreasonably high increase." ...

784 F.2d at 1343.

BCI's determination, in the exercise of its sound business judgment, that a 20% discount was economically unsound and unsustainable, casts a disturbing light on BCBSK's eager *request* for a *25%* discount from the Saints in Wichita, the hospitals' willing agreement to a *20%* discount (*see, e.g.,* Pltfs.' Ex. 4, *infra* ), and defendant's pious assertion this "new PPO" operates to the unqualified benefit of Kansas consumers of health care financing products.

■ Ever equal to the task, counselor Rawson responded articulately and persuasively. The 27 meetings between BCBSK and the Saints focused on the redevelopment of HMOK in the marketplace. "Blue Cross was well on the way to reestablishing HMO Kansas in the Wichita marketplace independent of any consideration of the termination of Wesley." Secondly, those meetings established an existing forum within which the question of the termination of Wesley and the reduction of MAPs could be, and were, discussed between defendant and the Saints. Even assuming actual discussion of the conspiracy didn't begin until August, 1985, the previous meetings are important for the factfinders' understanding of defendant's activities in the marketplace and "the context of communication within which a subsequent conspiracy could be hatched and brought to fruition." Knack knew the Saints were receptive to a discount on the MAPs as early as August 13; the only remaining issue at that point in time was the amount of the reduction. The testimony of other witnesses was adequate for any jury to infer that sufficient communication was made prior to August 29 to support a finding of agreement between defendant and those hospitals. Acknowledging there was no evidence the BCBSK staff told the executive committee that staff had previously met with the Saints, "it would stand the antitrust laws completely on their head if it were [the] case that a corporation could be shielded from liability for a conspiracy because of the fact that its staff willfully, deliberately would [not] tell the decisionmaker in fact they had an agreement which was in restraint of trade.... The staff had authority to act for Blue Cross, they were acting within their scope of authority. Saints believed that the conversations they were having represented commitments from Blue Cross." Antitrust laws do not require that a challenged agreement be formalized in writing; and there is abundant circumstantial evidence from which a reasonable jury could infer a conspiracy existed and its purpose was anticompetitive. (*Id.*, pp. 8–13.) I took under advisement defendant's motion for directed ver-

dict. Plaintiffs' closing argument to the jury focused in part on these same points (Dkt. 285, 293, Tran. of Closing Arguments) with which the jury obviously agreed.

■ With the benefit of time, I am persuaded this finding is satisfactorily, if not abundantly, supported by the evidence. The events underlying this case have been explored in minute detail at the outset of this memorandum and order. All of that, and more, was heard and considered by the jury. To that background material I need add only a short discussion of a few pieces of evidence which speak for themselves.

On September 3, 1985, Stephen Harris, the chief financial officer of St. Francis Hospital, met with the chief executive officer, Sister Sylvia Egan, to bring her up to date on events which had transpired during her vacation from August 16 through September 2. (Tran. 12, pp. 2109–10.) Harris' September 3 memorandum, which he delivered to Sister Sylvia at that meeting, reads:

When you left for Wisconsin, *we were working with Blue Cross on various options that would allow Blue Cross to cancel Wesley's Blue Cross contract.* At that time, *Blue Cross felt they needed a 25% discount* from the 1986 MAP's in order to offer a large enough discount the "employer" [sic] *so that the program would be supported and the "Wesley Boycott" would work.*

After a lot of discussion involving several different scenarial [sic], we agreed on a straight 20% discount from the 1986 MAPs. This would be effective on January 1, 1986.

[Pltfs. Ex. 4 (emphasis added).] Harris' memorandum continues, setting forth the calculations which led to that "agreement", calculations premised upon an expected 4% shift in BCBSK patient volume from Wesley, the victim of the "Boycott". *Id.* Harris' calculations assumed St. Francis would enjoy a 2% increase in BCBSK patient volume, with the remaining 2% going to St. Joseph and/or Riverside. (Tran. 13, p. 2189.)

Sometime in "early" September, 1985 (Tran. 5, p. 778), G. Wayne Johnston pre-

pared a memorandum entitled "Questions About Not Contracting With Wesley (HCA)" (*Id.*, p. 776; Pltfs.' Ex. 178). The very first question is revealing:

> If we think Wesley will react to our action by announcing that they will accept Blue Cross payment in 1986 and that results in little shift of patients from Wesley to St. Francis and St. Joseph and that as a result St. Francis and St. Joseph will not continue with the 20% discount in 1987—What do we do in 1987 to make available a competitive rate for our subscribers?

(Tran. 5, p. 777; Pltfs.' Ex. 178, p. 1.) Johnston assumed that if Wesley accepted the new MAPs there would be little shift of patients from Wesley; but if Wesley did not agree to the new MAPs, he expected a patient shift benefiting the Saints. (Tran. 5, p. 778.) The reduced MAPs for the remaining Wichita Peer Group V hospitals were first presented to and approved by the BCBSK executive committee on *September 19.* (Tran. 4, pp. 691–92; Pltfs.' Ex. 24, pp. 22–23.) Significantly, the jury also heard and considered the following question by Johnston in his "early September" memo:

> While it appears we can be selective in which hospitals we contract with and not be guilty of anti-trust violations, Wesley will undoubtedly seek public sympathy by contending they have been arbitrarily singled out by us. They will contend we should cancel contracts with hospitals that have any type of competitive program (St. Francis' PPO; Aetna PPO hospitals; Doorth C. Kombs Development of TPA with St. Francis and any hospital joining the VHA arrangement with Aetna.[ )] Will the public agree with Wesley's contention or *can we develop a sound rationale that the public will accept that Wesley/HCA is different and our action is in the public interest*[?]

(Tran. 5, p. 781; Pltfs.' Ex. 178, p. 2.)

After this lawsuit was filed, Edward Sullivan, vice president of administration at St. Joseph Hospital, sought BCBSK's assurance that if the lawsuit delayed Wesley's scheduled termination, defendant would not implement the reduced MAPs. (Tran. 14, pp. 2300–01.) By memorandum dated November 27, 12 days after plaintiffs' filed their motion for preliminary injunction, Mr. Sullivan informed William Leeker, St. Joseph's chief financial officer, that "[i]mplementation of [the] *new* 1986 MAPs would be delayed if the HCA suit is successful in gaining a temporary injunction. In that case, the *original* 1986 MAPs would be used." (Pltfs.' Ex. 5; emphasis original.) Robert Pearcy, BCBSK's former director of institutional relations, testified at trial, through deposition, that in the latter part of 1985 he was advised that as a result of this lawsuit, "an agreement had been reached ... that we were to continue making payments to all Wichita hospitals, based on the original 1986 MAPs rather than the revised MAPs." (Pltfs.' Ex. 551 (Pearcy Depo.), p. 64.) Defendant subsequently violated this "agreement", however, proceeding to implement the reduced MAPs in early 1986. (Trans. 14, p. 2301.)

The circumstances surrounding the Saints' actual acceptance of the reduced MAPs were the subject of conflicting testimony. [See Tran. 13, pp. 2236–37 (St. Francis did not decide to accept until after Wesley termination; no prior discussions with St. Joseph); Tran. 14, pp. 2287–89 (Sullivan did not recall if St. Joseph's acceptance was communicated to Dauner before or after August 29, 1985); Tran. 14, pp. 2293–95 (Sullivan may have learned that St. Francis had agreed to the reduced MAPs at a meeting on August 23); Tran. 14, pp. 2411–12 (St. Joseph agreed to MAPs reduction in January, 1986); Tran. 6, pp. 986–87 (Dauner recalls no agreement by Saints until November).] This conflicting testimony, particularly in light of the considerable evidence already addressed, raised credibility issues requiring resolution by the trier of fact. Even assuming neither hospital formally communicated its acceptance of the proposed MAPs reduction in the specific amount of 20% sought by BCBSK until after August 29, the evidence discussed clearly supports a finding there was a meeting of the minds as to the essential elements of the unlawful scheme

prior to that date; and the date, or even the complete absence, of any formal communication by the Saints as to the precise reduction, is immaterial. *See, e.g., United States v. Beachner Construction Co., Inc.,* 555 F.Supp. 1273, 1281 (D.Kan.1983), *aff'd* 729 F.2d 1278, 1283 (10th Cir.1984) (neither formal agreement nor personal communication necessary to establish conspiracy).

The jury was instructed that as an element of plaintiffs' § 1 claim the plaintiffs must prove by a preponderance of the evidence that defendant's participation in a contract, combination or conspiracy resulted in a restraint of interstate trade and commerce in the relevant market. (Dkt. 207, Jury Instructions, No. 21.) The jury understood unilateral conduct is entirely permissible under § 1 of the Sherman Act. (Instr. No. 23.) The jury was also instructed carefully, and in detail, about the specific elements which it could and could not consider in determining whether there was a contract, combination or conspiracy in this case. (See, generally, Instr. Nos. 22–33.) There is ample evidence in this record for the jury's conclusion defendant's termination of Wesley Medical Center was in no sense a unilateral act.

Given persuasive evidence on which the jury found the existence of a contract, combination or conspiracy, the fact BCBSK's senior management staff withheld, from the executive committee, the critical information regarding the prior meetings and understandings with the Saints is no legal impediment to defendant's liability. In Kansas, all corporate officers are under extremely strict fiduciary responsibilities. *Mid-West Underground Storage, Inc. v. Porter,* 717 F.2d 493 (10th Cir.1983); *Oberhelman v. Barnes Investment Corp.,* 236 Kan. 335, 338, 690 P.2d 1343 (1984) (citing *Newton v. Hornblower, Inc.,* 224 Kan. 506 Syl. ¶ 8, 582 P.2d 1136 (1978)). The president of a corporation, an executive officer, is more than a mere agent of the corporation. W. Fletcher, Cyclopedia of the Law of Private Corporations § 266 (1982). Even a "mere" agency relationship requires the agent to "give the principal the benefit of all his knowledge ... [the agent] cannot withhold or conceal information from the

principal." *Sanders v. Park Towne, Ltd.,* 2 Kan.App.2d 313, 317, 578 P.2d 1131 (1978); *see also* Restatement (Second) of Agency § 381 (1958) ("[A]gent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have...."). In Kansas, this is recognized as the duty of "full disclosure of corporate matters." *Schraft v. Leis,* 236 Kan. 28, 36, 686 P.2d 865 (1984). This is especially true where an officer has superior knowledge of corporate affairs because he is intimately involved in the daily operations of the corporation, while other directors or officers have only a limited role in corporate management. *Sampson v. Hunt,* 222 Kan. 268, 272, 564 P.2d 489 (1977). Officers (and directors) are *liable to the corporation* for losses resulting from their malfeasance, misfeasance or their failure or neglect to discharge the duties imposed by their offices. *Federal Savings & Loan Ins. Corp. v. Huff,* 237 Kan. 873, 879, 704 P.2d 372 (1985) (emphasis added); *Speer v. Dighton Grain, Inc.,* 229 Kan. 272, Syl. ¶ 8, 624 P.2d 952 (1981). Whatever the internal consequences of BCBSK senior staff's malfeasance as corporate agents, those consequences do not extend to externally shielding the defendant corporation, as principal, from liability under the federal antitrust laws. *See Amer. Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174, 1970 Trade Cas. (CCH) ¶ 73,331 (3d Cir.1970), *cert. denied* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971); *see also United States v. Bi-Co Pavers, Inc.,* 741 F.2d 730 (5th Cir.1984), and *United States v. Hilton Hotels Corp.,* 467 F.2d 1000 (9th Cir.1972), *cert. denied* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973).

There is neither a factual nor a legal impediment to the jury's finding of a contract, combination or conspiracy orchestrated by BCBSK.

*Is the Finding of Unreasonable Restraint of Trade Under § 1 Contrary to the Evidence?*

 Defendant next contends that even if Wesley's termination was the result of joint action with the Saints, there is no restraint of trade in the health care financing market resulting from the mere termination alone. Defendant contends plaintiffs' theory was that the market restraint, if any, occurred from Wayne Johnston's letter to all Kansas hospitals on October 4, 1985. (Pltfs.' Ex. 468–C, *supra.*) BCBSK argues that letter alone, the "sole evidence" supporting any contention of restraint of trade in the health care financing market, is not sufficient evidence on which to predicate § 1 liability because the letter was solely the unilateral act of BCBSK, not the result of any conspiracy or concerted action with others.

I disagree with the contention this letter was the sole evidence supporting plaintiffs' allegations of market restraint. Other evidence supports a finding that the threat posed by Wesley's termination had an anticompetitive effect in the market. Defendant intended its well-publicized termination to "send a message" to other Kansas hospitals (Pltfs.' Ex. 29), and the evidence shows this "message" was received ·even before Johnston's October 4 letter. That letter itself was prompted by an earlier letter from the Kansas Hospital Association expressing the competitive concerns raised by defendant's termination of Wesley's contract. (Pltfs.' Ex. 1; *see also* Tran. 5, pp. 857–58.) Johnston's reply may have fueled those concerns, but it was not the *sine qua non* of the anticompetitive effect resulting from defendant's conspiratorial conduct.

 Further, it is well established that all conspirators are jointly liable for the acts of their co-conspirators. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 253–54, 60 S.Ct. 811, 858, 84 L.Ed. 1129 (1940); *El Ranco, Inc. v. First Nat'l Bank of Nevada,* 406 F.2d 1205, 1216 (9th Cir.1968), *cert. denied* 396 U.S. 875, 90 S.Ct. 154, 24 L.Ed.2d 133 (1969); *Solomon v. United States,* 276 F.2d 669, 674 (6th Cir.), *cert. denied* 364 U.S. 890, 81 S.Ct.

219, 5 L.Ed.2d 186 (1960). It is not essential that each conspirator have knowledge of the exact details of the conspiracy or the means to be used. *United States v. Ward Baking Co.,* 224 F.Supp. 66, 69 (E.D.Pa. 1963). Nor is it required that each conspirator participate in or have knowledge of all the operations of the conspiracy. *Berenbeim v. United States,* 164 F.2d 679, 684 (10th Cir.1947), *cert. denied sub nom. Schechter v. United States,* 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113 (1948). Defendant enticed the Saints to become knowing participants in its unlawful conspiracy, and defendant's past and future acts in furtherance of its unlawful objectives were the acts of all. *United States v. Ward Baking Co.,* 224 F.Supp. at 70. The requisite plurality inhered in all actions undertaken by BCBSK furthering its unlawful scheme, and Johnston's October 4 letter was not the "unilateral act" of defendant. The jury's finding of market restraint must be upheld.

*Is Wesley Entitled to Recover Damages Under § 1?*

Defendant argues Wesley is not entitled to recover damages under § 1 for two reasons: first, Wesley has no standing to pursue its § 1 claim; second, there is no adequate evidentiary support for the damages awarded Wesley by the jury.

 Throughout this litigation, defendant has never challenged Wesley's standing under § 1, and it may not do so now. Indeed, defendant's position at the summary judgment stage was that Dr. Reazin, New Century, and HCP lacked standing because Wesley was the *only* plaintiff with appropriate standing under § 1. *Reazin I,* 635 F.Supp. at 1317. Failing to raise this issue, either at summary judgment or on its motion for directed verdict, defendant is now barred from pursuing this contention on a motion for JNOV or new trial. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2537, p. 598 (a Rule 50 motion for judgment notwithstanding the verdict is only a renewal of the motion for directed verdict made at the close of the evidence, and cannot assert a ground not included in the motion for

directed verdict); 10 Wright & Miller, Federal Practice and Procedure: Civil § 2805, p. 40 (a party may not seek a new trial under Rule 59 on the basis of a theory not urged at the first trial); *see also General Investment Co. v. New York C.R. Co.*, 271 U.S. 228, 230–31, 46 S.Ct. 496, 497, 70 L.Ed. 920 (1926) (antitrust standing is not a jurisdictional issue).[17]

■ Defendant's second contention relating to Wesley's damage award is that plaintiff's evidence was inadequate to support the recovery of $1.54 million. Plaintiff's evidence was presented by Donald Stewart, chief operating officer of Wesley, who testified about the damage estimates actually prepared by Edmund Berry, Mr. Stewart's subordinate. Defendant contends Stewart's testimony is speculation, or at best an "interested guess based on a slight decrease in market share," which merely coincided with the termination, was statistically insignificant, and was part of a continuing trend that began well before the announced termination. Defendant also contends plaintiffs deliberately proceeded in this manner in an attempt to frustrate defendant's cross-examination of Wesley's damage evidence, and to prevent the jury from evaluating the underlying data and methodology. BCBSK concludes the evidence is without adequate foundation and is highly speculative, and therefore the award based thereon should now be vacated.

I disagree. Mr. Stewart has responsibility for the oversight of all Wesley's financial operations. (Tran. 23, p. 3717.) Berry's financial calculations and work were performed under Stewart's supervision and direction, and were based on records prepared and maintained in the ordinary course of business. (Tran. 23, pp. 3735–36.) Evidence of Wesley's loss of BCBSK subscriber business was based on defendant's own data, the accuracy of which was attested to by Harold Thurman, director of BCBSK's Health Information Systems. (Tran. 28, pp. 4670–71.) Stewart was available for direct examination, voir dire, and cross-examination, and fully responded to defense counsels' questioning. Defendant's present contentions go not to the admissibility of this evidence, but merely to its weight and the witness' credibility, which are questions for the jury and which were resolved against BCBSK. Further, an antitrust plaintiff is not to be held to a rigid standard of proof regarding the amount of damages because in these cases economic harm is frequently intangible and difficult to quantify. *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1157 (10th Cir.1981), *cert. denied* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969); and *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1525–26 (10th Cir.1984), *aff'd* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

> [W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain

**17.** On its merits, defendant's contention Wesley lacks § 1 standing must be rejected out of hand. *Reazin I* analyzed and applied antitrust standing concepts to HCP, New Century and Dr. Reazin, concluding HCP was the only one of those three plaintiffs with standing to pursue actual antitrust damages under § 4 of the Clayton Act. 635 F.Supp. at 1310–18. Wesley is certainly the "victim of the forbidden practices" by defendant, suffering tangible economic injury as a consequence. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 475 n. 11, 102 S.Ct. 2540, 2544, 2546 n. 11, 73 L.Ed.2d 149 (1982). BCBSK recognized Wesley as a "competitor" by virtue of its association with HCA and HCP;

that is the precise reason defendant undertook the conduct at issue in this case. The harm to Wesley "was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the ... illegal conspiracy." *McCready*, 457 U.S. at 479, 102 S.Ct. at 2548. In fact, BCBSK's specific intent to harm Wesley may well be "dispositive" in creating standing to sue under § 4. *Assoc. General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 n. 35, 103 S.Ct. 897, 908 n. 35, 74 L.Ed.2d 723 (1983). Wesley's injury, as a "direct victim" of defendant's coercion, vests the hospital with the right to maintain its action for treble damages. *Assoc. General Contractors*, 459 U.S. at 542, 103 S.Ct. at 910.

that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

Under these standards, and because defendant was afforded the opportunity for full and complete cross-examination of plaintiff's damage witness, the jury was the proper judge of the credibility of that witness and the weight to be given his testimony. Further, it is not insignificant that this witness, Donald Stewart, testified Wesley's actual damages amounted to $2,070,209.59, as recited to the jury in Instruction No. 81. The fact the jury ultimately returned a verdict of actual damages in the amount of only $1,542,980.00 indicates the jury fully executed its duty to evaluate all the testimony and assess the damages it saw fit. The damage award returned by the jury was over half a million dollars less than the amount requested by plaintiff and testified to by Donald Stewart. The jury clearly understood the strengths and weaknesses of Wesley's damage evidence, and fully discharged its responsibilities in returning an appropriate damage award. That finding will not now be disturbed.

### Is the Finding of Tortious Interference Contrary to Kansas Law?

Defendant attacks my instructions to the jury on plaintiff's pendent claim of tortious interference, the jury's finding of liability, and its award of punitive damages. Specifically, defendant contends the jury instructions erroneously stated the law governing liability for tortious interference; the instructions permitted the jury to penalize BCBSK for the purely permissible exercise of its First Amendment rights in using the media; and there can be no award of punitive damages because the jury found Wesley suffered only nominal damages as a consequence of any interference which occurred.

In Contention No. 7, BCBSK argues that as a matter of law it committed no tort. Defendant attacks Instruction No. 84, which states:

Wesley alleges that Blue Cross has deliberately, through the media, and otherwise, attempted to discourage Blue Cross subscribers from using Wesley and has thus tortiously interfered with Wesley's present and future relations with Blue Cross subscribers.

To find for plaintiff Wesley Medical Center on its claim of tortious interference by Blue Cross, Wesley must prove and you must find:

1. That there existed a present business relationship and/or the expectancy of a future relationship with economic benefits between Wesley and Blue Cross' subscribers;

2. That Blue Cross actually knew of this present business relationship and/or expectancy of future relationship;

3. That, but for Blue Cross' deliberate use of the media and other efforts to discourage its subscribers from using Wesley, plaintiff Wesley was reasonably certain to have continued in the existing relationship or realized future expectancies;

4. That Blue Cross undertook this conduct with the wrongful intent of injuring or destroying Wesley's business; and

5. That Wesley suffered injury, loss or damages to its business relations as a direct or proximate result of Blue Cross' misconduct.

Defendant argues this instruction permitted the jury to find intentional interference without finding intentional misconduct, i.e., a knowing tortious act by BCBSK. It contends the instruction permitted the jury to find tortious interference based solely on conduct undertaken with the intent to injure, regardless of whether that conduct was wrongful or unlawful. Relying on the Kansas Supreme Court's recent decision in *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106 (1986), defendant argues the tortious interference verdict must be vacated because the jury was not properly instructed on the applicable law.

*Turner* involved an action for defamation, breach of employment contract, and tortious interference with the right to contract, between a former employee and his employer. The employee, as a "joke", had taken tools belonging to the company from a co-worker's truck. Upon discovering this, the company fired the employee. When plaintiff Turner sought employment with others, the Halliburton Company informed the prospective employers that Turner had been fired for stealing company property; consequently, Turner was unable to secure further employment. Addressing the tortious interference claim, the Kansas Supreme Court held that the requirements for the tort are as follows:

(1) The existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff;

(2) Knowledge of the relationship or expectancy by the defendant;

(3) That, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy;

(4) Intentional misconduct by defendant; and

(5) Damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Turner v. Halliburton Co.*, 240 Kan. at 12, 722 P.2d 1106 (citing *Maxwell v. Southwest Nat'l Bank of Wichita*, 593 F.Supp. 250, 253 (D.Kan.1984)). The *Maxwell* decision is the same authority I relied on in drafting the instructions for the jury in the present case. The *Turner* court went on to say that this tort is predicated on malicious conduct by the defendant, but that a person may be privileged or justified to interfere with contractual relations in certain situations. 240 Kan. at 12, 722 P.2d 1106.

"The issue raised on a plea of justification [or privilege] has been said to depend on the circumstances of the particular case, bearing in mind such factors as the nature of the interferer's conduct, the character of the expectancy with which the conduct interfered, the relationship between the various parties, the

interest sought to be advanced by the interferer, and the social desirability of protecting the expectancy or the interferer's freedom of action. Generally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of some lawful interest or purpose, but only if the right is as broad as the act and covers not only the motive and purpose but also the means used."

240 Kan. at 13, 722 P.2d 1106 (quoting 45 Am.Jur.2d Interference § 27). Tortious interference does require improper conduct, and the court relied on the Restatement (Second) of Torts § 767, as setting forth the proper factors to be considered in making this determination:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interests of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference, and

"(g) the relations between the parties."

*Turner*, 240 Kan. at 14, 722 P.2d 1106. The court concluded that under the terms of the Restatement, if the actions complained of were not improper, there is no ground for recovery. *Id.* Applying this law to the facts of that case, the court held there could be no recovery for tortious interference because Halliburton had a qualified privilege to exchange with prospective employers the reasons for Turner's termination, which privilege required plaintiff to prove actual malice by the defendant in making such communications. Actual malice was not proven; the verdict

was reversed and judgment entered in defendant's favor. *Id.,* at 14–15, 722 P.2d 1106.

Reading as a whole the instructions on tortious interference, the jury in this case properly understood it was looking for misconduct by defendant. See Instruction No. 85 ("Plaintiffs contend that at the time of Blue Cross' *conduct* there existed the business relationships I have enumerated...."); No. 87 ("... you must find that the alleged interference was both wrongful and intentional.... If you find that the *conduct* of Blue Cross was undertaken with the sole purpose and had the actual and sole effect of carrying out the statutory mandate ..."); and No. 88 ("Blue Cross asserts that its *conduct* is justified.... You must first determine, then, whether the *conduct* of Blue Cross relates to competition ... [but] [i]f you find ... that the *conduct* of Blue Cross was directed primarily to the satisfaction of ill will, and not for the advancement of its competitive interests, you must find that the *conduct* was not justified. ... [I]f you find Blue Cross' *conduct* is motivated primarily by malicious, anticompetitive or predatory purposes, rather than legal, fair and reasonable competition, you must conclude defendant's *conduct* falls outside this qualified privilege, and is not justified.").

Secondly, and as plaintiffs contend, on an evidentiary basis defendant's argument ignores the fact the jury found two significant violations of the antitrust laws, which were properly taken into account in determining tortious interference. Plaintiffs' claim, and the jury instructions ("but for Blue Cross' deliberate use of the media *and other efforts to discourage its subscribers from using Wesley ...*") are broad enough to encompass the use of the media, the conspiratorial refusal to deal, and the monopolization of health care financing in Kansas. If anything, the instructions on tortious interference imposed on plaintiff Wesley Medical Center a stricter burden of proof than is otherwise required, given the predicate findings of antitrust violations. *See, e.g.,* Restatement (Second) of Torts § 767, comment d.:

In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose....

The relation of the factor of motive to that of the nature of the actor's conduct is an illustration of the interplay between factors in reaching a determination of whether the actor's conduct was improper. *If the conduct is independently wrongful—as, for example, if it is illegal because it is in restraint of trade ...—the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper.*

(Emphasis added.) Viewing the tortious interference instructions as a whole, and particularly in light of the question whether they interfered with defendant's substantial rights, I perceive no error requiring the jury's verdict of tortious interference to be vacated.

■ In Contention No. 8, defendant argues the jury instructions on plaintiff's claim of tortious interference improperly penalized BCBSK for the permissible exercise of its First Amendment rights to freedom of speech. At most, what is at issue is the qualified privilege of "commercial speech" under the First Amendment. The law of tortious interference as outlined in *Turner* and the Second Restatement makes it clear that the interests of the competing parties are to be balanced against each other in this context; that is, BCBSK's interest in freedom of commercial speech must be balanced against Wesley's interests in freedom from outside wrongful and intentional interference with its present and prospective contractual relations. *Turner* itself holds that where a communication is subject to a qualified privilege (such as defendant's freedom of commercial speech in this case), plaintiff must prove actual malice by defendant in making such communication. 240 Kan. at 14, 722

P.2d 1106. Significantly, Instruction No. 88 to the jury in this case reads in part:

This competitive privilege is a qualified privilege, and if you find Blue Cross' conduct is motivated primarily by malicious, anticompetitive or predatory purposes, rather than legal, fair and reasonable competition, you must conclude defendant's conduct falls outside this qualified privilege, and is not justified.

This instruction was materially identical to the instruction proposed by defendant itself, and adequately informed the jury of the degree of motive it must find before it could impose liability upon defendant.

■ Defendant's ninth contention is that the jury's $750,000.00 punitive damage award cannot stand under plaintiff's claim of tortious interference, given the jury's finding plaintiff suffered actual damages of only a nominal amount, $1.00. This argument ignores the entire context of this case in which the jury found plaintiff Wesley Medical Center was significantly injured by BCBSK's entire conduct, in the amount of over $1.54 million. In Instruction No. 91, the jury was told: "if you find ... that a plaintiff prevailing on its state law claim [of tortious interference] has suffered no different or distinct damages or losses from Blue Cross' tortious interference, you should limit your damage award to that plaintiff to nominal damages for its state law claims, such as $1.00." Viewing all the facts of this case and the jury instructions in their entirety, the verdict can only be understood as the jury's conclusion Wesley suffered in excess of one and a half million dollars of damages as a direct consequence of defendant's conduct violating both the antitrust laws of the United States and the tort law of the State of Kansas. In these circumstances, the award of $750,000.00 of punitive damages is certainly not predicated upon a "nominal damage award" as that term is used in the case law upon which defendant relies.

*Was BCBSK Prejudiced by Evidentiary Rulings or Limiting Instructions Regarding Its § 1 Rule of Reason Defense?*

Defendant argues it was precluded from presenting an effective rule of reason defense to Wesley's § 1 claim because: (1) the court improperly excluded evidence relating to the alleged boycott of HMOK, and HCA's alleged attempt to monopolize the Wichita market; (2) the court improperly limited the purposes for which certain counterclaim evidence could be considered by the jury to determine the competitive effects of defendant's conduct; (3) the court made improper comments about the irrelevance of some of the evidence defendant admitted and/or sought to admit; (4) the court erred in excluding evidence of the FTC finding against HCA regarding hospital acquisitions in Chattanooga, Tennessee; and (5) the court erred in excluding evidence of price fixing engaged in by Wesley.

■ In Contention No. 10(a), defendant attacks Instruction No. 18, which limited the purposes for which I admitted evidence of historical market conditions in Wichita. Defendant contends the justification for its termination of Wesley was that BCBSK decided to act in that manner "in order to frustrate and protect itself from the efforts of HCA to obtain a monopoly in health care and health insurance in Wichita." BCBSK attempts to construct an erroneous and prejudicial conflict between Instruction Nos. 18 and 47.

As previously discussed, from the very outset of this case I have attempted to draw a delicate line between the evidence which defendant could properly use in support of its rule of reason defense, as contrasted with the well-established law that the alleged *illegal* action of HCA and plaintiffs in violation of the antitrust law, the basis of the counterclaim, cannot stand as BCBSK's defense against the independent antitrust violations alleged in plaintiffs' complaint. Against that barrier, I recognized and endeavored to apply the rule of reason analysis articulated in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Instruction No. 18 reconciled these two fundamental principles of antitrust law for the jury's understanding and application to the facts. Defendant objected to Instruction No. 18 at the instruction confer-

ence (Dkt. No. 255, Tran. of Instruc. Conf. Sept. 2–3, 1986, pp. 19–22) because it instructed the jury to consider defendant's evidence of historical market conditions "if at all, only if you believe it helps you decide what will be the likely future competitive impact of the Blue Cross conduct at issue in this case—Blue Cross' announced termination of Wesley Medical Center and its related actions and communications." There is no inconsistency between that limiting instruction and the later instruction, No. 47, which detailed the evidence the jury was to consider in determining whether the restraint was reasonable or unreasonable. Instruction No. 18 also states, "I hereby instruct you now that the evidence concerning HMO–Kansas and surrounding circumstances in 1983 and 1984 was admitted for the limited purpose of allowing Blue Cross to set forth historical information about Wichita and the health care financing market." HCA itself was not even participating in the Wichita market in 1983 and 1984, and Instruction No. 18, by its plain language, does not apply to the events of 1985, when HCA purchased both Wesley Medical Center and Health Care Plus. The jury heard considerable evidence about HCA's entrance into the market and was not limited in its consideration of that evidence, and its effect, by Instruction No. 18. Second, to the extent No. 18 limits the jury's consideration of the historical market information regarding 1983 and 1984, the jury was at the same time instructed it could consider that information in order to determine "the likely future competitive impact of Blue Cross' conduct." The factors they took into account in making that determination are those detailed in Instruction No. 47:

(1) *The nature of the private health care financing industry in the relevant market....*

(2) The nature of the restraint and its effects, actual and probable, on competition in the industry....

(3) The history and duration of the restraint.

(4) *The reasons given by Blue Cross for adopting the practice alleged to constitute an unreasonable restraint.*

(5) The relative size and economic strength of the plaintiffs and defendant Blue Cross, that is, the respective share of the market possessed by each of them as well as that share of the market held by defendant....

(6) Finally, ... whether, under all the circumstances, any legitimate objectives of defendant's conduct might have been achieved by alternative means with less restrictive effects on competition.

(Emphasis added.) I do not perceive the conflict defendant attempts to erect between Instruction Nos. 18 and 47. No. 18 simply tells the jury it is limited in its consideration of this evidence to the question of whether the restraint was reasonable or unreasonable; under No. 47, the jury was clearly entitled to, and did, consider that historical information in making precisely that determination.

In Contention No. 10(c), defendant argues I improperly commented upon its evidence. At issue are comments and rulings spanning virtually the entire 6–week trial, from pages 107 through 4273 of the transcript. A trial court has broad discretion in commenting on the relevance of evidence presented at trial. *United States v. White,* 671 F.2d 1126, 1130 (8th Cir. 1982). "The trial judge is not a mere moderator or umpire in the trial of a case in federal court, and, within reasonable bounds, he has the right to participate in eliciting the truth." *United States v. Gleeson,* 411 F.2d 1091, 1096 (10th Cir.1969). The court has "responsibility for directing the jury in matters of law, and may comment on the evidence to give appropriate assistance to the jury, ... so long as it does so fairly and impartially." *United States v. White,* 671 F.2d at 1130. Judicial comment on the irrelevance of proffered evidence is not improper even when the excluded evidence forms the basis of the defendant's defense. *Id.*

A review of the excerpts on which defendant now relies convinces me the dialogues at issue are simply my best efforts to discharge the obligation to guide the trial, rule on the evidence, and assist the

jury in its understanding of the case, while nowhere expressing any opinion on the *ultimate issues* involved. A few examples will suffice.

In its cross-examination of Wesley's chief executive officer, Jack Davis, defendant attempted to use an HCA confidential document of August 5, 1985. (Def's Ex. 381.) Davis testified he had not seen that document. (Tran. 1, p. 106.) Defendant offered the exhibit into evidence, and I requested a bench conference. (*Id.*) I admitted the evidence because it was identified as an HCA document. (*Id.* at p. 107.) Defense counsel then read to the jury, "'This document is extremely confidential and should be discussed only with HCA health plans staff.' First page under a plan summary, 'HCA Health Plans will begin marketing on a phased introduction basis in 1985. Fifteen cities are targeted for introduction in 1985, with Nashville and Chattanooga planned for early August. Other cities planned for 1985 are ... Wichita, Kansas; .... Introduction dates in these markets depend on the issuance of HMO and insurance licenses.'" (*Id.* at pp. 107–08.) I responded, "See if I can understand what you just read through, Mr. Alioto. I don't know if there is anything ominous in the statement about 15 cities are targeted. Targeted for what?" (*Id.* at p. 108.) The witness had testified he had not seen the document; through this evidence defendant was attempting to infer something which was not known by the witness, the jury, or the court. I simply attempted to define, for the benefit of the jury and myself, the direction defendant was taking. Defendant answered and proceeded with its cross-examination. (*Id.* at pp. 108–12.)

Defendant next challenges the following colloquy on the issue of the price paid for Health Care Plus. Plaintiffs objected to defendant's questioning of Marlon Dauner, its own employee, about the validity of the price paid for Health Care Plus.

THE COURT: Is it an issue here that the price paid for HCP is unreasonable even though substantive? I'm not sure it is, is it?

MR. SHULMAN: I believe the evidence is, Your Honor, it was a premium price.

THE COURT: So it is. What is the difference as far as this case is concerned?

MR. SHULMAN: Well, I think it goes—

THE COURT: Everybody would know it's a substantive amount and the amount paid. What difference does it make to this jury so far as value bought?

MR. SHULMAN: I think it shows the control of the market that was purchased by HCA when it bought Health Care Plus, Your Honor.

THE COURT: I'm going to sustain the objection on that reason.

MR. SHULMAN: All right.

THE COURT: Let me just say, of course, the jury has heard what that price of HCP was, if it's 41 million dollars, a substantial figure, may be a premium price. It's a bunch of money for anything, I suppose, but that's the end of it as far as I'm concerned unless you're trying to say somewhere in this case that it was an exorbitant price paid for a company is otherwise worth and I have never understood that to be an issue.

(Tran. 7, pp. 1174–75.) Defense counsel's acknowledgment the foundation for Dauner's testimony on this point was absent is clear from the ensuing exchange conveniently omitted from defendant's present motion:

MR. SHULMAN: I think the evidence will show that, Your Honor, before we're done.

THE COURT: Well I haven't heard that at all in this case.

MR. SHULMAN: *I realize that.*

THE COURT: All right.

(*Id.* at p. 1175; emphasis added.) The testimony defendant sought to elicit from Mr. Sullivan and Dr. Kardatzke regarding the "premium" price paid for Wesley suffered the same deficiencies. (Tran. 14, pp. 2344–45; Tran. 25, pp. 4049, 4080–84.)

The remaining "examples" are simply more of the same. In some cases, notwithstanding my "rulings", defense counsel

persisted with their questions to drive home their purportedly relevant points. (See, e.g., Tran. 23, p. 3828.) To hold for defendant on this issue would essentially require that rulings on the relevance and/or admissibility of evidence be made without the benefit of dialogue between the parties and the court, or otherwise would require the court to rule on every objection outside the hearing of the jury. Neither result is required nor tolerable. In every case, the jury looks to the court for guidance and understanding on the evidence and the direction of the case. The simple act of explaining my rulings for the benefit of the jury, particularly in a case as complex as this, is the act of discharging my obligations, not the act of unfairly commenting on the evidence.

Defendant's Contention No. 10(d) is that the court improperly excluded its evidence in support of the rule of reason defense. Once again, however, I have consistently recognized and endeavored to apply the *Chicago Board of Trade* rule to the facts of this case, from the *in limine* stage throughout the trial itself. Plaintiffs contend, and I agree, that defendant was granted wide latitude in presenting the evidence allegedly "relevant" to its rule of reason defense. A number of plaintiffs' *in limine* issues were denied or taken under advisement; and even as to those issues which I initially prohibited defendant from exploring, those rulings were continually tested by BCBSK throughout the trial. Defendant's rule of reason defense strained, if not burst, the bounds of *Chicago Board of Trade*. Consequently, the jury heard abundant testimony in evidence concerning the "premium prices" paid for HCP and Wesley; the size and economic strength of HCA, Wesley and HCP; the alleged "boycott" of HMOK; the stock dealings of the physicians under contract with HCP; alleged "exclusive dealing" arrangements by Wichita physicians with HCP; HCA's alleged efforts to "monopolize" the health care and health care financing markets in Wichita; and the "threat" HCA posed to BCBSK. In fact, so much of this evidence was presented to the jury that defendant incessantly sought to inject

its counterclaim into this trial, both before this court and the Tenth Circuit through writ of mandamus. Defendant's petition for that writ was predicated on its insistence that *"the counterclaim has already been tried in front of the present jury. All the evidence that is relevant to the counterclaim has been or will be introduced in the present trial."* Even after mandamus was denied, as late as the instruction conference defendant was arguing its counterclaim should be submitted to this jury in an "advisory capacity." Defendant pursued its rule of reason defense with a vengeance, and under the rubric of *Chicago Board of Trade*, my evidentiary rulings were so broadly in favor of that defense that if they operated to anyone's prejudice it was *plaintiffs'*, not defendant's.

■ Defendant next complains I improperly excluded its evidence regarding the Federal Trade Commission's finding HCA violated § 7 of the Clayton Act, and § 5 of the Federal Trade Commission Act, by acquiring or entering into management agreements with hospitals in Chattanooga, Tennessee. *In the Matter of Hospital Corporation of America*, 106 F.T:C. 361 (Oct. 25, 1985), involved HCA's 1981 acquisition of two companies which owned or managed hospitals in various areas, including Chattanooga, Tennessee. The FTC decision was rendered months after BCBSK announced the termination of Wesley's contracting provider agreement, and defendant cannot seriously claim the FTC's ruling played any part in its decision. At the time of trial, the FTC's order was on appeal to the Seventh Circuit Court of Appeals, whose decision affirming the FTC was not announced until December 18, 1986. *See Hospital Corporation of America v. Federal Trade Comm.*, 807 F.2d 1381 (7th Cir.1986). The acquisitions in that case preceded BCBSK's activities by four years and involved a different product market and a different geographic market—acute care hospital services in Chattanooga, Tennessee. Moreover, neither the FTC nor the Seventh Circuit found HCA's acquisitions had resulted in any actual anticompetitive

effects, but simply that certain aspects of the challenged transactions "may substantially lessen competition" in violation of § 7.

The proffered evidence of the FTC's findings is not probative of any issue of motive, intent, knowledge, common plan or scheme in the marketplace at issue in the present case. Possible anticompetitive effects of HCA's purchase of several acute care hospitals in Chattanooga shed no light on HCA's motive in purchasing a single Wichita hospital, its intent in entering the health care financing market, or its plans for vertical integration in Wichita.

The only conceivable purpose of this evidence was an attempt to persuade the jury that HCA's violation of § 7 in Chattanooga demonstrates *ipso facto* it violated the antitrust laws in Wichita, thus justifying defendant's response. Given the jury's verdict in this case, it is passing strange BCBSK would be making any argument based on the premise "once a monopolist, always a monopolist." This "character evidence" is inadmissible under Rule 404(a) of the Federal Rules of Evidence, both because of its prejudicial impact and its limited probative value. *United States v. Puckett*, 692 F.2d 663, 671 (10th Cir.1982), *cert. denied* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 497 (1983). A court has broad discretion to exclude proffered evidence, even if technically admissible, where its probative value is substantially outweighed by the danger of unfair prejudice and confusion of issues. *See* Federal Rule of Evidence 403; *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703 (2d Cir.1983); and *Internat'l Shoe Machine Corp. v. United Shoe Machine Corp.*, 315 F.2d 449 (1st Cir.), *cert. denied* 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 504 (1963). The issues in the present case involved *defendant's* intent, motive, and power in the market, and the anticompetitive impact of *its* activities. Under defendant's rule of reason defense, the jury heard volumes of direct evidence about the size, effect, and intent of HCA in the Wichita marketplace. The proffered evidence of the FTC decision regarding past events in Chattanooga, Tennessee would have added nothing, unless it

be defendant's right to have this jury decide the case on something other than the precise questions at issue.

■ Defendant's next argument, that evidence of alleged price fixing was improperly excluded, must also be rejected. The "evidence" proffered by BCBSK did not even approach "proof" of price fixing. The only thing at issue was an exchange of information relating to proposed price increases by two Wichita hospitals. There was no evidence of any agreement on price, or even parallel behavior, arising out of that exchange of information. It is within the sound discretion of the trial judge to prohibit parties from introducing evidence on collateral and prejudicial issues. *Cafasso v. Pennsylvania RR Co.*, 169 F.2d 451, 454 (3d Cir.1948). Even if there was "proof" of price fixing in the hospital services market, that is irrelevant to defendant's ability to restrain trade and monopolize the health care financing market. BCBSK certainly did not justify the August, 1985 termination of Wesley's contract as a mechanism to eliminate price fixing; in fact, defendant first became aware of the exchange of price information long after this litigation began. Finally, since BCBSK pays MAPs, not a hospital's actual charges, neither Wesley's termination nor the resulting reduction in MAPs would in any way lessen or eliminate collusion among hospitals in setting charges—the type of collusion defendant now alleges. This evidence was properly excluded, and defendant has not been deprived of any substantial right.

*Was Defendant Prejudiced by the Court's Responses to Questions From the Jury?*

■ Jury Instruction No. 43 reads in part:

If you determine defendant Blue Cross controls something less than 80% of the relevant market, to determine whether defendant has market power you should consider its relative size in relation to the following two factors:

(a) market structure; and

(b) the business policies, conduct and performance of the defendant.

The market structure is perhaps the most important element to be considered in determining whether or not market power exists for purposes of Section 1 of the Sherman Act. Analysis of market structure requires you to examine all competitive factors which bear on defendant's power to control prices or exclude competition. Among the factors you are to consider are the following:

(1) Number of firms in an industry;

(2) Relative size and strength of remaining competition;

(3) Increase of decrease in the defendant's market share;

(4) Past and probable development of the industry, that is, whether it is relatively static without sudden changes in the style of merchandise or volume of demand, or whether the industry is dynamic and constantly changing;

(5) Ease with which new firms may enter the industry; and

(6) Consumer demands, ...

All of these competitive factors must be taken into account in determining the existence of market power. Each of the factors is of equal importance; one factor will seldom control the final determination.

On the second day of deliberations the jury submitted the following question to the court:

On Instruction No. 43, Factor (5) in reference to which new firms may "enter the marketplace," is this in reference to gaining a share in the market or does this refer to a new product simply being licensed in Kansas? If neither definition is correct, would you please clarify as to the proper definition of the term?

(Dkt. 242, Tran. of Jury Questions & Related Proceedings (JQRP), p. 3.) This question was presented to counsel for both sides and they were heard on this issue, after which I responded to the jury as follows:

Instruction No. 43 addresses certain factors you may consider in addressing Blue Cross' market power and/or monopoly power, if any. Factor (5) of this instruction inquires of you as to the ease with which new firms may enter the industry and is, in the Court's view, self-explanatory. In the interest of clarity, however, "barriers to entry" fairly implies or assumes the ability to become a meaningful competitor.

(Tran. JQRP, pp. 11–12.)

Defendant contends this response is "flatly wrong and contrary to law, since it directs the jury that to find low barriers to entry, the jury must find that new entrants will be able to compete successfully or 'meaningfully'." I perceive no error.

"Barriers to entry" may be of many types, not the least of which are regulatory and economic obstacles. It cannot be that one's ability to simply surmount regulatory hurdles means *ipso facto* all established competitors lack market or monopoly power for purposes of the Sherman Act. The jury's question, and defendant's present argument, suggest that merely obtaining a license to sell insurance is sufficient to constitute "entry" for purposes of assessing the presence of absence of market and/or monopoly power. In significant part, those inquiries are directed to defendant's power to exclude *competition*. Giving effect to defendant's argument would enable companies with *de facto* power to exclude competition to deny that simply because others can easily obtain regulatory approval, when that has only limited bearing on actual, productive and efficient competition in the market. It ignores the economic barriers to actual competition which, intentionally or otherwise, defendant itself has erected in the market. What are those economic barriers? Defendant's unique ability to contract directly with Kansas hospitals; its provider contracts with all hospitals in this state; the most favored nations clause of those contracts preventing hospitals from providing any better price to defendant's competitors; the "clout" with Kansas hospitals, which defendant itself recognizes; and defendant's grip on 60% of all medically insured Kansans. Regulatory approval may thus be viewed as a preliminary "pass" or "ticket" for others to enter

the market, but where a large company with these powers has effectively barred from within the door to the marketplace, the regulatory ticket is worthless and speaks nothing about barriers to entry as they relate to defendant's power to exclude *competition.*

Therefore, "barriers to entry" cannot be limited to the simple question of whether regulatory requirements are stringent or lax. Given the broader inquiry to which this factor is related, that is, power over price and/or power to exclude *competition,* "barriers to entry" must embrace both the regulatory and economic realities of the market. The Sherman and Clayton Acts ensure consumers the benefits of free, open and unrestrained competition. The only competition conceivably benefiting consumers at the consumption level is that between different products, prices, terms, services, etc., *i.e.,* market competition through which consumers are offered a choice among competing products. Kansas health insurance consumers do not buy regulatory licenses; they buy health care financing products. The "ease of entry" analysis must embrace everything obstructing the ability of new entrants to attempt to deliver price-competitive health care financing products into the hands of Kansas consumers, if that inquiry is to serve its purpose in determining the market and/or monopoly power of BCBSK, an established market player. Thus, "ease of entry" fairly implies or assumes the ability of others to become meaningful competitors: not simply their ability to obtain a regulatory license, but their ability to enter the market itself and attempt to deliver a price-competitive product to Kansas consumers. The distinction is critical, and the jury was so instructed.

In no sense was the response worded, nor it could be understood, to mean the jury must find others "succeeding" in the market. The word "success" is wholly absent from my response. It is entirely possible for new entrants to possess both the regulatory and economic *ability* to enter as meaningful competitors, and yet fail miserably on the merits of their products. But where new entrants are denied the regula-

tory and economic abilities to meaningfully compete, that bears directly on an established company's market and/or monopoly power.

Thus, licensing alone cannot be the end of the inquiry into the ability of others to enter a market in a fashion showing the absence of market or monopoly power on the part of existing players. The very cases defendant now relies upon support this analysis and my response to the jury. In *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance,* 784 F.2d 1325, 1335 (7th Cir.1986), the court discussed the relevance of barriers to entry as follows:

In many cases a firm's share of current sales does indicate [market] power....

In other cases, however, a firm's share of current sales does not reflect an ability to reduce the total output in the market, and therefore it does not convey power over price. Other firms may be able, for example, to divert *production* into the market from the outside. They may be able to convert other *productive capacity* to the *product* in question or import the *product* from out of the area. *If firms are able to convert other productive capacity to enter, expand, or import sufficiently quickly, that may counteract a reduction in output by existing firms....* To put these points a little differently, the lower the barriers to entry, and the shorter the lags of new entry, the less power existing firms have.

(Emphasis added.) "Ease of entry", then, is the ability of other firms to enter the market in a meaningful fashion by introducing additional productive capacity, thereby restoring competitive conditions in a market in which existing firms might seek to exercise market power. In *United States v. Waste Management, Inc.,* 743 F.2d 976, 983 (2d Cir.1984), the court's "ease of entry" analysis was specifically premised on the district court's finding that "individuals operating out of their homes can acquire trucks and some containers *and compete successfully* 'with any other company.'" (Emphasis added.) In *United States v. Hammermill Paper Co.,* 429 F.Supp. 1271, 1285–86 (W.D.Pa.1977), the

court's "ease of entry" findings were based on evidence relating to the requirements needed to establish additional paper merchant outlets *"with substantial sales volume"* and evidence of *"strong competition"* provided by recent entrants at the manufacturing level. *See also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. ——, —— - —— n. 15, 107 S.Ct. 484, 494–95 n. 15, 93 L.Ed.2d 427, 441–42 n. 15 (1986) (no barriers to entry because plants could be *producing efficiently* in short amount of time); *Northeastern Tel. Co. v. American T & T Co.,* 651 F.2d 76, 80 (2d Cir. 1981), *cert. denied* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (evidence of plaintiff's revenue growth from $70,000 to $3 million in seven years and additional successful entry by "huge conglomerates"); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 821 (6th Cir.1982) (evidence of actual entry by new firms able to successfully underbid existing competitors); *American Floral Service v. Florists' Transworld Delivery,* 633 F.Supp. 201, 222 (N.D.Ill.1986) (evidence of successful entry by new firms); *White Consolidated Industries, Inc. v. Whirlpool Corp.,* 612 F.Supp. 1009, 1015 (N.D. Ohio 1985), *vacated* 619 F.Supp. 1022 (N.D. Ohio 1985), *aff'd* 781 F.2d 1224 (6th Cir. 1986) (evidence of actual market entry at the marketing level).

Thus, my response to the jury simply reflected the law and the logical purpose of the "ease of entry" inquiry: the ability of firms to actually enter the market and engage in meaningful competition, in order to assess defendant's market power or monopoly power, or the lack thereof. It is incredulous to believe, or argue, existing market players lack market or monopoly power simply because others hold a paper license, when at the same time those others are foreclosed from effective economic competition in that market. Contrary to defendant's assertion, my response to the jury's question does not constitute a "guarantee of success," or require the jury to find the presence of other "successful" competitors in the market. It merely called upon the jury to assess the existing prerequisites, regulatory and economic, necessary for firms to come into this market as actual competitors, in a fashion meaningful to consumers, not merely as theoretical possibilities or false hopes.

■ Defendant next takes issue with my response to a jury question regarding Instruction No. 46. In part, that instruction reads:

The amount or quantity or value of the interstate trade or commerce involved or affected by an unreasonable restraint of trade is immaterial. The antitrust laws of the United States brand as unlawful any contract or combination or conspiracy which would operate to restrain unreasonably any interstate trade or commerce regardless of how small in amount or quantity or value. To determine whether there was an unreasonable restraint, you need not find a specific injury, but must find conduct which appears to be reasonably calculated to, or tends to, prejudice the public interest. That public interest is that competition be open and unrestrained.

On September 26, 1986, I received the following question from the jury:

If the jury finds, (in accordance with Instructions 46 through 52) that the reasonable and unreasonable pro versus anti-competitive effects in the market balance out against each other, is the fact that there did exist conduct [as per Instruction 46] which appeared to be reasonably calculated, or tended to prejudice the public interest, to be given any weight in deciding the question of unreasonable restraint?

(Tran. JQRP, pp. 78–79.) After hearing counsel for all parties on this issue, I answered the jury's question, "Yes." (*Id.* at p. 82.) Defendant now contends this answer impermissibly relieved Wesley of its burden of proof and allowed the jury to consider matters extraneous and irrelevant to the issue of market effects under the rule of reason.

Instruction No. 46 was taken from the ABA Antitrust Civil Jury Instructions (1980). Defendant did not object to Instruction No. 46. (See Dkt. 255, Tran. of

Instruction Conference Sept. 2–3, 1986.) The "public interest" referenced in the jury's question, and implicit in my one word response, was specifically defined in Instruction No. 46 as the public interest and free and open competition, lying at the very heart of the antitrust laws. *See Community Communications Co. v. Boulder,* 455 U.S. 40, 56, 102 S.Ct. 835, 843, 70 L.Ed.2d 810 (1982); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972). In no sense was my response "an open-ended invitation to consider anything that might strike [the jury's] fancy, or appear to be arguably relevant to this case." The response merely confirmed the substance of Instruction No. 46, and squarely focused the jury's attention on the competitive ramifications of defendant's conduct. That the instruction itself, and my response, were entirely proper is evident from controlling law.

The [rule of reason] test prescribed in Standard Oil is whether the challenged contracts or acts "were unreasonably restrictive of competitive conditions." Unreasonableness under that test could be based *either* (1) on the nature or character of the contracts, *or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade* and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.

*Nat'l Society of Prof. Engineers v. United States,* 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978) (emphasis added). Defendant has waived any objection to Instruction No. 46 by failing to lodge a timely objection. *See Fiedler v. McKea Corp.,* 605 F.2d 542, 548 (10th Cir.1979). That instruction was entirely consistent with prevailing law. My response to the direct question from the jury merely confirmed the substance of that instruction, and is not now grounds for JNOV or new trial.

*Was Defendant Prejudiced by Post-Trial Procedures During the Jury's Deliberations?*

After attending six weeks of trial, listening to the testimony of approximately 40 witnesses, and being presented with over 300 exhibits, the jury began its deliberations on September 3, 1986. The deliberation room is located above my courtroom and personal chambers, and access to that deliberation room can only be obtained through the front of the courtroom itself. Less than one week after the jury began its deliberations, I began another jury trial in *Meuli v. A.O. Smith Harvestore Products, Inc.,* No. 84–1527–K. The jury in the present case (the "Blue Cross jury") normally entered the deliberation room at approximately 9:00 o'clock A.M. to begin work. Proceedings in *Meuli* normally began at approximately 9:30 A.M. To preserve the sanctity and progress of the Meuli trial, it was necessary to inform the Blue Cross jury that they, in turn, would be informed of the times at which they could leave the deliberation room for morning or afternoon breaks, or lunch, if they so desired. On September 17, 1986, after the Blue Cross jury had been deliberating for 10 days, my law clerk, acting as bailiff, informed the jury they could take a break from deliberating because the Meuli trial had momentarily recessed. The jury foreman voluntarily advised my law clerk that deliberations were progressing slowly that day and the jurors wanted to go home early. The clerk promptly informed me of this and I in turn shared it with counsel for the parties. (Tran. JQRP, p. 28.) I said to counsel:

I think it's time—they have been up there two weeks—just to bring them down, my first principal concern is just to have them understand how important their time is and they should not be rushed. On the other hand, I think I would ask them if they are having any problems and can I help them in any way as it might relate to reaching a verdict and can they reach a verdict. Diane [my law clerk] just tells me they are having problems with some of the matters, I guess, or whatever you said. Having done that, I'm ready now to remind them something about the importance of their own service here, recall the time and expense and energy that has gone in this

case, and its importance and they should come to realize how important it is that [they] do reach agreement if they can. I have no idea what their problem is. I don't have any reason at this time to think they are actually locked up, other than they have been there two weeks now and they have had ample time of course to read and reread about everything that is up there, and with what my clerk tells me, I think it's time to chide them on, stir them on. So I'm going to do that.

(*Id.* at pp. 28–29.) I informed counsel of the substance of a supplemental instruction I would give to the jury, focusing on the jurors' suitability to serve in this capacity; that they must decide this case on the basis of evidence presented; to remind them of the responsibilities and their duty to be impartial; and to urge them to keep working. (*Id.* at pp. 29–30.) What I wanted to know, and what I told counsel I wanted to know, was whether the jury was making progress and did they believe they could reach a verdict. (*Id.* at p. 30.) "I think I can do it without in any way having this jury understand: 'By God, we have got to reach a verdict one way or another,' that sort of thing, or in some harsh way as *Allen* dictates. That is a criminal case and I understand why it's criticized, but this isn't." (*Id.*, p. 31.) Defense counsel voiced no objection and said, "I guess that's all right." (*Id.*, p. 31.)

The jury was then brought into the courtroom. In response to my questioning, the jury foreman told the court and counsel for the parties that the jury was not deadlocked, and in fact was making progress and could reach a verdict on at least some issues. I then delivered my first supplemental instruction to provide the jury "some things that you might take into account as you continue with your deliberations." (Trans. JQRP, pp. 31–33.)[18] At no

---

18. The court, in addressing the jury, stated at pp. 33–38 of the JQRP:

I needn't tell you of the time that was expended here in a trial of this case, some seven weeks. You would know out of hand that to try it was a rather expensive venture for both of these sides. More than that, an expenditure of considerable energies [sic] and talent by these persons, but also your own and mine in hearing this case. I can tell you that from what I could see, it truly has been fully tried and fairly tried and it's all there in the evidence for you to make your judgments. Conversely, I would say to you that if this case were retried and has to be retried, that is to say mistried because of a hung jury of sorts and we did it all over again, I wouldn't know how to say that the case could be better tried to another jury. I think I made it clear when we closed out seven weeks ago or whenever, this is probably the best tried case by the best kind of attorneys that I have ever had the privilege to officiate with, and you should know that. As to those instructions that you had, ninety-four in number, took me three hours to read them to you, if you recall, again, so far as I can see, taking in account the instructions and the questions that are somewhat self-explanatory, it's the best I can make them. I'm just human and they are as clear as I know how to do. But, more than anything else, if we had to ever face down to that situation and we start over, somewhere down the line, honestly, folks, we can look this world over and we are not going to find a better jury, any of us, than you people that have given so much now of your time and

your talent. Indicating you're a congenial bunch and you have kept your wits and your humor, certainly a well-balanced cross-section with good common sense, and all of the lawyers know it and I know it and you know it. All of us are impressed. We are impressed with your attention span, your notes as you kept them. I'm convinced that when ya'll went to that jury room you truly did know about as much as you're ever going you [sic] think you need to know in this field.

Again, it is just a reminder of that. I would encourage you, don't give up, and come to grips with who you are. You're the best kind of jury that this Court could ever ask for, so I would encourage you to stay in there.

If I had any parting thoughts—and you indicated you want to go home, welcome to— maybe it is just to draw on some human nature qualities that probably persuade any kind of a body such as a jury that are each asked for your input and your own views and your own thoughts of the matter, you draw from your own good experiences and put your own sense of common sense into the background. Maybe, however, when all that transpires, work at it and think through it and come to grips with the questions, human nature sometimes can be that you wander away from your instructions and put into the factors here things that aren't in evidence and you may be holding judgments that aren't in evidence or considering extraneous matters that you should not be considering. And human nature is that but you should remember that. People just sometimes are set in their ways or hardheaded or obstinate or things of

time did defendant register any objection to my first supplemental instruction or my attempt to gauge the progress of deliberations.

Six days later, on September 23, I instructed my second law clerk/bailiff to ask the jury foreman if the jury was making

progress. The foreman informed my clerk/bailiff that the jury was having problems reaching a verdict, but it did not appear futile to continue deliberating. (Tran. JQRP, pp. 59–60.) Following an in-chambers discussion with counsel, I read the jury another supplemental instruction. (*Id.*, pp. 64–67.) [19] Defendant objected to

that character, and that is their nature, but that same person with good common sense, knowing his or her duty, should also know that that's not proper here if they can also realize they have some obligation to listen to the other side and try to come to grips and blend your own views with theirs, if you can.

I can think, by example, my own experience with other jurors has been that sometimes as you're picking on a particular decision or rule or evidence or what happened in this event or that, that you are drawing from the criminal experience as opposed to your duties in the civil case. I addressed that, I think, in the jury selection. In jury cases here in hearing a criminal case sometimes as they start—you have to test the evidence beyond any reasonable doubt and set aside these exigencies, still have a reasonable doubt in their mind, then they have to acquit somebody. I think human nature is that in civil cases sometimes the people test the evidence in a more severe test than they should if they understand the responsibility in a civil case, which is to approach it reasonably. The test really is to test it in the framework of is it more likely so than not that this occurred? Is that a reasonable proposition? Am I persuaded reasonably? I wouldn't know if that is your problem or not. I just know that human nature is sometimes that people pick on something that maybe is not a fair test. If they look at it reasonably, they can see it in a different light if they understand that is your responsibility in a civil case, as I know you do. I closed the other day when I mentioned lastly that probably in jury selection we ought to inquire if people like puzzles, and I think that does have some application. Jurors are really expected, understanding the case, to do their dead-level best to see if they can make that puzzle fit all together. You talk of forty plus witnesses and three hundred exhibits and all of the records that you have up there, that's what you're asked to do. You're challenged to see if you can be persuaded reasonably that that puzzle fits. If when you're all done, you find that there is a missing piece of that puzzle, then it doesn't fit. It's that simple. But in this case, the instructions I think tell you what you're charged to do. All the pieces are on the table and it's for you now to put them together as best you can.

So, if I can only leave you with this word as to what I said up front in those instructions, that you surely have to remember you did take an oath in this case and all of us expect

you to carry it out, as we know you will. Somewhere in those instructions I certainly say you must remember that you're not partisans in this case. You don't have your favorites. You have to be jurors and fact finders and then charge the case in that light and understand what you have before you and your responsibilities. I know you can do it. I think what you said to me, sir, you think you can do it.

I don't know if what I have said here has helped at all, but I did think it was time to maybe in light of what was said to my clerk, ought to bring you down and just kind of refresh you on some of your responsibilities and urge you on and certainly to inquire if there was any serious problem. I take from what you said, sir, at this moment that there's not. And I would only leave you to say that if time is a problem, just stay in there. If you need more time, take it. Nobody here would remotely tell you that anyone is impatient with this jury. We're not. We'll stand by to Halloween if need be awaiting to hear from you.

So, that is about all I can say now. And, again, if you want, you want to go up and commence your deliberations or take a break, want to go home, get a good nights sleep, walk around the chair, whatever you do, do it; then tell us what you want to do. You want to come back in the morning, that is fine. All right. Okay. You're excused. Thank you.

19. The court addressed the jury at pp. 64–67 of the JQRP as follows:

All right. Let me just make this observation and I have handed a formal statement to you and I do appreciate your communications and your patience and I say that again. I'm going to ask you, however, that you continue with these deliberations in an effort to agree upon a verdict and dispose of this case.

I wanted to make additional comments here that you might consider as well: Again remind you of the importance of this case. If you should fail to reach a decision this case is left open and undecided. Like all cases, it must be decided sometime. No reason to believe that the case can be tried again in any better or more exhaustive way than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side. Finally, there is no reason to believe that the case would ever be submitted to seven people more intelligent, more impartial or more reasonable

certain parts of the supplemental instruction and the timing of the instruction: "[M]y concern about the error in giving the instruction in our view was the fact that the jury foreman had indicated that they didn't feel they were deadlocked. I felt like not only timing wise, not only I objected to the instruction but it was the timing in light of that." (Tran. JQRP, p. 72.) Defense counsel also stated: "[The o]ther thing that I'm concerned about a little bit is I'm as much as the Court interested in what the jury is doing. At this time I think we must, because of the delicate nature of this situation, not have any further communication with the jury unless they ask a question, and I think that at this time we need to see what they are going to do, and for that reason I make any motion [sic]."

(*Id.*, p. 69.) Approximately 24 hours later, or after no more than eight additional hours of deliberation by this jury, defendant moved for a mistrial, arguing the jury was taking *too long:* "I think that at some point—Your Honor, the purpose of my motion is that we need to have something occur from this case. We would move that the court exercise its discretion to discharge the jury and enter judgment in accordance with our motions for directed verdict at the conclusion of the case." (*Id.*, p. 73.) How could it possibly be that my second supplemental instruction was erroneous in part because it was "too early," and yet after no more than eight additional hours of deliberation, defendant was entitled to discharge the jury because it had been out "too long"? Discharge was not

than you. Remember that the plaintiffs need only convince you of the sufficiency of their claims by a preponderance of the evidence. That is, more likely so than not. Plaintiffs do not labor under the higher burden of proving their claims beyond a reasonable doubt. If a substantial majority of your members agree on the absence of particular elements of the plaintiffs['] claims under the preponderance of evidence standard, each dissenting juror ought to reconsider his or here [sic] views since the evidence appears to make no effective impression upon the mind of others. On the other hand, if a majority of you find the plaintiffs have established the elements of their claim by a preponderance of the evidence, the other jurors ought to ask themselves again and most thoughtfully whether they are evaluating the evidence under the correct preponderance standard or whether they should continue to distrust the weight and sufficiency of evidence which convinces their fellow jurors that the elements of the plaintiffs' claims are more likely so than not. The fact each dissenting juror entertains some doubt about plaintiffs' claim does not necessarily mean that the plaintiffs have failed to produce a preponderance of the evidence to support their claim. Evidence must be evaluated under the correct standard without bias, prejudice or sympathy towards any party. One great mistake jurors or juries make in deliberating ofttimes on a verdict in a case is injecting an issue into the case which was not brought up or contended for in the courtroom trial or on which there is no evidence whatsoever. One good cure for such a misunderstanding and misconduct of a juror or jurors is to carefully read the instructions of the Court which focus on the issues to be decided. The Court's instructions contain the advice that a juror may use his or her common sense

in evaluating facts shown in the evidence. This advice clearly means that if some fact asserted is so contrary to human experience and belief, it may be rejected as not true, or if the fact is in accord with such ordinary human experience and belief, it may[ ]be accepted as true. Most of the jurors' mental function is to use his or her sense of good judgment to determine the truth, which means determining the believability of evidence admitted by the Court. Use of common sense does not include or invite the consideration or introduction of discussions by a juror of a fact, situation or issue that's not in this case. Likewise, the permission to use one's common sense does not mean a juror is licensed to decide the case any way they wish. The verdict must be based on the belief or disbelief of part or all of the evidence that is before you. Let me recite again that at all times no juror is expected to yield a conscientious conviction that he or she may have as to the weight or the effect of the evidence, but you must remember that after full deliberation and consideration of the evidence in the case, it is your sworn duty to agree upon a verdict if you can do so. So, again, you may be as leisurely in your deliberations as the occasion may required [sic] and you should take all the time you feel that is necessary.

Having said that, I will then again ask you that you retire once again to the jury room, and please continue your deliberations with these additional comments in mind to be applied of course in conjunction with all of the instructions that I have previously given you.

I don't know if that will help or not but I would ask that each juror take it to heart, read it and reread it if necessary, as you come to grips with the decision in this case, if you can do it. I will send you back. Thank you very much.

the answer; defendant's motion was denied. The answer, rather, lay in cautious, isolated attempts to simply discern whether or not the jury was continuing to make any progress in its deliberations.

On September 25, after communicating my intentions to counsel, I sent a note to the jury stating:

As long as the jury is deliberating toward reaching a verdict, you're at liberty to continue doing so as long as you believe necessary. If this is the case, of course, you're at liberty to leave early Friday afternoon.

Does it appear now that you can ultimately reach a verdict? Please advise.

(Tran. JQRP, p. 77.) The foreman responded through my clerk/bailiff that it was too early to tell whether they could ultimately reach a verdict, and the jurors were going home early and would return the next day to continue deliberating. (*Id.*, p. 77–78.) The next day, after the jury deliberated further and asked additional questions, I again told my clerk/bailiff to inquire whether the jury was making progress. (*Id.* at p. 82.) I informed counsel:

Yesterday I inquired of this jury as to their wishes about whether they could reach a verdict and sensitive to timing in that they are always anticipating [being] off on Friday [afternoon], and it was my thought if they could stay today. So, we awaited some word. Now since that time I think they have had a couple of questions and been at work with that. I asked my clerk to inquire what are their wishes. Frankly if they were then ready to [say] in response to a question that they are hung, come down and do something. We have reported through the foreman that they are making progress. They will elect to go through the noon hour and work until one o'clock [and] go home with every confidence that they can reach a verdict by the early part of next week.

(Tran. JQRP, p. 82.)

The following week, on September 30 (the 23rd day of deliberations), I directed my clerk/bailiff to tell the foreman that I would bring the jury into the courtroom before lunch to inquire about their progress. (Tran. JQRP, p. 96.) Upon that inquiry by my clerk/bailiff, the foreman responded with a note telling me "[w]e would welcome listening to your comments as soon as as [sic] is convenient for you, instead of waiting until after lunch, especially if they relate to the questions of punitive damages." (*Id.*) After the jury's response was relayed to counsel—and it became painfully obvious one or both plaintiffs had prevailed at least on the tortious interference claims—defense counsel, feigning ignorance and outrage over my approach, objected to my clerk's "contact with the jury." (Tran. JQRP, p. 97.) I responded to the jury: "It was my intention to inquire of the jury as to whether they are making progress toward reaching a decision one way or the other and today. In light of your question, it would appear that progress is ongoing. If you have any specific questions with regard to the element of punitive damages, please inquire." (*Id.*, pp. 96–98.) Following further questions on the element of punitive damages (*Id.*, pp. 98–102), the jury returned its verdict at 4:10 P.M., on September 30, 1986. (*Id.*, p. 103.)

■ Defendant now asserts it is entitled to a new trial because my supplemental instructions "coerced the jury" into returning a verdict for Wesley, and my attempts to ascertain the progress of jury deliberations were "prejudicial error." Clearly, the extenuated deliberations in this case, counsels' and the jury's personal needs and schedules, and the interests of those involved in the *Meuli* litigation, necessitated accommodation and some informalizing throughout this process. Nothing was done without the prior knowledge and approval, or at least acquiescence, of counsel whom I trusted. I regret and resent defendant's belated attempt to make me the scapegoat for a multi-million dollar verdict in Wesley's favor. Each of the defendant's present arguments must be rejected,

and given events which have subsequently come to light, certain defense counsel are

hardly in a position to contend *I* somehow acted improperly with this jury.[20]

20. Over three and a half months after the verdict was returned, and *10 minutes* before hearing oral argument on the post-trial motions in this case, I was visited by Mrs. Zelma Greenwood, one of the seven jurors, who delivered a 4–page, handwritten letter to me. In her letter, Mrs. Greenwood recanted her verdict, listing a number of "reasons" she was "forced into the decision that was given." (Dkt. 281–82.) Her reasons may be of interest to some, but not me.

Mrs. Greenwood proceeded into the courtroom and delivered a copy of her letter to defense counsel Shulman. She offered to provide a copy to plaintiffs' counsel but did not bring one with her into the courtroom. (*See* Dkt. 290, Att'd Aff. of Robert H. Rawson, Jr., ¶¶ 3–4.) Mrs. Greenwood remained in the courtroom for most of the hearing, as if to be available for the court's inquiry. I announced to all counsel at the outset of the hearing I had just received a troubling communication from one of the jurors and would consider its significance, if any, upon completion of oral arguments. (Dkt. 287, Tran. of Motions Proceeding Jan. 16, 1987, p. 4.) Mrs. Greenwood's letter parrots defendant's present arguments concerning my supplemental instructions to the jury. During the course of oral argument on these points, defense counsel Shulman rather impatiently inquired as to when we would address the matter of her letter. (*Id.,* pp. 83–84.) He later denied knowing she was coming to the hearing, stating that so far as he was concerned it was simply a "coincidence". (*Id.,* p. 145.) In light of my own questions about the import of her letter, I shared copies of it with all counsel and asked them to respond as to its effect, if any. (*Id.,* p. 148.)

I occasionally permit lawyers to communicate with jurors, in certain cases, following return of the verdict and the polling of the jurors. In my view, lawyers and litigants welcome the occasion to extend their appreciation to the jurors for their time and service. But in such an event, and in this case, I first remind the lawyers *not* to discuss the merits of the case, the reasons underlying any of the jury's decisions, or any part of its deliberations.

When the verdict was announced to a full courtroom on September 30, 1986, and after the jurors were polled and released from service, they were so greeted by the attorneys. Indeed, I myself participated in this, stepping down from the bench to host a "receiving line" of sorts. Each juror passed through this line on the way out of the courtroom. I recall my own salutation to Mrs. Greenwood; she exhibited no anxiety about her decision. She, like the others, seemed relieved and even pleased with her role.

Later that evening, as I left my chambers after business hours, I observed defense counsel Shulman and Alioto sitting with Mrs. Greenwood in a hallway adjacent to the courtroom. Surprised, I reminded counsel they were not to discuss the case with her. One responded, "Oh,

we're not!" (See also Aff. of Robert H. Rawson, Jr., ¶ 2.)

Recalling these events, and in light of the "coincidental" appearance of Mrs. Greenwood at the hearing on January 16, 1987, my misgivings heightened. On January 20, 1987, I conferred with United States Attorney Benjamin Burgess and requested that he contact juror Greenwood for the limited purposes of determining if anyone encouraged her letter, suggested its content, or apprised her of the January 16 hearing.

On January 22, Mr. Burgess, accompanied by an FBI agent, met Mrs. Greenwood for the purposes directed. Mr. Burgess then reported to me that defense counsel Shulman and Alioto had returned to Wichita, from Topeka, the day following the verdict and met with Mrs. Greenwood at a Grandy's Restaurant located on South Seneca Street. Following that meeting, Mrs. Greenwood called Mr. Shulman's office on at least one occasion to inquire whether he received the " 'first draft' " of her letter. Approximately one week before oral argument on the post-trial motions, counselor Shulman telephoned Mrs. Greenwood and informed her that hearing was scheduled for January 16, at 1:00 p.m.

The state courts of Minnesota, where counselor Shulman is licensed to practice, have made it abundantly clear attorneys should refrain from contacting jurors in hopes of impeaching a verdict. *See Olberg v. Minneapolis Gas Co.,* 291 Minn. 334, 191 N.W.2d 418 (1971). Why defense counsel might hope the rule is any different in this court, particularly in light of my two-fold warnings not to discuss the merits or the deliberations, is beyond belief. Further, it is axiomatic that where, as here, a jury gives its unanimous assent to a verdict, individual jurors will not thereafter be permitted to impeach their verdict. *See* Fed.R.Evid. 606(b); *United States v. Miller,* 806 F.2d 223 (10th Cir.1986); *United States v. Vanelli,* 595 F.2d 402, 407 (8th Cir.1979); *United States v. Schroeder,* 433 F.2d 846, 851 (8th Cir.1970), *cert. denied* 401 U.S. 943, 91 S.Ct. 951, 28 L.Ed.2d 224 (1971); *United States v. Chereton,* 309 F.2d 197, 200 (6th Cir. 1962), *cert. denied* 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); and *United States v. 16,000 Acres of Land, etc.,* 49 F.Supp. 645, 654 (D.Kan. 1942).

This inquiry need proceed no further. Defense counsel knowingly and blatantly violated my express rulings to avoid any communications with the jurors regarding the case or their deliberations. Adding insult to injury, Mr. Shulman, an officer of this court, misrepresented on the record his involvement. This entire matter reeks of fabrication and contrivance, if not obstruction of justice. *See generally* 18 U.S.C. § 1503 (influencing a juror), and § 1509 (obstruction of court orders). Defendant's motion for an evidentiary hearing is overruled; I refuse to lend any credence whatsoever to so-called

■ I informed counsel for both parties of the substance of my first supplemental instruction in chambers prior to presentation to the jury. Defendant never objected to the substance of that instruction, either before or after it was given. Accordingly, defendant is prohibited from now raising purported error in Supplemental Instruction No. 1, in an attempt to get a new trial. *See Chevron, USA, Inc. v. Hand,* 763 F.2d 1184, 1186–87 (10th Cir.1985); *Gundy v. United States,* 728 F.2d 484 (10th Cir.1984); *Neu v. Grant,* 548 F.2d 281, 286–87 (10th Cir.1977). In the absence of an objection, a court "will not review the propriety of the instruction given." *Fiedler v. McKea Corp.,* 605 F.2d 542, 548 (10th Cir.1979). Defendant waived any objection it may have had to Supplemental Instruction No. 1 and cannot now assign error to its use.

For the same reasons, defendant will not now be heard to assign error to Supplemental Instruction No. 2 in its entirety, because not only did it not object to the instruction *in toto* when it was given, but defendant agreed to a part of the instruction about which it now complains. Defendant's only timely objections to Supplemental Instruction No. 2 were that it "significantly overemphasizes the notion of the burden of proof", and that the part of the instruction which told the jurors they "should not abandon their conscientious conviction [was] too weak." (Tran. JQRP, pp. 62–63.) There was no objection to that part of Supplemental Instruction No. 2 suggesting the dissenting jurors should reconsider their views if the majority was convinced. Defendant's own proposed modification of Supplemental Instruction No. 2 contained language virtually identical to that it now attacks. Defendant's proposed language read:

> Those persons finding themselves in the minority should thoughtfully consider whether the opinions you hold are based on solid foundations.

Defendant cannot now assign error to those parts of Supplemental Instruction No. 2 to which it not only objected but "evidence" obtained in this contemptible manner.

which closely follow their own suggested instruction.

Finally, and for the same reasons, I view with no small degree of skepticism defendant's argument regarding my isolated attempts to gauge whether the jury was making any progress in its protracted deliberations. For the first few weeks of the jury's deliberations, Messrs. Shulman and Alioto were present at the courthouse, while remaining defense counsel attended to other matters. During that time I did "informalize" because of the circumstances already mentioned. After the jury first indicated on September 17 it might be having some problems (Tran. JQRP, p. 28), there was never any attempt to gauge the jury's progress without first informing counsel for all parties, at least on an informal basis. If defense counsel Shulman and Alioto didn't "approve" of my undertakings, they at least acquiesced, and never raised any objection. At some point Messrs. Shulman and Alioto left and were replaced by Mr. McCallister and Ms. Tibke, who denied all knowledge of these events and raised a nonspecific objection to the contact at one point (Tran. JQRP, p. 69), and said nothing after having been informed of a later similar request (*Id.,* pp. 82–89). Only after Mr. Shulman and Mr. Alioto returned to the courthouse, and on the last day of deliberations, was there a full-fledged objection to my limited inquiries as to whether the jury was making progress. (*Id.,* p. 97.) As indicated, my response to that objection was that "the only inquiry that has ever been made by me to the jury [is] as to the state of progress and that query has been agreed upon by counsel, so far as I know, over the past week or so." (*Id.*) Defense counsel did not disagree with that statement, nor could they, because at least tacitly they had welcomed and approved the prior contacts. Their attempt to now assign error to these contacts is highly questionable. *See, e.g., Chevron USA, Inc. v. Hand, supra;* and *Gundy v. United States, supra.*

■ What remains to be addressed, then, are defendant's timely objections to

Supplemental Instruction No. 2. Those objections are: it "significantly over-emphasizes the notion of the burden of proof" (Tran. JQRP, p. 62); it "fails to include the notion that [defendant is] entitled to a verdict if the plaintiff[s] fail[ I to prove their case by a preponderance of the evidence" (*Id.*, p. 68); and the failure to tell the jury "that they do not have to agree" (*Id.*, p. 68). Further, notwithstanding my dim view of defendant's allegations regarding my limited inquiries of the jury, I will address the purported error in that regard.

With full regard for the entire context of the jury's deliberations, and the record in this case, I decline to conclude Supplemental Instruction No. 2 was coercive under prevailing Tenth Circuit standards. That court permits the use of a full-fledged *Allen* instruction, but urges caution in its use. *United States v. Blandin*, 784 F.2d 1048, 1050 (10th Cir.1986). In *Blandin*, the court stated:

> If the Allen instruction is given at all, it should be incorporated into the body of the court's original instructions to the jury. It should not be given during the course of deliberations.

784 F.2d at 1050. But the Tenth Circuit has never held that a failure to incorporate a supplemental instruction (be it a full-fledged *Allen* instruction or otherwise) into the body of the original instructions is prejudicial error. *See, e.g., United States v. Brunetti*, 615 F.2d 899, 902 (10th Cir.1980); *United States v. Winn*, 411 F.2d 415, 416 (10th Cir.), *cert. denied* 369 U.S. 919, 90 S.Ct. 245, 24 L.Ed.2d 198 (1969) ("[T]he inquiry in each case is whether the language used by the judge can be said to be coercive, or merely the exercise of his common law right and duty to guide and assist the jury toward a fair and impartial verdict."). Indeed, in many cases where supplemental instructions were not included in the body of the original instructions, the Tenth Circuit has concluded they were nevertheless noncoercive and thus nonprejudicial. *See, e.g., Jet Time, Inc. v. Standard Oil Realty Corp.*, No. 82–1153 (10th Cir. Dec. 9, 1983); *United States v. Dyba*, 554 F.2d 417, 421 (10th Cir.), *cert. denied* 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Munroe v. United States*, 424 F.2d 243, 247 (10th Cir.1970); *United States v. Wynn*, 415 F.2d 135, 137 (10th Cir.1969), *cert. denied* 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970); *United States v. Winn, supra.*

In determining whether a supplemental instruction is coercive, consideration is to be given to all the circumstances existing at the time the instruction was given, such as whether the jury was deadlocked, whether the charge instructed the jurors that they were not required to give up their conscientiously held convictions, whether the court had a colloquy with the foreman, whether the court set a limit on the length of the deliberations, and whether the terms of the charge were obnoxious. In *Goff v. United States*, 446 F.2d 623, 626 (10th Cir.1971), the conviction was reversed because the district judge said if a verdict was not returned *in about an hour* he would declare a mistrial: "It was impermissibly suggestive and coercive for the court to place a time fuse on the period of deliberation. Such constitutes reversible error." It is entirely permissible to recall a jury to "beseech them to reason together," but that does not extend to entreating them to strive toward a verdict by a certain time. *Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir.1966). In *United States v. Winn*, 411 F.2d at 416, the court approved the use of a supplemental instruction as a proper exercise of the trial judge's common law right and duty to assist the jury toward a fair and impartial verdict so long as the jury is instructed they are not required to give up their convictions. *See also Munroe v. United States*, 424 F.2d at 245–46 (court permitted supplemental charge where foreman had advised judge that the jury was not deadlocked); *United States v. Dyba*, 554 F.2d at 421; and *United States v. Wynn*, 415 F.2d at 415.

The record itself belies any notion this jury was somehow "coerced" by either or both my supplemental instructions. The verdict was returned on September 30, *two weeks* after my first supplemental instruction (Sept. 17), and *one week* after my second (Sept. 23). During the time be-

tween the first and second supplemental instruction, and between the second supplemental instruction and the date of the verdict, the jury continued to ask thoughtful, skillful and probing questions about the law to be applied, and asked to review the testimony of several witnesses. On September 25, after both supplemental instructions had been given, the foreman reported it was still too early to tell whether the jury would ultimately reach a verdict. Clearly, the jury continued exploring the law and facts of this case until the date of the verdict itself; just as clearly, the jurors understood and used my supplemental instructions exactly as I had intended, as guidelines to keep in mind in their efforts to agree upon a verdict one way or another.

My second supplemental instruction was given after the foreman confirmed the jury was not deadlocked and that progress was being made in the deliberations. That instruction was in no sense an attempt to rush the jury's progress; indeed, I invited and reassured the jurors to be as leisurely in their deliberations as they desired, and to take all the time they felt was necessary. (Tran. JQRP, p. 67.) It was critical that the jury understand this, and it was a theme I pursued even as early as the jury selection process. At that point I told the veniremen not to concern themselves with the complexity of this case, that the learned counsel from both sides would assist them with that; what I sought and wanted was the jurors' assurance they could give this case the time and attention it required. Indeed, to have later taken any other approach in my supplemental instructions, in any way intimating a verdict must be returned before such and such a time, would assuredly have been error under prevailing law. *See Goff v. United States, supra;* and *Burroughs v. United States, supra.*

Supplemental Instruction No. 2 did not improperly emphasize the importance of reaching a verdict. The relevant portion of that instruction was taken directly from the Tenth Circuit's opinion in *Jet Time, supra,* where the court found that language to be permissible. *See also, United States v. Wynn, supra;* and *Munroe v.*

*United States, supra.* Given that the language in those cases was found noncoercive, the language of my instruction, taken directly therefrom, can be no different.

Supplemental Instruction No. 2 did not improperly stress "the minimal level of Wesley's burden of proof." Wesley has hardly labored under a "minimal" burden of proof; I never stated or implied anything of the type. Both supplemental instructions redirected the jury's attention to the original instructions given at the close of evidence. (Tran. JQRP, pp. 37, 66.) That portion of Supplemental Instruction No. 2 dealing with the burden of proof simply explains, again, the contents of original Instruction No. 11, as to which there neither was, nor could have been, any objection by defendant. (Dkt. 255, Tran. of Instruction Conf. Sept. 2–3, 1986, p. 9.)

Lastly, there is no prejudicial error to defendant in failing to expressly inform this jury it was not required to reach a verdict. In original Instruction No. 94, it was stated:

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of all the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and to change your opinion, if convinced it is erroneous. *But do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.*

(Emphasis added.) This jury knew, even before beginning its deliberations, that it did not have to reach a verdict. That the jury was aware of this during deliberations is also evidenced by the foreman's periodic indications the jury might not be able to reach agreement. In no sense did my second supplemental instruction discourage that understanding; the possibility a verdict would not be reached was implicit:

The verdict must be based on the belief or disbelief of part or all of the evidence that is before you. *Let me recite again that at all times no juror is expected to yield a conscientious conviction that he or she may have as to the weight or the effect of the evidence,* but you must remember that after your full deliberation and consideration of the evidence in the case, it is your sworn duty to agree upon a verdict *if you can do so.*

(Tran. JQRP, pp. 66–67; emphasis added.) Even assuming I had some duty to tell the jury it did not have to reach a verdict (a proposition for which defendant provides no case law), that duty was fulfilled.

██ On the matter of my isolated attempts to determine whether this jury was making progress, which occurred only after the foreman voluntarily indicated through my clerk/bailiff the jurors were facing some problems, I reject defendant's suggestion there was anything coercive or improper in what I did. Initially, I agree with plaintiffs it is inherently inconsistent for BCBSK to argue contacts directed at ascertaining the jury's progress were "improper" when those contacts were prompted at least in part by defendant's numerous motions for a mistrial on the grounds the jury had been out "too long." The cases defendant now relies on are inapposite. An inquiry between a court official and a jury is only prejudicial where substantive rights of one or more parties have been adversely affected. *See, e.g., United States v. United States Gypsum Co.,* 438 U.S. 422, 459–62, 98 S.Ct. 2864, 2284–86, 57 L.Ed.2d 854 (1978) (meeting between trial judge and foreman without counsel present amounted to a supplemental instruction to foreman to return a verdict, held reversible error); *United States v. Bensinger,* 492 F.2d 232, 238 (7th Cir.1974) (bailiff or judge telling jury, in response to statement by jury that it was deadlocked, that it had to continue to deliberate, held reversible error when counsel not consulted); *Petrycki v. Youngstown & N.R. Co.,* 531 F.2d 1363, 1367 (6th Cir.), *cert. denied* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 138 (1976) (reversible error for judge to respond to question about damage instructions without counsel present where answer may have increased amount of damages awarded by jury). Harmless contact between a court official and a jury does not constitute reversible error. *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Powell v. Kroger Co.,* 644 F.2d 1245, 1247 (8th Cir.1981); *United States v. Brumbaugh,* 471 F.2d 1128 (6th Cir.), *cert. denied* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973) (improper remarks by bailiff not prejudicial error where they did not affect the way a juror voted); *United States v. DiPietto,* 396 F.2d 283, 287 (7th Cir.1968), *vacated on other grounds* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (message sent by court to jury, through deputy marshal, to continue deliberations was harmless error).

At issue here are simple inquiries: *"Are you making progress?"* Defendant does not, and cannot, contend there is anything else involved. I did not tell the jury what they had to do, nor ask them the details of what they were doing; I did not tell the jury what they could consider, nor did I ask them what they were considering; I did not tell the jury how to vote, nor ask how they were voting; and I did not tell the jury *"keep working!"* "Are you making progress?"—not even an instruction; simply a request in the face of prolonged deliberations, the jury's acknowledgment of some problems, and a flurry of mistrial motions by defendant.

Even if this be viewed, by a wild stretch of imagination, as some sort of command or dictate from me to the jury, it is nevertheless not error. In *Acree v. Minolta Corp.,* 748 F.2d 1382, 1385 (10th Cir.1984), the court held "it is not error if the instructions given to the jury [without first consulting with counsel] are merely *administrative directions* rather than supplementary instructions." Supplementary instructions are those relating to the law or evidence in a particular case. *Acree,* 748 F.2d at 1384–85 (citing *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919); *United States v. Walker,* 557 F.2d 741 (10th Cir.1977); *Parfet v. Kansas City Life Ins. Co.,* 128 F.2d

361 (10th Cir.), *cert. denied* 317 U.S. 654, 63 S.Ct. 50, 87 L.Ed. 526 (1942)). By contrast, a court's response to requests for evidence or a question of whether a jury should proceed are "administrative directions," not error, because they neither tell the jury what the law is nor instruct the jury how to apply the law to the evidence. *Acree*, 748 F.2d at 1385 (citing *Sanders v. Buchanan*, 407 F.2d 161, 163 (10th Cir.1969); *General Motors Corp. v. Walden*, 406 F.2d 606, 609 (10th Cir.1969)). In *Acree* the trial judge responded to a request for an exhibit that was not in evidence. The trial judge not only informed the jury it could not have the exhibit, but went on to explain the reason they could not have it. Yet, because the explanation did not instruct the jury on what the law was or how to apply the law to the evidence, nor on how the jury was to conduct itself, the circuit concluded the trial judge's action was not error because it "merely gave the jury collateral information that did not affect its deliberation." *Id.* at 1385.

"Are you making progress?" It is not a supplementary instruction. It is not even an administration *direction.* It is at most, under the extenuating circumstances of this case, an administrative *request* seeking information not on what the jury was doing, but on whether it was doing anything at all. "Are you making progress?" does not instruct the jury on what the law is, or how to apply the law to the evidence, or how the jury is to conduct itself. It does not even give the jury *collateral* information not affecting its deliberations; it simply requests information about whether any productive deliberation is occurring. If an administrative direction, in the absence of counsel, that a jury is to continue its deliberations is not error, *Acree, supra,* then what is at best an "administrative request" to determine simply whether productive deliberations are occurring can be no different.

Defendant's motions for directed verdict taken under advisement during trial and at the close of evidence are overruled. Defendant's motion for JNOV or, alternatively, for a new trial is likewise overruled.

## INJUNCTIVE RELIEF

 Pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, plaintiffs Reazin, Wesley, HCP, and New Century seek injunctive relief against BCBSK. (Dkt. 260, 261.) The proposed injunction would: prohibit any termination of Wesley's contracting provider agreement under the CAP program, without cause, for a period of three years; enjoin defendant from any discrimination against Wesley in administering either the CAP program or other programs currently in place or that may be established in the future; require defendant to provide notice to this court, and counsel for plaintiffs, of any activities regarding the established MAPs; restrain any refusal to deal against any health care provider because of its relationship with plaintiffs, or for retaliatory reasons related to this litigation; require defendant to provide notice to its subscribers and providers that Wesley is, and remains, a contracting provider under the CAP program; and enjoin defendant from enforcing the nonassignment of benefits provision (Part 5.F) of its subscriber agreements. Counsel for both plaintiffs and defendant have provided most helpful memoranda addressing each side's arguments regarding the propriety of the relief requested. Each has been reviewed. For my own reasons, however, I decline to grant plaintiffs injunctive relief.

In its verdict the jury concluded that the termination of Wesley's contracting provider agreement, pursuant to defendant's unlawful conspiracy with the Saints, would, if fully carried out, unlawfully restrain trade in the market for health care financing in Kansas. Thus, Wesley was actually and significantly injured by defendant's announced implementation of that plan. Wesley will now be restored to its former position by the actual damages awarded in the amount of $1.54 million. The mechanism for trebling those damages under the federal antitrust laws, and as well the jury's award of punitive damages under state law, serve a variety of functions, not the least of which is deterrence. The resulting verdict in this case can point to but one crystal-clear and inescapable message

to defendant: *"Do not make any further attempt to implement this illegal plan."*

The verdict of $5,378,941.00 (after trebling) is by any measure sufficient to bring about long and careful consideration of any further attempt to proceed against Wesley, even by someone as ... "aggressive", shall I say, as defendant. The BCBSK board of directors, now facing a verdict of this magnitude because of the illegal and almost wanton activities of an unchecked senior staff, can be reasonably expected to seriously question, and doubt, any of Mr. Johnston's future attempts to take action of this type, particularly against Wesley Medical Center. If a $5.4 million verdict is insufficient incentive to refrain from this conduct in the future, it is equally unlikely the prospect of a contempt citation for violating any injunction issued from this court would have any greater impact.

Wesley Medical Center has been made whole. Defendant must now pay a $5.4 million bill (not counting fees and costs, *infra*), "tuition" if you will, to learn from the Kansas citizens of the jury a lesson on how, and through whom, defendant cannot conduct its "business". Wesley's contracting provider agreement with BCBSK remains in place. That contract requires 120 days' written notice before any future termination can occur. Plaintiffs have already exhibited the resolve and ability to move quickly against this type of conduct; no doubt that will continue to remain true. For my part, as in this case, the court stands prepared to move readily on these issues if, inconceivably, they should arise again in the future.

Thus, for the present I am denying plaintiffs' motion for injunctive relief. Reviewing the facts of this case and the jury's verdict, I perceive no particular significance to the 3–year "cooling off" period requested by plaintiffs. Three years may be too long a period during which to restrain defendant; on the other hand, three years may not be long enough. I have above expressed what is implicit in the jury's verdict should defendant somehow otherwise miss or be inclined to disregard its significance. All that remains to be said is that BCBSK should understand any future activities against Wesley even remotely implicating defendant's monopoly power, and/or its illegal conspiracy with St. Francis and St. Joseph Hospitals, will be subject to a swift, searing inquiry by this court upon a timely effort by plaintiffs bringing it to my attention.

Plaintiffs' motion for injunctive relief is denied.

## FEES AND COSTS

The next motion is plaintiffs' request for an award of $2,176,983.75 in attorneys' fees, representing 15,136.8 hours of service provided on their behalf through September 30, 1986, by attorneys from the law firm of Jones, Day, Reavis & Pogue ("Jones, Day"), and attorneys from Fleeson, Gooing, Coulson & Kitch ("Fleeson, Gooing"). (Dkt. 256–58.) These hours represent efforts undertaken on behalf of Wesley Medical Center, Health Care Plus, New Century, and Dr. Reazin, relating to those parties' complaint against BCBSK. Legal services provided those parties, and HCA, on defendant's counterclaim are specifically excluded from this request for fees. Plaintiffs also seek to recover expert witness' fees and other reimbursable items in the amount of $209,767.77; and various costs amounting to $37,077.22, under 28 U.S.C. § 1920.

Section 4 of the Clayton Act, 15 U.S.C. § 15, in addition to trebling the damages awarded in this case, permits plaintiffs to recover "the cost of suit, including a reasonable attorney's fee." The purpose of the fee provision is to insulate treble damage recovery from expenditure for legal fees, consonant with § 4's general purpose of encouraging private individuals to undertake enforcement of the antitrust laws. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1312 (9th Cir.), *cert. denied* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). The award of attorney's fees to successful plaintiffs under § 4 is mandatory. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 261, 95 S.Ct. 1612, 1623, 44 L.Ed.2d 141 (1975); *Illinois v. Sangamo Construc-*

*tion Co.,* 657 F.2d 855, 858 (7th Cir.1981); *Black Gold, Ltd. v. Rockwool Industries, Inc.,* 529 F.Supp. 272, 274 (D.Colo.1981).

The benchmark for nearly every award of attorney's fees under authorizing federal statutes is that the fee must be "reasonable". *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. ——, ——, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439, 454 (1986). The United States Supreme Court and the Tenth Circuit Court of Appeals have defined the "reasonableness" of fees primarily in civil rights actions, but those standards announced apply equally to all cases involving attorney's fees, including antitrust cases such as this. *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983); *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1481 & n. 8 (10th Cir.1985). Thus, I will apply to plaintiffs' request the controlling principles found in *Delaware Valley, supra; City of Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley, supra; Mares v. Credit Bureau of Raton,* 801 F.2d 1197 (10th Cir. 1986); and *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983). Plaintiffs must be "prevailing parties" to recover attorney's fees. Plaintiffs are considered "prevailing parties" for these purposes " 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *Hensley,* 424 U.S. at 433, 103 S.Ct. at 1939 (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)). Once plaintiffs cross that statutory threshold, it remains for a district court to determine what fee is reasonable. *Hensley, id.* A district court, with its intimate knowledge of the litigation, has a responsibility to encourage agreement. *Blum,* 465 U.S. at 902 n. 19, 104 S.Ct. at 1550 n. 19. I attempted to do that in this case, but the parties' efforts were fruitless. (Dkt. 287, Tran. of Motions Proceeding Jan. 16, 1987, p. 97.) Now, forced to rule on this question, I must also provide a clear explanation of the fee award I deem reasonable. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Ramos,* 713 F.2d at 552.

The basic standard for finding reasonable fees is the determination of reasonable hours and rates. *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548. The factors for evaluating legal representation—such as the time and labor required, the novelty and difficulty of the questions, the results obtained, etc.—"usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. The fee applicant bears the burden of establishing his entitlement to an award, documenting the hours expended and the rates charges. *Id.* at 437, 103 S.Ct. at 1941. The district court should exclude from the fee calculation hours which, in the court's opinion, given its familiarity with the litigation, were not reasonably expended on the case. *Rivera,* 477 U.S. at ——, 106 S.Ct. at 2691, 91 L.Ed.2d at 476. *See also In re: Dept. of Energy Stripper Well Exemption Litigation,* M.D.L. No. 378, slip op. at 3–4 [D.Kan. Apr. 24, 1987 (Opinion & Order on Motion of Kohn, Savett, Klein & Graf, P.C.)] [Available on WESTLAW, DCT database] and *Winterburg v. KG & E,* No. 83–1800–C, slip op. at 3 (D.Kan. Jan. 12, 1987). [Available on WESTLAW, DCT database].

Before embarking on this analysis, it is important to note the extraordinary process of this suit. Plaintiffs filed their complaint on November 12, 1985. At the end of that month, trial was set for March 26, 1986. From November, 1985 through the end of February, 1986, discovery of witnesses and experts across the continental United States proceeded at a furious pace. Never once during that entire time was I called upon to adjudicate a discovery dispute between the parties. At the end of no more than 3½ months, defendant was sufficiently satisfied with the results of discovery to move for summary judgment on the entirety of plaintiffs' complaint. The period from March 3 to May 23, 1986, during which counsel were no doubt engaged in extensive preparation for the revised trial date, was nevertheless a delay attributable to my research and writing on the motion for summary judgment. In June, 1986, the parties met and attempted to

settle their differences through a court-appointed mediator. That failing, trial began July 22, 1986. During the ensuing six weeks, there was never even a five minute delay awaiting a witness or a piece of evidence. Further, every important issue raised during the course of trial was, within hours, followed by an organized, well-researched memorandum, setting forth the applicable law and plaintiffs' arguments. That the jury trial itself lasted only six weeks is likewise significant given that initial estimates involved a three month trial period. The jury's verdict was returned on September 30, 1986, *10½ months after this case was first filed.* Ten and a half months—from filing to verdict! In my 25 years of active practice of law and what is now seven years as a federal district judge, I have never observed or even heard about a professional performance approaching that evident in this case. This is meant as no slight to defense counsel, who are entitled to, and have received, their share of credit for the remarkable pace at which this case progressed. (Tran. of Motions Proceeding Jan. 16, 1987, p. 103.) But in the present context, I am required to focus on the efforts of plaintiffs' attorneys, whose professionalism, dedication, efficiency, and attention to detail must be credited as phenomenal, deserving the regard and emulation of every practicing lawyer in this country.

The first step in determining the reasonableness of the fees requested is to determine whether the hours claimed have been reasonably expended in the litigation. It is permissible to use reconstructed time records to evaluate the reasonableness of the hours claimed. *Ramos,* 713 F.2d at 552 n. 2. Exhibit 1 to plaintiffs' memorandum in support of its application for fees contains a thorough chronology of the hours and tasks undertaken by each partner, senior attorney, associate, law clerk, and paralegal of Jones, Day, and Fleeson, Gooing, from September, 1985 through September, 1986. In reviewing the reasonableness of hours claimed, a district court must distinguish between "raw" and "billable" hours. *Ramos,* 713 F.2d at 554. This process is likened to that of a senior partner in a

private firm scrutinizing and adjusting time reported by subordinates. "The district court must carefully scrutinize the total number of hours reported to arrive at the number of hours that can reasonably be charged to the losing party, much as a senior partner in a private firm would review the reports of subordinate attorneys when billing clients whose fee arrangement requires a detailed report of hours expended and work done." *Credit Bureau of Raton,* 801 F.2d at 1203; *Ramos,* 713 F.2d at 555. That process, in this case, has already been fully performed by the senior partners of Jones, Day, and Fleeson, Gooing. The hours claimed in plaintiffs' motion are not "raw" hours; they are the "billable", and in fact "billed", hours already presented to their clients. (Tran. of Motions Proceeding Jan. 16, 1987, p. 100.)

Although the fact the hours claimed have already undergone scrutiny by the senior partners does not insulate those hours from my independent review, that fact is nevertheless persuasive. The hours claimed have been billed to, and paid by, HCA. Upon an independent review of the chronology provided me in plaintiffs' memorandum, I perceive no reason to disturb the hours claimed. Unquestionably, the excess of 15,000 hours claimed by plaintiffs, on its surface, might raise the specter of duplication of services. But a thorough examination of plaintiffs' chronology dispels any such suggestion. Further, that suggestion ignores the extraordinary efforts necessitated by the pace of this litigation. "In determining what is a reasonable time in which to perform a given task or to prosecute the litigation as a whole, the court should consider that what is reasonable in a particular case can depend upon factors such as the complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the maneuvering of the other side." *Ramos,* 713 F.2d at 554. And, where the complexity of a case demands an extraordinary number of hours to perform a task, those hours are properly billable. *Ramos, id.* n. 3. Each of these factors, and certainly

when considered in their totality, justifies the billable hours claimed in this case.

This litigation involved complex antitrust issues raised in the context of a complex, rapidly changing industry. Primary responsibility for developing and prosecuting plaintiffs' antitrust claims demanded, and secured, experienced antitrust counsel supported by legal and lay experts in the health care industry. The case was, as I have already indicated, efficiently and effectively prepared and presented, as demonstrated by the fact that only one year elapsed between the conduct giving rise to the complaint and the successful completion of the trial on the merits.

Plaintiffs pursued a number of related theories in this case, and the results on the merits of plaintiffs' claims demonstrate that plaintiffs' strategies were reasonably pursued. The elements of proof as to these claims were substantially related. For example, plaintiffs' claims under § 1 required plaintiffs to prove the existence of a relevant market, market power, the existence of a conspiracy and anticompetitive effects. Plaintiffs' § 2 claims also required proof of the relevant market, market power, conspiratorial conduct (as to the conspiracy to monopolize claim) and anticompetitive or otherwise predatory conduct. Evidence as to certain of these same elements also figured prominently in plaintiffs' state law claims, such as evidence of wrongful conduct, defendant's unique position under its special enabling legislation, and defendant's conduct inconsistent with its statutory cost containment mandate. Similarly, Wesley's damage claims as to both its antitrust and tort claims rested on identical proof. The jury found in Wesley's favor as to each of its claims for damages and, collectively, plaintiffs successfully achieved the primary objective sought in this litigation: preventing cancellation of Wesley's contracting provider agreement by defendant. It cannot be said that the time expended by counsel in developing and presenting plaintiffs' interrelated claims was ill-spent in any respect.

Finally, plaintiffs' counsel were opposed by able lawyers with considerable experience of their own in antitrust litigation. I have already addressed the broad-based rule of reason defense raised by BCBSK; the vigor with which opposing counsel defended this litigation certainly affected the hours expended by plaintiffs' attorneys. Both sides conducted rigorous discovery, including more than 60 depositions in locations throughout Kansas and across the country. Plaintiffs' counsel successfully resisted an extensive motion for summary judgment on the entire complaint.

The Tenth Circuit has also indicated the district court should carefully review the hours claimed to determine whether the services of more than one attorney were reasonably required in any given task. *Credit Bureau of Raton*, 801 F.2d at 1206. But defendant's suggestion this case could somehow have been handled by a few attorneys on plaintiffs' behalf is unfounded. If it takes in excess of 15,000 hours of effort by some 20 attorneys on plaintiffs' behalf to move a case of this complexity and magnitude through a federal trial court in 10½ months, so be it. Indeed, the stringent time requirements resulted largely from defendant's own insistence on a prompt resolution of this dispute.

The hours claimed have already undergone the "billable hours judgment" of the senior partners from Jones, Day, and Fleeson, Gooing. Those hours were billed to and paid by HCA. Upon reviewing the chronology set forth in plaintiffs' memorandum, and in light of the unusual circumstances of this case, I concur in that judgment, finding the hours claimed to be eminently reasonable in this case. It is safe to assume that if the number of attorneys or hours expended were appreciably less, the parties would, in all probability, still be languishing in discovery.

The next step in arriving at a reasonable attorney's fee is to determine the rate to be applied to the hours claimed. Reasonble fees generally are to be calculated according to the prevailing market rates in the relevant community in which the litigation occurs. *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. More precisely, the question is, what do lawyers of comparable

skill and experience, practicing in the area in which the litigation occurs, charge for their time? Lawyers who are outside their expertise in a given case may deserve lower than normal billing rates. Quality of performance is to be considered. Absent unusual circumstances, the fee rates of local attorneys should be applied even though the attorneys in question are from another area. *Ramos*, 713 F.2d at 555.

The hourly rates requested by plaintiffs represent the actual current billing rates for the Jones, Day attorneys who represented them in this litigation, and the circumstances cited in *Ramos* as possibly warranting a reduction of those rates do not exist here. First, lead counsel in this litigation were not working outside their fields of expertise. The antitrust claims were developed and litigated by experienced antitrust practitioners at Jones, Day. Support on the issues unique to the health industry was provided by counsel acknowledged as a leading expert in the field by defendant's attorneys. General litigation support was provided by co-counsel with extensive experience in complex litigation matters. The billing rates for partners in Fleeson, Gooing were reduced in plaintiffs' motion as compared to their normal billing rates, accounting for the fact they did not have primary responsibility for the prosecution of the case. And, as I have already indicated, the quality of the lawyers' performance was superb. It certainly occasions no reduction of rates; if anything, it should have the opposite effect.

The highest hourly rate requested in this case is $242.00, by a senior partner in Jones, Day. In support of its opposition, defendant responds with the affidavit of Mr. H.E. Jones, a partner in the law firm of Hershberger, Patterson, Jones & Roth, of Wichita, Kansas, stating that "based upon my experience in the Wichita community, ... hourly rates for complex litigation matters consistent with the prevailing community standards will generally fall in the range of $125.00 to $150.00 per hour.... [R]ates in the neighborhood of $200.00 per hour are uncommon for experienced Wichita attorneys in complex litigation matters under prevailing community standards."

(Dkt. 272.) At my request, Mr. Jones graciously appeared at oral argument on the post-trial motions on January 16, 1987. Mr. Jones indicated he would not at all be surprised to find Wichita lawyers charging a fee as high as $200.00 per hour for certain types of litigation. He acknowledged further his affidavit did not take into account the complex antitrust nature of this suit, nor the stringent pace of this litigation, nor the length of the trial itself. (Tran. of Motions Proceeding Jan. 16, 1987, pp. 107–08.) Mr. Jones further acknowledged that were he called upon to try a complex case in a location far removed from Wichita, that would likely affect his fees. (*Id.*, p. 108.) In *National Helium Corp. v. Panhandle Eastern Pipeline Co.*, Civil Action No. KC–1980 (D.Kan.), extensive testimony was submitted in hearings relating to the proposed class action settlement and fee application before Sr. Judge Wesley E. Brown in March, 1985, attesting to the fact that certain Wichita lawyers charge $200.00 an hour or more in complicated matters, and that such rates are reasonable for complex litigation under then prevailing community standards. *See, e.g.,* Testimony of Jerome E. Jones (a brother and partner of H.E. Jones at the Hershberger, Patterson firm in Wichita), *Nat'l Helium* Tran. of Proceedings March 6, 1985, Vol. 3 at 345 ("certain lawyers in our office now on complicated matters charge in excess of $200.00 an hour.").

■ A district court, in determining reasonable attorney fees, is not required to accept affidavits of local rates. *Credit Bureau of Raton*, 801 F.2d at 1205 n. 15. Where local rates are too low for the litigation at issue, the relevant community may be said to be comprised of that group of attorneys specializing in the relevant law and in complex litigation. *In re: Dept. of Energy Stripper Well Exemption Litigation*, slip op. at 18. *Ramos* does not establish an absolute rule that a district court is bound to adhere to forum community hourly rates in assessing fee awards. Rather, that case held the door open for the application of higher rates in "unusual circumstances." The Tenth Circuit declared that

civil rights cases have become a "common specialty", and therefore application of the local rate in that case was proper. 713 F.2d at 555. However, major, intricate, and complex antitrust litigation is in no sense a "common specialty". There is abundant evidence from which I find Wichita attorneys do occasionally charge $200.00 an hour or more for complex litigation. With all my respect and endearment for Wichita attorneys and law firms, it remains true there is neither a lawyer nor a firm in this town which could have devoted to this case the timely expertise, experience, and manpower put forth by Jones, Day.

If a high[er] priced, out of town attorney renders services which local attorney could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally....

Attorneys with specialized skills in a narrow area of law, such as admiralty law, patent law, or antitrust and other complex litigation, tend to be found in large cities, where an attorney may have a greater opportunity to focus on a narrow area of law. As a specialist, the attorney will usually charge more for performing services in his area of expertise than a general practitioner will charge for performing similar services.

*Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768–69 (7th Cir.1982), *cert. denied* 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 315 (1983); *accord, Maciera v. Pagan*, 698 F.2d 38, 40 (1st Cir.1983); *Donnel v. United States*, 682 F.2d 240, 252 (D.C.Cir.1982), *cert. denied* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983); *U.S. Industries, Inc. v. Norton Co.*, 578 F.Supp. 1561, 1565 (N.D. N.Y.1984).

The hourly rates sought by plaintiffs for Jones, Day's specialized expertise in this case are entirely reasonable when viewed in light of billing rates approved by various courts in antitrust cases no less challenging than the present one. Even in older, exceptional antitrust litigation, one finds courts awarding fees next to which plaintiffs' requested hourly rates pale by comparison. *See, e.g., Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851, 870–71 (N.D. Cal.1975) (fees in excess of $400/hr. awarded); *Arenson v. Bd. of Trade*, 372 F.Supp. 1349, 1357 (N.D.Ill.1974) (same). Recent awards, while lower, are nevertheless sometimes in excess of the rates currently requested. *See, e.g., Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27 (E.D.Pa.1985) (approving a $260–$300 hourly rate for lead antitrust counsel); *Brewer v. Southern Union Co.*, 607 F.Supp. 1511, 1526 (D.Colo. 1984) (hourly rate of $200 per hour "is low for attorneys involved in complex antitrust litigation"); and *Sun Publishing Co. v. Mecklenburg News, Inc.*, 594 F.Supp. 1512 (E.D.Va.1984) (fees awarded based upon a $200/hr. rate for lead antitrust counsel). In fact, in *McDonald v. Johnson & Johnson*, 546 F.Supp. 324, 332 (D.Minn.1982), *vacated following opinion vacating judgment in plaintiffs' favor* 722 F.2d 1390 (8th Cir.1983), the court approved a $250.00 per hour rate for Joseph M. Alioto, who served as lead counsel for BCBSK in the present case, and also noted that experienced antitrust counsel in Minnesota had submitted affidavits reflecting billing rates between $200.00 and $400.00 per hour.

Given evidence from which I find $200.00 per hour is the prevailing local rate for Wichita attorneys in complex litigation, the certainty that no attorney or law firm in Wichita could have provided the timely expertise or resources necessary in this case, and that the "unusual circumstances" of this case abundantly support the request for each rate through and including $242.00 per hour, I find the hourly rates assigned by plaintiffs' attorneys are eminently reasonable.

Consequently, the requested attorneys' fee of $2,176,983.75 is presumed to be

the reasonable fee contemplated, because plaintiffs have carried their burden of showing both hours reasonably expended and rates reasonably charged. *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548. This, then, is the "lodestar" figure. But the reasonableness inquiry does not end here; a reduced fee may be appropriate even if the significant relief obtained is limited in comparison with the scope of the litigation as a whole. *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943. This leads to defendant's primary contention that plaintiffs are not entitled to fees in this amount because HCP, New Century, and Dr. Reazin did not recover for their claims against BCBSK. Under prevailing law, in the context of this litigation, that is immaterial. Where a suit consists of related claims, substantial relief occasions no reduction simply because a district court (or a jury) does not adopt each contention raised. *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943. Where plaintiffs' claims for relief involve a common core of facts, or are based on related legal theories, much of counsels' time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. "Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff[s] in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. More precisely, the issue is "whether the plaintiffs acted reasonably under the circumstances facing them and whether they achieved 'excellent results' on what were clearly nonfrivolous, interrelated theories based upon a common core of facts." In such cases, the district court must focus on "the significance of the overall relief obtained by plaintiff." *Ramos*, 713 F.2d at 556.

■ Anyone who has read this far into the opinion will entertain no doubts the case involved a common core of facts focusing on defendant's conduct regarding its contracting provider agreements, MAPs, and agreement with the Saints. Each of the four named plaintiffs alleged distinct injury arising from defendant's conduct, but each of the four plaintiffs sought principally one thing: the cessation of that conduct. Wesley recovered actual damages, and the singular purpose of this case has been achieved: the cessation of defendant's conduct. From the outset, then, the plaintiffs' claims were not discrete, but were all related to this common core of facts and the relief sought. I removed Dr. Reazin and New Century from this suit on grounds of standing. The jury found HCP had not suffered compensable injury from defendant's conduct. But the primary relief sought, cessation of a federal antitrust violation, was secured. Throughout this case, plaintiff Wesley Medical Center faced an indiscriminate rule of reason defense through which BCBSK incriminated each of the named plaintiffs, as well as others not even parties to the suit. For this reason, and as I have also already indicated, the trial of "plaintiffs' complaint" evolved quickly into the virtual trial of defendant's counterclaim in everything but its name. Reviewing the trial in this light, there was not a person deposed, nor a witness presented, nor a piece of evidence admitted, that would have been "unnecessary" if Wesley had otherwise chosen to proceed alone. In these extreme circumstances, it is pure sophistry for defendant to argue the legal services provided HCP, New Century and Dr. Reazin are somehow improper grounds for recovery of attorneys' fees. A party cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiffs in response. *Rivera*, 476 U.S. at —— n. 11, 106 S.Ct. at 2697 n. 11, 91 L.Ed.2d at 483 n. 11 (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C.Cir.1980) (en banc)).

■ Plaintiffs have not received the injunctive relief requested. However, that was denied for my own reasons, previously set forth, not because BCBSK persuaded me plaintiffs were not entitled to that relief. It is not "necessarily significant that a prevailing plaintiff did not receive all the relief requested. For example, a plaintiff who failed to recover damages but obtained injunctive relief, *or vice versa*, may recover a fee award based on all hours reasonably

expended if the relief obtained justified that expenditure of attorney time." *Hensley*, 461 U.S. at 435 n. 11, 103 S.Ct. at 1940 n. 11. (emphasis added). Likewise, where a fee award is determined to be reasonable, the relationship of that award to the damages recovered is of little concern. The proposition fee awards should be "proportionate" to the amount of damages actually recovered has been flatly rejected by the Supreme Court and the Tenth Circuit Court of Appeals. *Rivera*, 476 U.S. at ——, 106 S.Ct. at 2694, 91 L.Ed.2d at 479; *Ramos*, 713 F.2d at 557. In *Rivera*, the Supreme Court affirmed an award of $245,456.25 in attorneys' fees, over *seven times* the damages of $33,350.00 recovered by plaintiffs. In the present case, the fee award requested is not even twice the amount of actual antitrust damages recovered by Wesley Medical Center, and the fee award is less than half the treble antitrust damages which Wesley will recover.

The focus is not on the relationship of the fee award to the amount or type of relief actually obtained by a prevailing plaintiff. Far more important is the public benefit obtained by the litigation. "Parties acting as private attorneys general should be reasonably compensated for their vindication of public policy even if they themselves do not receive a large financial benefit." *Ramos*, 713 F.2d at 557. Both the Supreme Court and the Tenth Circuit have strongly, and repeatedly, emphasized this concept in the context of civil rights litigation. *Rivera*, 476 U.S. at ——, 106 S.Ct. at 2694, 91 L.Ed.2d at 479–80; *Ramos, supra.* In the context of the antitrust litigation at bar, it is appropriate, if not required, to give equal consideration to this principle. Regardless of the form of relief actually obtained, a successful civil rights plaintiff often secures important social benefits not reflected in nominal or relatively minor damage awards. Additionally, the damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future. *Rivera*, 476 U.S. at ——, 106 S.Ct. at 2694, 91 L.Ed.2d at 480. The same is true in this case. BCBSK's conduct was tested under the rule of reason, which required the jury to evaluate the

effects of that conduct on Kansas consumers of health care financing products. The jury's finding of a significant antitrust violation under the § 1 rule of reason can mean but one thing: Kansas consumers of these products were adversely affected by defendant's conduct, and would have continued to be adversely affected unless that conduct was stopped. The jury also determined BCBSK was a monopolist under § 2, and had engaged in illegal activities violating Kansas tort law. Given these findings, Wesley's recovery of actual damages redounds to the benefit of not only all plaintiffs but as well to the benefit of all Kansas consumers of health care financing products. Although the right of consumers and competitors to free and unrestrained economic competition may not be "constitutional" in nature, it is nevertheless a fundamental public policy not far removed. Wesley's victory—plaintiffs' victory—is in the same breath a victory for Kansas consumers and deserves recognition as such.

■ As enhanced fee award is appropriate in cases in which the success achieved is exceptional. " 'Exceptional success' justifying an enhanced fee may be based upon the performance of counsel—for example, victory under unusually difficult circumstances *or* with an extraordinary economy of time—*or* upon the result achieved—total victory or establishment of significant new law." *Ramos*, 713 F.2d at 557 (emphasis added). In the present case plaintiffs have not sought enhancement of the lodestar figure, although certainly sound arguments could be made in support of enhancement under the *Ramos* formula. If there is anything to the isolated indication a court should judge a fee award in light of "public indignation over the costs of litigation" (*Rivera*, 476 U.S. at ——, 106 S.Ct. at 2701, 91 L.Ed.2d at 488 (Burger, C.J., dissenting)), then a court must also consider the public outrage over the unreasonable and unnecessary delay facing many litigants. The notion these fees would be any less if this case were to have staggered along for two, three, four years or more is preposterous. The *Ramos* enhancement factors

are present in this case, not alone, but in combination: victory under unusually difficult circumstances, *and* with extraordinary economy of time, *and* the establishment of significant new law. Plaintiffs never questioned BCBSK's right to compete vigorously against emerging alternative delivery systems; the focus of this suit was defining permissible and impermissible "competition". Plaintiffs perceived impermissible competition; they filed a complex, intricate antitrust suit to challenge it; they overcame a sweeping and vigorous rule of reason defense, establishing significant antitrust violations to the satisfaction of seven skeptical Kansans; and Wesley recovered for those violations, to its benefit, the benefit of all plaintiffs, and the benefit of all Kansas consumers of health care financing products. By any standard, this alone is a remarkable achievement. Add to it the fact all was accomplished in no more than *10½ months*, and counsels' performance becomes exceptional. If all this is not ground for enhancement of the fee award under *Ramos*, it is certainly a critical factor in my determination the fees requested are "reasonable".

What are first class, premium legal services worth? HCA sought them, and HCA received them. This was a bargained-for exchange, and the fees to which plaintiffs are now entitled have already undergone the "billable hours judgment" of the senior partners from Jones, Day, and Fleeson, Gooing. I have reviewed plaintiffs' motion for fees, with emphasis on the reconstructed time sheets, and wholeheartedly concur with the judgment of those attorneys. This case required each claimed hour of dedicated and efficient legal service. Both the hours and the rates are reasonable; the unique posture of this case, if anything, points to enhancement rather than reduction of those fees. I therefore grant plaintiffs' motion for attorneys' fees in the amount of $2,176,983.75. To the list of Jones, Day's considerable achievements in the practice of antitrust law, the firm can now add its acumen as lead *plaintiffs'* counsel in health care antitrust litigation.

■ Expenses not normally itemized and billed in addition to the hourly rate should be included in the a fee allowance if reasonable in amount. *Credit Bureau of Raton*, 801 F.2d at 1208; *Ramos*, 713 F.2d at 559. Under this rule recovery of the following additional out-of-pocket costs, not normally absorbed as part of law firm overhead, is appropriate: photocopying costs, long distance telephone charges, and travel expenses. *Credit Bureau of Raton*, 801 F.2d at 1208–09. Consistent with the foregoing, plaintiffs have established and are now entitled to recover the following items: photocopying charges of $10,112.77; long distance telephone charges of $4,570.85; computerized legal research charges of $10,766.90 [see *Wehr v. Burroughs Corp.*, 619 F.2d 276, 285 (3d Cir.1980); *O'Donnell v. Georgia Osteopathic Hospital, Inc.*, 99 F.R.D. 578, 581 (N.D.Ga.1983) ]; and travel expenses of $16,090.00.

■ Reasonable expert witness fees may be awarded if that expert testimony was reasonably necessary. *Ramos*, 713 F.2d at 559. Plaintiffs seek to recover $168,227.25 as expert witness fees paid to Dr. George Hay, Dr. Ray Davis, and William Guy. Each of these expert witnesses' testimony was indispensable for plaintiffs' recovery. These witnesses provided crucial testimony concerning central issues such as market definition, market power, and defendant's business practices and position in the market. They also provided invaluable foundation testimony regarding the nature of the health care industry and health care financing mechanisms. Their appearance and testimony was reasonably necessary; recovery of those fees is therefore granted.

For items not reimbursable as attorneys' fees under authorizing statutes, the general costs statute, 28 U.S.C. § 1920, is controlling. *Ramos*, 713 F.2d at 560. Plaintiffs are entitled to recover these costs as a matter of right pursuant to 15 U.S.C. §§ 15 and 26. Fed.R.Civ.P. 54(d) states that "costs shall be allowed as of course to the prevailing party."

■ 28 U.S.C. § 1920(1) expressly allows recovery of the clerk's fees. These fees are regularly included in the costs

taxed on behalf of the prevailing party. 6 Moore's Federal Practice ¶ 54.77[3.1] (1986). Plaintiffs' filing fee is required by 28 U.S.C. § 1914, and it is now taxable as costs. *Id.*

Section 1920(2) provides for the taxation of "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." Plaintiffs seek recovery of two specific items: the cost incurred in obtaining a daily trial transcript; and the cost incurred in connection with the taking of certain depositions, and obtaining copies of transcripts of certain depositions taken by defendant.

▬▬▬▬ The allowance for the cost of preparation of a daily transcript is within the court's discretion. *ABC Packard, Inc. v. General Motors Corp.*, 275 F.2d 63, 75 (9th Cir.1960). Taxation of the cost of a trial transcript is permitted whenever that transcript was reasonably necessary for use in the case, rather than a mere luxury or convenience. *Chemical Bank v. Kimmel*, 68 F.R.D. 679 (D.Del.1975); *see also Modick v. Carvel Stores of New York, Inc.*, 209 F.Supp. 361, 364–65 (S.D.N.Y. 1962). In the present case, I encouraged the use of a daily trial transcript. It assisted me and assisted the parties. The daily trial transcript was clearly necessary for proper preparation and effective presentation of the case. The weeks of testimony before this jury included expert testimony on complex economic issues, financial matters, and definitional terms. The daily transcript allowed both parties to bring relevant issues into focus, to better prepare factual testimony for presentation to the jury, to avoid repetitive testimony, and to generally expedite the trial. Moreover, the preparation of a daily transcript eliminated the necessity of having expert witnesses present for the entire trial. Counsel for plaintiffs also utilized the daily transcript in connection with witness preparation, cross-examination, preparation of *in limine* motions, and closing argument. The transcript was necessarily obtained for use in the case, and plaintiffs should be, and are, allowed the cost thereof. *See Kaiser Industries Corp. v. McLouth Steel Corp.*,

50 F.R.D. 5, 9 (E.D.Mich.1970) (costs of daily transcript allowed to prevailing party where trial lengthy and complex); *Brookside Theatre Co. v. Twentieth Century Fox-Film Corp.*, 11 F.R.D. 259, 266 (W.D. Mo.1951), *modified on other grounds* 194 F.2d 846 (8th Cir.), *cert. denied* 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952) ("obtaining daily copy in the trial of a long complicated case extending over a period of seven weeks and running into more than 4,000 pages of record, is essential both to the court and to counsel for a proper understanding of the case as it progresses, and therefore is a proper item of court costs.").

▬▬▬▬ A Rule 54(d) award of costs to the prevailing party includes the costs of depositions necessary to decide the case. *Gibson v. Greater Park City Co.*, 818 F.2d 722, 725 (10th Cir.1987); *see also Griffin v. Collins*, 443 F.Supp. 1010, 1014 (S.D.Ga. 1978); *Modick v. Carvel Stores*, 209 F.Supp. at 364. The prevailing party generally should recover the cost of taking depositions of the opposing party and key witnesses unless it is shown that the taking thereof was not reasonably necessary at the time or that the deposition process was abused. *Semke v. Enid Automobile Dealers Assn.*, 52 F.R.D. 518, 520 (W.D.Okla. 1971). Plaintiffs are entitled to recover the costs incurred in connection with the taking of depositions of BCBSK employees, defendant's expert witnesses, and St. Joseph and St. Francis representatives who testified at trial. These depositions provided critical assistance to me in resolving defendant's motion for summary judgment. *Greater Park City Co., supra*, at 725. Additionally, portions of Mr. Robert Pearcy's deposition were read into the record at trial, and the deposition transcripts of other BCBSK employees and Wichita hospital representatives were used extensively at trial for purposes of impeachment. The depositions of defendant's expert witnesses were used in connection with the preparation of plaintiffs' expert witnesses as well as in connection with cross-examination. *See Chemical Bank v. Kimmel*, 68 F.R.D. at 684. Plaintiffs are also entitled to recover the cost of depositions of Sister Mary

Alice Girrens, Sister Angelica May, Michael Westcott, George Farha, M.D., and S. Jim Farha, M.D., despite the fact these individuals did not testify at trial. They were deposed because defendant identified them as anticipated trial witnesses in the final pretrial order. The depositions were therefore reasonably necessary at the time of taking, and the cost thereof is granted.

 Plaintiffs also seek to recover the costs incurred to obtain copies of certain depositions taken by BCBSK. Specifically, plaintiffs seek recovery for the costs of copies of depositions of (1) plaintiffs' representatives and HCA executives; (2) plaintiffs' expert witnesses; and (3) third party witnesses. Plaintiffs are entitled to recover the costs incurred to obtain copies of the foregoing depositions because such copies were necessary for the effective presentation and proper handling of plaintiffs' case. *See Greater Park City Co., supra; Marcoin, Inc. v. Edwin K. Williams & Co.,* 88 F.R.D. 588, 590–92 (E.D.Va.1980). Portions of the depositions of certain HCA executives were read into the record and introduced via videotape, and plaintiffs' counsel needed copies of those depositions for purposes of making objections to defendant's deposition designations, and making counterdesignations. The same is true of Mr. Denman's deposition. Copies of the depositions of plaintiffs' witnesses who had been deposed by BCBSK were used to prepare those individuals for testifying at trial and to hold impeachment attempts within proper limits. *See Wade v. Mississippi Cooperative Extension Service,* 64 F.R.D. 102 (N.D.Miss.1974); *Hancock v. Albee,* 11 F.R.D. 139, 141 (D.Conn.1951). Similarly, the costs of obtaining copies of the depositions of defendant's third party witnesses is allowed since such depositions were used in preparing for the cross-examination of those witnesses. Finally, plaintiffs are also entitled to reimbursement for the allocated share of the costs incurred in editing the videotapes used for introduction at trial. Videotape testimony was introduced at defendant's initiative, and modern practice clearly supports plaintiffs' entitlement to reimbursement for incidental costs incurred. *See* Fed.R.Civ.P. 30(b)(4) (authorizing nonstenographic recording of deposition testimony).

28 U.S.C. § 1920(3) expressly provides that the court may award costs relating to "fees and disbursements for printing and witnesses." Under this category, plaintiffs seek to recover fees and disbursements for the witnesses who appeared on behalf of plaintiffs at trial. Applicable witness fees and per diem and mileage allowances are set forth in 28 U.S.C. § 1921, which provides that witnesses shall be paid an attendance fee of $30.00 per day for each day's attendance (including the time necessarily occupied in going to and returning from the place of attendance, 28 U.S.C. § 1821(b)), as well as travel expenses (a travel allowance of $0.205 per mile is provided for witnesses who travel by privately owned automobile, 28 U.S.C. § 1821(c)). The witness fees sought by plaintiffs have been calculated in accordance with § 1821, and are therefore taxed in their entirety.

 Lastly, plaintiffs seek to recover their costs (1) for three copies of all proposed plaintiffs' exhibits (one set for the court, one set for opposing counsel, and one set for plaintiffs' counsel); and (2) for the charts and graphs used by plaintiffs at trial. These costs are permitted, pursuant to 28 U.S.C. § 1920(4), which identifies "fees for exemplification and copies of papers necessarily obtained for use in the case" as allowable items of cost. *See also Mikel v. Kerr,* 499 F.2d 1178, 1182 (10th Cir.1974) (expenses in preparing maps, charts, graphs and similar materials taxable pursuant to § 1920); *Sperry, Rand Corp. v. A–T–O, Inc.,* 58 F.R.D. 132, 139 (E.D.Va.1973) (cost of exhibit photocopies allowed).

Plaintiffs' application for attorneys' fees and bill of costs is granted in its entirety.

## SUMMARY JUDGMENT ON COUNTERCLAIM

Defendant BCBSK and counterclaim plaintiff HMOK filed their counterclaim against plaintiffs and counterclaim defendant HCA on January 10, 1986, alleging violations of Section 1 and Section 2 of the

Sherman Act, Section 7 of the Clayton Act, and tortious interference with contractual relations and prospective advantage. Count I alleges a per se boycott in violation of § 1; Count II alleges restraint of trade in violation of the rule of reason; Count III alleges monopolization, attempt to monopolize and conspiracy to monopolize the health care financing and health care services market; Count IV alleges a violation of § 7 of the Clayton Act; and Counts V and VI allege interference with prospective advantage and contractual relations. Counterclaim ¶¶ 27–32. With the exception of the § 7 claim, all of the claims in the counterclaim are based in whole or in part on the allegation HCA, HCP and physicians in Wichita conspired to boycott HMOK "as a condition of and in connection with [the] negotiation and sale of Health Care Plus to HCA." Counterclaim ¶ 20. Counterclaim defendants now seek summary judgment on the entire counterclaim.

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The plain language of Rule 56(c) "mandates the entry of summary judgment" against any party "who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. ——, —— – ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273 (1986). The Court explained this holding in the following terms:

> In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.

*Celotex*, 477 U.S. at ——, 106 S.Ct. at 2553, 91 L.Ed.2d at 273.

■ Thus, a claimant must present affirmative evidence as to each essential element of its claim to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. ——, ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202, 217 (1986). The mere existence of a scintilla of evidence in support of plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff. *Liberty Lobby*, 477 U.S. at ——, 106 S.Ct. at 2512, 91 L.Ed.2d at 213–14.

■ Neither the fact that the counterclaim raises claims under the antitrust laws, nor my previous denial of defendant's motion for summary judgment on plaintiffs' complaint precludes summary disposition of its counterclaim. The Supreme Court expressly rejected the first proposition in *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968):

> To the extent that petitioner's ... argument can be interpreted to suggest that [Rule 56] should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support these allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint ... be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Instructional Sys. Dev. Corp. v. Aetna Cas. & Surety Co.*, 817 F.2d 639, 644 (10th Cir. 1987).

■ The second proposition is equally unsound. In essence, defendant claims that "consistency" alone requires the denial of the present motion for summary judgment: "Simply stated, this Court cannot

grant summary judgment against the Blue Cross counterclaim and be consistent with its prior decision denying the Blue Cross motion for summary judgment against the main claim." (Dkt. 266, Memo. in Opp. to Pltfs.' Motion for Summ. Judg. on Ctrclm., p. 121; *see also* pp. 2–3, 119, 156.) Summary judgment jurisprudence has never been based on such simplistic notions of "fairness", i.e., "you gave *them* a trial, now you have to give *us* one also!" Rather, true "consistency" requires careful application of established principles of law to the counterclaim, to determine whether BCBSK and HMOK have advanced significant probative evidence demonstrating the existence of genuine issues of material fact as to each of their claims.

A party resisting a motion for summary judgment must do more than make conclusory allegations; it "must set forth specific facts showing that there is a genuine issue for trial." *Dart Industries, Inc. v. Plunkett Co. of Okla.*, 704 F.2d 496, 498 (10th Cir.1983). To be considered "genuine", a material issue must be established by sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of truth at trial. *White v. Hearst Corp.*, 669 F.2d 14, 18 (1st Cir.1982); *see also Durasteel Co. v. Great Lakes Steel Corp.*, 205 F.2d 438, 441 (8th Cir.1953) ("An issue of fact is not genuine unless it has legal probative force as to a controlling issue.").

Under Rule 56, a party opposing summary judgment must establish the existence of an issue of fact which is *both* "genuine" *and* "material". A "material" issue is one which affects the outcome of the litigation. *White*, 669 F.2d at 18. A factual issue that is not necessary to that decision is not material within the meaning of Rule 56(c), and a motion for summary judgment may be granted without regard to whether it is in dispute. *Cox v. Bell Helicopter Internat'l*, 425 F.Supp. 99, 102 (N.D.Tex.1977) (quoting 10 Wright & Miller, Federal Practice & Procedure: Civil § 2725).

In assessing whether a party opposing summary judgment has raised a "genuine issue of material fact," the court may only consider evidence that would be admissible at trial. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). The party opposing summary judgment must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Matsushita*, 106 S.Ct. at 1357. Rather, it must adduce evidence that is "significantly probative" of the disputed fact. *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir.1978) (citing *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita*, 106 S.Ct. at 1356.

It is clear now the counterclaim was a defensive ploy, a maneuver, probably suggested and instigated by defense counsel, to divert attention from plaintiffs' complaint. Even after the counterclaim was filed, the principal responsible BCBSK executives, including its president, Wayne Johnston, the senior vice president for external affairs, Marlon Dauner, and the vice president of marketing and alternative delivery systems and chief executive officer and executive director of HMOK, John Knack, testified they were unaware of any facts tending to support the counterclaim. (Johnston Depo., pp. 293–94; Dauner Depo., pp. 95–98; Knack Depo., pp. 131–32.) Elsewhere, one of BCBSK's lawyers forthrightly acknowledges he "alone, was responsible for drafting Blue Cross' answer to the complaint and Blue Cross' counterclaim in this matter," and he estimates "my ... time expended for these tasks [was] no more than 10 hours." (Dkt. 267, Memo. in Opp. to Pltfs.' App. for Attys'. Fees & Bill of Costs, p. 17, and attached Aff. of Daniel R. Shulman, ¶ 5.) I wholeheartedly agree with defendant's representation to the Tenth Circuit Court of Appeals that this jury and I heard "all the evidence" related to the counterclaim. The 6–week trial of "plaintiffs' complaint" was focused largely on BCBSK's counterclaim as its "rule of reason defense." With the

**1462**

benefit of that trial evidence, time, and my study of the parties' memoranda on the motion for summary judgment, I am now inclined to agree with the BCBSK officials' assessment.

Thus, I address the motion for summary judgment on the counterclaim in the extraordinary posture of having received the documentary evidence and having heard, firsthand, the live testimony of the witnesses. Much of that evidence and testimony was set forth at the outset of this opinion. In these unique and unusual circumstances, having tried the counterclaim in everything but its name, I grant counterclaim defendants' motion for summary judgment.

The counterclaim defendants have prepared and submitted a well-researched memorandum containing proposed findings of fact and conclusions of law. I adopt both, and, with some repetition of facts in the interest of clarity, find as follows:

*Facts.*

### Health Care Plus

1. HCP was formed in October, 1977, under the name of Community Health Care Association. (Tran. 17, p. 2930.) Its founder, Garland Bugg, was then employed at the Wichita Clinic, a multi-specialty physician group practice located in Wichita. (*Id.* p. 2925.) At the Wichita Clinic, Mr. Bugg was responsible for the development and administration of the Wichita Clinic health plan, which on January 1, 1974, became the first state-certified HMO in Kansas. (*Id.,* pp. 2925–27.)

2. Participation in the Wichita Clinic HMO was limited to physicians at the clinic, but the experiment generated community-wide interest among other Wichita physicians. (*Id.,* p. 2927.) In January of 1977, the Wichita Clinic discontinued its own HMO activities. (*Id.*) Mr. Bugg left the Wichita Clinic one year later to work full-time in developing Community Health Care Association, a nonprofit HMO formed in the fall of 1977 in response to the interest expressed by physicians throughout Wichita in participating in a prepaid medical plan. (*Id.,* pp. 2927–28.)

3. On July 1, 1981, Community Health Care Association received federal qualification and changed its name to Health Care Plus. (Tran. 17, p. 2931.) By obtaining federal qualification, HCP achieved the ability to "mandate" employers, that is, to require employers to offer an HMO option in their employee health insurance benefits. (Tran. 4, pp. 531–32.) An employer is not required to offer more than one federally qualified HMO option of the same type to its employees. However, if another federally qualified HMO approaches an employer with an HMO option different in structure and benefit design, that HMO also can require the employer to offer this second HMO option to its employees. (Tran. 4, p. 532; Tran. 12, pp. 2022–23.)

4. When it obtained federal qualification, HCP was the only HMO in Sedgwick County, which conferred distinct marketing advantages upon HCP. (Tran. 4, pp. 533–34; Tran. 27, pp. 4491–92, 4513–14.) With federal qualification HCP was able to mandate employers beginning in July, 1981. This allowed HCP to establish an HMO enrollment base, a factor of critical importance in HMO development. (Tran. 6, p. 1038; Tran. 7, pp. 1104–05; Tran. 16, pp. 2691–92; Tran. 21, pp. 3411–13; Def's. Ex. 553.) HCP worked hard to take full advantage of its priority in the marketplace, employing between four to six marketing representatives in Sedgwick County. (Tran. 17, pp. 2932–33.) By 1983, it had enrolled approximately 13,000 members (*Id.*) and had established itself as one of the first successful HMOs in Kansas. (Tran. 4, p. 531.)

5. In addition, HCP established good relationships with its contracting providers during this period, which also contributed to its long-term success. (Tran. 17, p. 2932.) Because HCP was successful enrolling subscribers, medical groups which were initially unenthusiastic about prepaid medical plans ultimately signed on with HCP to prevent erosion of their patient base. (Tran. 16, pp. 2689–90.) HCP's success enrolling members provided its contracting physicians with increasing patient bases and attractive compensation arrangements. (Tran. 16, p. 2695; Tran. 26, p. 4195–97.)

6. HCP's contracts with medical groups are capitation contracts, under which physicians are paid a set fee per month for each HCP member choosing that physician as his or her primary care physician. (See Tran. 17, pp. 2978–79.) Capitation contracts are a prepayment mechanism which involved an element of "risk bearing" in the sense the provider bears part of the insurance risk under the arrangement. (Tran. 7, pp. 1246, 1257, 1259; Tran. 17, pp. 2979–81.) The provider receives a set capitation amount per member per month regardless of actual utilization by his or her patients. If no patients require medical attention in a given month, it results in a financial benefit to the provider, who has been "paid" despite the fact no services were performed. On the other hand, a serious illness might quickly deplete the entire capitation payment fund since the contracting physician is required to finance his own services as well as those of any referral specialists out of that fund. (Tran. 16, pp. 2691–95; Tran. 17, pp. 2979–83.)

7. Capitation arrangements work well for a primary care physician if there are a large number of individuals who are enrolled in the program. The concept behind paying so much per member per month is that the physician will receive payment on every individual patient who is enrolled in the program even if they do not receive care. If there are very few patients enrolled in the program, the services the primary care physician provides would not be covered by the amount of income he receives through his capitation payment. (Tran. 17, p. 1104.)

8. In addition, an adequate level of enrollment is essential to protect the primary care physician from an unacceptable level of risk by participating in the program. If enrollment is low, there is an insufficient "risk pool" to protect the physician from significant financial loss in the event one of his HMO patients requires intensive medical treatment. (Tran. 16, pp. 2691–95, 2701–02; Tran. 26, pp. 4197–98.)

9. In 1983 HCP decided to expand its operations to areas outside Sedgwick County. It planned to expand initially to Lawrence and Topeka, and then to other cities in Kansas. HCP anticipated this initial expansion would require approximately $2 million, and it decided to raise capital by converting to for profit status and issuing stock to investors pursuant to a private placement. (Tran. 17, pp. 2933–34, 2964–65.)

10. The HCP stock offering was formally made pursuant to a prospectus issued in March, 1984. (Tran. 16, p. 2708.) Stock was offered at $1.00 per share to certain physicians who were under contract with HCP as providers, in particular to those physicians who had been strong supporters of HCP. (Tran. 17, p. 2936; Tran. 25, p. 4095.) Stock was also offered to certain other physicians who were *not* under contract with HCP, as well as to other private investors in Wichita. (Tran. 17, pp. 2940–41; Tran. 25, p. 4095.) Investors who elected to purchase HCP stock were required to make their decisions and advance the requisite funds in early 1984. (Tran. 27, pp. 4372, 4382.) The stock was actually issued the following August. (Tran. 16, p. 2719; Tran. 26, p. 4183; Tran. 29, p. 4749.)

11. HCP's principal reason for offering stock to physicians and others was to raise capital to fund its planned expansion of operations. (Tran. 17, pp. 2936, 2964–65.) HCP also perceived equity involvement by physicians as a means of solidifying its relationship with providers and fostering physician involvement in the HCP program. (Tran. 17, p. 2937; Tran. 25, pp. 3986–87; Tran. 26, p. 4237.) However, HCP placed no conditions on the availability of its stock that the physician must do business "exclusively" with HCP or refrain from doing business with any other HMO. (Tran. 17, p. 2938; Tran. 25, pp. 3977–80.)

12. In 1984, there were approximately 250 primary care physicians in Wichita. (Tran. 17, p. 2939; Tran. 26, p. 4233.) Nineteen primary care physicians, excluding the primary care physicians at the Wichita Clinic, ultimately became HCP shareholders. (Tran. 17, p. 2940.) The Wichita Clinic purchased 100,000 shares of HCP stock as a group through a subsidiary corporation, The Wichita Clinic Building

Company, Inc. (Tran. 17, p. 2940; Tran. 26, p. 4151.) In 1984 there were approximately 80 physicians at the Wichita Clinic, approximately 20 of whom were primary care physicians. (Tran. 26, p. 4203.)

13. The Wichita Clinic was one of the groups which had been under contract with HCP since its inception. (Tran. 25, pp. 3984–85, 3987.) The Wichita Clinic's purchase of HCP stock was approved by the Clinic's Executive Committee after substantial discussion on March 19, 1984, by a vote of 4 to 3. (Tran. 26, pp. 4148, 4151; BC Ex. 452.)

14. HCP also offered stock to Hillside Medical Office, Dr. Reazin's group practice, in March of 1984. (Tran. 16, p. 2708.) At that time, five physicians were associated with Hillside Medical Office. (Tran. 16, p. 2665.) The office declined to purchase HCP stock as a group. (Tran. 16, p. 2708.) Subsequently, Dr. Conrad Osborne, one of Dr. Reazin's partners, purchased HCP stock individually. (Tran. 16, p. 2709; Tran. 27, p. 4372.) Thereafter, Dr. Reazin also purchased a block of HCP shares. (Tran. 16, p. 2709.) Dr. Reazin decided to purchase HCP stock as an investment, a decision which was unrelated to his medical practice. (Tran. 16, p. 2710.) Dr. Reazin's purchase of HCP stock was not conditioned upon any commitment that Hillside Medical Office would only do business with HCP. (Tran. 25, p. 4102.)

### Competition

15. Throughout its history, HCP has faced intense competition in the private health care financing market. (Tran. 25, pp. 4115–16.) This market includes traditional indemnity insurance products, HMOs, PPOs, and self-insured programs. (Tran. 6, p. 1013; Tran. 25, pp. 4115–16; Tran. 28, p. 4565.) There are approximately 200 companies offering traditional indemnity insurance products in Kansas. (Tran. 6, p. 1013.) The largest of these is BCBSK, which is also the largest provider of private health care financing in Sedgwick County. (Stip. j.)

16. Approximately 37% of the total population in Kansas has Blue Cross insurance coverage. (Tran. 21, p. 3394.) BCBSK

therefore has between 47% and 60% of the total insurable population in Kansas. (Tran. 21, pp. 3393, 3395–96; Pltfs.' Ex. 41.) Based on premium dollars, BCBSK has 62% of the private health care financing market in Kansas. (Tran. 9, p. 1476.) Its next largest competitors, Bankers Life and Aetna, have 4% and 3%, respectively. (Id.)

17. All but one hospital in Kansas (Memorial Hospital in Topeka) are contracting hospitals with BCBSK under its CAP program, BCBSK's traditional indemnity insurance program. (Tran. 4, pp. 558–59.) Ninety percent of all physicians in Kansas are contracting CAP providers. (Id., p. 559.) Under these contracts, BCBSK is able to invoke the "most favored nations clause", pursuant to which BCBSK is entitled to the lowest prices for medical services which a contracting provider makes available to any other health care financing organization. (Tran. 4, p. 600; Pltfs.' Ex. 112.)

18. BCBSK reimburses CAP providers on the basis of "maximum allowable payments", which are set unilaterally by BCBSK each year. (Tran. 5, p. 717; Tran. 6, pp. 943–46; Tran. 12, p. 2068.) Since BCBSK is the largest source of private revenues to its contracting providers, it is able to command considerable discounts from its providers' normal charges for medical services. (Tran. 9, pp. 1448–49, 1459–60; Tran. 1, pp. 26–27; Tran. 15, pp. 2639–40.)

19. HMOs also compete with PPOs in providing private health care financing. (Tran. 6, p. 1013.) Several PPOs are doing business in Wichita in direct competition with HCP. (Tran. 25, p. 4115.) Recent PPO entrants in Wichita include Aetna (Tran. 28, p. 4558) and two new PPOs formed by the Sedgwick County Medical Society and St. Francis Regional Medical Center. (Tran. 7, pp. 1104–05; Tran. 26, pp. 4152–53, 4193; Def.'s Ex. 553.)

20. A large number of companies in Wichita also provide health care financing benefits to their employees through self insurance. Approximately 100,000 persons in greater Wichita, or roughly one-third of the total population, are covered by self-in-

sured programs. (Tran. 28, pp. 4728–31.) These programs also compete against traditional indemnity insurance products, HMOs and PPOs. (Tran. 28, p. 4565.)

21. Despite its progress, these alternative products and programs placed competitive limitations on HCP's growth in the Wichita marketplace. In 1985, for example, HCP only had between 8% and 12% of the private health care financing market in greater Sedgwick County. (Tran. 25, pp. 4041–42.)

## HMO Kansas

22. BCBSK, the largest private health care financing organization in Kansas, established and maintained its preeminent position through its traditional indemnity insurance product. (Tran. 4, pp. 534–35.) BCBSK currently offers HMO products through HMO Kansas, Inc. ("HMOK"), a wholly-owned subsidiary. (Stip. h.) BCBSK's HMO effort is a relatively recent development, as BCBSK was slow in developing alternative delivery systems such as HMOs and PPOs. (Tran. 4, p. 574.)

23. In July of 1983, HMOK announced plans to enter Wichita and other parts of Kansas with an HMO product offering. (Tran. 6, pp. 1023–24.) HMOK received state certification in February, 1984, enabling it to commence marketing operations. (*Id.*, pp. 1036–37.) As of that time, HMOK had secured contracts with 73 primary care physicians and 201 specialists in Wichita in anticipation of beginning marketing operations. (*Id.*, pp. 1037–38; Def.'s Ex. 536.) Thirty-three primary care physicians and 103 specialists in Topeka had entered into contracts with HMOK at that time. (*Id.*) By July of 1984, HMOK had executed contracts with more than 100 primary care physicians in Wichita. (Knack Depo., pp. 115–16.)

24. HCP was already well established in Wichita by the time HMOK entered the market, having begun operations in Sedgwick County some three years earlier. (Tran. 12, p. 2027.) When HMOK began marketing in Wichita, HCP already had approximately 35,000 members in Sedgwick County. (*Id.*) BCBSK recognized HCP's head start in Wichita would place HMOK at a considerable disadvantage. (Tran. 4, pp. 533–34, 575; Tran. 6, p. 1038.)

25. From the outset, HMOK experienced difficulty penetrating the Wichita market. (Tran. 6, p. 1079–80; Def.'s Ex. 546.) HCP's early presence in the market had allowed it to capture a significant membership base and to develop a better physician list. (*Id.*) HMOK did not receive federal qualification in Wichita until July of 1984. (Knack Depo., p. 110.) Further, it attempted to enter Wichita with the same HMO model as HCP, and offering substantially similar benefits. (Tran. 12, pp. 2027–28.) Even after receiving federal qualification, HMOK was therefore unable to mandate employers to offer the HMOK product side by side with HCP. (See Statement of Material Fact (SMF) ¶ 3, *supra*.) HMOK had other difficulties as well. HMOK's marketing personnel observed, for example, that HMOK had inadequate staffing and an insufficient advertising budget. (Pltfs.' Ex. 51, at p. 6700.)

26. HMOK also experienced difficulties in recruiting and retaining physicians in Wichita. Certain groups declined to do business with HMOK from the outset. HCP had a definite advantage over HMOK because it offered higher capitation payments to physicians than the BCBSK HMO. (Tran. 8, p. 1348.) HMOK offered two different risk packages which physicians could accept: full risk and partial risk contracts. (Tran. 16, pp. 2702–03; Tran. 29, pp. 4762–63.) If a physician was under contract with HCP, however, HMOK required that physician to sign the full risk contract. (Tran. 29, pp. 4762–63.) Certain doctors objected to this requirement and declined to participate in the HMOK program on this basis. (*Id.*)

27. Doctors were also dissatisfied with other aspects of the HMOK program. Family Physicians, P.A., for example, a Wichita family practice group, decided not to contract with HMOK in the summer of 1983 (Tran. 26, pp. 4261–62) because HMOK's program involved participating in a community risk pool which placed Family Physicians at risk based on the performance of medical groups over which Family

Physicians had no control in terms of quality assurance and cost effectiveness. (Tran. 26, p. 4283.) HMOK's low enrollment and inferior coverage were also factors in Family Physicians' decision not to participate in the Blue Cross HMO. (Tran. 26, pp. 4282–84.) Other reasons why certain physicians declined to contract with HMOK included lingering philosophical reservations about prepaid medical plans generally, and general disenchantment with BCBSK. (Tran. 29, pp. 4762–63.)

28. Nevertheless, a substantial number of primary care physicians and specialists in Wichita did enter into contracts with HMOK in late 1983 and early 1984 (see SMF ¶ 23, *supra*), including Hillside Medical Office and the Wichita Clinic. (Tran. 16, p. 2688; Tran. 26, p. 4145.) Hillside Medical Office signed its contract with HMOK in October of November of 1983; the contract had an effective date of March, 1984. (Tran. 16, p. 2688.) The Wichita Clinic also decided to participate with HMOK in late 1983. (Tran. 26, p. 4145.) Both Hillside Medical Office and the Wichita Clinic were under contract with HCP when they entered into contracts with HMOK. (Tran. 16, pp. 2688, 2706; Tran. 26, pp. 4144–45.)

29. Despite HMOK's initial success in securing contracts with primary care physicians and specialists in Wichita, it was unable to develop an adequate membership base in Sedgwick County. By July of 1984, HMOK had enrolled only 1800 members in Wichita. (Knack Depo., pp. 115–16.) By the end of 1984, its Wichita enrollment totaled just 2,000 members. (Tran. 12, p. 2027.) HCP, by comparison, had approximately 35,000 members in 1984. (Tran. 17, p. 3025; Pltfs.' Ex. 65 at p. 9.)

30. By mid–1984, HMOK recognized it was having difficulty penetrating the Wichita area, particularly in view of HCP's established "predominance". (Def.'s Ex. 546 at p. 3.) This difficulty was attributed to the fact HCP was in Wichita prior to HMOK, resulting in predominant enrollment numbers and a better physician list. (Tran. 6, pp. 1079–80.)

31. On September 5, 1984, the HMOK board of directors decided to discontinue HMOK's activities in Sedgwick County. (Def.'s Ex. 553.) The minutes of that board meeting explained the reasons for that decision as follows:

Mr. Knack, at the request of Mr. Barnes, reported that activity in Wichita was not as promising as in other areas. The Wichita Clinic and the Hillside Clinic are both dropping or have dropped from the primary care physician lists of HMO Kansas. Since the HMO Kansas product is highly similar to that of Health Care Plus, and since the prices are competitive for both organizations, the only real arena for competition is in the physicians list. With Wichita and other large clinics affiliated with it, Health Care Plus has a definite and probably insurmountable marketing edge in Wichita. This marketing edge results in HMO Kansas not being able to enroll many persons. The lack of a volume of enrollment through employer groups results in the physicians who continue to participate with HMO Kansas having too few patients to provide them with a manageable risk. That is, with only a few patients, the capitation allowances are not large enough to provide physicians with a margin of safety against very ill cases among HMO enrollees. This causes physicians to continue to be tempted to drop out of the program and to have dissatisfaction with the program[;] even if they remain in, they incur losses or do not experience any distribution of surplus. The product, Mr. Knack reported, appears less and less marketable in Wichita because of this, and because of some impending actions of Blue Cross and Blue Shield. Preferred provider organizations are gaining a foothold in Wichita, with both the Sedgwick County Medical Society and St. Francis announcing the development of PPOs. In addition, there is a rumor that Health Care Plus is about to establish a PPO. In response, Blue Cross and Blue Shield intends to establish a form of PPO, with highly competitive reimbursement levels and rates, which will tend to eat into the

pricing advantage of HMOs. While there are some adverse effects from HMO Kansas ceasing operations in Wichita, Mr. Knack indicated it was staff's consensus that such was a proper step to take. That is, rather than continue to shuttle patients from one physician to another, and rather than see the program, and relationships with providers, destroyed by increasingly bad risks being taken by providers and severely limited enrollment opportunities causing a loss of morale in staff, staff recommends that the program in Sedgwick County be terminated.

(Def.'s Ex. 553.) Marlon Dauner, BCBSK's senior vice president for external affairs, testified these minutes accurately set forth the reasons why HMOK decided to discontinue operations in Wichita. (Tran. 12, p. 2051.)

32. By letter dated March 27, 1985, HMOK notified its Wichita area primary care physicians of its decision to cease marketing activities in Sedgwick County; that decision was explained as follows:

> HMO Kansas became operational in Wichita on April 1, 1984 with a product that featured a broad base of quality-minded Primary Care Physicians. Originally our major competitor offered a few select groups of Primary Care Physicians; however, they responded to our market entry by increasing their physician base. This resulted in little product differentiation between the two Federally Qualified HMO's in the Wichita Service Area. Employer groups, many of whom were mandated by our competitor, were reluctant to offer both plans. To date, HMO Kansas has 1800 members which is not a sufficient number in the Wichita Area to make the program feasible for the Primary Care Physician.
>
> We, therefore, have ceased marketing efforts of our present model and will be moving in a new direction of delivering health care. HMO Kansas is currently conducting feasibility studies in alternatives to include possible group or staff models and aligning with select hospitals in the area.

(Pltfs.' Ex. 49.)

33. Two months later, on May 22, 1985, BCBSK staff explained HMOK's withdrawal from Wichita to its medical advisory committee as follows:

> In Wichita, another situation is occurring. HMO Kansas was three years late with the major competitor being Health Care Plus with about 35,000 members. HMO Kansas had about 2,000 members. These were two HMOs that were almost identical in benefits. It was highly unlikely that both programs would stay in Kansas in identical form. HMO Kansas is now phasing out of the Wichita area in its current form. The program is being revitalized in Wichita and will be either a staff or group model HMO.... Staff thinks this will make a difference in what an employer will offer.... The Plan has been approached by physicians to be employed by HMO Kansas and several physicians want to sell their offices to HMO Kansas. All of these are alternatives and they are being evaluated and are options that will have to be considered in the future.

(Pltfs.' Ex. 65 at p. 9.)

34. Garland Bugg, president of HCP, testified he was surprised when he learned about HMOK's decision to cease marketing operations in Wichita, explaining he did not believe one year is a sufficient period in which to assess a program's prospects for success. (Tran. 17, pp. 2962–63.) Similarly, Marlon Dauner of BCBSK conceded that HMOK was a relatively new product in Wichita and that it was hard to assess its relative success or lack of success in the short period of one year. (Tran. 7, p. 1106; Tran. 8, pp. 1349–50.)

35. William Guy, a former Blue Cross executive with 37 years' experience with Blue Cross plans, including experience as the top executive of four different plans, assessed HMOK's difficulty in Wichita as follows:

> [T]he problem with HMO Kansas in Wichita is that they did not have the commitment to get an HMO here. They

did not know how to deal with the doctors. They were unwilling, unbending to do anything that it would take to get the physicians in the community back of them. (Tran. 21, p. 3453.)

## "Exclusivity"

36. As a general business practice, HCP has never sought exclusive contracts from its medical groups. (Tran. 17, p. 2945.) HCP's contracts with physicians in Wichita are nonexclusive in the sense that nothing in those contracts imposes any limitation on the provider's ability to contract with other HMOs, PPOs, or other health care financing programs. (Tran. 17, pp. 2957–61; Tran. 25, p. 3982; Pltfs.' Ex. 307A.) With the exception of discussing the possibility of an exclusive contract with the Wichita Clinic (see SMF ¶¶ 39–49, *infra*), HCP did not formally seek exclusive arrangements with any medical groups in Wichita. (Tran. 17, p. 2945; Tran. 25, pp. 3977–78, 3982; Tran. 26, p. 4244.) In particular, HCP never discussed exclusive arrangements with Hillside Medical Office (Tran. 16, p. 2706; Tran. 17, pp. 2961–62; Tran. 27, pp. 4382–83) or Family Physicians, P.A. (Tran. 26, p. 4261).

37. As HMOK and other competing prepaid plans began seeking to contract with providers in Wichita, HCP responded by increasing efforts to "sell" providers on the advantages of continuing to participate with HCP. (Tran. 25, pp. 3983–85.) At no time, however, did HCP tell medical groups that they could not do business with other HMOs or PPOs. (*Id.;* Tran. 26, p. 4239.)

38. Physicians under contract with HCP who declined to contract with HMOK were offered "exclusively" on HCP's provider list in the sense those physicians were not marketed by any other HMO. (Tran. 17, pp. 2957–58.) Such groups had an "exclusive" arrangement with HCP only in the sense they were dealing with HCP alone at the time. (Tran. 25, pp. 4021–23.) However, there was no limitation on those groups' ability to contract with another HMO, PPO, or any other competing system. (Tran. 17, p. 2943.)

## The Wichita Clinic

39. In the summer of 1984, HCP became aware that HMOK was attempting to create a stand-alone HMO to market the Wichita Clinic on an exclusive basis. (Tran. 17, pp. 2954–55.) During 1983, before HMOK entered Wichita, HCP had discussed the possibility of an exclusive contract with the Wichita Clinic. (*Id.*, p. 2947.) The Wichita Clinic did not respond to this proposal (*id.*, pp. 2943–44; Tran. 26, pp. 4141–42), and as discussed, the clinic subsequently entered into a contract with HMOK. (Tran. 26, pp. 4144–45.)

40. When the Wichita Clinic was approached by HMOK concerning an exclusive arrangement in the summer of 1984, HCP became concerned about the possible loss of the clinic as a contracting HCP provider. (Tran. 17, pp. 2954–55.) The Wichita Clinic was also considering possible participation in the new St. Francis Regional Medical Center PPO at that time. (Tran. 26, pp. 4152, 4172.) HCP responded to these developments by renewing discussions concerning a possible exclusive arrangement between the Wichita Clinic and HCP. (*Id.;* Tran. 17, p. 2958; Def.'s Ex. 453.) HCP officials made a presentation on this subject to the Wichita Clinic executive committee on June 26, 1984. (Def.'s Ex. 453.) The question under consideration by the Wichita Clinic executive committee at that time was whether the clinic would participate with HCP, HMOK, or both, as well as new PPOs. (Tran. 26, p. 4172.)

41. At the June 26 meeting, it was stated HCP would prefer that the Wichita Clinic not participate in St. Francis Regional Medical Center's PPO, but that the clinic instead participate in a new HCP program, "Health Options", a plan that would not restrict the patient to a single hospital. (Tran. 26, pp. 4152–53.) It was also indicated HCP "was interested in the clinic participating exclusively with HCP with HMO's ... and that *thie [sic] exclusive arrangement could be broken at any time if the clinic felt it was not advantageous to do so."* (Def.'s Ex. 453; emphasis added.)

42. The Wichita Clinic subsequently joined the St. Francis PPO. (Tran. 26, pp. 4152, 4193.) On July 10, 1984, however, the executive committee of the Wichita Clinic voted to terminate its contract with HMOK and to continue its HMO participation only with HCP. (*Id.*, p. 4173–75; Def.'s Ex. 455.)

43. Dr. Lloyd Hummer, a member of the Wichita Clinic, explained the clinic's reasons for terminating its contract with HMOK as follows:

> The reasons were several and all related to what we felt was advantageous from a business standpoint for the Wichita Clinic. The capitation for Health Care Plus patients was $20.29 per member per month. To provide essentially the same services for Blue Cross-Blue Shield would return $17.96 per patient per month. So that we would be receiving, for essentially the same work, a little over *ten percent less* in payment, so that when the numbers were run and advised the chief financial officer, at that time had all of our HMO, Health Care Plus patients switched to HMO Kansas, our monthly revenue stream would have been *$20,000 a month less.* HMO Kansas had projected rapid growth of their HMO by aggressive marketing, suggesting 6,000 patients at the end of the year. We had been participants in HMO Kansas for several months and at that time we had *a hundred and eighty-seven patients enrolled by HMO Kansas, with a monthly revenue stream of $3,300. We had ten thousand three hundred Health Care Plus patients with a monthly capitation of over $200,000.* We had also engaged the services of an outside consultant, Mr. DeMarco, to survey the overall health market in Wichita. It was additionally our consultant's advice, to whom we paid the money, that at this time we remain exclusive with Health Care Plus primarily because of lesser return. He also made the point that the most likely source for patients for HMO Kansas would be conversion of our current patients enrolled in Health Care Plus, and if we were on the same provider list, there would be no reasons for patients to choose one or the other, and if they converted to HMO Kansas, we again would get less return for essentially the same services. So, it was a decision of dollars and cents basically. Also, with only a hundred and eighty-seven patients in a particular plan, in prepayment modes of health care, your greater risks were small numbers of patients and the more patients you have disseminate the risk out among the larger population. So if there is a car wreck with six people in it and you have a hundred and eighty-seven, it's different than if such a tragic event would occur in a patient enrollment with ten thousand. So, *we were at risk. The program had not grown as projected, capitation was less, and our consultant's recommendation was that we stay at that point in time with Health Care Plus.*

(Tran. 26, pp. 4195–97; emphasis added.)

44. The Wichita Clinic advised HMOK of its decision to terminate its HMOK primary care physician contracts by letter dated July 19, 1984. (Def.'s Ex. 456.) The letter stated the "decision was made solely on the basis of our best business judgment that a discontinuance of these primary care contracts would be in the best interests of all concerned." (*Id.*) The July 19 letter further advised that the Wichita Clinic's decision was not intended to affect Referral Physician Agreements signed by certain referral specialists at the clinic, indicating the clinic's desire that those agreements continue in effect. (*Id.*)

45. When the Wichita Clinic terminated its contract with HMOK, the only HMO with whom the clinic was then under contract was HCP. By letter dated August 16, 1984, Ben Boldt (Wichita Clinic's business manager) indicated the clinic's interest in pursuing a possible exclusive contractual relationship with HCP. (Def.'s Ex. 392.) However, no such contract was ever prepared or signed (Tran. 17, pp. 2958–59; Tran. 26, p. 4201), and the clinic has never been party to an exclusive contract with HCP. (Tran. 26, p. 4156.) The Wichita Clinic has maintained an "exclusive" relationship with HCP since 1984 solely by

virtue of not having entered into any contracts with other HMOs. (Tran. 26, p. 4201.) But this relationship can be terminated by the clinic at any time in the clinic's sole discretion, and there is no limitation whatsoever on the clinic's ability to contract with another HMO or other prepaid plans. (*Id.*)

46. Dr. Hummer explained this variety of "exclusivity" from the Wichita Clinic's perspective as follows:

> It was never and still is not the intent of the Wichita Clinic to commit themselves exclusively to any particular product at any one point in time. We may choose to participate with one or more of similar plans, depending upon the business sense of that decision. If it makes business sense at one point in time to remain with one plan for a period of time, then that's the decision that's made based on the numbers and the business judgment at the time. That could be changed at any time should it be advantageous for the group to change.
>
> Q. (By Mr. Shulman) You understand an exclusive arrangement between a provider and an HMO to be an arrangement where the provider does business only with that HMO and not with other HMOs?
>
> A. As long as it's to the Wichita Clinic's advantage from a business sense to do that, yes, but not on a long term commitment.
>
> Q. An exclusive arrangement or agreement is an arrangement or agreement where a provider does business only with one HMO and not with others.
>
> A. It's a conscious choice of the provider to do business with any of a number of competing plans according to what is best for them at the time.

(Tran. 26, pp. 4165–66.)

47. HCP representatives had the same understanding of the "exclusive" arrangement between the Wichita Clinic and HCP, namely, that it was an "exclusive" arrangement only in the sense that, as a matter of fact, the Wichita Clinic had decided to contract only with HCP, an arrangement which could be terminated at any time if

the clinic decided to do so. (Tran. 17, p. 2958; Tran. 25, pp. 3981–82, 4021–23.)

48. The parties' understanding of the nature of their arrangement has been borne out in practice, since the Wichita Clinic has continued to negotiate with HMOK on various proposals since the summer of 1984, including a February, 1985 HMOK proposal regarding the formation of a group model HMO in Wichita. (Tran. 7, pp. 1142–48; Tran. 8, p. 1372; Tran. 25, p. 4056; Tran. 26, p. 4204; Def.'s Ex. 461; Pltfs.' Ex. 490.) Similarly, the Wichita Clinic subsequently signed with the St. Francis Regional Medical Center's PPO (Tran. 26, pp. 4152, 4193), the Sedgwick County Medical Society PPO and the Aetna PPO. (Dkt. 119, Hummer Depo., pp. 76–77.) Throughout this period, physicians at the Wichita Clinic have also continued as contracting providers under the BCBSK CAP program, defendant's basic indemnity insurance program. (*Id.*)

49. Marlon Dauner, BCBSK's senior vice president for external affairs, testified at trial he is aware of no facts to suggest that the Wichita Clinic would not be receptive to a good business proposal from HMOK. (Tran. 8, p. 1392.) At the same time, however, he also observed that HMOK's capitation rates are still lower than those of HCP. (*Id.*, pp. 1390–91.)

### Hillside Medical Office

50. As discussed, Hillside Medical Office signed a contract with HMOK in the fall of 1983. The contract had an effective date of March, 1984. (Tran. 16, p. 2688.) Similar to the Wichita Clinic, Hillside Medical Office was under contract with HCP at the time it entered into its contract with HMOK. (Compare Tran. 16, p. 2688 with p. 2706.)

51. While it was under contract with HMOK, Hillside Medical Office cooperated fully with the BCBSK HMO. (Tran. 16, p. 2691.) At no time did anyone from HCP seek to discourage Hillside Medical Office from participating with HMOK. (*Id.*, p. 2706.)

52. In July of 1984, Hillside Medical Office decided to terminate its contract

with HMOK. At that time, Hillside Medical Office had only 52 HMOK members among the five physicians in the office. (Pltfs.' Ex. 511.) During its six month participation with HMOK, Hillside's capitation payments from HMOK grew from $200 to just $550 per month, compared to a growth from $800 to $14,000 per month during its first six months with HCP. (Tran. 16, p. 2695.)

53. The extremely low level of capitation payments received from HMOK was insufficient to cover even a significant number of routine office visits per month, much less a catastrophic illness. (Tran. 16, pp. 2691–95; Tran. 27, pp. 4379–81; Pltfs.' Ex. 511.) Nor did there seem to be any prospect of improvement in HMOK's performance, particularly since HMOK had assigned only two marketing representatives to the Wichita area, and its media advertising was virtually nonexistent. (Tran. 16, pp. 2696–97; Tran. 27, p. 4401; Pltfs.' Ex. 511.)

54. Hillside Medical Office therefore concluded the financial risk associated with HMOK was too great to justify continued participation. (Tran. 16, p. 2697.) By letter dated July 11, 1984, Hillside advised HMOK as follows:

> This letter is to inform you that the physicians of Hillside Medical Office want to terminate their agreement with HMO Kansas according to Article V of the Agreement. It is our understanding that this termination will be effective 30 days from the date of this letter.
>
> There are several reasons for requesting termination, and we would briefly cite a couple. The rate of growth for HMO Kansas is very slow in Wichita, and it is our feeling that HMO Kansas is not actively pursuing a marketing program to help accelerate or stimulate the growth. It is our understanding that only two marketing people serve this area containing the greatest concentration of people in the state. Fifty-two members in 3½ months for an office of five physicians is not sufficient to establish a workable base for this type program. As you know, numbers are vital.

> The low capitation rate under the Basic Plan and the 25% withholding for the referral fund does not leave an adequate compensation for the primary provider to cover the most meager in-house fee for services charged on the HMO Kansas patient. On the other hand, the larger capitation rate under the full risk plan is more realistic but is immediately offset by the cost of referrals, and certainly places the primary care physician in a precarious financial position with the low subscription level.

> Rather than continue for an additional time, and exposing ourselves to additional patient encounters and referrals, we believe and feel now is the time to terminate the agreement.

(Pltfs.' Ex. 511.)

55. The Hillside physicians' decision to terminate the HMOK contract was unanimous. (Tran. 16, p. 2711; Tran. 27, p. 4399.) Dr. Reazin testified the above-quoted letter accurately sets forth Hillside Medical Office's reasons for terminating that contract. (Tran. 16, p. 2704; see also pp. 2691–95.) His testimony was corroborated by Dr. Conrad Osborne, another member of the Hillside group (Tran. 27, pp. 4379–81), and by Paul Pfortmiller, Hillside's business manager, who authored the July 11 letter. (*Id.*, pp. 4388, 4399–4402.)

56. After Hillside Medical Office terminated its contract with HMOK, it was an "exclusive" HCP provider only in the sense it was not being marketed by any other HMO. (Tran. 17, pp. 2961–62.) However, there is no limitation on Hillside Medical Office's ability to enter into arrangements with HMOK or any other prepaid health care financing plans. (Tran. 27, p. 4383.) All physicians at Hillside Medical Office are contracting providers under the BCBSK CAP program. (Tran. 16, pp. 2671–72, 2705.) Additionally, the Hillside group, in early 1985, submitted a bid to participate in Choice Care, BCBSK's PPO. (*Id.*, p. 2705; see also SMF ¶ 83, *infra.*)

### Unilateral Decisions

57. There is no evidence any medical group in Wichita agreed with any other group not to do business with HMOK, nor

that any groups reached their respective decisions regarding HMOK in consultation with or even with information concerning any other group. Dr. Hummer testified that when the Wichita Clinic made its decision to terminate its contract with HMOK, he was not aware that Hillside Medical Office was also discontinuing its contractual relationship with BCBSK's HMO. (Tran. 26, p. 4176.) He had never spoken to anyone at Hillside regarding their intentions with respect to HMOK, and he did not have any idea that Hillside Medical Office had any intention to terminate its contract with HMOK. (*Id.*, p. 4202.) He was not even aware that Hillside Medical Office had terminated its contract with HMOK until the time of his deposition in February, 1986. (*Id.*, p. 4176.)

58. Dr. Reazin of Hillside Medical Office testified he had no knowledge concerning the Wichita Clinic's intentions regarding HMOK when Hillside made its decision to terminate the HMOK contract. He further testified he did not have any information concerning what any other doctors in Wichita were doing with respect to HMOK. (Tran. 16, pp. 2704–05.) According to Dr. Reazin, the actions or intentions of other groups with respect to HMOK "wouldn't have changed my mind a bit because it wouldn't have changed my numbers here.... We were looking at low enrollment and we made our decision based on that." (*Id.*) He further testified that if HMOK had been successful in attracting subscribers, "I'd still be with them today." (*Id.*, pp. 2696–97.)

59. Dr. Conrad Osborne, Dr. Reazin's partner at Hillside Medical Office, testified to the same effect, stating that when Hillside made its decision to terminate its HMOK contract in July, 1984, he had no knowledge what the Wichita Clinic was doing with respect to HMOK. (Tran. 27, pp. 4373–7382.) He did not learn that the Wichita Clinic had terminated its HMOK contract until long after the fact. (*Id.*, p. 4373.) Dr. Osborne further testified that Hillside Medical Office's decision was made independently, without any input from anyone else. (*Id.*, p. 4382.)

60. Dr. Donald Ray Cook, a family practice sole practitioner associated with Medical Arts Health Care Associates, P.A., testified that he reached his decision not to contract with HMOK without having any knowledge regarding whether other physicians were entering into contracts with the BCBSK HMO. (Tran. 29, pp. 4744–45.) He testified he would have considered signing with HMOK if it had been in his own financial interest to do so. (*Id.*, p. 4767.)

61. Dr. Stanley Mosier of Family Physicians, P.A., a family practice group which decided against participating with HMOK in the summer of 1983 (See SMF ¶ 27, *supra*), similarly testified that he did not discuss HMOK with other medical groups in Wichita (*Id.*, pp. 4271, 4275), nor did he have any knowledge as to the status or intentions of any other group when Family Physicians, P.A. made its decision. (Dkt. 118, Mosier Depo., pp. 28–29, 32, 60–65.)

### HCP Stock

62. As discussed, HCP offered stock to various investors, including certain physicians, in March of 1984. This stock was actually issued to subscribing investors in August of 1984. (See SMF ¶ 10, *supra.*) Certain primary care physicians, including the Wichita Clinic, Dr. Reazin, Dr. Osborne, Dr. Mosier, and Dr. Cook, purchased HCP stock in connection with this offering. (Tran. 17, p. 2940; Tran. 16, p. 2707; Tran. 27, p. 4372; Tran. 26, p. 4262; Tran. 29, p. 4744.) Although these physicians hoped HCP stock would be a good investment, it was generally perceived as a risky investment. (Tran. 16, p. 2710; Tran. 26, pp. 4150, 4233; Tran. 29, p. 4763.)

63. It was not required that physicians do business with HCP, "exclusively" or otherwise, as a condition to being allowed to purchase HCP stock. (Tran. 17, p. 2938; Tran. 25, pp. 3977–80; Tran. 26, p. 4268; Tran. 29, p. 4763.) Those physicians and groups who declined to participate with HMOK and/or who discontinued such participation have articulated independent business reasons for their decisions, which were wholly unrelated to any investment in HCP. (See SMF ¶¶ 26–27, 43, 54–55, *supra.*) There is no evidence that any physi-

cian's investment in HCP influenced his decision regarding whether to participate with HMOK. In fact, the evidence of record conclusively establishes that HCP stock holdings played no part in the respective decisions of any groups at issue in this litigation.

64. For example, Family Physicians, P.A. decided not to contract with HMOK in the summer of 1983. (SMF ¶ 27, *supra.*) HCP stock was not even being offered at that time. (SMF ¶ 10, *supra.*)

65. Dr. Reazin testified his investment in HCP had no effect on his decision to discontinue his affiliation with HMOK. (Tran. 16, p. 2710.) Dr. Osborne also testified Hillside Medical Office's decision regarding HMOK had nothing to do with his HCP investment. (Tran. 27, p. 4381.) According to Dr. Osborne, "those were totally independent decisions." (*Id.*)

66. This direct testimony is corroborated by the fact that as a group, Hillside Medical Office *declined* to purchase HCP stock. (Tran. 16, p. 2708.) Further, only Drs. Reazin and Osborne individually decided to acquire HCP stock while their three partners at Hillside declined to do so, yet the decision to terminate the HMOK contract was *unanimous.* (*Id.*, p. 2711.)

67. Similarly, HCP's stock offering to the Wichita Clinic was unrelated to any notion of exclusivity. (Tran. 25, pp. 3977–80.) Nor was the Wichita Clinic's purchase of HCP stock connected in any fashion to the clinic's consideration of possible participation in other prepaid plans. (Tran. 26, p. 4152.) Rather, the HCP stock purchase was merely viewed as an investment opportunity, the desirability of which was decided by a 4 to 3 vote by the clinic's executive committee. (Tran. 26, pp. 4148, 4151; Def.'s Ex. 452.)

68. Dr. Donald Ray Cook was one of six physicians associated with Medical Arts Health Care Associates, P.A. (SMF ¶ 60, *supra.*) Within that group, Dr. Cook alone purchased HCP stock. (Tran. 29, p. 4762.) Dr. Cook individually decided not to contract with HMOK, and he did not know whether any of the other physicians associated with his group contracted with HMOK. (*Id.*, p. 4744–45.) Dr. Cook's individual reasons for deciding not to contract with HMOK had nothing to do with his investment in HCP. (*Id.*, pp. 4762–63.)

### Hospital Corporation of America

69. On April 25, 1985, HCA acquired New Century from E.F. Hutton. (Stip. u.; Tran. 19, p. 3182.) Although New Century was licensed to do business in over 30 states, including Kansas, it was basically a "shell" corporation without any active operations. (Stip. f.; Tran. 19, p. 3182.) New Century is not yet actively engaged in health care financing in Kansas. (Stip. f.)

70. In October of 1984, representatives from Wesley contacted HCA and indicated Wesley's potential interest in being acquired by HCA. (A.B. Davis Depo., pp. 69–75.) Negotiations ensued, and the sale was publicly announced in November of 1984. (Tran. 1, p. 36.) HCA acquired Wesley on July 11, 1985. The acquisition was effected to HCA Health Services of Kansas, Inc., a wholly-owned subsidiary of HCA. (Stip. v.)

71. In late 1984, HCP began planning toward national expansion of its HMO operations. Recognizing that additional capital would be needed to finance that expansion, HCP began talking to investment bankers, venture capitalists, and other institutional investors. (Tran. 17, pp. 2963–64.) In the spring of 1985, HCP began discussing its plans with HCA. (*Id.*, pp. 2965–66.) Initial discussions focused on the possibility of HCA making an investment in HCP as opposed to purchasing the company. (*Id.*, pp. 2966–67.) Ultimately, it was decided to sell HCP to HCA. (*Id.*, p. 2967.) The proposed transaction was publicly announced on May 30, 1985. (Def.'s Ex. 239.)

72. When HCA decided to acquire Wesley in late 1984, HCA was not contemplating the possible purchase of an HMO in Wichita. (Tran. 19, p. 3181.) HCA was interested in acquiring HCP because its management expertise and management systems offered the potential for national expansion. (Tran. 19, p. 3181; Tran. 20, pp. 3263–64; Tran. 21, p. 3330; Tran. 25,

pp. 4084–85.) Neither HCP's presence in Wichita nor HCA's pending acquisition of Wesley were relevant to HCA's decision to acquire HCP. (Tran. 19, p. 3181.)

73. HCA did not examine HCP's presence in Wichita in any great detail, because HCA's interest in HCP was not focused on local considerations. (Tran. 20, pp. 3263–64.) HCP's local physician list was discussed only in a limited fashion, and the existence of "exclusive" arrangements with physicians (or the lack thereof) played no role in the negotiations between HCA and HCP. (Bugg Depo., pp. 116–18; Kardatzke Depo., p. 58.) Indeed, this subject was not even discussed in connection with the transaction. (Tran. 17, pp. 2967–68.) As a result, none of the HCA representatives involved in the negotiations had any knowledge concerning any putative "exclusive" arrangements between HCP and physicians' groups. (Dkt. 118, Reeves Depo., pp. 30–31.)

74. On August 14, 1985, HCA consummated its acquisition of HCP. HCA acquired the stock of HCP through a merger of HCA Acquisition Corp. of Kansas, Inc. into HCP. (Dkt. 161, Memo. in Support of Ctrclm. Defs.' Motion for Summ. Judg. on Ctrclm., Att'd Aff. of Charles L. Kown and Att'd Ex., "Agreement of Merger".) Paragraph 1 of the Agreement of Merger provided that HCP was the Surviving Corporation and that:

> [t]he Surviving Corporation shall thereupon and thereafter without other transfer succeed to all the rights and property, subject to all debts and liabilities, of Health [Care] Plus and [HCA Acquisitions Corp. of Kansas, Inc.] in the same manner as if the Surviving Corporation itself had incurred them....

(*Id.*)

75. Wesley has been under contract with HCP since 1981. (Tran. 22, p. 3687.) In the fall of 1984, prior to any contact between HCA and HCP regarding a possible acquisition, HCP and Wesley successfully negotiated a capitation contract with an effective date of January 1, 1985. (Tran. 17, pp. 2976–78; Tran. 22, pp. 3687–88.) Although Wesley was the first hospital in Wichita to enter into a capitation contract with HCP, HCP also had fee-for-service contracts with the other hospitals in Wichita at that time. (Tran. 17, pp. 2968–70.)

76. HCP's existing relationship with Wesley had no bearing on HCA's decision to acquire HCP. (Tran. 19, p. 3181.) In fact, HCP made it clear from the outset that its existing model involved dealing with all hospitals, and that HCP would not be interested in pursuing discussions with HCA if HCA might require HCP to deal exclusively with HCA hospitals. (Tran. 17, pp. 2968–69.) HCA agreed that HCP could continue to deal with any and all hospitals in Wichita and elsewhere. (*Id.*, p. 2969.)

77. From the time of its acquisition of HCP, HCA has made no effort to require HCP to do business only with Wesley, and HCP has continued to do business with the other hospitals in Wichita. (Tran. 17, pp. 2969–70.) HCP entered into capitation contracts with St. Francis Regional Medical Center, in Wichita, in July of 1985 (after the HCA letter of intent had been executed), and with St. Joseph Medical Center, in Wichita, in April of 1986 (after HCP had been acquired by HCA). (Tran. 17, p. 2970.) Under these contracts, it may be more advantageous for HCP to send members to St. Francis or St. Joseph, rather than Wesley, under certain circumstances, and HCP continues to desire to have its members utilize all three hospitals. (*Id.*, p. 2984.)

78. HCA adheres to a policy of decentralized management with respect to its subsidiaries' operations. (Tran. 19, pp. 3144–45.) Both HCP and Wesley have continued to operate under the direction of their local, preacquisition management personnel, who operate autonomously in conducting the day-to-day operations of their respective organizations. (Tran. 1, p. 38; Tran. 17, p. 2971; Tran. 19, p. 3175; Tran. 22, p. 3683.) Dealings with HCA are limited mainly to budgetary approval. (Tran. 17, p. 2971; Tran. 22, p. 3684.)

79. HCA does not have any practice or policy involving special arrangements between its subsidiary hospitals and HMOs,

leaving such matters to the discretion of local management of the institutions involved. (Tran. 19, pp. 3147–48.) This general policy has been observed with respect to dealings between HCP and Wesley. (*Id.*, pp. 3146–47.) HCA has not involved itself in dealings between HCP and Wesley, requiring both firms to negotiate arrangements satisfactory to each. (*Id.*)

80. There have been no changes in HCP's relationship with Wesley since the HCA acquisitions—a relationship which continues to be characterized by arms-length negotiations. (Tran. 17, p. 2974; Tran. 22, p. 3690.) There has been no discussion of any type of "exclusive" arrangement between HCP and Wesley, either before or after HCP's acquisition by HCA. (Tran. 22, pp. 3688–3692.)

81. Wesley has participated with BCBSK as a contracting provider under its indemnity insurance program since BCBSK's inception. (Stip. q.; Tran. 4, p. 630.) Wesley has always cooperated fully with BCBSK, and Wesley has continued to do so after being acquired by HCA. (Tran. 4, pp. 630, 640.)

82. Wesley entered into a provider contract with HMOK in November, 1983. Wesley was already under contract with HCP at that time. (Tran. 22, pp. 3688–89.) Wesley's contract with HMOK is still in effect (*Id.*), and HCP has never attempted to interfere with Wesley's contractual arrangement with HMOK. (*Id.*, pp. 3689–90.)

Post-Acquisition Developments

83. In the spring of 1985, BCBSK began efforts to establish a PPO in Wichita. This PPO was known as "Choice Care". (Tran. 4, p. 631.) BCBSK solicited bids from all four Wichita hospitals to participate as preferred providers in the Choice Care program, and in the summer of 1985 BCBSK selected Wesley and St. Francis as Choice Care hospitals based on this competitive bidding process. (*Id.*) During this same period, BCBSK was successful in securing contracts with Wichita area physicians to participate in its new PPO. (Tran. 12, pp. 2056–58; Pltfs.' Ex. 358.)

84. BCBSK decided to discontinue development of Choice Care in Wichita in August, 1985. This decision was prompted by BCBSK's determination it would seek to terminate Wesley's contracting provider agreement under the CAP program. (Tran. 4, pp. 646–48; Pltfs.' Ex. 168.)

85. In the summer and fall of 1985, BCBSK developed an arrangement with Kansas Health Plan, a newly formed joint venture between St. Joseph Medical Center and St. Francis Regional Medical Center. Pursuant to this arrangement, BCBSK has reintroduced HMO Kansas into Wichita, offering a new HMO product in competition with HCP. (Tran. 8, p. 1336; Tran. 11, pp. 1907–08; Tran. 14, pp. 2316–17.)

86. More recently, BCBSK has renewed development of its Choice Care PPO in Wichita. BCBSK anticipates that Choice Care will offer lower premiums to its subscribers. (Tran. 8, p. 1338.)

87. BCBSK continues to be the largest provider of private health care financing in the State of Kansas and in Sedgwick County. (Stip. j.) Between 1983 and 1984, BCBSK experienced a net gain of 10,000 insurance contracts. (Tran. 21, pp. 3378–80; Def.'s Ex. 663.) Using a conservative estimate of BCBSK's market share of the insurable population in Kansas, BCBSK's market share increased from 43% to 47% during the period 1983 to 1985. (Tran. 21, pp. 3393–94.)

88. In 1986 HCA decided to withdraw from the health care financing business. This withdrawal will be effected through a joint venture with the Equitable Insurance Company. HCA will contribute all of its health care financing business, including HCP, to the joint venture in return for an initial 50% stock interest in the newly formed company. The joint venture corporation will have a separate board of directors and separate management. The corporation ultimately will be a publicly held company, and HCA therefore anticipates that its 50% interest will be diluted rapidly. (Tran. 20, pp. 3203–04.)

*Conclusions of Law.*

§ 1 Claims

The counterclaim plaintiffs (hereinafter "BCBSK") advance two principal claims un-

der § 1 of the Sherman Act. First, BCBSK alleges a per se violation of § 1 stemming from an alleged conspiracy with providers in 1984 to terminate contracts and refuse to deal with HMO Kansas. Alternatively, BCBSK alleges HCP entered into "exclusive dealing arrangements" with various physician groups pursuant to which those groups agreed not to do business with HMOK.

These claims provide no basis for relief against counterclaim defendants Wesley Medical Center or New Century. There is no evidence that Wesley was a participant in any such conspiracy or that it was a party to any allegedly unlawful contract. Nor is there any evidence linking New Century, which has not yet even begun doing business in Kansas, to any allegedly unlawful acts.

■ Nor do these allegations state any claim for relief against HCA. HCA did not begin discussions with HCP until the spring of 1985, long after the activities alleged in the counterclaim had taken place. The evidence further shows that HCA had no knowledge of any purported conspiracy or "exclusive dealing arrangements" between HCP and providers in Wichita. The mere fact HCA subsequently acquired HCP's stock is not sufficient to render HCA liable for the allegedly unlawful acts of its subsidiary. *Quarles v. Fuqua Industries*, 504 F.2d 1358, 1362 (10th Cir.1974); *Murphy Tugboat Co. v. Ship Owners & Merchants Towboat Co., Ltd.*, 467 F.Supp. 841, 854 (N.D.Cal.1979), *aff'd* 658 F.2d 1256 (1981), *cert. denied* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *First Stop Book Shop, Inc. v. Matthews Book Co.*, 476 F.Supp. 1054, 1056 (E.D.Mo. 1979), *rev'd on other grounds* 634 F.2d 396 (8th Cir.1981).

Counterclaim defendants HCP and Dr. Reazin have denied BCBSK's § 1 claims and have offered substantial evidence corroborating those denials. To survive summary judgment, BCBSK must therefore establish there is a genuine issue of material fact as to whether HCP and/or Dr. Reazin entered into an illegal conspiracy or agreement. If the record taken as a whole could

not lead a rational trier of fact to find for BCBSK on this issue, HCP and Dr. Reazin are entitled to summary judgment on the § 1 claims. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

No direct evidence implicates anyone in a conspiracy to "boycott" HMOK, and BCBSK therefore must rely on inferences from the evidence to establish the existence of the alleged conspiracy. In this case, Dr. Reazin and the other physicians who allegedly participated in the conspiracy to boycott HMOK have articulated independent business justifications for their respective decisions regarding dealings with HMOK. The reasons advanced by these providers were uniformly corroborated by contemporaneous documents, including HMOK's own internal memoranda and minutes.

■ While true, on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, it is also true that antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. *Matsushita*, 475 U.S. at ——, 106 S.Ct. at 1356, 89 L.Ed.2d at 553.

[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.... [Plaintiffs], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [them].

475 U.S. at ——, 106 S.Ct. at 1357, 89 L.Ed.2d at 553 (citations omitted; quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)). *Matsushita* establishes a two-part inquiry for evaluating the propriety of summary judgment in an antitrust conspiracy case: (1) whether a

plaintiff's evidence of conspiracy is ambiguous, i.e., whether it is as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) whether there is any evidence tending to exclude the possibility that the defendants were pursuing these independent interests. *Gibson v. Greater Park City Co.*, 818 F.2d 722, 723–4 (10th Cir. 1987).

 BCBSK's attempt to infer a conspiracy from the terminations of HMOK's contracts with Hillside and Wichita Clinic does not survive the *Matsushita/Greater Park City Co.* standards. Resolving all permissible inferences in favor of BCBSK, the evidence is *at best* ambiguous because those contract terminations are as consistent with counterclaim defendants' and the physicians' permissible independent interests as with an illegal conspiracy. But that ambiguity fails to create any genuine issue of material fact because BCBSK provides *no* evidence tending to exclude the possibility counterclaim defendants and the physicians were pursuing these independent interests. First, the undisputed facts demonstrate both of these physician groups made independent unilateral decisions to terminate their respective relationships with HMOK. Neither group was aware of the other's decision to terminate until after the fact. (SMF ¶¶ 57–59.) Second, the evidence establishes the decision of each group was in its individual financial interest because HMOK's small subscriber base subjected those groups to unacceptable financial risks, particularly in light of HMOK's unattractive reimbursement provisions. (SMF ¶¶ 43, 52–55.) The foregoing facts are also true as to those groups which declined to contract with HMOK from the outset. (SMF ¶¶ 26–28.) Indeed, BCBSK's own contemporaneous internal documents demonstrate that HMOK's difficulties in recruiting and retaining physicians were due to the limitations in its own program and the superiority of HCP's program. (SMF ¶¶ 30–33.)

 The fact HCP sought to convince physicians that it was in their best interests to continue to deal with HCP does not support any inference of conspiracy. An HMO's provider list is an integral part of the HMO itself, and efforts to develop and maintain that list are part and parcel of the normal competitive process. (SMF ¶¶ 31–33, 37, 40.) There is absolutely no evidence any physician group made its decision to deal with HCP, as opposed to HMOK, on any basis other than the relative competitive merits of the two programs. (SMF ¶¶ 26–27, 43–44, 52–55.)

Nor can a conspiracy be inferred from the fact certain HCP providers were also shareholders of HCP. It is not contradicted HCP offered stock to contracting physicians, *noncontracting* physicians and even *nonphysicians*. (SMF ¶ 10.) As to contracting physicians, HCP placed no conditions on the availability of its stock that the physician must do business "exclusively" with HCP or refrain from doing business with other HMOs. (SMF ¶¶ 11, 14, 62–68.) That a provider's financial interest in HCP might have created an additional incentive to deal with HCP—or, conversely, *not* to deal with a competitor of HCP—is not sufficient to infer a conspiracy. This is especially true here, since the unrebutted testimony elicited at trial demonstrates HCP stock played no part whatsoever in the decision of any provider regarding HMOK. (SMF ¶¶ 62–68.)

 Nor is there any genuine issue of material fact regarding BCBSK's "exclusive dealing" claim. First, it is undisputed HCP did not impose any contractual limitations upon any group's ability to contract with HMOK. Groups under contract with HCP, which declined to contract with HMOK, were offered "exclusively" by HCP only in the sense they had independently decided not to be marketed by any other HMO. Such arrangements were thus "exclusive" only in the descriptive sense, not as "exclusive dealing arrangements" designed, intended and implemented as those for which the antitrust laws provide relief. That the independent economic self-interest of various medical groups dictated participation with HMOK was *not* desirable does not raise any inference of con-

spiracy or "exclusive dealing" cognizable under the antitrust laws.

■ Thus, the evidence of record, viewed most favorably to BCBSK, shows only that certain physician groups in Wichita independently decided not to do business with HMOK based on an assessment of the acknowledged deficiencies of the HMOK program. That those groups were therefore dealing "exclusively" with HCP merely describes the status quo: having decided not to contract with HMOK, those groups' HMO involvement was *de facto* limited to their relationship with HCP. An arrangement which is "exclusive" in the descriptive sense, in that a company is only dealing with a single firm, but is not restrictive in any way of the rights of other buyers or sellers, is simply not an "exclusive dealing arrangement" cognizable under the antitrust laws.

■ Further, even if HCP's relationships with certain Wichita physician groups could be characterized as "exclusive dealing arrangements", HCP would still be entitled to summary judgment because the existence of such arrangements does not raise a triable issue under § 1. The mere existence of an exclusive dealing clause does not violate the antitrust laws. *See Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.), *cert. denied* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). An exclusive dealing claim does not present a per se violation of § 1. *Instructional Sys. Dev. Corp. v. Aetna Cas. and Surety Co.*, 817 F.2d 639, 644, 645 (10th Cir.1987). Rather, "exclusive dealing arrangements" are analyzed under the rule of reason, and thus condemned only upon an affirmative showing that they restrain trade unreasonably. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 1575, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring); *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 329, 334, 81 S.Ct. 623, 629, 631, 5 L.Ed.2d 580 (1961); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 393 (7th Cir.1984).

Among other things, this means a plaintiff seeking to challenge an "exclusive dealing arrangement" must demonstrate the defendant possesses market power, as this is a prerequisite to being able to restrain trade unreasonably. *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1225 (10th Cir.1986); *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 702 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982). Thus, to establish the existence of a genuine issue of material fact as to its "exclusive dealing" claim, BCBSK must produce evidence tending to show HCP possesses "market power", which the Tenth Circuit has defined as "the power to control prices" or "the power to exclude competition." *Hobart*, 796 F.2d at 1225 n. 3; *see also Board of Regents of Univ. of Oklahoma v. NCAA*, 707 F.2d 1147, 1158 (10th Cir.1983), *aff'd* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).

■ The facts of record establish HCP lacks market power, and HCP is therefore entitled to summary judgment on BCBSK's "exclusive dealing" claim even if such arrangements, in the antitrust sense, could be shown to exist. The evidence shows HCP competes with well over 200 firms in this market. (SMF ¶¶ 15, 19, 20.) HCP is a relatively minor player in the private health care financing market in Kansas, with a market share of less than 3% based on premium dollars. (SMF ¶ 16.) Indeed, even within greater Sedgwick County, its 1985 market share was only between 8% and 12%. (SMF ¶ 21.)

In an effort to avoid summary judgment on this ground, BCBSK seeks to posit a separate "submarket" consisting exclusively of HMOs wherein HCP might be said to possess market power. In support of the alleged existence of this "submarket", BCBSK relies exclusively on the affidavit of its expert, Peter R. Hamilton. (Dkt. 266, Memo. in Opp. to Motion for Summ. Judg. on the Ctrclm., Att'd Aff. of Peter R. Hamilton.) Dr. Hamilton's affidavit, however, is wholly inadequate to raise a genuine issue of fact as to the existence of the

insupportable and unduly restrictive "sub-market" alleged by BCBSK.

■ Indeed, the affidavit does not even rise to the level of admissible evidence as required by Fed.R.Civ.P. 56. An expert's affidavit submitted in opposition to a motion for summary judgment must set forth specific facts from the record to support its conclusions. *Evers v. General Motors Corp.*, 3 Fed.R.Serv. 3d 959, 962 (11th Cir. 1985); *United States v. Various Slot Machines*, 658 F.2d 697, 700–01 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C.Cir.1977). Theoretical speculation, unsupported assumptions and conclusory allegations advanced by an expert are neither admissible at trial, *see, e.g., American Bearing Co. v. Litton Industries, Inc.*, 540 F.Supp. 1163, 1171–75 (E.D.Pa.1982), *cert. denied* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984), nor are they entitled to any weight when raised in opposition to a motion for summary judgment. *See Evers, supra; Various Slot Machines, supra;* and *Merit Motors, supra.* As applied to Dr. Hamilton's affidavit, these principles demonstrate his conclusory assertions respecting the alleged existence of an "HMO submarket" are entitled to no weight.

It is undisputed HMOs compete with traditional indemnity insurance products, PPOs and self-insured programs. (SMF ¶ 21.) Nor is it disputed all of these health care financing mechanisms are included within the "private health care financing market" (*Id.*), which BCBSK stipulated is the relevant market in this case. Indeed, Dr. Hamilton himself testified in deposition that "at the least," indemnity insurers, PPOs, HMOs, other prepaid health plans and self-insurance would be included in the relevant market in this case. (Hamilton Depo., p. 84.) Moreover, Dr. Hamilton's deposition testimony flatly contradicts the theory he now postulates in his affidavit:

Q. [By Mr. Rawson] [W]hat is your, as an economist, definition of a sub-market?

Q. *Sub-market to me is some definition of market which does not—that if one firm owned all of the products in that particular market they still would*

*not have the power to raise prices over a competitive price.* However, I believe by [*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)] [the] definition of a sub-market is that it is some definition of market more constrained than what economists would call it but still has legal significance. *So to me a submarket has no significance. . . .*

Q. All right. Let me ask the question this way. To you as an economist, are there any significant sub-markets geographically for health care financing in Kansas?

A. *I believe we've got the same objection. Sub-market can be anything we want to define it, as that has no significance. . . .*

. . . .

Q. *In your opinion is Wichita a geographic sub-market in health care financing?*

A. *No,* and I once again point out you have used the term that at least economically speaking is not well-defined, so my answer's always contingent on that. You have been insisting on using the term sub-market even though I haven't really defined it as anything you want to define it as other than a definition of market.

Q. Let me ask it this way: *Is Wichita a market for health care financing?*

A. *No.*

Q. Are there any ambiguities in that question as far as you're concerned as an economist?

A. No.

(Hamilton Depo., pp. 80–82; emphasis added.)

■ These undisputed facts are sufficient to dispose of Dr. Hamilton's conclusory affidavit and, correspondingly, of BCBSK's "HMO submarket" argument. The evidence of record conclusively establishes that HMOs are in direct competition with other methods of private health care financing, and that these alternative health care financing mechanisms are reasonably interchangeable. Viewed in light of the undisputed evidence of record, the unrealistically narrow "submarket" posited by

BCBSK does not withstand scrutiny. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Telex Corp. v. Internat'l Business Machines Corp.,* 510 F.2d 894, 919 (10th Cir.), *cert. dism'd* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). *See also* BCBSK Preliminary Trial Brief dated Feb. 28, 1986, at pp. 76–77 ("The relevant market ... is comprised of all third-party financers of health care ... indemnity-type insurance, prepaid HMO plans, etc., are reasonably interchangeable health care products.") (citing *du Pont, supra,* and *Telex, supra* ).

Dr. Hamilton's affidavit neglects the facts of record in favor of theory, and nothing contained therein raises any genuine issue as to the alleged existence of a separate HMO "submarket". His "economic analysis" (Aff., ¶¶ 7–13) is a hypothetical and circular exercise in which he attempts to bootstrap HMOK's lack of success in Wichita to the conclusion there is an HMO submarket, the existence of which he "assumed" from the outset. (Aff., ¶ 7.) His "legal analysis" (¶¶ 14–18), for which he is not qualified, is equally defective. In an effort to make *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), fit this case, he argues HMOs are "a separate economic entity," because *inter alia* they are called "HMOs" (presumably calling for the same conclusion as to "Fords"), and because BCBSK "found it necessary" to separately incorporate HMOK (overlooking the fact this was required due to BCBSK' special enabling legislation). (¶ 15.) He argues the HMO "submarket" is served by "specialized vendors" (¶ 16), ignoring the fact both BCBSK and HCA are fully integrated providers of health care financing services, i.e., indemnity programs, HMOs, PPOs, and ASO services. Similarly, he disregards Aetna's presence in Wichita through indemnity insurance and a PPO product. Indeed, Dr. Hamilton excludes PPOs altogether, despite the facts they have many characteristics in common with HMOs and that they are in direct competition with HMOs and traditional indemnity insurance.

He goes on to assert that *"[s]ome* HMO's have 'distinct customers' that prefer the HMO method of delivery ..."* (¶ 17, emphasis added), ignoring the fact the actual "customers" consist primarily of employers who offer their employees both HMO and traditional indemnity programs, and who also have the option of establishing their own self-insured programs. Thus, Dr. Hamilton's argument is oblivious to the record as a whole, and additionally, by his own admission in deposition, amounts to poor economics. His affidavit is a classic example of why Fed.R.Civ.P. 56, as interpreted by the courts, requires an expert's opinions to be rooted *in fact* before they will be considered in opposition to a motion for summary judgment. *See Merit Motors,* 569 F.2d at 673 ("To hold that Rule 703 [regarding admissibility of expert testimony] prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no basis in or out of the record than [the expert's] theoretical speculations would seriously undermine the policies of Rule 56.").

Under these circumstances, BCBSK cannot be heard to argue HCP possesses market power in the private health care financing market. BCBSK successfully recruited physicians in Wichita to participate in its Choice Care PPO during the period the alleged "exclusive arrangements" were in effect, and it has subsequently reintroduced HMOK in the Wichita area. (SMF ¶¶ 83, 85.) BCBSK anticipates these competitive product offerings will reduce premiums to Wichita area subscribers. (SMF ¶¶ 85–86.) HCP's lack of market power is further demonstrated by the fact Wichita is also characterized by a large degree of competition in the form of self-insured programs. (SMF ¶ 20.)

The evidence conclusively establishes HCP lacks market power in the private health care financing market. HCP is therefore entitled to summary judgment on BCBSK's "exclusive dealing" claim. *See Hobart, supra; Assam Drug Co. v. Miller Brewing Co., Inc.,* 798 F.2d 311 (8th Cir. 1986) (applying federal precedent to exclusive territorial assignments challenged un-

der South Dakota antitrust laws, summary judgment granted because defendant lacked market power); *Barnosky Oils, Inc. v. Union Oil Co. of Calif.*, 582 F.Supp. 1332 (E.D.Mich.1984) (summary judgment granted in exclusive dealing case where defendant lacked substantial market share and competition was vigorous).

BCBSK's inability to establish HCP possesses market power, in itself, entitles HCP to summary judgment, *see Celotex Corp. v. Catrett, supra,* but BCBSK's "exclusive dealing" claim is deficient in other respects as well. None of the factors which courts have relied upon to invalidate exclusive dealing arrangements—such as unreasonable duration, lack of business justification, or the risk that entry will be deterred—are present here. *See In re Beltone Electronics Corp.*, 100 FTC 68, 204 and n. 39 (1982). Even crediting Dr. Hamilton's "HMO submarket" hypothesis, BCBSK cannot avoid summary judgment on its "exclusive dealing" claim. The "exclusive" arrangements at issue constitute at-will relationships which could be terminated at any time in the sole discretion of the medical groups. (SMF ¶¶ 36–38, 45–48, 56.) Thus, even assuming such arrangements constitute "exclusive dealing" agreements within the meaning of the anti-trust laws, the at-will nature of the arrangements would preclude any finding of illegality as a matter of law, even assuming HCP possesses market power in the contrived submarket. *See American Passage Media Corp. v. Cass Communications*, 750 F.2d 1470, 1473 (9th Cir. 1985) (market power alone is insufficient to establish anticompetitive harm from exclusive dealing contracts where contracts are terminable at will); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 395 (7th Cir.1984) (exclusive dealing contracts terminable in less than one year are presumptively lawful under Section 3 of the Clayton Act, 15 U.S.C. § 14); *see also Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580 (1961) (arrangements which do not violate the broader proscription of Clayton Act § 3 do not violate § 1 of the Sherman Act).

In support of its § 1 claims, BCBSK contends there is both "direct and circumstantial evidence of conspiracy." Its "direct evidence" consists of the deposition testimony of James Denman, the deposition and trial testimony of Dr. Beth Alexander, and the minutes of the Wichita Clinic. Its "circumstantial evidence" includes "numerous meetings between Dr. Kardatzke and the Wichita physician groups, meetings of the Consortium, the timing of the Wichita [Clinic] and Hillside contract cancellations, the timing of the stock offers and issuance, and the inability of HMOK to contract with key physician groups in Wichita." The foregoing "evidence" is insufficient to avoid summary judgment on BCBSK's § 1 claims.

BCBSK seeks to use Mr. Denman's testimony to support its contention HCP, through its stock offering and otherwise, elicited "exclusive dealing arrangements" from Wichita area physician groups. Mr. Denman's deposition testimony reveals, however, the proffered testimony is inadmissible because he is incompetent to testify as to HCP's dealing with Wichita area physicians. He testified; for example: "I did not work with the Wichita area physicians. I just heard of names and groups from time to time but was far too busy in other areas to work with physicians." (Denman Depo., p. 50.) He did not recall having any involvement whatsoever in recruiting physicians in Wichita. (*Id.*, p. 57.) Further, he testified he "was not at any time in the direct discussions with physicians leading to allocating or promising, committing blocks of Health Care Plus stock...." (*Id.*, p. 48.) Indeed, he complained he was literally "locked out" of negotiations with doctors relating to the possible purchase of HCP stock because he was not a member of HCP's upper management. (*Id.*, p. 19.) Lacking any foundation in his personal knowledge, Mr. Denman's testimony is barred by Fed.R.Evid. 602 ("A witness may not testify unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.").

BCBSK next cites Dr. Alexander's testimony regarding, first, alleged statements made by members of Family Physicians, P.A., concerning contacts with other Wichita physician groups about doing business with HMOK. On this point, Dr. Alexander's testimony is inadmissible hearsay. Neither Family Physicians nor any individual members of that group are parties to this litigation. Dr. Alexander's testimony concerning alleged statements made by other members of Family Physicians is flatly prohibited by Fed.R.Evid. 802. BCBSK's attempted reliance on the "co-conspirator" proviso of Rule 801(d)(2)(E) is fruitless. "[A]cts and declarations of an alleged co-conspirator are admissible against another only if the *existence* of the conspiracy is in fact first established by independent evidence." *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985) (emphasis original). The required independent evidence must show more likely than not that "(1) the conspiracy existed; (2) the declarant and the defendant against whom the conspirator's statement is offered were members of the conspiracy; and (3) the statement was made during the course of and in the furtherance of the objects of the conspiracy." *La-Z-Boy*, 756 F.2d at 1474 (citing *United States v. Petersen*, 611 F.2d 1313, 1330 (10th Cir.1979), *cert. denied* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980)). These criteria are not satisfied.

BCBSK also relies on Dr. Alexander's testimony regarding alleged statements made by Dr. Stan Kardatzke (an HCP representative) at a breakfast meeting of Family Physicians sometime in 1984 relative to dealing exclusively with HCP. This testimony, even if admissible, fails to raise a genuine issue of material fact as to the existence of conspiratorial conduct. The substance of her testimony regarding Dr. Kardatzke's remarks is:

> [T]he content of what he said was at least related to HMO Kansas and Health Care Plus was to try to convince us that we should not participate with Blue Cross-Blue Shield and my understanding of that is because it was financially ad-

vantageous for our group as well as other groups to participate with only one HMO and that if all of the groups, primary care groups in Wichita, were to do that that the Blue Cross-Blue Shield plan would not survive in the Wichita market.

(Tran. 27, p. 4312.) This testimony, even if credited, is not probative of the existence of the conspiratorial conduct alleged by BCBSK. First, it lacks even a hint of any "agreement" between Family Physicians and any other physician group in Wichita supporting BCBSK's boycott claim. Further, the testimony is not probative of any "agreement" by Family Physicians to deal exclusively with HCP. Indeed, even crediting Dr. Alexander's hazy recollection as to the earliest date of the breakfast meeting (see Tran. 26, p. 4293; Tran. 27, p. 4357 ("early to mid-1984")), the meeting occurred well after Family Physicians' decision not to contract with HMOK, which was reached in the summer of *1983*. (Tran. 26, pp. 4261–62.)

Further, even assuming contrary to the evidence that Dr. Kardatzke's alleged remarks played some part in Family Physicians' decision not to contract with HMOK, Dr. Alexander's testimony does not "tend to exclude the possibility" that Family Physicians acted independently in arriving at that decision. To the contrary, the clear thrust of Dr. Alexander's testimony concerning Dr. Kardatzke's remarks is that his presentation focused on why it was to Family Physicians' independent economic advantage to deal with HCP as opposed to HMOK, and the unrebutted evidence of record establishes Family Physicians had earlier declined to participate with HMOK because it had reached the same conclusion. (Tran. 26, pp. 4282–84.) Dr. Alexander herself confirmed that Family Physicians' decisions regarding HCP and HMOK were based on Family Physicians' independent assessment of the relative economic merits of the competing programs. (Tran. 27, pp. 4313, 4358–59.) Thus, Dr. Alexander's testimony concerning Dr. Kardatzke's alleged remarks at the Family Physicians' breakfast meeting sometime in 1984 suggest only an effort by Dr. Kardatzke to

emphasize the relative competitive merits of HCP as opposed to HMOK. That Family Physicians agreed with Dr. Kardatzke's assessment as to the competitive merits of the competing programs and declined to participate with HMOK raises no inference of conspiratorial conduct. Conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Matsushita*, 106 S.Ct. at 1362 n. 21; *Greater Park City Co., supra*, 818 F.2d at 724.

■ Nor is it of any moment, even if true, that Dr. Kardatzke opined HMOK might be "forced out" of Wichita as a result of the competitive process. The evidence is overwhelming that if HMOK was "forced out" of Wichita, it was forced out because it was a commercial failure. The antitrust laws are intended to protect competition, not individual competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Natrona Service, Inc. v. Continental Oil Co.*, 598 F.2d 1294, 1297–98 (10th Cir.1979); *see also Pac. Eng. & Prod. Co. of Nev. v. Kerr-McGee Corp.*, 551 F.2d 790, 795 (10th Cir.), *cert. denied* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) ("Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise.").

For these reasons, the proffered testimony of Mr. Denman and Dr. Alexander, whether viewed independently or in conjunction, is wholly insufficient to raise a genuine issue of material fact regarding BCBSK's § 1 claims. Mr. Denman lacks any foundation to provide admissible testimony relating to HCP's dealings with Wichita physician groups. Dr. Alexander's testimony regarding alleged statements regarding alleged statements made by other members of Family Physicians, P.A. is inadmissible hearsay. Her testimony relating to Dr. Kardatzke's alleged statements at the Family Physicians breakfast meeting, even if considered competent, is not probative of conspiratorial conduct.

The final category of "direct evidence" of conspiracy cited by BCBSK is the Wichita Clinic meetings. These "minutes" refer to the minutes of a June 26, 1984 meeting of the Wichita Clinic executive committee attended also by HCP representatives. (Def.'s Ex. 453.) HCP's presentation at this meeting was prompted by its concern about the possible loss of the Wichita Clinic as a contracting HCP provider. (Tran. 17, pp. 2954–55.) In particular, HCP had become aware HMOK had approached the clinic concerning the creation of a stand alone HMO to market the clinic on an exclusive basis. (*Id.*) In addition, the clinic was considering possible participation in a, new St. Francis PPO at that time. (Tran. 26, pp. 4152, 4172.) The question under consideration by the Wichita Clinic executive committee at the June 26 meeting was whether the clinic would participate with HCP, HMOK, or both, as well as new PPOs. (Tran. 26, p. 4172.) The Wichita Clinic subsequently joined the St. Francis PPO. (*Id.*, pp. 4152, 4193.) On July 10, 1984, however, the clinic's executive committee voted to terminate its contract with HMOK and to continue its HMO participation only with HCP. (*Id.*, pp. 4173–4175; Def.'s Ex. 455.)

■ In this context, the Wichita Clinic "minutes" are not probative of conspiratorial conduct. The minutes do not evidence any agreement between the Wichita Clinic and any other physician group to "boycott" HMOK. Nor do the minutes reflect any solicitation by HCP of any binding commitment by the Wichita Clinic to refrain from doing business with HMOK. To the contrary, the minutes merely reflect HCP's effort to "sell" the clinic on the advantages of participating with HCP, and HCP's "interest" in having the clinic "participating exclusively with HCP with HMO's," an *"arrangement [which] could be broken at any time if the clinic felt it was not advantageous to do so."* (Def.'s Ex. 453; emphasis added.) This is nothing more than competition on the merits, particularly in light of the fact HCP was responding to HMOK's own "exclusive" overtures to the Wichita Clinic. Dr. Hummer gave detailed

testimony concerning the reasons why the Wichita Clinic terminated its contract with HMOK. In essence, these reasons were: (1) HMOK paid the clinic less than HCP for essentially the same work; (2) to the extent HMOK was successful in attracting patients from HCP, the clinic's revenue stream would be adversely affected; and (3) HMOK's limited enrollment base placed the Wichita Clinic at considerable financial risk under its capitation contract. (Tran. 26, pp. 4195–97.)

Thus, the evidence demonstrates that the Wichita Clinic's decision to discontinue its contractual relationship with HMOK was based on legitimate business reasons relating to the competitive merits of HCP versus HMOK from the clinic's standpoint. Economics and common sense led the Wichita Clinic to conclude that continued participation with HMOK was a losing proposition. Under these circumstances, the fact it decided to terminate its contract with HMOK is simply no evidence of conspiratorial conduct.

Nor does BCBSK advance any facts to challenge the unrebutted testimony that the Wichita Clinic is an "exclusive" HCP provider only in the sense it has not entered into contract with any other HMOs. (Tran. 26, p. 4201.) In particular, BCBSK has not produced any evidence which calls into question the fact there is no limitation whatsoever on the clinic's ability to contract with another HMO or any other prepaid plans. (Tran. 26, p. 4201; Tran. 17, p. 2958; Tran. 25, pp. 3981–82, 4021–23.) Indeed, the unrebutted evidence shows the Wichita Clinic has *continued to negotiate* with HMOK on various proposals since the summer of 1984, including a February, 1985 HMOK proposal regarding formation of a group model HMO. (Tran. 7, pp. 1142–48; Tran. 8, p. 1372; Tran. 25, p. 4056; Tran. 26, p. 4204; Def.'s Ex. 461; Pltfs.' Ex. 490.) There are simply no facts to suggest the Wichita Clinic would not presently be receptive to a good business proposal from HMOK, as BCBSK's Dauner conceded at trial (Tran. 8, p. 1392), nor that the clinic would not have continued its contractual relationship with HMOK in 1984 if the BCBSK HMO had offered an economi-

cal, viable program. Thus, even assuming the Wichita Clinic's decision to terminate its contract with HCP evidences an "agreement" to deal exclusively with HCP, the at-will nature of that "agreement" does not raise a jury-submissible issue under § 1 of the Sherman Act. *See Roland Machinery Co. v. Dresser Industries, supra; Tampa Electric Co. v. Nashville Coal Co., supra.*

■ Nor does the "circumstantial evidence" cited by BCBSK raise any genuine issue of material fact as to its § 1 claims. The mere opportunity to conspire is not sufficient to support any inference of conspiracy or of participation in a conspiracy. *Weit v. Continental Illinois Bank & Trust Co.,* 641 F.2d 457, 462 (7th Cir.1981), *cert. denied* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 79 (2d Cir. 1980), *cert. denied* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Thus, the mere existence of "numerous meetings between Dr. Kardatzke and Wichita physician groups" raises no genuine issue as to the existence of the alleged conspiracy. In contrast to the present situation, in opposition to defendant's motion for summary judgment on the complaint, plaintiffs produced evidence showing BCBSK not only met jointly with St. Francis *and* St. Joseph, but that BCBSK discussed Wesley's termination in connection with the solicitation of discounts from the Saints, the acceptance of which was contrary to their economic self-interest. In other words, plaintiffs produced evidence to show BCBSK actually seized the opportunity to conspire in restraint of trade. *Reazin I,* 635 F.Supp. at 1303–08. BCBSK can point to no such evidence in support of its counterclaim.

■ Likewise, the "timing of the Wichita [Clinic] and Hillside contract cancellations, ... and the inability of HMOK to contract with key physician groups in Wichita" failed to support any inference of conspiracy. BCBSK seeks to invoke the "conscious parallelism" or the narrower "hub and spoke" theory, but the facts of record fail to support application of that theory as a matter of law. To successfully

invoke "conscious parallelism" BCBSK must produce facts showing the physician groups' conduct was indeed "conscious". That is, it must produce evidence showing the medical groups were conscious of each other's conduct and that such awareness played a part in their decisionmaking process. *Theatre Enterprises v. Paramount,* 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 559 (5th Cir.1980), *cert. denied* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). There is no evidence that the Wichita Clinic or Hillside were "conscious" of each other's respective decision at the time of their own decisions regarding HMOK. Indeed, the evidence is to the contrary. (SMF ¶¶ 57–59.) Nor is there any evidence that such awareness, even if it existed, played any part in their individual decisions. Dr. Reazin specifically testified that the actions or intentions of other groups regarding HMOK "wouldn't have changed my mind a bit because it wouldn't have changed my numbers here.... We were looking at low enrollment and we made our decision based on that." (Tran. 16, pp. 2704–05.) Nor is there any evidence supporting BCBSK's allegations as to those physician groups which declined to contract with HMOK from the outset. (SMF ¶¶ 60–61.)

 Further, it is well settled that even consciously parallel conduct, standing alone, will not support an inference of conspiracy. *Theatre Enterprises,* 346 U.S. at 541, 74 S.Ct. at 259; *Consolidated Farmers Mut. Ins. Co. v. Anchor Savings,* 480 F.Supp. 640, 649 (D.Kan.1979), *aff'd* 1980–2 Trade Cases (CCH) ¶ 63,530 (10th Cir.1980), *cert. denied* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 208 (3d Cir.1980); *Modern Home Institute, Inc. v. Hartford Accid. & Indem. Co.,* 513 F.2d 102, 110 (2d Cir.1975). Before BCBSK can successfully invoke conscious parallelism, it must produce additional facts, or "plus" factors tending to show the actions of the medical groups were interdependent or somehow concerted. *Nat'l Auto Brokers Corp. v. General Motors Corp.,* 572 F.2d 953, 959 (2d Cir.

1978), *cert. denied* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1972); *United States v. General Motors Corp.,* 1974–2 Trade Cases (CCH) ¶ 75,253 (E.D.Mich.1974). At a minimum, BCBSK must also show (1) the medical groups acted in contradiction of their economic self-interest, *and* (2) they had a motive to enter into the unlawful agreement. *Schoenkopf,* 637 F.2d at 208; *Consolidated Farmers,* 480 F.Supp. at 649. Even assuming BCBSK could produce credible evidence relating to the "motive" to conspire, the unrebutted evidence demonstrates the medical groups *did not* act in contradiction of their economic self-interest. The evidence shows the exact opposite is true. (SMF ¶¶ 26–27, 43, 52–55.) Thus, BCBSK's attempt to invoke "conscious parallelism" fails as a matter of law to raise any genuine issue of material fact.

BCBSK's reliance on *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 86 L.Ed. 610 (1939), is misplaced. Here, no evidence suggests knowledge among the physician groups of a common scheme, or even that others were asked to participate, or that each knew that cooperation was essential to the plan, or that the plan would unreasonably restrain trade. Nor is there any evidence of "early awareness" or renewal. *See Interstate Circuit,* 306 U.S. at 226–27, 59 S.Ct. at 474. Although parallel business behavior is admissible circumstantial behavior from which the factfinder may infer agreement, proof of parallel business behavior does not conclusively establish agreement; " 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." *Theatre Enterprises,* 346 U.S. at 538–39, 74 S.Ct. at 258.

 The "timing of the [HCP] stock offers and issuance" is equally devoid of any probative value as to the existence of a conspiracy. As previously discussed, even if HCP stock created an additional financial incentive to deal with HCP as opposed to HMOK, that is no more suggestive of conspiratorial conduct than is reimbursing physicians at higher capitation levels. Where, as here, two HMOs offer the same model, any financial advantages offered by

one will inure to the detriment of the other relative to provider participation because, from the provider's perspective, supporting the success of the financially inferior HMO ultimately will result in "less return for essentially the same services." (See Tran. 26, pp. 4195–97.) HMOK did nothing to tip the economic balance in its favor—neither through its own issuance of stock, higher capitation payments, or offering an alternative HMO model—and it was therefore the loser in the competition for physician support. In any event, the unrebutted testimony elicited at trial demonstrates HCP stock played no part whatsoever in the decision of any provider regarding HMOK. (SMF ¶¶ 62–68.)

Finally, the activities of the physicians' "Consortium" provide BCBSK no support. There is no evidence the members of the Consortium actually acted in concert to "boycott" HMOK. More specifically, the Consortium did not begin meeting until the fall of 1984 at the earliest, well after the alleged events here in issue *and* subsequent to HMOK's September 5, 1984 decision to withdraw from Wichita. (Tran. 26, p. 4285; Tran. 27, p. 4376; SMF ¶ 31.)

■ Where a plaintiff's evidence of an agreement to undertake joint activity violating § 1 is not indirect or ambiguous, and the evidence tends to exclude the possibility the alleged conspirators acted independently in pursuing the challenged conduct, *Matsushita* and the cases upon which it relies require defendants' motion for summary judgment be denied. *Instructional Sys. Dev. Corp. v. Aetna Cas. and Surety Co.,* 817 F.2d 639, 646 (10th Cir.1987). But where a plaintiff's evidence of an alleged conspiracy violative of § 1 is met, as here, with evidence of legitimate business reasons for defendants' conduct, that shifts to plaintiff the burden of providing evidence which tends to exclude the possibility the alleged conspirators acted independently. *Gibson v. Greater Park City Co.,* 818 F.2d at 723–24, 725 (10th Cir.1987). Where the evidence put forth by plaintiff in an attempt to meet that burden is equivocal, supporting *either* a permissible or a conspiratorial motive, that is not evidence tending to *exclude* the possibility defendants were pursuing independent interests, and defendants' unrebutted independent plausible explanations bring such a case within the *Matsushita* test for awarding summary judgment. *Greater Park City Co., supra,* at 725. BCBSK has failed to provide, as *Matsushita/Greater Park City Co.* require, evidence that tends to *exclude* the possibility the alleged provider-conspirators acted independently—a "possibility" which, as discussed above, direct testimony has established as actual *fact.*

I conclude there is no significant probative admissible evidence tending to support the § 1 allegations of the counterclaim. Even resolving in BCBSK's favor the permissible inferences from its admissible evidence, that evidence fails to raise a genuine issue of material fact from which a jury could find in favor of BCBSK and HMOK on all elements of their § 1 claims. Accordingly, counterclaim defendants are granted summary judgment on those claims. *Greater Park City Co., supra.*

### § 2 Claims

BCBSK also claims counterclaim defendants violated § 2 of the Sherman Act, alleging the offenses of monopolization, attempt to monopolize, and conspiracy to monopolize. To establish the offense of monopolization, a plaintiff must prove defendant possesses "monopoly power" in a relevant market, and that such power was willfully acquired or maintained. *Instructional Sys. Dev. Corp. v. Aetna Cas. and Surety Co., supra,* at 647–48 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). "Monopoly power" is defined as "the power to control prices in the relevant market *and* exclude competition." *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies,* 783 F.2d 159, 164 (10th Cir. 1986) (emphasis added).

■ There is no evidence any counterclaim defendant has monopoly power, thus defined, in any relevant market. BCBSK's § 2 claims as to HCP rest exclusively upon Dr. Hamilton's inadmissible and defective affidavit alleging the existence of a "Wichita HMO submarket." As previously dis-

cussed, Dr. Hamilton's affidavit raises no genuine issue as to this contrived "submarket". His affidavit is inconsistent with his deposition testimony; he himself has undercut the very foundation which would now be necessary to support the allegations contained in his affidavit. As counterclaim defendants point out, the only "dispute" as to this issue, therefore, is between Dr. Hamilton today and Dr. Hamilton yesterday. As to HCP in particular, the evidence shows it lacks either power over price or power to exclude competition in the private health care financing market. Further, even crediting Dr. Hamilton's affidavit, and assuming HCP possesses market power in this nonexistent "submarket", there is no evidence HCP possessed any purpose or intent to exercise monopoly power for anticompetitive or exclusionary purposes, an essential element of monopolization under § 2. *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383 (6th Cir.1962), *cert. denied* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

At a minimum, BCBSK must show—and it cannot—HCP abused its monopoly power by acting "in an unreasonably exclusionary manner" relative to its competitors. *See, e.g., Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276 (2d Cir.1979), *cert. denied* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Mid-Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 615 F.2d 1372, 1387 (5th Cir.), *cert. denied* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Soo Hardwoods, Inc. v. Universal Oil Products Co.*, 493 F.Supp. 76, 78 (W.D.Mich. 1980) ("It is a familiar rule of antitrust law that a competitor, even one with monopoly power, does not violate Section 2 ... unless it engages in anticompetitive practices."). With the exception of its defective § 1 claims, BCBSK can point to no allegedly exclusionary practices by HCP. HCP has been no more than a vigorous and effective competitor. BCBSK's monopolization claim as to HCP therefore fails as a matter of law, even assuming contrary to fact, HCP possesses monopoly power.

Nor is there any genuine issue of material fact as to BCBSK's remaining § 2 claims. BCBSK's attempt to monopolize claim is defective because BCBSK cannot show there is a "dangerous probability" that HCP could succeed in achieving monopoly power; nor is there any evidence of a specific intent to monopolize by HCP. *Shoppin' Bag of Pueblo*, 783 F.2d at 161.

To establish a conspiracy to monopolize in violation of § 2, a plaintiff must show an agreement, overt acts in furtherance of that agreement, and a specific intent to monopolize any part of interstate commerce. *Instructional Sys. Dev. Corp. v. Aetna, supra,* at 646–47. BCBSK's failure of proof as to its conspiracy claim under § 1 precludes any issue of fact as to its conspiracy to monopolize claim under § 2. *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982). HCP's entitlement to summary judgment on this claim is also established by the absence of any proof of a specific intent to monopolize. *Pac. Eng. & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 472 (1977).

The foregoing principles are also dispositive of BCBSK's § 2 allegations against Wesley and HCA. There is simply no evidence of any exclusionary conduct or specific intent to monopolize on the part of either Wesley or HCA. Thus, BCBSK's § 2 claims against those parties fail as a matter of law, even assuming, contrary to fact, that Wesley and/or HCA are "dominant" factors in any relevant market. There is no evidence either Wesley or HCA *did anything* anticompetitive, exclusionary, or even remotely suspect with respect to BCBSK or anyone else.

█ BCBSK finds much comfort in the testimony of its own employees that on July 24, 1985, at the meeting regarding Wesley's participation in the Choice Care PPO, Edmund Berry allegedly stated " 'it was HCA's intention to put one of the other large hospitals in Wichita out of busi-

ness and then work with the other hospital.' " (Tran. 7, pp. 1193–94.) As evidence of allegedly unlawful specific intent, however, this is inadequate to lend support to BCBSK's § 2 claims. "Whether a particular employee's intent may be attributable to the company [for these purposes] depends on the employee's role in the decisional process of the company." *Instructional Sys. Dev. Corp. v. Aetna, supra,* at 647 n. 4 (citing VII P. Areeda, Antitrust Law ¶ 1506 (1986)). In *Aetna,* defendant Doron's national sales manager stated "his goal" was to put plaintiff ISDC out of business. The manager reported to Doron's president, and the Tenth Circuit held "[t]his and other evidence clearly permits a factfinder to infer that Doron and Aetna made joint decisions, pursuant to the contract and outside it, which furthered Doron's goal of driving ISDC out of business." *Id.,* at 647. If a company can be bound to statements of an employee's *personal* intent by virtue of his role in the decisionmaking process of the company, it is equally appropriate to examine that same relationship to determine whether a company is bound to an employee's statements regarding *company* intent. Mr. Berry is a senior vice president and financial officer of Wesley. (Tran. 2, p. 251.) He is responsible for preparing financial statements and budgets, monitoring accounts receivable and presenting financial information to the hospital's board of trustees. (Tran. 16, p. 2798.) Mr. Berry's responsibility in connection with Wesley's relations with third-party payors (insurance companies) is to provide support to Senior Vice President Robert O'Brien in O'Brien's role as chief negotiator of contracts. (*Id.;* Tran. 2, p. 251.) Mr. Donald Stewart, Wesley's president, also participates in these negotiations from his policy perspective as chief operating officer. (Tran. 2, p. 252.) Mr. Berry's participation was limited to providing supporting financial data; he lacked full negotiating authority. (Tran. 2, pp. 252–53; Tran. 16, pp. 2798–99, 2817.) Mr. Berry's notes following the July 24 meeting and his observations and recommendations on the Choice Care contract (Def.'s Ex. 272) were circulated to Robert O'Brien and other Wesley administrative officials, but were never acted upon or implemented. (Tran. 17, pp. 2833–41.) Neither Berry nor anyone else from Wesley discussed the Choice Care contract with HCA officials in Nashville or Dallas (the regional office), either before or after the July 24 meeting. (*Id.,* pp. 2843–44, 2845–46, 2849–50.) Mr. Berry was not involved in the earlier decisionmaking process which led Wesley to contact HCA about the possible sale of the hospital; he was informed after the fact and simply provided financial data for Wesley's use in the negotiations. (Tran. 16, pp. 2800–02.) Finally, Mr. Berry was not involved in any way with HCA's acquisition of HCP. (*Id.,* p. 2803.) Mr. Berry no doubt serves an important function in the administration of Wesley, but in the face of this evidence it cannot be argued he plays a role in the *policy* decisionmaking processes of the hospital, let alone those of HCA.

But even crediting BCBSK's version of his statement, it does not support any jury-submissible issue regarding specific intent to monopolize. Assuming *arguendo* it was HCA's intention to "force" another Wichita hospital out of business, Berry's alleged remark does not suggest the contemplated use of anticompetitive means to achieve that result. As the Tenth Circuit observed in *Pac. Eng. & Prod. Co.,* 551 F.2d at 795:

> "[A] person does not have an exclusionary intent merely because he foresees that a market is only large enough to permit one successful enterprise, and intends that his enterprise shall be that one and that all other enterprises shall fail.... To prove that a person has that type of exclusionary intent which is condemned in anti-trust cases, there must be evidence that the person who foresees a fight to the death intends to use or actually does use unfair weapons ..."

(quoting *Union Leader Corp. v. Newspapers of New England, Inc.,* 180 F.Supp. 125, 140 (D.Mass.1959), *modified* 284 F.2d 582 (1st Cir.1960), *cert. denied* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961)). Thus, Mr. Berry's comment, even assuming it was made, does not counter the total

absence of any anticompetitive conduct—actual or intended—by Wesley or HCA, nor is it sufficient to raise a genuine issue of fact as to specific intent to monopolize.

Counterclaim defendants are granted summary judgment on BCBSK's § 2 claims.

### § 7 of the Clayton Act

██ BCBSK next alleges HCA's acquisition of Wesley, HCP and New Century violates § 7 of the Clayton Act, which prohibits acquisitions "the effect of [which] may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. On its face, BCBSK's § 7 claim fails to state a cause of action against counterclaim defendant Reazin. The corporate counterclaim defendants are entitled to summary judgment on the § 7 claim because BCBSK has advanced no evidence that HCA's acquisitions of Wesley, HCP or New Century, individually or as a group, will "substantially lessen competition" in violation of that statute.

██ Vertical integration is not an unlawful or even suspect category under the antitrust laws. *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 710 (7th Cir.1984). Consequently, vertical mergers will not be condemned under § 7 in the absence of facts tending to show the merger will result in a foreclosure of access to sources of supply, a significant increase in concentration in a relevant market, or heightened barriers to entry in either market. *See Ford Motor Co. v. United States*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). The mere possibility a merger might have anticompetitive effects does not satisfy the statutory requirement of § 7. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 590–93, 77 S.Ct. 872, 875–77, 1 L.Ed.2d 1057 (1957). Rather, to avoid summary judgment it is a plaintiff's burden to produce evidence which shows a reasonable probability that anticompetitive effects will, in fact, occur. *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962); *United States v. First Nat'l Bank of Maryland*, 310 F.Supp. 157, 161 (D.Md. 1970).

HCA's acquisitions do not create any actual or probable horizontal anticompetitive effects. The undisputed facts demonstrate HCA's acquisitions of Wesley and HCP have resulted in no structural changes in the hospital services or health care financing markets in Wichita. Prior to Wesley's acquisition, there were four independently owned hospitals in Wichita; today all four of those hospitals are still operating independently. If anything, Wesley—the largest hospital both before and after the acquisition—has lost market share following its affiliation with HCA. (Tran. 23, pp. 3860–61; Pltfs.' Ex. 507–A.) Similarly, the acquisition of HCP did not result in a reduction in the number of health care financing entities doing business in Wichita; in fact, that number has increased since the acquisition with the reintroduction of BCBSK's HMO through Kansas Health Plans, the reintroduction of Choice Care, and the commencement of St. Francis' PPO. (Tran. 8, pp. 1336–38; Tran. 11, pp. 1907–08; Tran. 14, pp. 2316–17.) BCBSK's own expert, Dr. Christianson, conceded HCA's acquisitions did not change the structure of the market in Wichita; HCA simply seized a unique opportunity. (Tran. 28, pp. 4605–06.) Thus, it is undisputed there has been no increase in concentration in either market as a result of HCA's acquisitions.

BCBSK's next suggestion, that HCA's acquisition of Wesley will somehow drive one of the other hospitals in Wichita out of business, is rank speculation. The excess capacity that exists in the hospital services market in Wichita predated the HCA acquisition by several years, as did the speculation in the medical community that one of the hospitals might not survive; neither says anything about HCA's intentions in entering the Wichita market. There is no evidence in the record HCA's acquisition of Wesley has in any way exacerbated the situation. That Wesley sought a buyer with significant resources to ensure its future competitive viability is not illegal. Wesley's competitors lacked "the share, strength and resources of Wesley" prior to the acquisition, not as a result of it. In

fact, Wesley's competitors have gained market share vis-a-vis Wesley since the acquisition—clear proof the acquisition is not likely to have the anticompetitive effects posited by BCBSK.

Equally lacking merit is BCBSK's argument HCA's acquisitions eliminated a potential entrant. There is no record evidence HCA had any inclination to enter the Wichita hospital services or health care financing markets until it was approached by Wesley and HCP. (SMF ¶¶ 70, 71.) HCA certainly did not abandon plans to construct a new hospital or establish a new HMO in Wichita when these opportunities arose. BCBSK's references to internal position papers prepared by Wesley prior to its approach to HCA are not probative of *HCA*'s intent; even if they were, however, they establish nothing more than the possibility an investor-owned chain might enter the Wichita market by purchasing a hospital. This is precisely the type of entry which in fact occurred, but it does not demonstrate the likelihood of *de novo* entry—by constructing a hospital—which is required under the potential entrant doctrine. *FTC v. Atlantic Richfield Co.*, 549 F.2d 289, 294–95 (4th Cir.1977) ("clear proof" that acquiring firm would in fact have entered the relevant market is required).

Finally, the contention HCA's acquisition of HCP somehow "solidified" the alleged conspiracy to boycott HMOK is clearly unfounded. Even if such a conspiracy existed (contrary to the evidence), HCA's purchase of HCP dissipated rather than "cemented" the ties between physicians and HCP by eliminating the stock ownership which, according to BCBSK itself, created the motivation for the "boycott". There is no evidence in the record, then, that even tends to suggest HCA's acquisition of HCP will make it more difficult for competing HMOs to contract with providers, including Wesley. Indeed, Wesley has had, and continues to have, a contract with HMOK. (SMF ¶ 82.)

BCBSK has failed to present any evidence it has suffered antitrust injury as a result of HCA's acquisitions of Wesley and HCP. That these acquisitions may make Wesley and HCP more formidable competitors does not constitute antitrust injury to BCBSK. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

BCBSK's argument regarding the likely anticompetitive effects of HCA's vertical integration in the Wichita market is premised on the notion HCA's purchases of Wesley and HCP created a "closed, fully integrated system." This argument is contrary to the evidence, and the law.

The undisputed evidence shows Wesley is still a participant (and wishes to continue to participate) in BCBSK's CAP program and HMOK. (SMF ¶¶ 81–82.) Similarly, HCP maintains contracts with all of the hospitals in Wichita. In fact, prior to HCP's sale to HCA, HCP sought and received assurances from HCA that it would not be required to deal solely with Wesley after the acquisition, and the evidence conclusively demonstrates this has been the case. (Tran. 17, pp. 2968–70.) Thus, there is no evidence of the actual or probable market foreclosure that is the harm which Dr. Christianson imagined could possibly occur from the creation of a closed system. The capitation agreement between Wesley and HCP was signed long before the integrated system allegedly created by HCA's acquisitions was even conceived. (SMF ¶ 75.) The purported "channeling mechanisms" of HCA were fully explored at trial, and it is clear on the record no such mechanisms are in place, or are even under consideration, in Wichita. (SMF ¶¶ 79–80.)

The absence of any actual or probable market foreclosure also distinguishes this case from the vertical integration cases relied upon by BCBSK. As BCBSK concedes, vertically integrated systems are not a concern per se; it is only when the vertical integration produces probable or actual anticompetitive effects of a substantial nature that § 7 is implicated. In this case, despite HCA's "track record" of almost two years, BCBSK is unable to identify any such actual or probable anticompetitive effects, much less any injury to BCBSK, arising out of HCA's acquisitions.

The contention these acquisitions somehow raised the barriers to entry in the health care services or health care financing markets is similarly without foundation. The only evidence in the record—other than Dr. Christianson's speculation—is that at least three vertically integrated competitors *have* entered the market since the acquisition: HMO Kansas re-entered the market through Kansas Health Plans; BCBSK has reestablished its Choice Care PPO; and St. Francis established its own PPO. (SMF ¶¶ 85–86.) Not only is there no evidence that entry barriers have been raised, but Dr. Christianson's assumption the payment of "premium prices" for Wesley and HCP will deter entry by vertically integrated competitors is legally and logically suspect. As the Court noted in *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 866 n. 32 (2d Cir.), *cert. denied* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974), "mere recitation of the 'deep pocket' shibboleth [is] not enough" to establish a § 7 violation. BCBSK fails to produce any evidence demonstrating *how* the presence of a "deep pocket" company in the Wichita market will increase barriers to entry. This failure of proof distinguishes the instant case from *Kennecott Copper Corp. v. FTC*, 467 F.2d 67 (10th Cir.1972), *cert. denied* 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), where the Court approved the FTC's finding Kennecott would use its "deep pocket" to acquire vast coal reserves and compete for long-term utility supply contracts, thus gaining new market share and increasing concentration in the market. Even assuming *arguendo* HCA did pay substantially more for Wesley and HCP than their "true values", that would not increase the cost of entry for an integrated competitor. BCBSK's speculation that other vertically integrated competitors might view opportunities in other geographical markets to be more attractive than Wichita, does not demonstrate that HCA's acquisitions have had, or will have, any anticompetitive effects in Wichita; to the contrary, it demonstrates the highly competitive nature of the hospital services market in Wichita.

In conclusion, the undisputed record demonstrates nothing more than that HCA purchased the largest hospital and the only existing HMO in Wichita in 1985, and since that time Wesley has lost market share and BCBSK has introduced new programs in Wichita in competition with HCP to Choice Care and Kansas Health Plans. Lacking any evidence of actual or probable anticompetitive effects (or antitrust injury), BCBSK has utterly failed to sustain its burden of proof under § 7. In fact, the evidence of record demonstrates, with the exception of BCBSK's own unlawful conduct, that the acquisitions in question have neither occasioned nor threatened any anticompetitive consequences.

Counterclaim defendants are therefore entitled to summary judgment on BCBSK's § 7 claims.

### State Tort Claims

The last two counts of BCBSK's counterclaim allege HCP interfered with BCBSK's prospective advantage and contractual relations by causing Hillside Medical Office and Wichita Clinic to terminate their agreements with HMOK. Counterclaim ¶¶ 31, 32. There is no issue whatsoever as to these claims as they relate to Hillside Medical Office, because the evidence demonstrates HCP did not interfere with Hillside's relations with HMOK in any manner. Hillside's decision to terminate its contract with HMOK was made independently, without any input from HCP or any other third party. Nor can BCBSK's tort claims relating to the Wichita Clinic survive this motion for summary judgment.

■■■■ It is fundamental that the tort of interference with contractual relations requires proof HCP induced Wichita Clinic to *breach* its contract with HMOK. *Professional Investors Life Ins. Co. v. Roussel*, 528 F.Supp. 391, 397 (D.Kan.1981); *see also Prudential Ins. Co. of Amer. v. Sipula*, 776 F.2d 157, 162 (7th Cir.1985). The contract between Wichita Clinic and HMOK, however, was terminable at will upon 30 days' notice, and the Wichita Clinic therefore committed no breach by terminating the contract in accordance with its terms.

Further, it is well settled under Kansas law that not all interference in present or future contractual relations is tortious. *Turner v. Halliburton Co.,* 240 Kan. 1, 12, 722 P.2d 1106, 1115 (1986). Rather, a necessary predicate for both causes of action is "malice". *Turner,* 240 Kan. at 12–13, 722 P.2d 1106. Malice is defined as "intentional interference without justification." Restatement (Second) of Torts § 766 comment s (1979); *see also May v. Santa Fe Trail Transp. Co.,* 189 Kan. 419, 370 P.2d 390 (1962) ("While it is true that an action will lie for unjustifiably inducing a breach of contract by a party thereto, the inducement must be wrongful and not privileged.").

One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. Restatement (Second) of Torts § 768 comment b (1979); *see also Prudential Ins. Co.,* 776 F.2d at 162–63 ("lawful competition . . . constitutes a privileged interference with another's business"). Consequently, no tort is committed by a competitor who causes a third person not to enter into a prospective contractual relation, or not to continue in existing contracts terminable at will, so long as the actor does not employ improper means and his purpose is at least in part to advance his interest in competing with the other. Restatement (Second) of Torts § 768 (1979).

It is clear HCP's discussions with the Wichita Clinic regarding a possible "exclusive arrangement" were made to advance HCP's competitive interests vis-a-vis HMOK; indeed, the discussions in 1984 were prompted by HMOK's own overtures regarding an exclusive arrangement with that group.

Nor is there any evidence to suggest HCP engaged in fraud, coercion, or any other arguably wrongful or illegal means in an effort to convince the Wichita Clinic (or any other group for that matter) to deal "exclusively" with HCP—yet another failure of proof distinguishing BCBSK's claims of tortious interference from those of plaintiff Wesley. At most, the evidence shows HCP sought to persuade the Wichita Clinic that it was in the clinic's best interest to continue to deal with HCP. Persuasion, however, is not wrongful, and such efforts do not support a claim for tortious interference. Restatement (Second) of Torts § 770 comment d (1979).

Counterclaim defendant HCP is granted summary judgment on BCBSK's claims of tortious interference with prospective advantage and contractual relations.

### Counterclaim

To avoid summary judgment under Rule 56 requires the non-moving party to demonstrate the existence of genuine issues of material fact. The massive record before the court portrays not anticompetitive conduct by counterclaim defendants, but competition and BCBSK's fear of competition. In 1984, HMOK lost the competitive contest to HCP; HCP was able to persuade medical groups to do business with it, often at the expense of HMOK, by offering a better product: more patients, an acceptable risk level, more profits, and the possibility of future equity returns as to the limited number of physicians who purchased the stock. HMOK failed to respond effectively and voluntarily decided to withdraw from the marketplace. In 1985, HCA acquired Wesley and HCP, acquisitions which left the number of Wichita hospitals and health care financing organizations unchanged. The structure of neither market was altered. BCBSK, however, became frightened because it perceived the arrival of even more effective competition.

BCBSK's litany of "conspiracy", "force-out", "lock-up", "payoff", and the like, unsupported by probative admissible evidence does not alter these truths. I read the Tenth Circuit's recent decision in *Gibson v. Greater Park City Co., supra,* with no small sense of *déja vu.* Plaintiffs Gibson, et al., pursued an approach to their antitrust allegations striking in its similarity to the approach undertaken by BCBSK in this case. BCBSK has seized on a plethora of "facts", isolating and attributing to each a conspiratorial motive, as did plaintiff Gibson. Gibson's evidence was ambiguous because respondents Greater Park City Co.,

et al., offered plausible nonconspiratorial explanations for each action about which he complained. BCBSK's evidence in this case is, at best, equally ambiguous because the counterclaim defendants have done the same. Plaintiff Gibson was unable to respond with evidence tending to exclude the possibility the alleged conspirators acted independently, and his antitrust complaint was summarily judged and dismissed. *Greater Park City Co., supra,* 818 F.2d 722, 724–25. BCBSK has likewise failed in this case, and summary judgment is, for the same reasons, required.

Counterclaim defendants' motion for summary judgment is sustained in its entirety.

## EPILOGUE

Reviewing the evidence and testimony relating to both the complaint and counterclaim, the quintessence is this: for the first time in its corporate existence Blue Cross and Blue Shield of Kansas faces vigorous, efficient, well-managed, and effective price and product competition, attracting the attention and business of Kansas consumers of health care financing products. The allegations in the counterclaim are unsupported; Blue Cross and Blue Shield of Kansas, and HMO Kansas, suffered no anticompetitive, illegal or remotely impermissible competition from Hospital Corporation of America, Health Care Plus, or Wesley Medical Center. After hearing the evidence on plaintiffs' complaint, the jury found Blue Cross and Blue Shield chose to react to this competition not on the merits of its own products but in a manner violating federal antitrust and state laws, injuring the very consumers defendant professes to serve, competition in the market for health care financing products, and plaintiff Wesley Medical Center. That verdict is supported by prevailing law and abundant evidence, and will not be disturbed. Therefore, in order to restore the rights of Kansas consumers, the competition in the relevant market, and the respective positions of the parties required by law:

IT IS ACCORDINGLY ORDERED this 22 day of May, 1987, the motion of defendant Blue Cross and Blue Shield of Kansas, Inc., to set aside the jury's verdict and dismiss this case for lack of jurisdiction under the McCarran-Ferguson Act is *overruled.*

IT IS FURTHER ORDERED defendant's motions for directed verdict, taken under advisement during trial and at the close of evidence, are *overruled.*

IT IS FURTHER ORDERED defendant's motion for judgment notwithstanding the verdict or alternatively for a new trial is *overruled.*

IT IS FURTHER ORDERED that judgment this day is entered upon the jury's verdict of September 30, 1986, in favor of plaintiff HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center, against defendant Blue Cross and Blue Shield of Kansas, Inc., in the amount of $5,378,941.00, representing trebled actual antitrust damages in the amount of $4,628,940.00, actual nominal damages of $1.00, and punitive damages of $750,000.00. Interest thereon shall be calculated from May 22, 1987, the date of the entry of judgment. 28 U.S.C. § 1961.

IT IS FURTHER ORDERED the motion of plaintiffs Walter L. Reazin, M.D., HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center, Health Care Plus, Inc., and New Century Life Insurance Company for injunctive relief against defendant Blue Cross and Blue Shield of Kansas, Inc., is *overruled.*

IT IS FURTHER ORDERED plaintiffs' application for an award of attorneys' fees and costs through September 30, 1986, in the combined amount of $2,423,828.74, consisting of attorneys' fees of $2,176,983.75, expert witness fees and other reimbursable items of $209,767.77, and allowable costs of $37,077.22, is *granted* against defendant Blue Cross and Blue Shield of Kansas, Inc.

IT IS FURTHER ORDERED plaintiffs are hereby granted 30 days to file application, with supporting records and affidavits, for an award of attorneys' fees and costs representing services associated with their complaint provided after September

**1494**

30, 1986. Defendant is provided 10 days thereafter to respond in writing.

IT IS FURTHER ORDERED the motion of counterclaim defendants Walter L. Reazin, M.D., HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center, Health Care Plus, Inc., New Century Life Insurance Company, and Hospital Corporation of America for summary judgment on the counterclaim of Blue Cross and Blue Shield of Kansas, Inc., and HMO Kansas, Inc., is *sustained.* The counterclaim is dismissed with prejudice in its entirety.